UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

_____

UNITED STATES OF AMERICA, et al.,

               Plaintiffs,

       v.

FORT JAMES LLC, et al.,

               Defendants.

_____

Civil No. 1:22-cv-395

**CONSENT DECREE**

# TABLE OF CONTENTS

I.      JURISDICTION AND VENUE ................................................................................................. 4
II.     PARTIES BOUND ................................................................................................................... 4
III.    DEFINITIONS ......................................................................................................................... 5
IV.     OBJECTIVES .......................................................................................................................... 8
V.      PERFORMANCE OF THE WORK .......................................................................................... 8
VI.     PROPERTY REQUIREMENTS ............................................................................................. 10
VII.    FINANCIAL ASSURANCE ................................................................................................... 12
VIII.   INDEMNIFICATION AND INSURANCE ............................................................................ 16
IX.     PAYMENTS FOR RESPONSE COSTS ................................................................................ 17
X.      FORCE MAJEURE ............................................................................................................... 19
XI.     DISPUTE RESOLUTION ...................................................................................................... 20
XII.    STIPULATED PENALTIES ................................................................................................... 22
XIII.   PLAINTIFFS' COVENANTS AND SETTLEMENT OF CLAIMS ....................................... 23
XIV.    COVENANTS BY SETTLING DEFENDANTS..................................................................... 26
XV.     EFFECT OF SETTLEMENT; CONTRIBUTION .................................................................. 26
XVI.    RECORDS ............................................................................................................................. 27
XVII.   NOTICES AND SUBMISSIONS........................................................................................... 29
XVIII.  APPENDIXES ....................................................................................................................... 30
XIX.    MODIFICATIONS TO DECREE .......................................................................................... 30
XX.     SIGNATORIES ..................................................................................................................... 30
XXI.    PRE-ENTRY PROVISIONS .................................................................................................. 31
XXII.   INTEGRATION .................................................................................................................... 31
XXIII.  FINAL JUDGMENT ............................................................................................................. 31

WHEREAS, the United States of America ("United States"), on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), and the State of New Hampshire ("State") filed a complaint in this matter. In the complaint the United States seeks, under sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") from Fort James LLC, Georgia-Pacific Consumer Products LP, and North American Dismantling Corp. ("NADC", *inter alia*: (1) reimbursement of costs incurred by EPA and the Department of Justice ("DOJ") for response actions at the Chlor-Alkali Facility (Former) Superfund Site in Berlin, New Hampshire ("Site"), together with accrued interest; and (2) performance by the defendants of a response action at the Site consistent with the National Contingency Plan, 40 C.F.R. part 300 ("NCP"). In the complaint, the State alleged that Fort James LLC and Georgia-Pacific Consumer Products LP are liable to the State under section 107 of CERCLA, and N.H. Revised Statutes Annotated ch. 147-A and 147-B for a declaratory judgment that Georgia-Pacific Consumer Products LP and Fort James LLC are jointly and severally liable for Site contamination and for the State's future response costs incurred by the State related to any future response actions at the Site. The State asserted no claims against NADC.

WHEREAS, in accordance with the NCP and section 121(f)(1)(F) of CERCLA, EPA notified the State of New Hampshire ("State") on March 30, 2021, of negotiations with potentially responsible parties ("PRPs") regarding the implementation of the remedial design and remedial action ("RD/RA") for the Site, and EPA has provided the State with an opportunity to participate in such negotiations and to be a party to this Consent Decree ("Decree").

WHEREAS, in accordance with section 122(j)(1) of CERCLA, EPA notified the U.S. Department of the Interior, the National Oceanic and Atmospheric Administration, the U.S. Fish and Wildlife Service on January 26, 2021, of negotiations with PRPs regarding the release of hazardous substances that may have resulted in injury to the natural resources under federal trusteeship and encouraged the trustee(s) to participate in the negotiation of this Decree.

WHEREAS, the defendants that have entered into this Decree ("Settling Defendants") do not admit any liability to Plaintiffs arising out of the transactions or occurrences alleged in the complaints, nor do they acknowledge that the release or threatened release of hazardous substance(s) at or from the Site constitutes an imminent and substantial endangerment to the public health or welfare or the environment.

WHEREAS, in accordance with section 105 of CERCLA, EPA listed the Site on the National Priorities List ("NPL"), set forth at 40 C.F.R. part 300, Appendix B, by publication in the Federal Register on September 14, 2005, 70 Fed. Reg. 54286.

WHEREAS, in response to a release or a substantial threat of a release of hazardous substances at or from the Site, EPA completed a Remedial Investigation for the Site on March 1, 2014, Settling Defendants completed a Supplemental Remedial Investigation ("SRI") on October 19, 2018, and Settling Defendants completed a Feasibility Study ("FS") for the Site on April 7, 2020, in accordance with 40 C.F.R. § 300.430.

WHEREAS, in accordance with section 117 of CERCLA and 40 C.F.R § 300.430(f), EPA published notice of the completion of the Feasibility Study and of the proposed plan for remedial action on May 28, 2020, in a major local newspaper of general circulation. EPA provided an opportunity for written and oral comments from the public on the proposed plan for remedial action. A copy of the transcript of the public meeting and comments received are available to the public as part of the administrative record upon which the Director, Superfund and Emergency Management Division, EPA Region 1, based the selection of the response action.

WHEREAS, EPA selected a remedial action to be implemented at the Site, which is embodied in a final Record of Decision ("Record of Decision"), executed on September 23, 2020, on which the State has given its concurrence. The Record of Decision includes a summary of responses to the public comments. Notice of the final plan was published in accordance with section 117(b) of CERCLA.

WHEREAS, based on the information currently available, EPA and the State have determined that the Work will be properly and promptly conducted by Settling Defendants if conducted in accordance with this Decree.

WHEREAS, the Parties recognize, and the Court by entering this Decree finds, that this Decree has been negotiated by the Parties in good faith, that implementation of this Decree will expedite the cleanup of the Site and will avoid prolonged and complicated litigation between the Parties, and that this Decree is fair, reasonable, in the public interest, and consistent with CERCLA.

**NOW**, **THEREFORE**, it is hereby **ORDERED** and **DECREED** as follows:

# I.     JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1367, and 1345, and sections 106, 107 and 113(b) of CERCLA, and personal jurisdiction over the Parties. Venue lies in the District of New Hampshire under section 113(b) of CERCLA and 28 U.S.C. §§ 1391(b), and 1395(a), because the Site is located in this judicial district. This Court retains jurisdiction over the subject matter of this action and over the Parties for the purpose of resolving disputes arising under this Decree, entering orders modifying this Decree, or effectuating or enforcing compliance with this Decree. Settling Defendants may not challenge the terms of this Decree or this Court's jurisdiction to enter and enforce this Decree.

# II.     PARTIES BOUND

2.      This Decree is binding upon the United States and the State and upon Settling Defendants and their successors. Unless the United States otherwise consents, (a) any change in ownership or corporate or other legal status of any Settling Defendant, including any transfer of assets, or (b) any Transfer of the Site or any portion thereof, does not alter any of Settling Defendants' obligations under this Decree. Settling Defendants' responsibilities under this Decree cannot be assigned except under a modification executed under ¶ 70.

3.      In any action to enforce this Decree, Settling Defendants may not raise as a defense the failure of any of their officers, directors, employees, agents, contractors, subcontractors, or any person representing Settling Defendants to take any action necessary to comply with this Decree. Settling Defendants shall provide notice of this Decree to each person representing Settling Defendants with respect to the Site or the Work. Settling Defendants shall provide notice of this Decree to each contractor performing any Work and shall ensure that notice of the Decree is provided to each subcontractor performing any Work.

## III.   DEFINITIONS

4.      Subject to the next sentence, terms used in this Decree that are defined in CERCLA or regulations promulgated under CERCLA have the meanings assigned to them in CERCLA and the regulations promulgated under CERCLA. Whenever the terms set forth below are used in this Decree, the following definitions apply:

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675.

"Consent Decree" or "Decree" means this consent decree, all appendixes attached hereto (listed in Section XVIII), and all deliverables incorporated into the Decree under ¶ 7.6 of the SOW. If there is a conflict between a provision in Sections I through XXIII and a provision in any appendix or deliverable, the provision in Sections I through XXIII controls.

"Day" or "day" means a calendar day. In computing any period under this Decree, the day of the event that triggers the period is not counted and, where the last day is not a working day, the period runs until the close of business of the next working day. "Working day" means any day other than a Saturday, Sunday, or federal or State holiday.

"DOJ" means the United States Department of Justice.

"Effective Date" means the date upon which the Court's approval of this Decree is recorded on its docket.

"EPA" means the United States Environmental Protection Agency.

"Fund" means the Hazardous Substance Superfund established under section 9507 of the Internal Revenue Code, 26 I.R.C. § 9507.

"Future Response Costs" means all costs (including direct, indirect, payroll, contractor, travel, and laboratory costs) that the United States: (a) pays between March 31, 2022, and the Effective Date; and (b) pays after the Effective Date in implementing, overseeing, or enforcing this Decree, including: (i) in developing, reviewing and approving deliverables generated under this Decree; (ii) in overseeing Settling Defendants' performance of the Work; (iii) in assisting or taking action to obtain access or use restrictions under ¶ 12.a; (iv) in securing, implementing, monitoring, maintaining, or enforcing Institutional Controls, including any compensation paid; (v) in taking action under ¶ 21 (Access to Financial Assurance); (vi) in taking response action described in ¶ 54 because of Settling Defendants' failure to take emergency action under ¶ 5.4 of the SOW; (vii) in implementing a Work Takeover under ¶ 9; (viii) in implementing community

involvement activities, including the cost of any technical assistance grant provided under section 117(e) of CERCLA; (ix) in enforcing this Decree, including all costs paid under Section XI (Dispute Resolution) and all litigation costs; and (x) in conducting periodic reviews in accordance with section 121(c) of CERCLA. Future Response Costs also includes all interest accrued after March 31, 2022, on the Future Response Costs.

"Including" or "including" means "including but not limited to."

"Institutional Controls" means Proprietary Controls (*i.e.*, easements or covenants running with the land that (i) limit land, water, or other resource use, provide access rights, or both and (ii) are created under common law or statutory law by an instrument that is recorded, or for which notice is recorded, in the appropriate land records office) and state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices that: (a) limit land, water, or other resource use to minimize the potential for human exposure to Waste Material at or in connection with the Site; (b) limit land, water, or other resource use to implement, ensure noninterference with, or ensure the protectiveness of the Remedial Action; (c) provide information intended to modify or guide human behavior at or in connection with the Site; or (d) any combination thereof.

"Interest" means interest at the rate specified for interest on investments of the Fund, as provided under section 107(a) of CERCLA, compounded annually on October 1 of each year. The applicable rate of interest will be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year. As of the date of lodging of this Decree, rates are available online at https://www.epa.gov/superfund/superfund-interest-rates.

"National Contingency Plan" or "NCP" means the National Oil and Hazardous Substances Pollution Contingency Plan promulgated under section 105 of CERCLA, codified at 40 C.F.R. part 300, and any amendments thereto.

"NHDES" means the New Hampshire Department of Environmental Services and any successor departments or agencies of the State.

"Owner Settling Defendant" means the following Settling Defendant who owns or controls all or a portion of the Site: North American Dismantling Corp. ("NADC").

"Paragraph" or "¶" means a portion of this Decree identified by an Arabic numeral or an upper or lower case letter.

"Parties" means the United States, the State, and Settling Defendants.

"Past Response Costs" means all costs (including direct, indirect, payroll, contractor, travel, and laboratory costs) that the United States paid in connection with the Site through March 31, 2022, plus all interest on such costs accrued under section 107(a) of CERCLA.

"Performance Standards" means the cleanup levels and other measures of achievement of the remedial action objectives, as set forth in the Record of Decision.

"Plaintiffs" means the United States and the State.

"RCRA" means the Solid Waste Disposal Act, 42 U.S.C. §§ 6901-6992k, (also known as the Resource Conservation and Recovery Act).

"Record of Decision" means the EPA decision document that memorializes the selection of the remedial action relating to the Site signed on September 23, 2020, by the Director of the Superfund and Emergency Management Division, EPA Region 1, and all attachments thereto. The Record of Decision is attached as Appendix A.

"Remedial Action" means the remedial action selected in the Record of Decision.

"Remedial Design" means those activities to be undertaken by Settling Defendants to develop plans and specifications for implementing the Remedial Action as set forth in the SOW.

"Scope of the Remedy" means the scope of the remedy set forth in ¶ 1.3 of the SOW.

"Section" means a portion of this Decree identified by a Roman numeral.

"Settling Defendants" means Fort James LLC, Georgia-Pacific Consumer Products LP, and North American Dismantling Corp. As used in this Decree, this definition means all settling defendants, collectively, and each settling defendant, individually. When a provision is applied solely to the State, this definition means Fort James LLC and Georgia-Pacific Consumer Products LP.

"Site" means the Chlor-Alkali Facility (Former) Superfund Site, comprising approximately 44 acres, located on the east bank of the Androscoggin River, in the City of Berlin, Coos County, New Hampshire, and depicted generally on the map attached as Appendix C.

"Special Account" means the Chlor-Alkali Facility (Former) Special Account, within the Fund, established for the Site by EPA under section 122(b)(3) of CERCLA, and the Administrative Settlement Agreement and Order on Consent for Supplemental Remedial Investigation/ Feasibility Study *In re: Fort James LLC and Georgia-Pacific Consumer Products LP*, U.S. EPA Region 1, CERCLA Docket No. 01-2015-0043.

"State" means the State of New Hampshire.

"State Future Response Costs" means all costs (including direct, indirect, payroll, contractor, travel, and laboratory costs) that the State: (a) pays between January 1, 2022, and the Effective Date; and (b) pays after the Effective Date in implementing, overseeing, or enforcing this Decree, including: (i) in developing, reviewing and approving deliverables generated under this Decree; (ii) in overseeing Settling Defendants' performance of the Work; (iii) in assisting or taking action to obtain access or use restrictions under ¶ 12.a; (iv) in securing, implementing, monitoring, maintaining, or enforcing Institutional Controls, including any compensation paid; (v) in taking response action described in ¶ 54 because of Settling Defendants' failure to take emergency action under ¶ 5.4 of the SOW; (vi) in implementing a Work Takeover under ¶ 11; (vii) in implementing community involvement activities, including the cost of any technical assistance grant provided under section 117(e) of CERCLA; (viii) in enforcing this Decree,

including all costs paid under Section XI (Dispute Resolution) and all litigation costs; and (ix) in conducting periodic reviews in accordance with section 121(c) of CERCLA.

"Statement of Work" or "SOW" means the document attached as Appendix B, which describes the activities Settling Defendants must perform to implement and maintain the effectiveness of the Remedial Action.

"Transfer" means to sell, assign, convey, lease, mortgage, or grant a security interest in, or where used as a noun, a sale, assignment, conveyance, or other disposition of any interest by operation of law or otherwise.

"United States" means the United States of America and each department, agency, and instrumentality of the United States, including EPA.

"Waste Material" means (a) any "hazardous substance" under Section 101(14) of CERCLA; (b) any pollutant or contaminant under section 101(33) of CERCLA; (c) any "solid waste" under section 1004(27) of RCRA; and (d) any "hazardous waste" or "hazardous materials" under New Hampshire Revised Statutes Annotated 147-B:2, VII or VIII; and (5) any "hazardous waste" under New Hampshire Revised Statutes Annotated 147-A:2, VII.

"Work" means all obligations of Settling Defendants under Sections V (Performance of the Work) through VIII (Indemnification and Insurance).

"Work Takeover" means EPA's assumption of the performance of any of the Work in accordance with ¶ 11.

## IV.    OBJECTIVES

5.       The objectives of the Parties in entering into this Decree are to protect public health, welfare, and the environment through the design, implementation, and maintenance of a response action at the Site by Settling Defendants, to pay response costs of Plaintiffs, and to resolve and settle the claims of Plaintiffs against Settling Defendants as provided in this Decree.

## V.    PERFORMANCE OF THE WORK

6.       Settling Defendants shall finance, develop, implement, operate, maintain, and monitor the effectiveness of the Remedial Action all in accordance with the SOW, any modified SOW and all EPA-approved, conditionally approved, or modified deliverables as required by the SOW or modified SOW.

7.       Nothing in this Decree and no EPA approval of any deliverable required under this Decree constitutes a warranty or representation by EPA or the State that completion of the Work will achieve the Performance Standards.

8.       Settling Defendants' obligations to finance and perform the Work and to pay amounts due under this Decree are joint and several. In the event of the insolvency of any Settling Defendant or the failure by any Settling Defendant to participate in the implementation

of the Decree, the remaining Settling Defendants shall complete the Work and make the payments.

9.    **Modifications to the Remedial Action and Further Response Actions**.

a.    Nothing in this Decree limits EPA's authority to modify the Remedial Action or to select further response actions for the Site in accordance with the requirements of CERCLA and the NCP. Nothing in this Decree limits Settling Defendants' rights, under sections 113(k)(2) or 117 of CERCLA, to comment on any modified or further response actions proposed by EPA.

b.    If EPA modifies the Remedial Action in order to achieve or maintain the Performance Standards, or both, or to carry out and maintain the effectiveness of the Remedial Action, and such modification is consistent with the Scope of the Remedy, then Settling Defendants shall implement the modification as provided in ¶ 9.d.

c.    If EPA selects a further response action for the Site because a reopener condition in ¶ 50 is satisfied, then, subject to ¶ 70, Settling Defendants shall implement the further response action as provided in ¶ 9.d.

d.    Upon receipt of notice from EPA that it has modified the Remedial Action as provided in ¶ 9.b or selected a further response action as provided in ¶ 9.c and requesting that Settling Defendants implement the modified Remedial Action or further response action, Settling Defendants shall implement the modification or further response action, subject to their right to initiate dispute resolution under Section XI within 30 days after receipt of EPA's notice. Settling Defendants shall modify the SOW, or related work plans, or both in accordance with the Remedial Action modification or further response action or, if Settling Defendants invoke dispute resolution, in accordance with the final resolution of the dispute. The Remedial Action modification or further response action, the approved modified SOW, and any related work plans will be deemed to be incorporated into and enforceable under this Decree.

10.    **Compliance with Applicable Law**. Nothing in this Decree affects Settling Defendants' obligations to comply with all applicable federal and state laws and regulations. Settling Defendants must also comply with all applicable or relevant and appropriate requirements of all federal and state environmental laws as set forth in the Record of Decision and the SOW. The activities conducted in accordance with this Decree, if approved by EPA, will be deemed to be consistent with the NCP as provided under Section 300.700(c)(3)(ii).

11.    **Work Takeover**

a.    If EPA determines that Settling Defendants: (i) have ceased to perform any of the Work required under this Section; (ii) are seriously or repeatedly deficient or late in performing the Work required under this Section; or (iii) are performing the Work required under this Section in a manner that may cause an endangerment to human health or the environment, EPA may issue a notice of Work Takeover to Settling Defendants, including a description of the grounds for the notice and a period of time ("Remedy Period") within which Settling Defendants must remedy the circumstances giving rise to the notice. The Remedy Period will be 20 days,

unless EPA determines in its unreviewable discretion that there may be an endangerment, in which case the Remedy Period will be 10 days.

        b.     If, by the end of the Remedy Period, Settling Defendants do not remedy to EPA's satisfaction the circumstances giving rise to the notice of Work Takeover, EPA may notify Settling Defendants and, as it deems necessary, commence a Work Takeover.

        c.     EPA may conduct the Work Takeover during the pendency of any dispute under Section XI but shall terminate the Work Takeover if and when: (i) Settling Defendants remedy, to EPA's satisfaction, the circumstances giving rise to the notice of Work Takeover; or (ii) upon the issuance of a final determination under Section XI (Dispute Resolution) that EPA is required to terminate the Work Takeover.

## VI.    PROPERTY REQUIREMENTS

12.    **Agreements Regarding Access and Noninterference.**

        a.     As used in this Section, "Affected Property" means any real property, including the Site, where EPA determines, at any time, that access; land, water, or other resource use restrictions; Institutional Controls; or any combination thereof, are needed to implement the Remedial Action.

        b.     Settling Defendants shall use best efforts to secure from the owner(s), other than Owner Settling Defendant, of all Affected Property, an agreement, enforceable by Settling Defendants and by Plaintiffs, requiring such owner: (i) to provide Plaintiffs and Settling Defendants, and their respective representatives, contractors, and subcontractors with access at all reasonable times to such owner's property to conduct any activity regarding the Decree, including the following:

        (1)     implementing the Work and overseeing compliance with the Decree;

        (2)     conducting investigations of contamination at or near the Site;

        (3)     assessing the need for, planning, or implementing additional response actions at or near the Site;

        (4)     determining whether the Site is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted under the Decree;

        (5)     implementing, monitoring, maintaining, reporting on, and enforcing any land, water, or other resource use restrictions and Institutional Controls;

        (6)     implementing the Work pursuant to the conditions set forth in ¶ 70 (Work Takeover); and

(7)     determining whether the Affected Property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted under this Decree.

c.     Further, each agreement required under ¶ 12.b must commit the owner to refrain from using its property in any manner that EPA determines will pose an unacceptable risk to human health or to the environment as a result of exposure to Waste Material, or will interfere with or adversely affect the implementation, integrity, or protectiveness of the Remedial Action, including the following:

(1)     engaging in activities that could interfere with the Remedial Action;

(2)     using contaminated groundwater;

(3)     engaging in activities that could result in human exposure to contaminants in soils and groundwater;

(4)     constructing new structures that may interfere with the Remedial Action; and

(5)     Ensuring that any new structures on the Site will be constructed only in a manner such that building occupants will not be subjected to unacceptable inhalation risks due to vapor intrusion from contaminated groundwater.

d.     As used in this Section, "best efforts" means the efforts that a reasonable person in the position of Settling Defendants would use to achieve the goal in a timely manner, including the cost of employing professional assistance and the payment of reasonable sums of money to secure access or use restriction agreements or both.

e.     Settling Defendants shall provide to EPA and the State a copy of each agreement required under ¶ 12.b. If Settling Defendants cannot accomplish what is required through best efforts in a timely manner, they shall notify EPA, and include a description of the steps taken to achieve the requirements. If the United States deems it appropriate, it may assist Settling Defendants, or take independent action, to obtain such access or use restrictions.

13.     **Access and Noninterference by Owner Settling Defendant**. The Owner Settling Defendant shall: (a) provide Plaintiffs and the Settling Defendants, and their representatives, contractors, and subcontractors with access at all reasonable times to the Site to conduct any activity regarding the Decree, including those listed in ¶ 12.b; and (b) refrain from using the Site in any manner that EPA determines will pose an unacceptable risk to human health or to the environment because of exposure to Waste Material, or will interfere with or adversely affect the implementation, integrity, or protectiveness of the Remedial Action, including the restrictions listed in ¶ 12.c.

14.     If EPA determines in a decision document prepared in accordance with the NCP that Institutional Controls in the form of state or local laws, regulations, ordinances, zoning

restrictions, or other governmental controls or notices are appropriate, Settling Defendants shall cooperate with EPA's and the State's efforts to secure and ensure compliance with such Institutional Controls.

15.     Notwithstanding any provision of the Decree, EPA and the State retain all of their access authorities and rights, as well as all of their rights to require land, water, or other resource use restrictions and Institutional Controls, including related enforcement authorities, under CERCLA, RCRA, and any other applicable statute or regulations.

## VII.   FINANCIAL ASSURANCE

16.     To ensure completion of the Work required under Section V, Settling Defendants shall secure financial assurance, initially in the amount of $5.1 million ("Estimated Cost of the Work"), for the benefit of EPA. The financial assurance must: (i) be one or more of the mechanisms listed below, in a form substantially identical to the relevant sample documents available from EPA; and (ii) be satisfactory to EPA. As of the date of lodging of this Decree, the sample documents can be found under the "Financial Assurance - Settlements" category on the Cleanup Enforcement Model Language and Sample Documents Database at https://cfpub.epa.gov/compliance/models/. Settling Defendants may use multiple mechanisms if they are limited to surety bonds guaranteeing payment, letters of credit, trust funds, insurance policies, or some combination thereof. The following are acceptable mechanisms:

a.      a surety bond guaranteeing payment, performance of the Work, or both, that is issued by a surety company among those listed as acceptable sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury;

b.      an irrevocable letter of credit, payable to EPA or at the direction of EPA, that is issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or state agency;

c.      a trust fund established for the benefit of EPA that is administered by a trustee that has the authority to act as a trustee and whose trust operations are regulated and examined by a federal or state agency;

d.      a policy of insurance that provides EPA with acceptable rights as a beneficiary thereof and that is issued by an insurance carrier that has the authority to issue insurance policies in the applicable jurisdiction(s) and whose insurance operations are regulated and examined by a federal or state agency;

e.      a demonstration by one or more Settling Defendants that they meet the relevant test criteria of ¶ 17, accompanied by a standby funding commitment that requires the affected Settling Defendants to pay funds to or at the direction of EPA, up to the amount financially assured through the use of this demonstration in the event of a Work Takeover; or

f.      a guarantee to fund or perform the Work executed in favor of EPA by a company: (1) that is a direct or indirect parent company of a Settling Defendant or has a "substantial business relationship" (as defined in 40 C.F.R. § 264.141(h)) with a Settling

Defendant; and (2) demonstrates to EPA's satisfaction that it meets the financial test criteria of ¶ 17.

17.     Settling Defendants seeking to provide financial assurance by means of a demonstration or guarantee under ¶ 16.e or 16.f must, within 30 days after the Effective Date:

    a.     demonstrate that:

        (1)     the affected Settling Defendant or guarantor has:

            i.     two of the following three ratios: a ratio of total liabilities to net worth less than 2.0; a ratio of the sum of net income plus depreciation, depletion, and amortization to total liabilities greater than 0.1; and a ratio of current assets to current liabilities greater than 1.5; and

            ii.     net working capital and tangible net worth each at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

            iii.     tangible net worth of at least $10 million; and

            iv.     assets located in the United States amounting to at least 90 percent of total assets or at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; or

        (2)     the affected Settling Defendant or guarantor has:

            i.     a current rating for its senior unsecured debt of AAA, AA, A, or BBB as issued by Standard and Poor's or Aaa, Aa, A or Baa as issued by Moody's; and

            ii.     tangible net worth at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

            iii.     tangible net worth of at least $10 million; and

            iv.     assets located in the United States amounting to at least 90 percent of total assets or at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of

other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

b.      submit to EPA for the affected Settling Defendant or guarantor: (1) a copy of an independent certified public accountant's report of the entity's financial statements for the latest completed fiscal year, which must not express an adverse opinion or disclaimer of opinion; and (2) a letter from its chief financial officer and a report from an independent certified public accountant substantially identical to the sample letter and reports available from EPA. As of the date of lodging of this Decree, a sample letter and report is available under the "Financial Assurance - Settlements" subject list category on the Cleanup Enforcement Model Language and Sample Documents Database at https://cfpub.epa.gov/compliance/models/.

18.      Settling Defendants providing financial assurance by means of a demonstration or guarantee under ¶ 16.e or 16.f must also:

a.      annually resubmit the documents described in ¶ 17.b within 90 days after the close of the affected Settling Defendant's or guarantor's fiscal year;

b.      notify EPA within 30 days after the affected Settling Defendant or guarantor determines that it no longer satisfies the relevant financial test criteria and requirements set forth in this Section; and

c.      provide to EPA, within 30 days of EPA's request, reports of the financial condition of the affected Settling Defendant or guarantor in addition to those specified in ¶ 17.b; EPA may make such a request at any time based on a belief that the affected Settling Defendant or guarantor may no longer meet the financial test requirements of this Section.

19.      Settling Defendants shall, within 30 days after the Effective Date, seek EPA's approval of the form of Settling Defendants' financial assurance. Within 30 days after such approval, Settling Defendants shall secure all executed or otherwise finalized mechanisms or other documents consistent with the EPA-approved form of financial assurance and shall submit such mechanisms and documents to the SEMS Records and Information Center and to DOJ and the State in accordance with ¶ 68.

20.      Settling Defendants shall diligently monitor the adequacy of the financial assurance. If any Settling Defendant becomes aware of any information indicating that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, such Settling Defendant shall notify EPA of such information within seven days. If EPA determines that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, EPA will notify the affected Settling Defendant of such determination. Settling Defendants shall, within 30 days after notifying EPA or receiving notice from EPA under this Paragraph, secure and submit to EPA for approval a proposal for a revised or alternative financial assurance mechanism that satisfies the requirements of this Section. EPA may extend this deadline for such time as is reasonably necessary for the affected Settling Defendant, in the exercise of due diligence, to secure and submit to EPA a proposal for a revised or alternative financial assurance mechanism, not to

exceed 60 days. Settling Defendants shall follow the procedures of ¶ 22 in seeking approval of, and submitting documentation for, the revised or alternative financial assurance mechanism. Settling Defendants' inability to secure financial assurance in accordance with this Section does not excuse performance of any other requirement of this Decree.

21.     **Access to Financial Assurance**

a.     If EPA issues a notice of a Work Takeover under ¶ 11.b, then, in accordance with any applicable financial assurance mechanism including the related standby funding commitment], EPA may require that any funds guaranteed be paid in accordance with ¶ 21.d.

b.     If EPA is notified that the issuer of a financial assurance mechanism intends to cancel the mechanism, and the affected Settling Defendant fails to provide an alternative financial assurance mechanism in accordance with this Section at least 30 days prior to the cancellation date, the funds guaranteed under such mechanism must be paid prior to cancellation in accordance with ¶ 21.d.

c.     If, upon issuance of a notice of a Work Takeover under ¶ 11.b, either: (1) EPA is unable for any reason to promptly secure the resources guaranteed under any applicable financial assurance mechanism including the related standby funding commitment, whether in cash or in kind, to continue and complete the Work; or (2) the financial assurance is a demonstration or guarantee under ¶ 16.e or 16.f, then EPA is entitled to demand an amount, as determined by EPA, sufficient to cover the cost of the remaining Work to be performed. Settling Defendants shall, within 21 days after such demand, pay the amount demanded as directed by EPA.

d.     Any amounts required to be paid under this ¶ 21 must be, as directed by EPA: (i) paid to EPA in order to facilitate the completion of the Work by EPA or by another person; or (ii) deposited into an interest-bearing account, established at a duly chartered bank or trust company that is insured by the FDIC, in order to facilitate the completion of the Work by another person. If payment is made to EPA, EPA may deposit the payment into the Fund or into the Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the Fund.

22.     **Modification of Amount, Form, or Terms of Financial Assurance**. Beginning after the first anniversary of the Effective Date, and no more than once per calendar year, Settling Defendants may submit a request to change the form, terms, or amount of the financial assurance mechanism. Any such request must be submitted to EPA in accordance with ¶ 19, and must include an estimate of the cost of the remaining Work, an explanation of the bases for the cost calculation, and a description of the proposed changes, if any, to the form or terms of the financial assurance. EPA will notify Settling Defendants of its decision regarding the request. Settling Defendants may initiate dispute resolution under Section XI regarding EPA's decision by the earlier of 30 days after receipt of EPA's decision or 180 days after EPA's receipt of the request. Settling Defendants may modify the form, terms, or amount of the financial assurance mechanism only: (a) in accordance with EPA's approval; or (b) in accordance with any resolution of a dispute under Section XI. Settling Defendants shall submit to EPA, within

30 days after receipt of EPA's approval or consistent with the terms of the resolution of the dispute, documentation of the change to the form, terms, or amount of the financial assurance instrument.

23.    **Release, Cancellation, or Discontinuation of Financial Assurance**. Settling Defendants may release, cancel, or discontinue any financial assurance provided under this Section only: (a) if EPA issues a Certification of Work Completion under ¶ 5.9 of the SOW; (b) in accordance with EPA's approval of such release, cancellation, or discontinuation; or (c) if there is a dispute regarding the release, cancellation or discontinuance of any financial assurance, in accordance with the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XI.

# VIII.  INDEMNIFICATION AND INSURANCE

24.    **Indemnification**

a.    Plaintiffs do not assume any liability by entering into this Decree or by virtue of any designation of Settling Defendants as EPA's and the State's authorized representatives under section 104(e)(1) of CERCLA. Settling Defendants shall indemnify and save and hold harmless Plaintiffs and their officials, agents, employees, contractors, subcontractors, and representatives for or from any claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of Settling Defendants, their officers, directors, employees, agents, contractors, subcontractors, and any persons acting on Settling Defendants' behalf or under their control, in carrying out activities under this Decree, including any claims arising from any designation of Settling Defendants as EPA's and the State's authorized representatives under section 104(e)(1) of CERCLA. Further, Settling Defendants agree to pay Plaintiffs all costs they incur including attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made against Plaintiffs based on negligent or other wrongful acts or omissions of Settling Defendants, their officers, directors, employees, agents, contractors, subcontractors, and any persons acting on their behalf or under their control in carrying out activities under with this Decree. Plaintiffs may not be held out as parties to any contract entered into by or on behalf of Settling Defendants in carrying out activities under this Decree. The Settling Defendants and any such contractor may not be considered an agent of Plaintiffs.

b.    Either Plaintiff shall give Settling Defendants notice of any claim for which such Plaintiff plans to seek indemnification in accordance with this ¶ 24, and shall consult with Settling Defendants prior to settling such claim.

25.    Settling Defendants covenant not to sue and shall not assert any claim or cause of action against Plaintiffs for damages or reimbursement or for set-off of any payments made or to be made to Plaintiffs, arising from or on account of any contract, agreement, or arrangement between any one or more of Settling Defendants and any person for performance of Work or other activities on or relating to the Site, including claims on account of construction delays. In addition, Settling Defendants shall indemnify and save and hold Plaintiffs harmless with respect to any claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between any one or more of Settling Defendants and any person for

performance of work at or relating to the Site, including claims on account of construction delays.

26.     **Insurance**. Settling Defendants shall secure, by no later than 15 days before commencing any on-site Work, the following insurance: (a) commercial general liability insurance with limits of liability of $1 million per occurrence; (b) automobile liability insurance with limits of liability of $1 million per accident; and (c) umbrella liability insurance with limits of liability of $5 million in excess of the required commercial general liability and automobile liability limits. The insurance policy must name Plaintiffs as additional insureds with respect to all liability arising out of the activities performed by or on behalf of Settling Defendants under this Decree. Settling Defendants shall maintain this insurance until the first anniversary after issuance of EPA's Certification of Remedial Action Completion under ¶ 5.7 of the SOW. In addition, for the duration of this Decree, Settling Defendants shall satisfy, or shall ensure that their contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of Settling Defendants in furtherance of this Decree. Prior to commencement of the Work, Settling Defendants shall provide to EPA certificates of such insurance and a copy of each insurance policy. Settling Defendants shall resubmit such certificates and copies of policies each year on the anniversary of the Effective Date. If Settling Defendants demonstrate by evidence satisfactory to EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, Settling Defendants need provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor. Settling Defendants shall ensure that all submittals to EPA under this Paragraph identify the Chlor-Alkali Facility (Former) Superfund Site, Berlin, New Hampshire, and the civil action number of this case.

## IX.     PAYMENTS FOR RESPONSE COSTS

27.     **Payment for Past Response Costs**. Within 30 days after the Effective Date, Settling Defendants shall pay EPA, in reimbursement of Past Response Costs in connection with the Site, $7,609,400. The Financial Litigation Unit ("FLU") of the United States Attorney's Office for the District of New Hampshire shall provide to Settling Defendants, in accordance with ¶ 68, instructions for making this payment, including a Consolidated Debt Collection System ("CDCS") reference number. Settling Defendants shall make such payment by FedWire Electronic Funds Transfer ("EFT") in accordance with the FLU's instructions, including references to the CDCS Number. Settling Defendants shall send notices of this payment to DOJ and EPA in accordance with ¶ 68. If the payment required under this Paragraph is late, Settling Defendants shall pay, in addition to any stipulated penalties owed under Section XII, an additional amount for Interest accrued from the Effective Date until the date of payment.

28.     **Payments by Settling Defendants for Future Response Costs**.

a.     On a periodic basis, EPA will send Settling Defendants a bill for Future Response Costs, including a cost summary listing direct and indirect costs paid by EPA, its contractors, subcontractors, and DOJ. Settling Defendants may initiate a dispute under Section XI regarding a Future Response Cost billing, but only if the dispute relates to one or

more of the following issues: (i) whether EPA has made an arithmetical error; (ii) whether EPA has included a cost item that is not within the definition of Future Response Costs; or (iii) whether EPA has paid excess costs as a direct result of an EPA action that was inconsistent with a specific provision or provisions of the NCP. Settling Defendants must specify in the Notice of Dispute the contested costs and the basis for the objection.

      b.     Settling Defendants shall pay the bill, or if they initiate dispute resolution, the uncontested portion of the bill, if any, within 30 days after receipt of the bill. Settling Defendants shall pay the contested portion of the bill determined to be owed, if any, within 30 days after the determination regarding the dispute. Each payment for: (i) the uncontested bill or portion of bill, if late, and; (ii) the contested portion of the bill determined to be owed, if any, must include an additional amount for Interest accrued from the date of receipt of the bill through the date of payment. Settling Defendants shall make payment at https://www.pay.gov using the "EPA Miscellaneous Payments Cincinnati Finance Center" link, and including references to the Site/Spill ID and DJ numbers listed in ¶ 68 and the purpose of the payment. Settling Defendants shall send notices of this payment to DOJ and EPA in accordance with ¶ 68.

29.    **Deposit of Payments**. EPA may, in its unreviewable discretion, deposit the amounts paid under ¶¶ 27 and 28 in the Fund, in the Special Account, or both. EPA may, in its unreviewable discretion, retain and use any amounts deposited in the Special Account to conduct or finance response actions at or in connection with the Site, or transfer those amounts to the Fund.

30.    **Payments by Settling Defendants for State Future Response Costs**

      a.     On a periodic basis, NHDES will send Settling Defendants a bill for State Future Response Costs, including a cost summary listing direct and indirect costs paid by NHDES and its contractors and subcontractors.  Settling Defendants may initiate a dispute under Section XI regarding a State Future Response Cost billing, but only if the dispute relates to one or more of the following issues: (i) whether NHDES has made an arithmetical error; (ii) whether NHDES has included a cost item that is not within the definition of State Future Response Costs; or (iii) whether NHDES has paid excess costs as a direct result of a NHDES action that was inconsistent with a specific provision or provisions of the NCP.  Settling Defendants must specify in the Notice of Dispute the contested costs and the basis for the objection.

      b.     Settling Defendants shall pay the State's Future Response Cost bill, or if they initiate dispute resolution, the uncontested portion of the bill, if any, within 30 days after receipt of the bill. Settling Defendants shall pay the contested portion of the bill determined to be owed, if any, within 30 days after the determination regarding the dispute. Each payment for: (i) the uncontested bill or portion of bill, if late, and; (ii) the contested portion of the bill determined to be owed, if any, must include an additional amount for Interest accrued from the date of receipt of the bill through the date of payment. Settling Defendants shall make payment by check made payable to "Treasurer, State of New Hampshire," sent to the New Hampshire Department of Justice Environmental Protection Bureau contact set forth in ¶ 68.  Settling Defendants shall send notices of this payment to NHDES in accordance with ¶ 68.

# X.   FORCE MAJEURE

31.     "Force majeure," for purposes of this Decree, means any event arising from causes beyond the control of Settling Defendants, of any entity controlled by Settling Defendants, or of Settling Defendants' contractors that delays or prevents the performance of any obligation under this Decree despite Settling Defendants' best efforts to fulfill the obligation. Given the need to protect public health and welfare and the environment, the requirement that Settling Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure (a) as it is occurring and (b) following the potential force majeure such that the delay and any adverse effects of the delay are minimized to the greatest extent possible. "Force majeure" does not include financial inability to complete the Work or a failure to achieve the Performance Standards.

32.     If any event occurs for which Settling Defendants will or may claim a force majeure, Settling Defendants shall notify EPA's Project Coordinator by email. The deadline for the initial notice is seven days after the date Settling Defendants first knew or should have known that the event would likely delay performance. Settling Defendants shall be deemed to know of any circumstance of which any contractor of, subcontractor of, or entity controlled by Settling Defendants knew or should have known. Within seven days thereafter, Settling Defendants shall send a further notice to EPA and the State that includes: (i) a description of the event and its effect on Settling Defendants' completion of the requirements of the Decree; (ii) a description of all actions taken or to be taken to prevent or minimize the adverse effects or delay; (iii) the proposed extension of time for Settling Defendants to complete the requirements of the Decree; (iv) a statement as to whether, in the opinion of Settling Defendants, such event may cause or contribute to an endangerment to public health or welfare, or the environment; and (v) all available proof supporting their claim of force majeure. Failure to comply with the notice requirements herein regarding an event precludes Settling Defendants from asserting any claim of force majeure regarding that event, provided, however, that if EPA, despite late or incomplete notice, is able to assess to its satisfaction whether the event is a force majeure under ¶ 31 and whether Settling Defendants have exercised their best efforts under ¶ 31, EPA may, in its unreviewable discretion, excuse in writing Settling Defendants' failure to submit timely or complete notices under this Paragraph.

33.     EPA, after a reasonable opportunity for review and comment by the State, will notify Settling Defendants of its determination whether Settling Defendants are entitled to relief under ¶ 31, and, if so, the duration of the extension of time for performance of the obligations affected by the force majeure. An extension of the time for performance of the obligations affected by the force majeure shall not, of itself, extend the time for performance of any other obligation. Settling Defendants may initiate dispute resolution under Section XI regarding EPA's determination within 15 days after receipt of the determination. In any such proceeding, Settling Defendants have the burden of proving that they are entitled to relief under ¶ 31 and that their proposed extension was or will be warranted under the circumstances.

34.     The failure by EPA or NHDES to timely complete any activity under the Decree or the SOW is not a violation of the Decree, provided, however, that if such failure prevents

Settling Defendants from timely completing a requirement of the Decree, Settling Defendants may seek relief under this Section.

# XI.    DISPUTE RESOLUTION

35.    Unless otherwise provided in this Decree, Settling Defendants must use the dispute resolution procedures of this Section to resolve any dispute arising under this Decree. Settling Defendants shall not initiate a dispute challenging the Record of Decision. The United States and the State may enforce any requirement of the Decree that is not the subject of a pending dispute under this Section.

36.    A dispute will be considered to have arisen when one or more parties sends a written notice of dispute ("Notice of Dispute") in accordance with ¶ 68. Disputes arising under this Decree must in the first instance be the subject of informal negotiations between the parties to the dispute. The period for informal negotiations may not exceed 20 days after the dispute arises, unless the parties to the dispute otherwise agree. If the parties cannot resolve the dispute by informal negotiations, the position advanced by EPA is binding unless Settling Defendants initiate formal dispute resolution under ¶ 37.

37.    **Formal Dispute Resolution**

a.    **Statements of Position**. Settling Defendants may initiate formal dispute resolution by serving on the Plaintiffs, within ten days after the conclusion of informal dispute resolution under ¶ 36, an initial Statement of Position regarding the matter in dispute. The Plaintiffs' responsive Statements of Position are due within 21 days after receipt of the initial Statement of Position. All Statements of Position must include supporting factual data, analysis, opinion, and other documentation. A reply, if any, is due within 10 days after receipt of the response. If appropriate, EPA may extend the deadlines for filing statements of position for up to 45 days and may allow the submission of supplemental statements of position.

b.    **Formal Decision**. The Director of the Superfund & Emergency Management Division, EPA Region 1, will issue a formal decision resolving the dispute ("Formal Decision") based on the statements of position and any replies and supplemental statements of position. The Formal Decision is binding on Settling Defendants unless they timely seek judicial review under ¶ 38.

c.    **Compilation of Administrative Record**. EPA shall compile an administrative record regarding the dispute, which must include all statements of position, replies, supplemental statements of position, and the Formal Decision.

38.    **Judicial Review**

a.    Settling Defendants may obtain judicial review of the Formal Decision by filing, within 20 days after receiving it, a motion with the Court and serving the motion on all Parties. The motion must describe the matter in dispute and the relief requested. The parties to the dispute shall brief the matter in accordance with local court rules.

b.      **Review on the Administrative Record**. Judicial review of disputes regarding the following issues must be on the administrative record: (i) the adequacy or appropriateness of deliverables required under the Decree; (ii) the adequacy of the performance of the Remedial Action; (iii) whether a Work Takeover is warranted under ¶ 11; (iv) determinations about financial assurance under Section VII; (v) whether a reopener condition under ¶ 50 is satisfied, including whether the Remedial Action is not protective of human health and the environment; (vi) EPA's selection of modified or further response actions; (vii) any other items requiring EPA approval under the Decree; and (viii) any other disputes that the Court determines should be reviewed on the administrative record. For all of these disputes, Settling Defendants bear the burden of demonstrating that the Formal Decision was arbitrary and capricious or otherwise not in accordance with law.

c.      Judicial review of any dispute not governed by ¶ 38.b shall be governed by applicable principles of law.

39.     **Escrow Account**. For disputes regarding a Future Response Cost billing or State Future Response Cost billing, Settling Defendants shall: (a) establish, in a duly chartered bank or trust company, an interest-bearing escrow account that is insured by the Federal Deposit Insurance Corporation ("FDIC"); (b) remit to that escrow account funds equal to the amount of the contested Future Response Costs or State Future Response Costs; and (c) send to EPA and the State, as applicable, in accordance with ¶ 68, copies of the correspondence and of the payment documentation (*e.g.*, the check) that established and funded the escrow account, including the name of the bank, the bank account number, and a bank statement showing the initial balance in the account. EPA or the State, as applicable, may, in its unreviewable discretion, waive the requirement to establish the escrow account. Settling Defendants shall cause the escrow agent to pay the amounts due to EPA and the State under ¶ 28, if any, by the deadline for such payment in ¶ 28. Settling Defendants are responsible for any balance due under ¶ 28 after the payment by the escrow agent.

40.     The initiation of dispute resolution procedures under this Section does not extend, postpone, or affect in any way any requirement of this Decree, except as EPA agrees, or as determined by the Court. Stipulated penalties with respect to the disputed matter will continue to accrue, but payment is stayed pending resolution of the dispute, as provided in ¶ 44.

41.     **Disputes Solely between the State and the Settling Defendants**. Disputes arising under this Decree or the SOW between the State and the Settling Defendants that relate to State Future Response Costs, or assessment of stipulated penalties by the State, shall be governed in the following manner: The procedures for resolving disputes mentioned in this Paragraph shall be the same as provided for in Paragraphs 35-40, except that each reference to EPA shall read as a reference to NHDES, each reference to the Director of the Superfund & Emergency Management Division, EPA Region 1, shall be read as a reference to the Director of the Waste Management Division, NHDES, and each reference to the United States shall be read as a reference to the State.

# XII.   STIPULATED PENALTIES

42.     Unless the noncompliance is excused under Section IX (Force Majeure), Settling Defendants are liable to the United States and the State [specify percentage split] for the following stipulated penalties:

a.     for any failure: (i) to pay any amount due under Section IX; (ii) to establish and maintain financial assurance in accordance with Section VII; and (iii) to submit timely or adequate deliverables under Section 8 of the SOW:

| Period of Noncompliance | Penalty Per Noncompliance Per Day |
|---|---|
| 1st through 14th day | $1,500 |
| 15th through 30th day | $3,000 |
| 31st day and beyond | $5,000 |

b.     for any failure to submit timely or adequate deliverables required by this Decree other than those specified in ¶ 42.a:

| Period of Noncompliance | Penalty Per Noncompliance Per Day |
|---|---|
| 1st through 14th day | $1,000 |
| 15th through 30th day | $1,500 |
| 31st day and beyond | $2,250 |

43.     **Work Takeover Penalty**. If EPA commences a Work Takeover, Settling Defendants are liable for a stipulated penalty in the amount of $500,000. This stipulated penalty is in addition to the remedy available to EPA under ¶ 21 (Access to Financial Assurance) to fund the performance of the Work by EPA.

44.     **Accrual of Penalties**. Stipulated penalties accrue from the date performance is due, or the day a noncompliance occurs, whichever is applicable, until the date the requirement is completed or the final day of the correction of the noncompliance. Nothing in this Decree prevents the simultaneous accrual of separate penalties for separate noncompliances with this Decree. Stipulated penalties accrue regardless of whether Settling Defendants have been notified of their noncompliance, and regardless of whether Settling Defendants have initiated dispute resolution under Section XI, provided, however, that no penalties will accrue as follows:

a.     with respect to a submission that EPA subsequently determines is deficient under ¶ 7.6 of the SOW (Approval of Deliverables), during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies Settling Defendants of any deficiency;

b.     with respect to a matter that is the subject of dispute resolution under Section XI, during the period, if any, beginning on the 21st day after the later of the date that EPA's Statement of Position is received or the date that Settling Defendants' reply thereto (if any) is received until the date of the Formal Decision under ¶ 37.b; or

c.      with respect to a matter that is the subject of judicial review by the Court under ¶ 38, during the period, if any, beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until the date that the Court issues a final decision regarding such dispute.

45.      **Demand and Payment of Stipulated Penalties**. EPA and/or the State may send Settling Defendants a demand for stipulated penalties. The demand will include a description of the noncompliance and will specify the amount of the stipulated penalties owed. Settling Defendants may initiate dispute resolution under Section XI within 30 days after receipt of the demand. Settling Defendants shall pay the amount demanded or, if they initiate dispute resolution, the uncontested portion of the amount demanded, within 30 days after receipt of the demand. Settling Defendants shall pay the contested portion of the penalties determined to be owed, if any, within 30 days after the resolution of the dispute. Each payment for: (a) the uncontested penalty demand or uncontested portion, if late, and; (b) the contested portion of the penalty demand determined to be owed, if any, must include an additional amount for Interest accrued from the date of receipt of the demand through the date of payment. Settling Defendants shall pay 90% of each stipulated penalty payment to EPA and 10% of each stipulated penalty payment to the State. Settling Defendants shall make payment to EPA at https://www.pay.gov using the link for "EPA Miscellaneous Payments Cincinnati Finance Center," including references to the Site/Spill ID and DJ numbers listed in ¶ 68, and the purpose of the payment. Settling Defendants shall send a notice of this payment to DOJ and EPA, in accordance with ¶ 68. For payments of stipulated penalties to the State, Settling Defendants shall make payment by check made payable to "Treasurer, State of New Hampshire," sent to the New Hampshire Department of Justice Environmental Protection Bureau contact set forth in ¶ 68. Settling Defendants shall send notices of this payment to NHDES in accordance with ¶ 68. The payment of stipulated penalties and Interest, if any, does not alter any obligation by Settling Defendants under the Decree.

46.      Nothing in this Decree limits the authority of the United States or the State: (a) to seek any remedy otherwise provided by law for Settling Defendants' failure to pay stipulated penalties or interest; or (b) to seek any other remedies or sanctions available by virtue of Settling Defendants' noncompliances with this Decree or of the statutes and regulations upon which it is based, including penalties under section 122(*l*) of CERCLA, provided, however, that the United States may not seek civil penalties under section 122(*l*) of CERCLA for any noncompliance for which a stipulated penalty is provided for in this Decree, except in the case of a willful noncompliance with this Decree.

47.      Notwithstanding any other provision of this Section, the United States or the State, or both, may, in their unreviewable discretion, waive any portion of stipulated penalties owed to them that have accrued under this Decree.

## XIII.   PLAINTIFFS' COVENANTS AND SETTLEMENT OF CLAIMS

48.      **Covenants for Settling Defendants**. Subject to ¶¶ 50 and 51, the United States covenants not to sue or to take administrative action against Settling Defendants under sections 106 and 107(a) of CERCLA and section 7003(a) of RCRA regarding the Site.

49.     The covenants under ¶ 48: (a) take effect upon the Effective Date, except with respect to future liability, for which these covenants take effect upon Certification of Remedial Action Completion by EPA under ¶ 5.7 of the SOW; (b) are conditioned on the satisfactory performance by Settling Defendants of the requirements of this Decree; (c) extend to the successors of each Settling Defendant but only to the extent that the alleged liability of the successor of the Settling Defendant is based solely on its status as a successor of the Settling Defendant; and (d) do not extend to any other person.

50.     **United States' Pre- and Post-Certification Reservations**.

a.     Notwithstanding any other provision of this Decree, the United States reserves, and this Decree is without prejudice to, the right to issue an administrative order or to institute proceedings in this action or in a new action seeking to compel Settling Defendants to perform further response actions relating to the Site, to pay the United States for additional costs of response, or any combination thereof. The United States may exercise this reservation only if, at any time, conditions at the Site previously unknown to EPA are discovered, or information previously unknown to EPA is received, and EPA determines, based in whole or in part on these previously unknown conditions or information, that the Remedial Action is not protective of human health or the environment.

b.     Before certification of Remedial Action Completion, the information and the conditions known to EPA include only that information and those conditions known to EPA as of the date the Record of Decision was signed and set forth in the Record of Decision for the Site and the administrative record supporting the Record of Decision.

c.     After certification of Remedial Action Completion, the information and the conditions known to EPA include only that information and those conditions known to EPA as of the date of Certification of Remedial Action Completion and set forth in the Record of Decision, the administrative record supporting the Record of Decision, the post-Record of Decision administrative record, or in any information received by EPA in accordance with the requirements of this Decree prior to Certification of Remedial Action Completion.

51.     **General Reservations**. Notwithstanding any other provision of this Decree, the United States reserves, and this Decree is without prejudice to, all rights against Settling Defendants regarding the following:

a.     liability for failure by Settling Defendants to meet a requirement of this Decree;

b.     liability arising from the past, present, or future disposal, release, or threat of release of Waste Material outside of the Site;

c.     liability based on Settling Defendants' ownership of the Site when such ownership commences after Settling Defendants' signature of this Decree;

d.     liability based on Settling Defendants' operation of the Site when such operation commences after Settling Defendants' signature of this Decree and does not arise solely from Settling Defendants' performance of the Work;

e.      liability based on Settling Defendants' transportation, treatment, storage, or disposal, or arrangement for transportation, treatment, storage, or disposal of Waste Material at or in connection with the Site, after signature of this Decree by Settling Defendants, other than as provided in the Record of Decision, under this Decree, or ordered by EPA or NHDES;

f.      liability, prior to achievement of Performance Standards, for additional response actions that EPA determines are necessary to achieve and maintain Performance Standards or to carry out and maintain the effectiveness of the Remedial Action, but that are not covered by ¶ 9.b;

g.      liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments; and

h.      criminal liability.

52.      **Settlement of State Claims**. In full and final settlement, release, satisfaction, and resolution of the State's claims that were or could have been brought herein against Settling Defendants, Georgia-Pacific Consumer Products LP and Fort James LLC, for State Future Response Costs and Site liability pursuant to CERCLA, RCRA, N.H. Rev. Stat. Ann. ch. 147-A and 147-B, the State Constitution, other State law, and common law, Georgia-Pacific Consumer Products LP and Fort James LLC agree to pay the State its State Future Response Costs and undertake the Site work described in Section V herein, Performance of the Work as set forth herein.

53.      **General Reservations of Rights by the State**. The State reserves, and this Decree is without prejudice to, all rights against Settling Defendants by the State with respect to all matters not expressly settled and included within this Decree. Notwithstanding any other provision of this Decree, the State reserves all rights against Settling Defendants with respect to:

a.      Liability for failure by Settling Defendants to meet a requirement of this Decree;

b.      Liability arising from the past, present, or future disposal, release, or threat of release by Settling Defendants of Waste Material outside of the Site;

c.      Liability, prior to achievement of Performance Standards, for additional response actions that EPA determines are necessary to achieve and maintain Performance Standards or to carry out and maintain the effectiveness of the Remedial Action, but that are not covered by ¶ 9.b;

d.      Liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments; and

e.      Criminal liability.

54.      Subject to ¶ 48, nothing in this Decree limits any authority of Plaintiffs to take, direct, or order all appropriate action to protect human health and the environment or to prevent,

abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site, or to request a Court to order such action.

## XIV.  COVENANTS BY SETTLING DEFENDANTS

55.   **Covenants by Settling Defendants**.

a.       Subject to ¶ 56, Settling Defendants covenant not to sue and shall not assert any claim or cause of action against the United States or the State under CERCLA, section 7002(a) of RCRA, the United States Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, the State Constitution, State law, or at common law regarding the Site.

b.       Subject to ¶ 56, Settling Defendants covenant not to seek reimbursement from the Fund through CERCLA or any other law for costs regarding the Site.

56.   **Settling Defendants' Reservation**. The covenants in ¶ 55 do not apply to any claim or cause of action brought, or order issued, after the Effective Date by the United States or the State to the extent such claim, cause of action, or order is within the scope of a reservation under ¶¶ 50, and 51.a through 51.g.

## XV.   EFFECT OF SETTLEMENT; CONTRIBUTION

57.   The Parties agree and the Court finds that: (a) the complaints filed by the United States and the State in these actions are civil actions within the meaning of section 113(f)(1) of CERCLA; (b) this Decree constitutes a judicially approved settlement under which each Settling Defendant has, as of the Effective Date, resolved its liability to the United States and the State within the meaning of sections 113(f)(2) and 113(f)(3)(B) of CERCLA; and (c) each Settling Defendant is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by section 113(f)(2) of CERCLA, or as may be otherwise provided by law, for the "matters addressed" in this Decree. The "matters addressed" in this Decree are all response actions taken or to be taken and all response costs incurred or to be incurred, at or in connection with the Site, by the United States or any other person, provided, however, that if the United States exercises rights under the reservations in ¶ 50 and ¶¶ 51.a through 51.f, the "matters addressed" in this Decree will no longer include those response costs or response actions or natural resource damages that are within the scope of the exercised reservation.

58.   Each Settling Defendant shall, with respect to any suit or claim brought by it for matters related to this Decree, notify DOJ and EPA and the State no later than 60 days prior to the initiation of such suit or claim. Each Settling Defendant shall, with respect to any suit or claim brought against it for matters related to this Decree, notify DOJ and EPA and the State within 10 days after service of the complaint on such Settling Defendant. In addition, each Settling Defendant shall notify DOJ and EPA and the State within 10 days after service or receipt of any Motion for Summary Judgment and within 10 days after receipt of any order from a court setting a case for trial.

59.    **Res Judicata and Other Defenses**. In any subsequent administrative or judicial proceeding initiated against any Settling Defendant by either Plaintiff for injunctive relief, recovery of response costs, or other appropriate relief relating to the Site, Settling Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, claim preclusion (res judicata), issue preclusion (collateral estoppel), claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State in the subsequent proceeding were or should have been brought in the instant case.

60.    Nothing in this Decree diminishes the right of the United States or the State under section 113(f)(2) and (3) of CERCLA to pursue any person not a party to this Decree to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

# XVI.   RECORDS

61.    **Settling Defendant Certification**. Each Settling Defendant certifies individually that: (a) it has implemented a litigation hold on documents and electronically stored information relating to the Site, including information relating to its potential liability under CERCLA regarding the Site, since the earlier of notification of potential liability by the United States or the State or the filing of suit against it regarding the Site; and (b) it has fully complied with any and all EPA and State requests for information under sections 104(e) and 122(e) of CERCLA, and section 3007 of RCRA, and State law.

62.    **Retention of Records and Information**

a.    Settling Defendants shall retain, and instruct their contractors and agents to retain, the following documents and electronically stored data ("Records") until 10 years after the Certification Completion of the Work under SOW Paragraph 5.9 ("Record Retention Period"):

(1)    All records regarding Settling Defendants' liability under CERCLA regarding the Site;

(2)    All reports, plans, permits, and documents submitted to EPA in accordance with this Decree, including all underlying research and data; and

(3)    All data developed by, or on behalf of, Settling Defendants in the course of performing the Remedial Action.

b.    At the end of the Record Retention Period, Settling Defendants shall notify EPA that it has 90 days to request the Settling Defendants' Records subject to this Section. Settling Defendants shall retain and preserve their Records subject to this Section until 90 days after EPA's receipt of the notice. These record retention requirements apply regardless of any corporate record retention policy.

63.    Settling Defendants shall provide to EPA and the State, upon request, copies of all Records and information required to be retained under this Section. Settling Defendants shall also make available to EPA and the State, for purposes of investigation, information gathering,

or testimony, their employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

64.     **Privileged and Protected Claims**

a.      Settling Defendants may assert that all or part of a record requested by Plaintiffs is privileged or protected as provided under federal law, in lieu of providing the record, provided that Settling Defendants comply with ¶ 64.b, and except as provided in ¶ 64.c.

b.      If Settling Defendants assert a claim of privilege or protection, they shall provide Plaintiffs with the following information regarding such record: its title; its date; the name, title, affiliation (e.g., company or firm), and address of the author, of each addressee, and of each recipient; a description of the record's contents; and the privilege or protection asserted. If a claim of privilege or protection applies only to a portion of a record, Settling Defendants shall provide the record to Plaintiffs in redacted form to mask the privileged or protected portion only. Settling Defendants shall retain all records that they claim to be privileged or protected until Plaintiffs have had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in Settling Defendants' favor.

c.      Settling Defendants shall not make any claim of privilege or protection regarding: (1) any data regarding the Site, including all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, radiological or engineering data, or the portion of any other record that evidences conditions at or around the Site; or (2) the portion of any record that Settling Defendants are required to create or generate in accordance with this Decree.

65.     **Confidential Business Information (CBI) Claims**. Settling Defendants may claim that all or part of a record provided to Plaintiffs under this Section is CBI to the extent permitted by and in accordance with section 104(e)(7) of CERCLA and 40 C.F.R. § 2.203(b). Settling Defendants shall segregate and shall clearly identify all records or parts thereof submitted under this Decree for which they claim is CBI by labeling each page or each electronic file "claimed as confidential business information" or "claimed as CBI." Records that Settling Defendants claim to be CBI will be afforded the protection specified in 40 C.F.R. part 2, Subpart B. If no CBI claim accompanies records when they are submitted to EPA, or if EPA notifies Settling Defendants that the records are not entitled to confidential treatment under the standards of section 104(e)(7) of CERCLA or 40 C.F.R. part 2, subpart B, the public may be given access to such records without further notice to Settling Defendants. With respect to the State, all documents provided to the State are subject to N.H. Rev. Stat. Ann. ch. 91-A (the Right-to-Know Law).  For documents or CBI provided to the State, Settling Defendants understand that information may be shared with the public without notice unless the documents are exempt from disclosure pursuant to N.H. RSA ch. 91-A.

66.     In any proceeding under this Decree, validated sampling or monitoring data generated in accordance with the SOW and reviewed and approved by EPA, if relevant to the proceeding, is admissible as evidence, without objection.

67.     Notwithstanding any provision of this Decree, Plaintiffs retain all of their information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## XVII. NOTICES AND SUBMISSIONS

68.     All agreements, approvals, consents, deliverables, modifications, notices, notifications, objections, proposals, reports, waivers, and requests specified in this Decree must be in writing unless otherwise specified. Whenever a notice is required to be given or a report or other document is required to be sent by one Party to another under this Decree, it must be sent as specified below. All notices under this Section are effective upon receipt, unless otherwise specified. In the case of emailed notices, there is a rebuttable presumption that such notices are received on the same day that they are sent. Any Party may change the method, person, or address applicable to it by providing notice of such change to all Parties.

<div style="margin-left:2em;">

As to DOJ:   *via email to*:
eescdcopy.enrd@usdoj.gov
Re: DJ # 90-11-2-09455/3

As to EPA:   *via email to*:
Director, Superfund & Emergency Mgmt. Div.
olson.bryan@epa.gov
  and
Darryl Luce, EPA Project Coordinator
luce.darryl@epa.gov
Re: Site/Spill ID # 01BQ

SEMS Records &   U.S. EPA - Region 1
Information Center:   SEMS Records & Information Center
Financial Assurance Repository
5 Post Office Square (02-3)
Boston, MA 02109-3912
Re: Site/Spill ID # 01BQ

As to the State:   *via email to*:
Joshua C. Harrison, Assistant Attorney General
Environmental Protection Bureau
New Hampshire Office of the Attorney General
33 Capitol Street, Concord, New Hampshire 03301
Joshua.C.Harrison@doj.nh.gov

Andrew Hoffman
State Project Coordinator
andrew.j.hoffman@des.nh.gov

</div>

As to Settling     *via email to*:
Defendants:     Tye G. Darland
            Senior Vice President & General Counsel
            Georgia-Pacific LLC
            tye.darland@gapac.com

            Charles M. Denton
            Barnes & Thornburg LLP
            cdenton@btlaw.com

            Neal Melchionni, Kennedy-Jenks
            NealMelchionni@kennedyjenks.com
            and
            David Smith, Georgia-Pacific
            david.smith8@gapac.com

            and
            Charles Dunn, Charles Dunn PLC
            charlesedunnplc@gmail.com

## XVIII.       APPENDIXES

69.     The following appendixes are attached to and incorporated into this Decree:

"Appendix A" is the Record of Decision.

"Appendix B" is the SOW.

"Appendix C" is the map of the Site.

## XIX.   MODIFICATIONS TO DECREE

70.     Except as provided in ¶ 9 of the Decree and ¶ 7.6 of the SOW (Approval of Deliverables), nonmaterial modifications to Sections I through XXIII and the Appendixes must be in writing and are effective when signed (including electronically signed) by the Parties. Material modifications to the Decree, including the SOW, must be in writing, signed (which may include electronically signed) by the Parties, and are effective upon approval by the Court. As to changes to the remedy, a modification to the Decree, including the SOW, to implement an amendment to the Record of Decision that "fundamentally alters the basic features" of the Remedial Action within the meaning of 40 C.F.R. § 300.435(c)(2)(ii) will be considered a material modification.

## XX.   SIGNATORIES

71.     The undersigned representative of the United States, the undersigned representative of the State, and each undersigned representative of Settling Defendants, certifies

that he or she is fully authorized to enter into the terms and conditions of this Decree and to execute and legally bind such Party to this document.

## XXI.  PRE-ENTRY PROVISIONS

72.     If for any reason the Court should decline to approve this Decree in the form presented, this agreement, except for ¶ 73 and ¶ 74, is voidable at the sole discretion of any Party and its terms may not be used as evidence in any litigation between the Parties.

73.     This Decree will be lodged with the Court for at least 30 days for public notice and comment in accordance with section 122(d)(2) of CERCLA and 28 C.F.R. § 50.7. The United States may withdraw or withhold its consent to this Decree if the comments regarding the Decree disclose facts or considerations that indicate that the Decree is inappropriate, improper, or inadequate.

74.     Settling Defendants agree not oppose or appeal the entry of this Decree.

## XXII. INTEGRATION

75.     This Decree constitutes the entire agreement among the Parties regarding the subject matter of the Decree and supersedes all prior representations, agreements and understandings, whether oral or written, regarding the subject matter of the Decree.

## XXIII.        FINAL JUDGMENT

76.     Upon entry of this Decree by the Court, this Decree constitutes a final judgment under Fed. R. Civ. P. 54 and 58 among the Parties.

SO ORDERED THIS __ DAY OF _____, 20__.


_____

United States District Judge

Signature Page for Consent Decree in *U.S., et al., v. Fort James LLC, et al.* (D.N.H.)

**FOR THE UNITED STATES:**

Todd Kim
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division


_9/30/2002_              ___/s/ Mark Gallagher_____
Dated                         Mark A. Gallagher
                              Senior Attorney
                              U.S. Department of Justice
                              Environment and Natural Resources Division
                              Environmental Enforcement Section
                              Washington, D.C.  20044-7611
                              mark.gallagher@usdoj.gov
                              202-514-5405

                              Jay McCormack
                              First Assistant United States Attorney
                              District of New Hampshire
                              Acting under Authority Conferred
                                 by 28 U.S.C. § 515

                              Raphael Katz
                              Assistant United States Attorney
                              District of New Hampshire
                              53 Pleasant Street, 4th Floor
                              Concord, NH  03301

Signature Page for Consent Decree in *U.S., et al., v. Fort James LLC, et al.* (D.N.H.)

**FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:**

BRYAN OLSON
Digitally signed by BRYAN OLSON
Date: 2022.09.23 09:05:05 -04'00'

Bryan Olson
Director
Superfund and Emergency Management Division
U.S. Environmental Protection Agency, Region 1
5 Post Office Square, Suite 100 (SEMD 07-1)
Boston, MA 02109-3912

RONALD GONZALEZ
Digitally signed by RONALD GONZALEZ
Date: 2022.09.23 13:11:43 -04'00'

Ronald A. González
Senior Enforcement Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency, Region 1
5 Post Office Square, Suite 100 (ORC 04-3)
Boston, MA 02109-3912

Signature Page for Consent Decree in *U.S., et al., v. Fort James LLC, et al.* (D.N.H.)

**FOR THE STATE OF NEW HAMPSHIRE DEPARTMENT OF ENVIRONMENTAL SERVICES:**

**BY ITS ATTORNEY,**

**THE OFFICE OF THE ATTORNEY GENERAL**

Joshua C. Harrison, Bar #269564
Assistant Attorney General
Environmental Protection Bureau
New Hampshire Department of Justice
Office of the Attorney General
33 Capitol Street
Concord, New Hampshire 03301

Signature Page for Consent Decree in *U S , et al   v  Fort James LLC  et al* (D N H )

**FOR FORT JAMES LLC and**
**GEORGIA-PACIFIC CONSUMER**
**PRODUCTS LP:**

9/13/22

Dated

| | |
|---|---|
| Name | Tye G  Darland |
| Title | Senior Vice President & General Counsel |
| Address | 133 Peachtree Street NE, 36th Floor |
| | PO Box 105605 |
| | Atlanta, GA 30303 |

If the Decree is not approved by the Court within 60 days after the date of lodging, and the United States requests, this Settling Defendant agrees to accept service of the complaint by mail, and to execute a waiver of service of a summons under Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court  **This Settling Defendant hereby designates the agent below to accept service of the complaint by mail and to execute the Rule 4 waiver of service.** This Settling Defendant understands that it does not need to file an answer to the complaint until it has executed the waiver of service or otherwise has been served with the complaint

| | |
|---|---|
| Name | Charles M  Denton |
| Title | Attorney for Settling Defendants |
| | Fort James LLC and |
| | Georgia-Pacific Consumer Products LP |
| Company | Barnes & Thornburg LLP |
| Address | 3475 Piedmont Road, NE, Suite 1700 |
| | Atlanta, GA 30305 |
| Phone | 616-742-3974 |
| email | cdenton@btlaw com |

Signature Page for Consent Decree in *U.S., et al., v. Fort James LLC, et al.* (D.N.H.)

### FOR NORTH AMERICAN
### DISMANTLING CORP.:

9-14-22

Dated

Name: Rick Marcicki
Title: President
Address: 384 Lake Nepessing Road
Lapeer, Michigan 48446

If the Decree is not approved by the Court within 60 days after the date of lodging, and the United States requests, this Settling Defendant agrees to accept service of the complaint by mail, and to execute a waiver of service of a summons under Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court. **This Settling Defendant hereby designates the agent below to accept service of the complaint by mail and to execute the Rule 4 waiver of service.** This Settling Defendant understands that it does not need to file an answer to the complaint until it has executed the waiver of service or otherwise has been served with the complaint.

Name: Charles E. Dunn
Title: Attorney for North American Dismantling Corp.
Company: Charles E. Dunn PLC
Address: P.O. Box 230
Clarkston, MI. 48348
Phone: 248-807-6248
email: charlesedunnplc@gmail.com

Consent Decree in U.S., et al. v. Fort James LLC, et. al.

Appendix A

EPA Record of Decision

U.S. ENVIRONMENTAL PROTECTION AGENCY
EPA REGION 1 – NEW ENGLAND

RECORD OF DECISION
CHLOR-ALKALI FACILITY (FORMER) SUPERFUND SITE
BERLIN, NEW HAMPSHIRE

SEPTEMBER 2020

# Table of Contents

**PART 1: THE DECLARATION FOR THE RECORD OF DECISION** ................................. 1

   A. SITE NAME AND LOCATION ........................................................... 1

   B. STATEMENT OF BASIS AND PURPOSE ........................................ 1

   C. ASSESSMENT OF SITE ..................................................................... 1

   D. DESCRIPTION OF SELECTED REMEDY ...................................... 2

      1.   SOIL AND DEBRIS IN THE CELL HOUSE PARCEL LANDFILL ...................... 2

      2.   SOIL IN AREAS SURROUNDING THE CELL HOUSE PARCEL LANDFILL..... 3

      3.   GROUNDWATER ................................................................................ 3

      4.   ANDROSCOGGIN RIVER .................................................................. 3

      5.   FIVE-YEAR REVIEWS ...................................................................... 4

   E. STATUTORY DETERMINATIONS .................................................... 4

   F. SPECIAL FINDINGS ........................................................................... 5

   G. DATA CERTIFICATION CHECKLIST ............................................. 6

   H. AUTHORIZING SIGNATURES ........................................................ 7

**PART 2: THE DECISION SUMMARY** ...................................................... 8

   A. SITE NAME, LOCATION, AND BRIEF DESCRIPTION .................. 8

   B. SITE HISTORY AND ENFORCEMENT ACTIVITIES ..................... 9

      1.   SITE HISTORY ................................................................................... 9

      2.   HISTORY OF FEDERAL AND STATE INVESTIGATIONS AND ACTIONS....... 9

      3.   HISTORY OF CERCLA ENFORCEMENT ACTIVITIES ..................................... 10

   C. COMMUNITY PARTICIPATION........................................................ 10

   D. SCOPE AND ROLE OF OPERABLE UNIT OR RESPONSE ACTION ......................... 11

   E. SITE CHARACTERISTICS ................................................................. 12

      1.   DESCRIPTION OF THE SITE ........................................................... 12

      2.   CONTAMINATION AND THE CONCEPTUAL SITE MODEL........................... 14

   F. CURRENT AND POTENTIAL FUTURE SITE AND RESOURCE USES...................... 15

      1.   LAND USES ....................................................................................... 15

      2.   GROUNDWATER AND SURFACE WATER USES ............................... 16

   G. SUMMARY OF SITE RISKS ............................................................. 16

1.   HUMAN HEALTH RISK ASSESSMENT ................................................................. 16

2.   ECOLOGICAL RISK ASSESSMENT ..................................................................... 20

3.   BASIS FOR REMEDIAL ACTION ...................................................................... 21

H. REMEDIAL ACTION OBJECTIVES ....................................................................... 22

I. DEVELOPMENT AND SCREENING OF REMEDIAL ALTERNATIVES .................... 23

1.   STATUTORY REQUIREMENTS & RESPONSE OBJECTIVES ......................... 23

2.   TECHNOLOGY AND ALTERNATIVE DEVELOPMENT & SCREENING ........ 24

J. DESCRIPTION OF ALTERNATIVES ....................................................................... 25

K. SUMMARY OF COMPARATIVE ANALYSIS OF ALTERNATIVES ......................... 27

L. THE SELECTED REMEDY ..................................................................................... 33

1.   Summary of the Rationale for the Selected Remedy ........................... 33

2.   Description of the Selected Remedy ...................................................... 34

3.   Summary of the Estimated Remedy Costs .......................................... 37

4.   Expected Outcomes of the Selected Remedy ...................................... 38

M. STATUTORY DETERMINATIONS ......................................................................... 39

N. DOCUMENTATION OF NO SIGNIFICANT CHANGES .......................................... 45

O. STATE ROLE ....................................................................................................... 45


PART 3: THE RESPONSIVENESS SUMMARY ................................................... 46


APPENDICES
Appendix A: New Hampshire Department of Environmental Services Letter of
Concurrence ........................................................................................................ 52

Appendix B: Tables ............................................................................................ 58

Appendix C: Figures ......................................................................................... 69

Appendix D: ARARs Tables ............................................................................... 74

Appendix E: References .................................................................................. 117

Appendix F: Acronyms and Abbreviations ................................................... 119

Appendix G: Administrative Record Index ................................................... 121

## PART 1: THE DECLARATION FOR THE RECORD OF DECISION

### A. SITE NAME AND LOCATION

Chlor-Alkali Facility (former) Superfund Site
Berlin, Coos County, New Hampshire
CERCLIS # NHN000103313

### B. STATEMENT OF BASIS AND PURPOSE

This decision document presents the selected remedial action for the Chlor-Alkali Facility (former) Superfund Site (Site), in Berlin, New Hampshire, which was chosen in accordance with the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA, also commonly referred to as "Superfund"), 42 U.S.C. § 9601 *et seq*., as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), and, to the extent practicable, the National Oil and Hazardous Substances Pollution Contingency Plan (NCP), 40 C.F.R. Part 300 *et seq*., as amended. The Region 1 Director of the Superfund and Emergency Management Division (SEMD) has been delegated the authority to approve this Record of Decision (ROD).

This decision was based on the Administrative Record for the Site, which has been developed in accordance with § 113(k) of CERCLA, 42 U.S.C. § 9601 *et seq.*, and which is available for review at the Berlin Public Library, located at 270 Main Street in Berlin, New Hampshire, at the U.S. Environmental Protection Agency (EPA) Region 1 Superfund and Emergency Management Division Records Center located at 5 Post Office Square, Boston, Massachusetts, and online at: www.epa.gov/superfund/chloralkali. The Administrative Record Index (Appendix G to the ROD) identifies each of the items comprising the Administrative Record upon which the selection of the remedial action is based.

The State of New Hampshire, through its Department of Environmental Services (NHDES) as the support agency, concurs with the selected remedy. A copy of the concurrence letter is in Appendix A.

### C. ASSESSMENT OF SITE

The remedial action selected in this ROD is necessary to protect public health or welfare or the environment from actual or threatened releases of hazardous substances, pollutants, or contaminants into the environment. The March 2014 Remedial Investigation Report[1] (RIR) and the October 2018 Supplemental Remedial Investigation Report[2] (SRIR) summarize the nature and extent of contamination at the Site. The RIR and SRIR were used to prepare an April 2020 Feasibility Study (FS) Report that identified all the remedial options considered for cleanup of the Site.[3]

---

[1] Nobis Engineering, Inc., Remedial Investigation, Volumes I, II, and III, March 2014.
[2] Kennedy/Jenks Consultants, Final Supplemental Remedial Investigation, October 2018.
[3] Kennedy/Jenks Consultants, Final Feasibility Study, April 2020.

D. DESCRIPTION OF SELECTED REMEDY

This ROD sets forth the selected remedy for the Site, which is a comprehensive cleanup approach that addresses all current and potential future risks caused by a landfill, contaminated soil, groundwater, the vapor intrusion pathway, and the appearance of mercury in the Androscoggin River. The selected remedy utilizes soil excavation with off-site disposal; *in-situ* treatment of groundwater; collection of mercury as it appears in the river; land use and access restrictions; and long-term operation, maintenance and monitoring to address unacceptable exposure to these risks posed by the Site. The selected remedy is based on a combination of remedial alternatives set out in a Proposed Plan issued for public comment in June 2020.

The Proposed Plan divided the remedial actions into Operable Units (OUs) intended to distinguish each action based on the media addressed. The Proposed Plan proposed remedies for each of the three OUs: OU-1, the Cell House Parcel Landfill (CHP Landfill), OU-2, contaminated soil outside the landfill, and OU-3, which was subdivided into three areas that address groundwater and a section of the Androscoggin River adjacent to the CHP Landfill discussed below. The Proposed Plan then compared a range of alternatives developed in the FS for each OU. The remedial alternatives selected in this ROD incorporates all three OUs and include the following:

1.     SOIL AND DEBRIS IN THE CELL HOUSE PARCEL LANDFILL

The 4-acre CHP Landfill at the Site contains construction debris as well as hazardous substances. EPA's selected remedy for the CHP Landfill is OU-1-2 in the FS and Proposed Plan which consists of the following components:

- Engineering Controls (ECs): maintaining the existing fence and containment system. The containment system consists of the CHP Landfill cap, monitoring wells, a retaining wall along the River, and a slurry wall along the east and south sides of the landfill to prevent groundwater infiltration. Maintenance will consist of removing woody vegetation on the cap, as required; inspections; and repairs to the infrastructure, as needed.
- Institutional Controls (ICs) (in effect as long as wastes remain in place): legally-enforceable restrictions that will prohibit the construction of buildings on the CHP Landfill, disturbance of the existing landfill cap and other remedial infrastructure (including monitoring wells, the retaining wall and slurry wall), prohibit use of the property for residential and other unrestricted uses, and prohibit the use of groundwater for anything other than monitoring.
- Monitoring of ICs and ECs, both on the landfill, in downstream groundwater, and in the River will ensure that the containment system will continue to isolate the waste within the CHP Landfill and prevent its release to the River and adjacent drinking water aquifers.

Record of Decision
Part 1: The Declaration for the Record of Decision

2.      SOIL IN AREAS SURROUNDING THE CELL HOUSE PARCEL LANDFILL

In the areas of the Site surrounding the CHP Landfill, that EPA has designated the Southern Facility Study Area (SFSA) and the Eastern Facility Study Areas (EFSA), EPA found discreet occurrences of contaminants in soil that posed a risk to human health and the environment. EPA's selected remedy for contaminated soil occurring in hotspots in the SFSA and EFSA, as well as in areas of the CHP Landfill property not covered by the landfill cap, is OU-2-4 which consists of the following actions:

- Additional testing to refine the extent of contamination in those areas identified by the Human Health Risk Assessment.
- Excavation of soils that exceed Cleanup Levels that pose unacceptable risks for commercial/industrial exposure. A current estimate is 150 cubic yards of soil will require excavation.
- Disposal of excavated soils, either beneath the CHP Landfill cap or at appropriate off-site facilities.
- Institutional Controls that will consist of legally enforceable restrictions to prohibit residential and other unrestricted uses.

3.      GROUNDWATER

Groundwater contamination exists in two areas with different remedial actions selected. Beneath the CHP Landfill EPA will continue to monitor groundwater in remedy OU-3-CHP-2 as well as maintaining ECs and ICs. The objective is to ensure that the landfill containment system prevents contaminated groundwater from migrating outside of the CHP Landfill. Outside of the CHP Landfill EPA selected remedy OU-3-GW-3, *in situ* treatment of groundwater with chemical oxidants or amendments designed to destroy or immobilize contaminants. OU-3-CHP-2 and OU-3-GW-3 will also maintain ICs to prevent the use of groundwater for drinking water and prevent exposure to indoor groundwater vapors. The ICs will be permanent in the OU-3-CHP-2 area and temporary in the OU-3-GW-3 area, until groundwater Cleanup Levels are achieved.

4.      ANDROSCOGGIN RIVER

The disposal of mercury used at the Chemical Plant contaminated the riverbed of the Androscoggin River in the segment of the River adjacent to the CHP Landfill designated Reach AR-3. EPA's preferred alternative for the mercury and mercury-contaminated material in the River is described in the FS and Proposed Plan as Alternative OU-3-AR-3-2. The remedy will consist of liquid mercury, hardened metal amalgams and mercury-contaminated debris removals (based on visual inspection) performed on at least an annual basis with accompanying inspections to map the trend of mercury appearance and the effectiveness of the remedy.

Record of Decision
Part 1: The Declaration for the Record of Decision

5.    FIVE-YEAR REVIEWS

Because all of the remedial alternatives selected will leave contamination in place either permanently or for an extended period of time, statutorily-required five-year reviews will be conducted at a minimum every five years to assess the ongoing protectiveness of the remedy.

E. STATUTORY DETERMINATIONS

The selected remedy is protective of human health and the environment, complies with federal and State requirements that are applicable or relevant and appropriate to the remedial action (see Appendix D), is cost-effective, and utilizes permanent solutions and alternative treatment technologies to the maximum extent practicable.

- OU-1-2, as the presumptive remedy for the continued monitoring and maintenance of the landfill, did not need to assess treatment of the landfilled waste, in accordance with EPA guidance. The remedy will leave wastes in-place and untreated but isolated from the environment by the existing landfill cap, retaining wall, and slurry wall.
- OU-2-4, due to the relatively small volume and scattered nature of the contaminated soil it was determined treatment was not practicable. Excavation of the soil and disposal at an off-site facility or, if none are available, inside the CHP Landfill, will isolate those wastes from the environment.
- OU-3-CHP-2, in accordance with the NCP preamble, contaminated groundwater beneath a waste management (i.e., landfill) unit does not require active cleanup if migration of the contaminated groundwater is controlled. Groundwater beneath the CHP Landfill will not be treated but will be monitored to ensure that those wastes are isolated from the environment by the CHP Landfill containment system.
- OU-3-AR-3-2, due to the relatively small volume of waste generated it was determined that on-site treatment of the mercury and mercury-contaminated debris was not practicable. Mercury recovery in the Androscoggin River will send the wastes to a facility for disposal or off-site treatment/recovery.

The remedies for OU-1-2, OU-2-4, OU-3-CHP-2, and OU-3-AR-3-2 do not meet the statutory preference for treatment as a principle element of the remedy for the reasons described above. The remedy for OU-3-GW-3, *in situ* treatment of groundwater with chemical oxidants satisfies the statutory preference for treatment as a principle element of the remedy reducing the toxicity and volume of the VOCs present in groundwater and immobilizing dissolved metals.

Because this remedy will result in hazardous substances, pollutants, or contaminants remaining on-site above levels that would allow for unlimited use and unrestricted exposure, a statutory review will be conducted within five years after initiation of remedial actions to ensure that the remedy continues to provide adequate protection of human health and the environment. Five-year reviews will continue as long as waste remains at the Site and unlimited use is restricted.

## F. SPECIAL FINDINGS

Issuance of this ROD embodies the following specific determinations:

**Wetlands Impacts**

Pursuant to Section 404 of the Clean Water Act (CWA), EPA has determined that the selected remedy is the Least Environmentally Damaging Practicable Alternative (LEDPA) for protecting federal jurisdictional wetlands and aquatic ecosystems at the Site under these standards. EPA will minimize potential harm and avoid adverse impacts to wetlands by using best management practices during excavation and by restoring or replicating, if necessary, these areas consistent with federal and New Hampshire's wetlands protection laws. Any wetlands affected by remedial work will be restored (or replicated, if necessary) with native wetland vegetation and any restoration efforts will be monitored. Mitigation measures will be used to protect wildlife and aquatic life during remediation, as necessary. EPA solicited public comment through its Proposed Plan on its LEDPA determination and did not receive any negative comments (see Part 3 of this ROD).

EPA's selected remedy balances the need to address the contamination that poses an ecological risk to the wetlands and waterways and its ability to restore any (temporarily or permanently) altered wetland resources and aquatic habitats impacted by the remediation. As required under relevant and appropriate federal wetlands regulations at 44 C.F.R. Part 9 and Executive Order 11990 (Protection of Wetlands), EPA solicited public comment through its Proposed Plan regarding the remedy's potential impacts on wetland resources and received no comments adverse to the proposed remedies regarding this issue (see Part 3 of this ROD).

**Floodplain Impacts**

Pursuant to Executive Order 11988 (Floodplain Management) and federal regulations at 44 C.F.R. Part 9, EPA has determined that the selected remedy will cause temporary impacts to 100-year and 500-year floodplains but will not result in the occupancy and modification of floodplains, except for limited periods during remedy implementation or potentially Operation and Maintenance (O&M) of the CHP Landfill. Best management practices will be used during the remedial activities to minimize temporary impacts to floodplains and any excavations within floodplain will be returned to original grade to avoid diminishing flood storage capacity. Remedial infrastructure within the floodplain (*i.e.* monitoring wells, the CHP Landfill retaining wall) will be installed/maintained to prevent any release of contamination in the event of a 500-year flood/storm. Restoration and monitoring activities are included in the response actions. As required under relevant and appropriate federal wetlands regulations at 44 C.F.R. Part 9, EPA solicited public comment in its Proposed Plan regarding the remedy's potential impacts on floodplain resources and received no negative comments regarding this issue (see Part 3 of this ROD).

**TSCA PCB Determination**

In this ROD EPA finds that polychlorinated biphenyl (PCB) contaminated soil and landfill debris at the Site meets the definition of a PCB remediation waste, as defined under 40 C.F.R. § 761.3 of regulations promulgated under the Toxic Substances Control Act (TSCA), 15 U.S.C. § 2601 et seq., and thus are regulated for cleanup and disposal under 40 C.F.R. Part 761. Under 40 C.F.R.

§ 761.61(c), EPA may authorize disposal of PCBs in a manner not otherwise specified, provided EPA determines that the disposal will not pose an unreasonable risk of injury to health or the environment. EPA has determined that the selected remedy meets this standard (see Part 2, Section L.2). EPA solicited public comment in its Proposed Plan regarding EPA's draft determination and received one comment concerning EPA's determination. That comment is addressed in this ROD (see Part 3, Comment #1) and EPA maintains its determination regarding this issue.

## G. DATA CERTIFICATION CHECKLIST

The following information is included in the Decision Summary section of this Record of Decision. Additional information can be found in the Administrative Record file for this Site.

1. Contaminants of Concern (COCs) and their respective concentrations;
2. Baseline risk represented by the COCs;
3. Cleanup levels established for COCs and the basis for the levels;
4. How source materials constituting principal threats are addressed
5. Current and reasonably anticipated future land use assumptions and current and potential future beneficial uses of groundwater used in the baseline risk assessment and ROD;
6. Potential land and groundwater use that will be available at the Site as a result of the selected remedy;
6. Estimated capital, annual Operation & Maintenance (O&M), and total present worth costs; discount rate; and the number of years over which the remedy cost estimates are projected; and
7. Decisive factors that led to selecting the remedy.

## H. AUTHORIZING SIGNATURES

This ROD documents the selected remedy for the landfill, soil, groundwater, and the Androscoggin River at the Chlor-Alkali Facility (former) Superfund Site.

Human health and ecological risk assessments were conducted using CERCLA risk assessment methods and guidance. Accordingly, and based on the provisions of 40 CFR § 761.61 (c), EPA has determined that the risk-based cleanup levels for PCBs in soil developed for the Site and the remedial alternatives selected to address risks posed by PCB-contaminated soil will meet the no unreasonable risk of injury standard in accordance with § 761.61(c) as described in Part 2, Section L.2 of this ROD. EPA reserves its right to modify this § 761.61(c) determination and/or to require additional remedial measures in the event of changes in site conditions or use, review of long-term monitoring results, or if any new information is presented that indicates these measures are no longer effective, including the discovery of additional PCB contamination or previously unknown conditions.

This remedy was selected by EPA with concurrence of the New Hampshire Department of Environmental Services. A copy of the State of New Hampshire's concurrence letter is attached to this ROD in Appendix A.

**BRYAN OLSON**
Digitally signed by BRYAN OLSON
Date: 2020.09.23 19:07:02 -04'00'

Bryan Olson, Director                                     Date
Superfund and Emergency Management Division
U.S. Environmental Protection Agency, Region 1

## PART 2: THE DECISION SUMMARY

## A. SITE NAME, LOCATION, AND BRIEF DESCRIPTION

The Chlor-Alkali Facility (former) Superfund Site (the "Site") lies on the east bank of the Androscoggin River in Berlin, New Hampshire. It is bound on the east by Hutchins Street and a closed industrial landfill, the Dummer Yard. To the south lies a small residential area and the Burgess Biomass power plant, which is located on a portion of a former Brown Company paper mill property. North of the Site is Bridge Street, a small recreational area, and a large residential area. West of the Androscoggin River and directly across the river from the Site is the Sawmill Dam power station with residential and commercial areas located further west, south of which is the larger part of downtown Berlin. The Androscoggin River is dammed for hydroelectric power adjacent to the Site by Sawmill Dam. Sawmill Dam meets the east bank at the northern end of the Cell House Parcel Landfill (CHP Landfill) and Riverside Dam, the next down-stream dam, meets the east bank at the southern end of the Site. Figure 1 in Appendix C shows the general location of the Site relative to these features.

The Site is the location of a former chlor-alkali chemical plant that commenced operations in the late 1890's to provide chlorine for the manufacture of bleached pulp and paper. Chemical production ceased in the mid-1960's and portions of the former chemical plant were either demolished or used for other purposes. The last Chemical Plant building was demolished and the building debris and presumably other waste materials were interred in an on-site landfill that was capped by the owners of the paper plant at that time and closed under the oversight of the State of New Hampshire Department of Environmental Services (NHDES).

The CHP Landfill property has an area of 4.6-acres. Presently this area is maintained as a 4-acre capped landfill with a slurry wall on the east and south to prevent groundwater infiltration and a retaining wall on the west and north separating the contents of the landfill from the Androscoggin River that flows southward less than 10-feet away from the retaining wall.

Although the initial focus of the investigation was on the former chlor-alkali process, which had been housed in a number of cell houses located at or in close proximity to the CHP Landfill, EPA's 2014 Remedial Investigation Report (RIR) revealed that the former Chemical Plant operated over an area wider than the 4.6-acre CHP parcel. Accordingly, a Southern Facility Study Area (SFSA) that lay largely south of the CHP Landfill and an Eastern Facility Study Area (EFSA), east of the CHP Landfill, were designated for investigation so that possible releases from the Chemical Plant could be characterized, and the nature and extent of contamination at the Site defined. The SFSA contained many of the Chemical Plant buildings that were demolished. A rail line traversing the EFSA indicated the potential for spills and other wastes in this area. At the time of the Remedial Investigation (RI) and to the present, the SFSA and EFSA have been vacant parcels that are partially wooded with scattered wetlands. Figures 1 and 2 in Appendix C show the location of the CHP Landfill, the SFSA and EFSA.

The Site has been divided into three Operable Units (OUs). The CHP Landfill, OU-1, contains contaminated soils beneath the 4-acre capped area as well as a 0.6-acre uncapped area of native soils. The SFSA and EFSA, OU-2, have isolated hotspots of contaminated soils. OU-3 consists

of two units: contaminated groundwater beneath the CHP Landfill and SFSA, and liquid and amalgam mercury that periodically appears on the banks, in debris, and in the Androscoggin River between Sawmill and Riverside Dams. Appendix C, Figure 2, shows the location and general features of these areas, Figure 3 shows the general features of the Site in photographs, and Figure 4 shows the location of groundwater contaminant plumes.

A more complete description of the Site and its history are in Section 2 of the Supplemental Remedial Investigation Report (SRIR) and Feasibility Study (FS).

B. SITE HISTORY AND ENFORCEMENT ACTIVITIES

1.      SITE HISTORY

Chemical Plant operations at the Site continued from the late 1890s through the mid-1960s and perhaps (in some manner) until the landfill was capped in 1999.[4] Wastes and hazardous materials are observed now in Site soils, groundwater and in the Androscoggin River adjacent to the CHP Landfill. Between September and December 1999, Crown Vantage, Inc., the owner at the time of the Site property, conducted closure activities in the CHP under the oversight of NHDES.  At that time, the Chemical Plant was an undivided portion of the larger paper mill known as the Burgess Paper Mill, which in turn had been a part of Brown Company's extensive paper mill operations in Berlin.

2.      HISTORY OF FEDERAL AND STATE INVESTIGATIONS AND ACTIONS

EPA used the results of environmental investigations conducted by the successive owners of the paper mill (including what is now the Site property) between 1999 and 2001, as well as environmental investigation activities and mercury removals in the river conducted by NHDES beginning in December 2001, to develop the Preliminary Assessment/Site Inspection (PA/SI) under CERCLA.[5] In January 2004, EPA added the Site to the Comprehensive Environmental Response, Compensation, and Liability Information System (CERCLIS) database (EPA 2004a). In April 2005, EPA conducted a Hazard Ranking System (HRS) evaluation (EPA 2004a). Based on the HRS score, the Site was proposed for listing to the National Priorities List (NPL) on April 27, 2005. Pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, EPA placed the Site on the NPL, set forth at 40 C.F.R. Part 300, Appendix B, by publication in the Federal Register on September 14, 2005, 70 Fed. Reg. 54286.

Between 2009 and 2012, EPA conducted RI activities at the Site. These activities included investigation of a 24-mile reach of the Androscoggin River because mercury had been found within the river adjacent to the CHP. EPA's contractor, Nobis collected and analyzed samples of soil, building debris, air, groundwater and biota from the CHP Landfill, SFSA and EFSA. For the

---

[4] Aerial Photographic and Fracture Trace Analyses of Chlor-Alkali Facility, TS-PIC-20801101S. U.S. Environmental Protection Agency. February 2008.

[5] Final Combined Preliminary Assessment/Site Investigation Report for Chlor-Alkali Facility (Former) Berlin, New Hampshire. Weston, Inc., January 2005.

Record of Decision
Part 2: The Decision Summary

river investigation Nobis, along with the U.S. Geologic Survey, U.S. Fish & Wildlife Service, and Dartmouth College, collected sediment, porewater, surface water, and biota (both terrestrial and aquatic) (Nobis 2014). This investigation resulted in the three volume RIR released to the public in March 2014 that also contained a human health and ecological risk assessment as separate volumes.

### 3.        HISTORY OF CERCLA ENFORCEMENT ACTIVITIES

EPA commenced the RI activities at the Site with funding from the Superfund. Subsequently, EPA identified two Georgia-Pacific (G-P) entities that the Agency believed were successors to Brown Company, and its successors, as operators of the Site at the time hazardous substances were disposed.   EPA issued notice letters to Fort James LLC and Georgia-Pacific Consumer Products, LP on June 21, 2013 (also referred to as the Potentially Responsible Parties (PRPs)). Following negotiations, on April 21, 2015, EPA and G-P executed an Administrative Settlement Agreement and Scope of Work to perform a Supplemental Remedial Investigation (SRI) to address data gaps and the FS to select potential remedies for contamination at the Site.

G-P began SRI activities in 2015 with further investigation of mercury-containing material identified in test pit TP-6, a foundation/retaining wall assessment, and liquid elemental mercury and hardened metal amalgam collection in Reach AR-3 (the area adjacent to the Site) of the River. SRI activities continued in 2016 and 2017 that involved groundwater assessment, additional foundation/retaining wall monitoring, assessment and improvements, and continued collection of liquid elemental mercury, hardened metal amalgams, and mercury-containing debris from Reach AR-3. These efforts resulted in the 2018 SRIR[6] and the 2020 FS.[7]

A detailed history and timeline of Site activities is presented in Section 2 of the SRIR.

### C. COMMUNITY PARTICIPATION

Throughout the Site's history, community concern, interest, and involvement have been consistent. EPA has kept the community and other interested parties apprised of Site activities through informational meetings, fact sheets, press releases, and public meetings.  Below is a brief chronology of the most recent public outreach efforts for the Chlor-Alkali Superfund Site:

- EPA has met with Municipal Officials, principally the City Manager and City Planner, throughout the years on at least an annual basis to discuss plans for that year as well as listen to any concerns.
- EPA held a series of charettes in 2008 to talk to the community about future uses of the CHP Landfill.
- EPA also held a public meeting in Berlin to present the results of the 2014 RIR. The PRPs and NHDES held a public meeting in September 2017 to discuss progress with the SRI.

---

[6] Final Supplemental Remedial Investigation Report. Kennedy/Jenks Consultants, Inc. October 19, 2018.
[7] Final Feasibility Study. Kennedy/Jenks Consultants, Inc. April 7, 2020.

- On May 29, 2020, EPA published a news release which announced the start of the public comment period and upcoming public information meeting and public hearing for the Proposed Plan.  EPA also produced and mailed postcards of this meeting information to nearby property owners.  A public notice was completed to announce the release of a link on EPA's website to the Proposed Plan, which identified EPA's proposed remedy, and also to announce EPA would be holding a virtual public meeting/public hearing on June 10, 2020.
- On June 3, 2020, EPA completed the Administrative Record (AR) for the Proposed Plan, including the 2020 Feasibility Study report, and made them available for public review on-line as well as at EPA's office in Boston, MA, and at the Berlin Public Library, 79 Main Street, Berlin, NH.  The AR file is the primary Site information repository for residents and has been kept up to date by EPA.
- On June 8, 2020, EPA held a virtual briefing for the City of Berlin Officials running through the presentation prepared for the June 10th public meeting.
- On June 10, 2020, EPA held a virtual public information meeting on-line, immediately followed by an on-line public hearing, to describe and then discuss the Proposed Plan, and to accept any oral or written comments.  No comments were received during the public hearing. The transcript of the public hearing is in the AR.
- From June 3, 2020 through July 3, 2020, EPA held a public comment period to accept public comments on EPA's proposed remedy for the Site presented in the Proposed Plan. EPA also made available a dedicated voice-mail box to receive verbal comments throughout the comment period.  EPA received one set of written comments that are in the AR. EPA's responses to those comments are included in the Responsiveness Summary, which is Part 3 of this ROD.

## D. SCOPE AND ROLE OF OPERABLE UNIT OR RESPONSE ACTION

EPA has determined that there are both current and future threats to human health and the environment at the Site due to historic chemical and waste disposal and defined three Operable Units (OUs) to facilitate the Site investigation and the development of remedial alternatives. Those OUs and their general actions include:

OU-1, CHP Landfill: Monitor and maintain the CHP Landfill containment system. The containment system consists of the landfill cover system, a slurry wall that prevents groundwater from entering the landfill, and a retaining wall that prevents groundwater from leaving the landfill. During the SRI, G-P maintained the landfill cover system, and repaired and augmented the retaining wall with shotcrete.

OU-2, the SFSA and EFSA: The SFSA and EFSA contain isolated areas of contaminated soil that will be excavated and disposed at a permitted off-site facility or, if necessary, beneath the CHP Landfill cover system.

OU-3 consists of two divisions: groundwater and the Androscoggin River. Groundwater is further divided into two areas of contamination:

OU-3, Groundwater beneath the CHP Landfill: Although contaminated, it is within the limits of the CHP Landfill and under federal guidance standards, contaminated groundwater beneath a waste management (i.e., landfill) unit does not require active cleanup if migration of the contaminated groundwater is controlled. EPA has determined that presently migration is prevented by the landfill containment system.

OU-3, Groundwater beneath the SFSA: Contaminated groundwater in this area will be treated *in situ* to destroy or immobilize the contaminants and restore the groundwater to its beneficial use as a potential source of drinking water.

OU-3, Androscoggin River: Liquid, elemental mercury and solid mercury amalgams periodically appear in the riverbed, in river debris, and on the banks. The remedy will include periodic inspections and removals of mercury, mercury amalgams, and mercury-contaminated debris that appears.

The selected remedy, comprised of the above remedial alternatives, is a comprehensive remedial approach for the Site. Figure 2 in Appendix C depicts the areal extent of OU-1, OU-2, and the river portion of OU-3. The groundwater portion of OU-3 is shown as a transparent brown overlay bordered by a dashed line.

## E. SITE CHARACTERISTICS

### 1.     DESCRIPTION OF THE SITE

The Site is a former industrial area on the east bank of the Androscoggin River. The area of the former Chemical Plant is level and, except for the CHP Landfill, reverting to forest and forested wetlands. When the paper company was operating, this was a singular approximately 200-acre property. The paper company closed at the end of the Twentieth Century and the property was subsequently subdivided. The southern portion of the paper mill property was demolished, sold, and is now an operating biomass power plant. The properties constituting the Superfund Site are:

- The Cell House Parcel (CHP): Lot 262 on the Berlin Tax Assessor Map No. 128 is a 4.6-acre property that includes the 4-acre CHP Landfill, closed in 1999, and contains construction and demolition debris from former Site structures. The property also contains a 0.6-acre uncapped area with a thin cover of soil that is forested. This lot is OU-1, the vertical limits of which extend from ground surface to the top of competent bedrock. The last title owner of the lot was Pulp of America LLC.  Pulp of America LLC entered bankruptcy and this lot, together with certain other property of Pulp of America was "abandoned" in 2002 in the bankruptcy proceeding pursuant to Section 544(a) of the Bankruptcy Code 11 U.S.C §544(a).
- The SFSA and EFSA, together OU-2, cover 37-acres of Lot 54.001 on Berlin Tax Assessor Map No. 129. These two parcels are currently owned by North American Dismantling Corp. OU-2 includes Site-related waste materials found within isolated "hotspots" within the 19-acre EFSA located between Hutchins Street to the east and the 17-acre SFSA to the west. The SFSA is surrounds the southern, eastern, and northern

Record of Decision
Part 2: The Decision Summary

sides of the CHP Landfill. The EFSA, at one time a log storage area for the paper mill, now consists of connected, wooded wetland areas.

- The Androscoggin River: specifically, the 1,400-foot stretch of river that borders the CHP Landfill and SFSA and lies between Sawmill Dam to the north and south to Riverside Dam has been designated AR-3.

The CHP Landfill has an engineered cover system consisting of an approximately 18-inch thick layer of sand underlying a 40-mil high-density polyethylene (HDPE) geomembrane, a geo-composite drainage net, and approximately 2 feet of bark mulch/wood chips at the landfill surface. A slurry wall, also constructed in 1999, isolates the landfilled wastes from the intrusion of groundwater on the east and south of the landfill, while a retaining wall, the original foundation wall for the cell house constructed in the late 1890's, contains the waste on the west and northern bounds of the landfill. The retaining wall also separates the landfill from the Androscoggin River.

Debris materials from former Site structures disposed in the CHP Landfill include brick, concrete, wood, ceramic, piping, ash, metal, conduit, and asbestos-containing material (ACM). Below the water table, near the retaining wall, isolated occurrences of mercury beads, generally 1mm in size, were found. Beneath the CHP, the bedrock has an irregular surface that varies in depth below ground surface but generally lies 12 to 20 feet below the surface.

Topography at the Site resembles a large flood-plain with the Androscoggin River in the middle. The River flows over solid rock with no fine-grained sediment. Adjacent to the CHP Landfill the River lies 10 to 20-feet below the surface of the CHP separated by either the retaining wall for the landfill or bedrock. A short distance downstream the steep bedrock face deepens to over 100-feet adjacent to the River. Soils at the Site are disturbed and affected by more than a century of industrial use. Much of the unconsolidated soils and gravels in the CHP Landfill and the SFSA appear to be fill. These overburden deposits vary from 5 to 20 feet in thickness and are underlain by fractured, crystalline bedrock. The bedrock fractures trend generally north-south with steep dips to the east.

The Androscoggin River is the overwhelming hydrologic feature at the Site. The dam just upstream of the Site, Sawmill Dam, is the first of 5 closely spaced hydroelectric dams that are in the City of Berlin. Over the past 10 years the flow of the Androscoggin River has varied from a low of 400 cubic feet per second (cfs) to a high of 18,000 cfs. Generally, in winter (frozen) and summer (dry) periods, flows averaged 1,000 cfs and during the wetter periods between 3,000 and 6,000 cfs. Operation of the hydroelectric dams make the flow of the river even more varied.

Photos of these features are contained in Appendix C as Figure 3.

Record of Decision
Part 2: The Decision Summary

### 2.   CONTAMINATION AND THE CONCEPTUAL SITE MODEL

Contamination at the Site includes:

- Elemental liquid mercury, mercury-lead amalgams, and mercury-contaminated debris that is continually found on the banks and riverbed of the Androscoggin River that originates from past releases.
- Dioxins, furans, PCBs, polyaromatic hydrocarbons (PAHs), and metals, including mercury and lead, beneath the cover and interred with the construction debris in the CHP Landfill.
- The same contaminants found in the CHP Landfill are also found in isolated hotspots of soil in the SFSA and EFSA and in the uncapped area of the CHP Landfill property.
- Volatile Organic Compounds (VOCs) and dissolved metals in groundwater beneath the SFSA and CHP Landfill.

The Site came to the attention of NHDES, and subsequently EPA, due to the periodic, continuing appearance of elemental liquid mercury, solid mercury amalgams, and mercury-contaminated debris on the banks of, and in the riverbed, of the Androscoggin River. The liquid beads of elemental mercury range from between 0.5 millimeter in diameter to elongated forms that are 1 centimeter in diameter and up to 3 centimeters in length. Amalgam mercury occurs as coatings on pebbles and solid metal forms that range up to the size of chicken eggs. Debris-associated mercury consists of isolated liquid beads of mercury contained within scrap metal and solidified masses resembling concrete or plaster.

The SRIR developed and presented a Conceptual Site Model (CSM) in Section 6, clarified by EPA in its clarification letter attached to the SRIR, to describe the contaminant sources, release mechanisms, exposure pathways, migration routes, and potential human and ecological receptors. It documents current and potential future Site conditions and discusses what is known about human and environmental exposure through contaminant release and migration to potential receptors. The risk assessment and response action described in this ROD for the Site is based on this CSM.

The present contamination at the Site resulted from improper handling of hazardous wastes and materials containing those wastes at the Chemical Plant during the period beginning in the late 19th Century. The production of bleach and various chlorinated products at the Chemical Plant released hazardous wastes into the environment that subsequently entered Site soils and groundwater.[8] Hazardous wastes and debris appear to have also been released into the river during Chemical Plant operations.[9]

The CSM for the RIR posited that the source of the mercury in the Androscoggin River was the CHP Landfill and that several possible transport mechanisms were responsible for the migration. The SRIR developed and added an additional, potential source of the mercury. The modified CSM now posits that most of the mercury and mercury-lead amalgams are the result of direct disposal into the river while the Chemical Plant was operating. The heavy mercury drifted into

---

[8] Kennedy-Jenks, October 2018.
[9] Kennedy-Jenks, April 2020.

the metallic debris in the river and into fractures and crevices in the bedrock surface of the river. The variable, periodic high flows in the river described above, create lift that causes mercury to "float" out of the debris and fractures. This mercury is then found on the River bottom and east bank. Photos of mercury occurrences are in Appendix C, Figure 3.

Soil contamination at the Site is likely due to ongoing operations and disposal activities while the Chemical Plant was operating. The use of ash as dry fill material at the Site, a typical practice over the years, is also assumed. Isolated pockets of contaminated ash remain scattered in the EFSA and SFSA. These isolated pockets are estimated to contain a total of approximately 150 cubic yards of contaminated soil.

Groundwater inside the CHP Landfill is contaminated above State and Federal standards, yet no groundwater has been found leaving the bounds of the CHP Landfill with the character or appearance of groundwater found in the CHP Landfill. Groundwater within the CHP Landfill has an oil-sheen and a distinct coal-tar odor. The contaminated CHP Landfill groundwater appears to be perched on bedrock, prevented from westward flow by a retaining wall, and insulated from groundwater flowing in the overlying overburden by a thick layer of paper pulp.[10]

Contaminants of Concern (COCs) in groundwater beneath the SFSA and CHP include VOCs such as trichloroethene (TCE), carbon tetrachloride, chloroform and carbon disulfide, as well as dissolved metals including mercury. These contaminants occur in tight bedrock fractures. Groundwater monitoring did find contamination in the EFSA, that include manganese and perfluoroalkyl substances (PFAS); however, NHDES concluded that the up-gradient Dummer Yard Landfill is the likely source of the PFAS, based on groundwater sampling conducted at that site. The Dummer Yard Landfill is also the likely source of manganese groundwater contamination based on the manganese contamination distribution and the presence of what appears to be dissolved iron breakout occurring in the EFSA.

F. CURRENT AND POTENTIAL FUTURE SITE AND RESOURCE USES

1.    LAND USES

The CHP, the SFSA and the EFSA are within areas the City of Berlin has zoned for Industrial and Business use. Residential use may be allowed through Special Exception by the City. Currently the land is vacant and re-vegetating with birch, poplar and various shrubs. From 2007 to 2008 EPA hosted meetings in Berlin with residents of the City and Berlin public officials to solicit future use preferences for the CHP, an abandoned property. The EFSA and SFSA, part of a larger property owned by North American Dismantling Corp., were not discussed. The resulting document outlined the community preference that the CHP area be retained for future recreation, primarily for hiking and historic interpretation uses. To the extent that portions of the EFSA and SFSA have been used in the more recent past, that use has been consistent with the industrial and business zone designation, and it is assumed that future use would remain industrial/commercial.

---

[10] Chlor-Alkali analysis of groundwater contamination beneath the CHP Landfill, U.S. EPA, May 20, 2020.

The southern half of the former papermill property now has an operating biomass power plant. The owners of that power plant have expressed an interest in using some portions of the SFSA for storing woodchips for the powerplant and for installing green houses.  Currently, the biomass power plant is negotiating with third parties regarding the potential use of the waste heat from power generation for green houses that would produce food for the local area.

## 2.  GROUNDWATER AND SURFACE WATER USES

The groundwater at the Site has been designated by the State as a medium use aquifer and although there are no current uses of this groundwater, the State requires all groundwater to be suitable for drinking water purposes. The State has designated the Androscoggin River as recreational use and allows fishing downstream of the Site as catch-and-release only due to elevated levels of contamination from Berlin to the Maine border from various sources. From Sawmill Dam, just upstream of the Site, to Riverside Dam, a stretch of river the EPA designated as AR-3 in the RIR, there is no public access to the river and the river is maintained solely for hydroelectric generation. Further downstream of the Site, particularly in the lower reaches in Gorham, the river is used for recreational boating and swimming.

## G. SUMMARY OF SITE RISKS

During the RI from 2009 to 2014 EPA sampled environmental media that included surface soil, subsurface soil, soil invertebrates, groundwater, surface water and CHP Landfill debris to perform a Human Health Risk Assessment (HHRA) and a Terrestrial Screening-Level Ecological Risk Assessment (TSLERA). These efforts resulted in Volumes II and IIIb, respectively, in the RIR. EPA also sampled surface water, sediments, sediment pore water and biota in the Androscoggin River as part of a Baseline Ecological Risk Assessment (BERA) that is presented in the RIR as Volume IIIa. A summary of the results of these assessments follow.

## 1.  HUMAN HEALTH RISK ASSESSMENT

The exposure assessment in the HHRA examined the physical setting of the Site and evaluated the potential exposures to people. The factors for exposure are the source of contamination, how people may contact those contaminants in different media such as surface water, soils, and sediment, and the current and potential future uses of the contaminated areas.

Tables 3a and 3b in Appendix B describe the risks that are generated by various types of exposure. These exposures included:

- Adult and child residents that may be exposed to contaminants over a long-term;
- Adult and child recreational visitors as well as adolescent trespassers that may be exposed to contaminants over a shorter-term;
- Industrial and Commercial Workers that may be exposed to more contamination but over a short-term; and
- Day-care children because day-care use might be considered a potential use for the area in the future.

Below, summary tables characterize each exposure route for age-adjusted residents, the greatest risk with the exception of exposure to children. The other exposure routes are discussed regarding the overall risk which is characterized in Tables 3a and 3b in Appendix B. Based on the results of the HHRA, EPA found that the following exposure routes pose unacceptable human health risks because the calculated risks exceed EPA's acceptable cancer risk range of $10^{-6}$ to $10^{-4}$, the non-cancer Hazard Index (HI) of 1, or EPA's risk-based standard for lead or some combination of these risks:

**Future residents, workers, and trespassers in the CHP Landfill** could be exposed to dioxin, furan, mercury, and benzo(a)pyrene in the landfilled materials that would create an unacceptable risk if the existing cover system, slurry wall or retaining wall, the containment system, were to fail to contain the wastes (see Table 3a in Appendix B). The primary contaminants that create risk from CHP Landfill soil and debris are summarized below for an age-adjusted adult resident:

| Summary of Contaminants of Concern in Soil and Debris in the CHP Landfill | | | | |
|---|---|---|---|---|
| **Contaminant of Concern**[1] | **Maximum Concentration**[2] | **Frequency** | **Risk**[3] | |
| | | | **Cancer** | **Non-Cancer**[6] |
| PCB (high risk = Aroclor 1254)[4] | 12.1 mg/kg | 10/13 | $2.2 \times 10^{-4}$ | 2.3 |
| PCDD/PCDF (TEQ)[5] | 94.8 mg/kg | 12/12 | $1.6 \times 10^{-2}$ | 160 |
| Benzo(a)anthracene | 16 mg/kg | 8/12 | $7.1 \times 10^{-4}$ | |
| Benzo(a)pyrene | 8.7 mg/kg | 8/12 | $5.1 \times 10^{-3}$ | |
| Benzo(b)fluoranthene | 12 mg/kg | 8/12 | $6.2 \times 10^{-4}$ | |
| Dibenz(a,h)anthracene | 3.2 mg/kg | 4/12 | $2.7 \times 10^{-4}$ | |
| Arsenic (inorganic) | 828 mg/kg | 10/10 | $4.7 \times 10^{-4}$ | 3.1 |
| Mercury (elemental) | 1410 mg/kg | 13/16 | | 488 |
| **Total Risk** | | | $5.8 \times 10^{-1}$ | 126 |

[1] This summary table includes only those contaminants listed as COCs.
[2] Maximum Concentrations and Frequencies were derived from Figures 4-1 to 4-25 in Volume 1 of the 2014 Remedial Investigation.
[3] Risk values are taken from Table 6.2-1 from 2014 Remedial Investigation, Volume II – Human Health Risk Assessment. Unacceptable risks are those that exceed $1 \times 10^{-4}$ for cancer risks and HI=1 for non-cancer risks.
[4] Polychlorinated biphenyls.
[5] Polychlorinated dibenzodioxins / Polychlorinated dibenzofurans, toxicity equivalent.
[6] Exposure was changed to Adult Resident (age-adjusted resident was not evaluated). Child resident non-cancer risk was 1023.

There is no current risk to people or the environment because the wastes are isolated by the CHP Landfill containment system.

**Current workers and trespassers, and future residents in the SFSA and EFSA**. In both the SFSA and EFSA contamination is widespread but with generally low concentrations. The highest concentrations were in isolated hotspots perhaps due to past spills or discreet releases. In the SFSA, which includes the uncapped areas of the CHP property, dioxin, furans, mercury lead, and arsenic in soils may pose unacceptable risk in the hotspots. The contaminants in the SFSA and the risk are summarized below:

Record of Decision
Part 2: The Decision Summary

| Summary of Contaminants of Concern in Soils in the Southern Facility Study Area | | | | |
|---|---|---|---|---|
| Contaminant of Concern[1] | Maximum Concentration[2] | Frequency | Risk[3] | |
| | | | Cancer | Non-Cancer[6] |
| PCB (high risk = Aroclor 1254)[4] | 15.8 mg/kg | 18/23 | $1.2 \times 10^{-5}$ | 1.4 |
| PCDD/PCDF (TEQ)[5] | 0.00469 mg/kg | 37/56 | $2.0 \times 10^{-5}$ | 1.8 |
| Benzo(a)anthracene | 5 mg/kg | 29/56 | $1.3 \times 10^{-5}$ | |
| Benzo(a)pyrene | 4.3 mg/kg | 36/56 | $1.2 \times 10^{-4}$ | |
| Benzo(b)fluoranthene | 4.5 mg/kg | 30/56 | $1.3 \times 10^{-5}$ | |
| Dibenz(a,h)anthracene | 1.6 mg/kg | 22/56 | $3.0 \times 10^{-5}$ | |
| Arsenic (inorganic) | 281 mg/kg | 77/80 | $1.6 \times 10^{-4}$ | 2.9 |
| Mercury (elemental) | 125 mg/kg | 26/80 | | 5 |
| Lead | 24438 mg/kg | 13/80 | | |
| Total Risk | | | $4 \times 10^{-4}$ | 5.6 |

[1] This summary table includes only those contaminants listed as COCs and present unacceptable risk.
[2] Maximum Concentrations and Frequencies were derived from Figures 4-1 to 4-25 in Volume 1 of the 2014 Remedial Investigation.
[3] Risk values are taken from Table 6.2-1 from 2014 Remedial Investigation, Volume II – Human Health Risk Assessment.
[4] Polychlorinated biphenyls.
[5] Polychlorinated dibenzodioxins / Polychlorinated dibenzofurans, toxicity equivalent.
[6] Exposure was changed to Adult Resident (age-adjusted resident was not evaluated).  Child resident non-cancer risk was 22.

In the EFSA, COCs in soil that pose unacceptable risk include SVOCs such as benzo(a)pyrene and benzo(a)anthracene, as well as dioxin/furans, arsenic and mercury.

| Summary of Contaminants of Concern in Soils in the Eastern Facility Study Area | | | | |
|---|---|---|---|---|
| Contaminant of Concern[1] | Maximum Concentration[2] | Frequency | Risk[3] | |
| | | | Cancer | Non-Cancer[6] |
| PCDD/PCDF (TEQ)[5] | 0.003370 mg/kg | 8/17 | $6.1 \times 10^{-4}$ | 6 |
| Benzo(a)anthracene | 37 mg/kg | 12/17 | $1.2 \times 10^{-4}$ | |
| Benzo(a)pyrene | 27 mg/kg | 13/17 | $8.7 \times 10^{-4}$ | |
| Benzo(b)fluoranthene | 23 mg/kg | 14/17 | $7.9 \times 10^{-5}$ | |
| Dibenz(a,h)anthracene | 4.9 mg/kg | 14/17 | $1.3 \times 10^{-5}$ | |
| Arsenic (inorganic) | 54.7 mg/kg | 20/20 | $4.7 \times 10^{-5}$ | |
| Mercury (elemental) | 34.4 mg/kg | 6/23 | | 2.2 |
| Lead | 1117 mg/kg | 1/20 | | |
| Total Risk | | | $1.9 \times 10^{-3}$ | 8.4 |

[1] This summary table includes only those contaminants listed as COCs and create unacceptable risk.
[2] Maximum Concentrations and Frequencies were derived from Figures 4-1 to 4-25 in Volume 1 of the 2014 Remedial Investigation.
[3] Risk values are taken from Table 6.2-1 from 2014 Remedial Investigation, Volume II – Human Health Risk Assessment.
[4] Polychlorinated biphenyls.
[5] Polychlorinated dibenzodioxins / Polychlorinated dibenzofurans, toxicity equivalent.
[6] Exposure was changed to Adult Resident (age-adjusted resident was not evaluated).  Child resident non-cancer risk was 59.

Future Residents in the SFSA and EFSA would be also be exposed to lead in soil at concentrations that would create unacceptable risk to children.[11]

**Future residents exposed to contaminated groundwater through drinking water and groundwater vapors** would incur unacceptable risk due to exposure to chloroform, carbon tetrachloride, chromium, arsenic and dioxin in drinking water (See Table 3b in Appendix B).

| Summary of Contaminants of Concern in Groundwater as Drinking Water for an Age-adjusted Resident | | | | |
|---|---|---|---|---|
| Contaminant of Concern[1] | Maximum Concentration (µg/l)[2] | | Risk[3] | |
| | CHP Landfill | SFSA | Cancer | Non-Cancer[6] |
| Chloroform | 1,500 | 100,000 | $5.3 \times 10^{-1}$ | 1190 |
| Carbon tetrachloride | A | 16,000 | $4.1 \times 10^{-2}$ | 400 |
| Arsenic | 105 | 37 | $3.0 \times 10^{-3}$ | 29 |
| PCDD/PCDF (TEQ)[4] | 1390 | ND | $2.7 \times 10^{-3}$ | 127 |
| Trichloroethene | 130 | A | $3.0 \times 10^{-4}$ | 50 |
| Carbon disulfide | 23,000 | 260,000 | | 361 |
| Mercury | 134 | ND | | 213 |
| Total Risk | | | $5.8 \times 10^{-1}$ | 2510 |
| [1] This summary table includes only those contaminants listed as COCs that exceed $1 \times 10^{-4}$ Cancer Risk. | | | | |
| [2] Maximum Concentrations were derived from Figures 4-25 to 4-90 in Volume 1 of the 2014 Remedial Investigation. | | | | |
| [3] Risk values are taken from Table 6.2-1 from 2014 Remedial Investigation, Volume II – Human Health Risk Assessment. | | | | |
| [4] Polychlorinated dibenzodioxins / Polychlorinated dibenzofurans, toxicity equivalent. | | | | |

Future structures that may be built on either the CHP Landfill or the SFSA may expose occupants to carbon tetrachloride, chloroform and mercury groundwater vapors (see Table 3c in Appendix B).[12]

The RIR found no contamination in the Androscoggin surface water and therefore no unacceptable risk. The HHRA found that sediment in the Androscoggin River did contain COCs (mercury, PCBs, dioxins/furans and PAHs) but the RIR could not determine if these contaminants originated from the Site. Berlin, especially along the banks of the Androscoggin River was formerly industrialized and many past sources of contaminants existed. Regardless, the HHRA found that downstream sediment, including that with COCs, did not pose an unacceptable risk to adult or child recreator visitors.

EPA found many of the COCs, including mercury, in fish sampled downstream of the Site. Consumption of fish was found to pose a risk to human health. But with many other potential upstream and downstream sources for mercury, the RIR could not attribute those contaminants as

---

[11] Memorandum: Estimated Risks of Soil Exposure Point Concentrations (EPCs) for Contaminants of Concern to Hypothetical Residents, Courtney Carroll, EPA Risk Assessor, November 20, 2019.
[12] Memorandum: Potential Vapor Intrusion Risk to Workers Due to VOCs in Groundwater at Chlor Alkali Superfund Site, Rick Sugatt, EPA Risk Assessor, January 2, 2020.

originating from the Site. Mercury was determined to pose a risk to anglers that consumed the fish; however, the concentrations of mercury in fish were not statistically different from the background areas upstream of the Site. In accordance with the NCP preamble, CERCLA remedial actions do not generally cleanup below background or include measures to address background contamination. The State of New Hampshire prohibits the taking and consumption of fish from Sawmill Dam downstream to the Maine State line due to the presence of contamination in those fish. The risk to the public from sediments, surface water and fish in the Androscoggin River is displayed in Table 3b of Appendix B.

2.      ECOLOGICAL RISK ASSESSMENT

EPA assessed risk to the environment through two analyses: Terrestrial Screening Level Ecological Risk Assessment (TSLERA) for exposure to biota in the area of the EFSA, SFSA, and CHP, and a Baseline Ecological Risk Assessment (BERA) for biota in the Androscoggin River. In the EFSA and SFSA the TSLERA found little to no potential for current adverse effects to plant and soil invertebrate communities.

The CHP is capped and therefore there is only a future risk to bird and mammal populations if the cap were to fail. EPA did determine that there was potential ecological risk from exposure to contamination in the CHP landfill if the containment system were to fail and result in exposure of contamination to ecological receptors on land or in the River. The TSLERA is Volume IIIb of the 2014 RIR. A potential for adverse effects to bird and mammal populations was found to exist in the EFSA and SFSA from the presence of dioxins, furans, PCBs, lead and PAHs. However, the TSLERA identified comparable risk to avian and mammalian receptors in background soils. In accordance with the NCP preamble, CERCLA does not generally cleanup below background. EPA determined that the risk to ecological receptors at the CHP Landfill, as well as the SFSA and EFSA, at present, did not warrant a remedial action.

Because of the presence of mercury and mercury amalgams in the Androscoggin River adjacent to the CHP Landfill, EPA considered the potential for adverse effects over a greater length of the river in the BERA. EPA believed that examining only the stretches of the River near the Site would neglect the potential for changes in risk from mercury further downstream. From Sawmill Dam, adjacent to the Site, to Smith Hydro Dam, approximately 4,000-feet downstream, the Androscoggin River falls over 100-feet. This steep hydraulic gradient prevents the accumulation of fine-grained sediments. Through this stretch the river can be very turbulent and bedrock is exposed over much of the riverbed. Mercury would remain in elemental form and not be readily mobile in the environment in that portion of the River. Fine-grained, organic-rich sediments that are found further downstream of Smith Hydro Dam, create conditions for mercury methylation, a process that increases the mobility and toxicity of mercury.

Therefore, EPA collected data over a long length of the Androscoggin River from Wheeler Bay, north of Milan, New Hampshire to Shelburne on the New Hampshire-Maine state line, over 20-miles in length. The river is segmented over much of this area by a series of hydro-electric dams that create impoundments behind them.

Record of Decision
Part 2: The Decision Summary

For the BERA, EPA sampled the sediment, sediment pore-water, surface water, aquatic invertebrates, and fish (white sucker and small-mouth bass). EPA also obtained samples from songbirds, swallows and their nestlings, bats, and Bald Eagle chicks. The BERA found that, excepting mercury in bats foraging in the vicinity of the Shelburne Reservoir, that risk from mercury, PCB, and dioxin/furan exposure, to the flora and fauna inhabiting the river, is of limited ecological significance. None of the evaluations conducted as part of the assessment provided evidence that the levels of contaminants in sediments (surface water was uncontaminated) in the Androscoggin River from Sawmill Dam, downstream to Shelburn Dam in Shelburne, were sufficiently high to induce effects above the regional variability in reproduction, maintenance, and survival of the flora and fauna in the river. It was not possible to determine the source or impact of the mercury present in the Shelburne Reservoir bats because no other impacts from site-related contamination was identified in the River.

Volumes 3a and 3b of the RIR describe ecological risk at the Site and associated with the Androscoggin River.

3.    BASIS FOR REMEDIAL ACTION

**OU-1, CHP Landfill**: EPA has determined that there are no current exposures to contaminants in the CHP Landfill but that if the containment system were to be compromised unacceptable risk to human health and the environment would occur.  Groundwater was found to pose a hazard to future groundwater users and that there was no current evidence for migration from the CHP Landfill. EPA has also determined that vapor intrusion from the capped area may occur. Therefore, to prevent risk to human health and the environment it will be necessary to:

- Monitor the containment of wastes.
- Prohibit structures that may compromise the containment system or allow exposure to groundwater vapors.
- Prohibit activities and uses that will impair remedy infrastructure.
- Prohibit the use of groundwater for anything other than monitoring and remediation.

**OU-2, the SFSA and EFSA**: EPA determined that there is unacceptable risk to human health through exposure to discreet hotspots of soil contamination in both the SFSA and EFSA. Concentrations of lead in soil in these areas also exceed standards for exposure to future residents. In the SFSA EPA determined that future structures may expose occupants to groundwater vapors that create an unacceptable risk. To prevent risk to human health it will be necessary to:

- Prevent human exposure to contaminated soils.
- Prohibit residential or day-care uses in the EFSA or SFSA.
- Prohibit structures that may allow exposure to groundwater vapors.

**OU-3, Groundwater**: EPA determined that the future use of groundwater in either the CHP or SFSA would create an unacceptable risk to human health from drinking water. To prevent risk to human health it will be necessary to:

Record of Decision
Part 2: The Decision Summary

- Ensure that contaminated groundwater inside the CHP Landfill is contained and does not migrate.
- Restore groundwater outside the CHP Landfill for drinking water purposes.
- Until groundwater is restored in the SFSA, prevent the use of groundwater for drinking water purposes.
- Prevent use of groundwater in the CHP for any use other than monitoring and remediation.

**OU-3, Androscoggin River**: The appearance of visible, liquid elemental mercury and mercury amalgams in the Androscoggin River creates the opportunity for exposure by the public and environment. To prevent such exposure, inspections of the river and removals will be needed on a yearly basis, until it is determined that inspections can be conducted less frequently.

## H. REMEDIAL ACTION OBJECTIVES

Remedial action objectives (RAOs) describe, in general terms, what a remedial action should accomplish to be protective of human health and the environment. RAOs are statements that specify the environmental media of concern, contaminant type, potential exposure pathways to be addressed by remedial actions, receptors to be protected, and cleanup levels (40 CFR Section 300.430[e][2][i]). The RAOs for each OU is listed below.

The RAOs for OU-1, contaminated debris in the CHP Landfill:

- Prevent direct human contact, ingestion or inhalation of COCs within the CHP Landfill that exceed Applicable or Relevant and Appropriate Requirements (ARARs) or risk-based criteria.
- Prevent exposure of ecological receptors to landfill contents that present an unacceptable ecological risk.
- Control CHP Landfill runoff and erosion.
- Prevent the release and migration of COCs through leaching from the CHP Landfill to groundwater outside the CHP Landfill groundwater compliance boundary and the Androscoggin River.
- Prevent infiltration and washout during flooding, up to a 500-year event.

2.  The RAO for contaminated soils in OU-2, the SFSA, the EFSA, and the uncapped contaminated soils on the CHP property within OU-1:

- Prevent exposure to COCs in soil that exceed ARARs or risk-based criteria for human health.

3.  The RAOs for OU-3, contaminated groundwater, consist of two divisions, beneath the CHP Landfill and outside the CHP Landfill. The RAOs for each:

a. Groundwater beneath the CHP Landfill are:

- Prevent potential human exposure to COC concentrations in groundwater in excess of ARARs or risk-based criteria within the compliance boundary for the CHP Landfill.
- Prevent migration of Site COCs in groundwater from beyond the edge of the compliance boundary of the waste management area (i.e., landfill).
- Prevent exposure by future building occupants to indoor air vapors, via a vapor intrusion pathway, containing Site contaminants that would result in a total excess lifetime cancer risk greater than the target risk range of $10^{-6}$ to $10^{-4}$, or a non-cancer HI greater than 1.

b. Groundwater beyond the CHP Landfill compliance boundary:

- Return the groundwater to its beneficial use as a source of drinking water.
- Prevent use of groundwater with COC concentrations greater than ARARs or risk-based standards until groundwater cleanup standards are achieved.
- Prevent exposure by future building occupants to indoor air vapors, via a vapor intrusion pathway, containing Site contaminants that would result in a total excess lifetime cancer risk greater than the target risk range of $10^{-6}$ to $10^{-4}$, or a non-cancer HI greater than 1, until groundwater cleanup standards are achieved.

4. The RAO for OU-3, Androscoggin River, the recovery of liquid and amalgam mercury appearing on the banks and in the riverbed of the Androscoggin River. The RAO for the Androscoggin River:

- Reduce the presence of liquid elemental mercury, hardened metal amalgams, and mercury-containing debris in Reach AR-3 of the River adjacent to the CHP to protect designated use and comply with ARAR standards.

I. DEVELOPMENT AND SCREENING OF REMEDIAL ALTERNATIVES

1.      STATUTORY REQUIREMENTS & RESPONSE OBJECTIVES

Under its legal authorities, EPA's primary responsibility at Superfund sites is to undertake remedial actions that are protective of human health and the environment. In addition, Section 121 of CERCLA establishes several other statutory requirements and preferences, including: a requirement that EPA's remedial action, when complete, must comply with all federal and more stringent state environmental and facility siting standards, requirements, criteria or limitations, unless a waiver is invoked; a requirement that EPA select a remedial action that is cost-effective and that utilizes permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable; and a preference for remedies in which treatment which permanently and significantly reduces the volume, toxicity or mobility of the hazardous substances is a principal element over remedies not involving such treatment. Response alternatives were developed to be consistent with these Congressional mandates.

2.       TECHNOLOGY AND ALTERNATIVE DEVELOPMENT & SCREENING

CERCLA and the National Contingency Plan (NCP) set forth the process by which remedial actions are evaluated and selected. In accordance with these requirements, a range of alternatives were developed for the Site. Section 5 of the FS identified and screened technologies capable of meeting the RAOs. Tables 1 through 6 of the FS describe, evaluate and screen to determine if they should be retained for development into remedial alternatives based on the following criteria:

- Effectiveness;
- Implementability; and
- Relative cost.

Representative process options were selected for each remedial technology type that are well-established, proven and reliable over a range of conditions. The FS identified, screened, and evaluated over 30 remedial technologies and over 80 process options for OUs 1, 2, and 3. This range included alternatives that remove or destroy hazardous substances to the maximum extent feasible, eliminating or minimizing to the degree possible the need for long term management. The result that is further developed into remedial alternatives in Section 6 of the FS include:

- OU-1, CHP Landfill: Four general response actions were identified that included No-Action, ICs, ECs and containment.
- OU-2, contaminated soil in the EFSA and SFSA: Eight general response actions were identified including No-Action, ICs, ECs, removal and disposal were retained for development. *In situ* and *ex situ* treatments, containing six and nine process options, respectively, were evaluated but not retained because each of the technologies were ineffective against some COCs.
- OU-3, Groundwater: Seven general response actions were identified that included No-Action, ICs, MNA, containment, *in situ* treatment, *ex situ* treatment, and discharge. In Table 6 of the FS, Process Screening, the *ex situ* and many of the *in situ* technologies were screened out due to cost or, in the case of the *in situ* treatments, the technology was incompatible with the contaminants.
- OU-3, mercury in Reach AR-3: Two general response actions were identified, No-Action and manual removal.

Section 6 of the FS then combined the technologies into remedial alternatives to address the RAOs for each of the OUs. The combined technologies were then evaluated in Section 7 of the FS to evaluate the ability of the alternatives to meet the Threshold and Balancing Criteria in the NCP.

Record of Decision
Part 2: The Decision Summary

## J. DESCRIPTION OF ALTERNATIVES

To address the risk posed by contaminated media at the Site remedial alternatives were developed and evaluated in the FS. The alternatives selected in the FS and Proposed Plan are believed those most likely to protect the public and environment from exposure to the contaminants found in Site media. These media include 1) wastes beneath the CHP Landfill cover system; 2) contaminated soils in the SFSA, the EFSA, and the uncapped areas of the CHP property; 3) contaminated groundwater; and 4) mercury and mercury amalgams that periodically appear on the banks, in debris, and in the riverbed, of the Androscoggin River.

A No Action alternative is required by the NCP for each of the contaminated media as a baseline of effects against the performance of an active remedy. For each of the contaminated media the No Action alternative would leave contaminants in place or allow them to migrate exposing the public and environment to contamination that exceeds EPA's risk range or that may adversely affect the environment. As such, the No Action alternative for each of the four media described above may result in the exposure of contaminants to the public and environment.

In the Proposed Plan EPA presented the following alternatives for each of the operable units:

The CHP Landfill is currently isolated from the environment by a 40-mil HDPE cap, a slurry wall on the east and south, a retaining wall on the north and west and bedrock beneath. The alternatives developed in the FS and presented in the Proposed Plan for OU-1 include:

- OU-1-1: No Action. Contaminants isolated from the environment may become exposed if the cap is not maintained or if monitoring and maintenance of the slurry wall are not continued.
- OU-1-2: Monitoring and maintenance of the landfill cap, foundation/retaining wall and slurry wall, ECs and ICs to prevent actions that may damage the containment system.

Contaminated soil in hotspots located in the SFSA, EFSA, and uncapped areas of the CHP property had three alternatives presented in the Proposed Plan along with the No Action alternative. The four alternatives evaluated for OU-2, contaminated soil:

- OU-2-1: No Action. Contaminants would remain and no monitoring would be performed.
- OU-2-2: Contaminated soils would remain undisturbed. Engineering Controls (ECs) consisting of fencing and signage would limit access to soils exceeding commercial/industrial cleanup levels. ECs would require permanent O&M and enforcement measures. ICs, established pursuant to applicable requirements, would be implemented to prohibit disturbance of the ECs and exposure to soils exceeding both commercial/industrial and residential cleanup levels.
- OU-2-3: A soil cap with a vegetative soil cover would be constructed over OU-2 surface soil where the HHRA and post-ROD sampling identify soil exceeding commercial/industrial cleanup levels. A soil cap with vegetative cover would eliminate potential direct contact exposure to COCs that pose a risk to commercial/industrial workers in soil. The soil COCs are all immobile constituents with low water solubility

and strong tendencies to partition to the solid phase or on the surfaces of particulate matter. The alternative includes implementation of ICs established pursuant to a selected remedy under CERCLA and long-term maintenance and monitoring to ensure ongoing compliance with ICs and protectiveness requirements for the soil cap. ICs would be implemented to prevent disturbance of the soil cap. Over the broader area, ICs would restrict residential land uses where there is an exceedance of residential cleanup levels.

- OU-2-4:  This alternative involves excavation of soil to address locations where the HHRA and post-ROD sampling identify potential unacceptable risk/hazard to human commercial/industrial workers related to exceedances of commercial/industrial cleanup levels. Excavated soil not meeting the cleanup levels for OU-2 in Table 1, Appendix B, would be disposed offsite at a licensed landfill or onsite beneath the CHP landfill engineered cover system, and the excavation backfilled with clean fill and vegetation restored. ICs, established pursuant to a selected remedy under CERCLA and applicable requirements, would be implemented to restrict residential land uses in areas exceeding residential cleanup levels. Excavation and off-Site or on-Site disposal removes soils that pose potential commercial/industrial risk related to soil COCs.

Contaminated groundwater at the Site is divided into two areas: beneath the CHP Landfill and outside the CHP Landfill. The Proposed Plan presented two alternatives for each of these areas. Groundwater beneath the CHP Landfill:

- OU-3-CHP-1: No Action. Groundwater contamination would not be monitored and could potentially migrate.
- OU-3-CHP-2: Groundwater monitoring, ICs to prevent the use of groundwater and ECs to ensure that the landfill containment system continues to isolate contaminated groundwater.

For groundwater outside of the CHP Landfill:

- OU-3-GW-1: No Action. Groundwater contamination would remain and able to migrate.
- OU-3-GW-3: *In Situ* Chemical Oxidation (ISCO), groundwater monitoring, ICs to prevent groundwater use and building structures that may be subject to vapor intrusion from the contaminated groundwater.

OU-3 includes the riverbed and banks of the Androscoggin river where mercury continually appears. The Proposed Plan presented two alternatives:

- OU-3-AR-3-1: No Action. Mercury would be allowed to accumulate and be transported further downstream.
- OU-3-AR-3-2: Monitoring the appearance of mercury and periodic removals of liquid mercury, solid mercury amalgams, and mercury-containing debris from the Androscoggin River.

The alternatives selected for each of these media/areas of contamination are described fully in Section L: The Selected Remedy. Following an analysis of the remedies developed in the FS,

EPA selected proposed remedies in the Proposed Plan for each of the areas of contamination that best meet seven of nine criteria set forth by the NCP for selecting a remedy. Following the comment period, EPA then examined the two modifying criteria, community and state acceptance, to determine if the alternatives required reconsideration in whole or part. A description of that process is provided in Section K that follows.

## K. SUMMARY OF COMPARATIVE ANALYSIS OF ALTERNATIVES

Section 121(b)(1) of CERCLA presents several factors that, at a minimum, EPA is required to consider in its assessment of remedial alternatives. Building upon these specific statutory mandates, the NCP articulates nine evaluation criteria to be used in assessing the individual remedial alternatives. A detailed analysis of each developed alternative using the first seven of the nine evaluation criteria to select a Site remedy is set forth in in the FS and further developed by EPA in the Proposed Plan. The comparative analysis of alternatives was presented in Section 5.0 of the FS as well as EPA's evaluation in the Proposed Plan. The remaining two evaluation criteria, State Acceptance and Community Acceptance, are evaluated in this ROD after evaluating comments received on EPA's Proposed Plan. Below is a description of these criteria followed by a summary comparing each alternative's strength and weakness with respect to the nine evaluation criteria.

**Threshold Criteria**

The two threshold criteria described below must be met for the alternatives to be eligible for selection in accordance with the NCP.

> 1. **Overall protection of human health and the environment** addresses whether or not a remedy provides adequate protection and describes how risks posed through each pathway are eliminated, reduced, or controlled through treatment, engineering controls, or institutional controls.
> 2. **Compliance with applicable or relevant and appropriate requirements (ARARs)** addresses whether or not a remedy will meet all Federal environmental laws and more stringent State environmental and facility siting laws, unless a waiver is invoked.

**Primary Balancing Criteria**

For those alternatives that meet the threshold criteria, the following five criteria are utilized to compare and evaluate the elements of one alternative to another:

> 3. **Long-term effectiveness and permanence** addresses the criteria that are utilized to assess alternatives for the long-term effectiveness and permanence they afford, along with the degree of certainty that they will prove successful.
> 4. **Reduction of toxicity, mobility, or volume through treatment** addresses the degree to which alternatives employ recycling or treatment that reduces toxicity, mobility, or volume, including how treatment is used to address the principal threats posed by the site.

5. **Short term effectiveness** addresses the period of time needed to achieve protection and any adverse impacts on human health and the environment that may be posed during the construction and implementation period, until cleanup goals are achieved.

6. **Implementability** addresses the technical and administrative feasibility of a remedy, including the availability of materials and services needed to implement an alternative.

7. **Cost** includes estimated capital and O&M costs, as well as present-worth costs.

**Modifying Criteria**

Two modifying criteria are used as the final evaluation of remedial alternatives, generally after EPA has received public comment on the RI/FS and Proposed Plan:

8. **State acceptance** addresses the State's position and key concerns related to the preferred alternative and other alternatives described in the Proposed Plan and RI/FS, and the State's comments on ARARs or the proposed use of waivers.

9. **Community acceptance** addresses the public's general response to the alternatives described in the Proposed Plan and RI/FS.

Following the detailed analysis of each individual alternative, a comparative analysis, focusing on the relative performance of each alternative against the nine criteria, was conducted. The following presents a narrative summary of the alternatives and a comparison of their strengths and weaknesses with respect to the two threshold criteria, five balancing criteria, and two modifying criteria. Table 4 in Appendix B summarizes how each of the alternatives meet each of the nine criteria.

**CHP Landfill.** The No Action alternative, OU-1-1, would not be protective of human health and the environment under CERCLA because no actions would be taken to maintain the cap or ensure that exposure was controlled. OU-1-2 (Monitoring and maintenance of the landfill cap, foundation/retaining wall and slurry wall, ECs and ICs) will be protective of human health and the environment through maintenance of existing containment infrastructure, ECs, implementation and enforcement of legally enforceable ICs established pursuant to a selected remedy under CERCLA, and construction and O&M of additional ECs (*i.e.*, fencing and signage). Maintenance of the CHP Landfill engineered cover system, slurry wall, and foundation/retaining wall will prevent potential exposure to soil/debris beneath the CHP Landfill engineered cover system. Implementation and enforcement of ICs as well as installation and O&M of additional ECs as part of alternative OU-1-2 will further minimize potential future exposure via land use and access restrictions.

Alternative OU-1-2 is a presumptive remedy for landfill sites under EPA guidance standards and complies with ARARs. This alternative is effective in the short term since the engineered cap system is currently in place and would meet the relevant and appropriate requirements for a hazardous waste landfill cap. Long-term effectiveness of landfill capping has been demonstrated broadly at many Superfund remedial sites. Alternative OU-1-2 is readily implementable, the cap is already in place, the technology is reliable, and the ability to monitor the effectiveness of the alternative as a remedy is easily accomplished. Note that under Alternative OU-2-4 the landfill cap may need to be opened to receive contaminated soil excavated as part of the alternative (unless the contaminated soil is disposed of off-site). If the on-site disposal option is

implemented the landfill would need to be modified to receive the excavated soil and the cap reconfigured and resealed.

Alternative OU-1-1 has no cost except the cost to conduct statutorily required five-year reviews. Alternative OU-1-2 has relatively low capital and O&M costs. Part of the cost of monitoring is also covered under OU-3 alternatives, which address groundwater monitoring and surface water monitoring in the Androscoggin River in Reach AR-3. Alternative OU-1-2 would not reduce the toxicity, mobility, or volume of the contamination through treatment, but represents an effective alternative that may incorporate previously implemented ECs with implementation of ICs and additional ECs (fencing and signage) to restrict and prohibit future activities by which exposure could occur.

**Soil Contamination in the Eastern and Southern Facility Study Areas and in the uncapped area of the CHP property.** The No Action alternative, OU-2-1, would not protect human health and the environment because COCs would remain in soil at concentrations greater than industrial/commercial and residential remediation goals (cleanup levels)[13] and no measures would exist to prevent exposure. Alternatives OU-2-2 (Installation/maintenance of ECs and ICs to protect the ECs and prohibit residential and unrestricted uses), OU-2-3 (a soil cover, monitoring/maintenance and ICs to protect the cover and prohibit residential and unrestricted uses), and OU-2-4 (excavation and disposal with ICs to prohibit residential and unrestricted uses) are protective of human health and the environment. Alternative OU-2-2 relies on on-going maintenance of fencing and enforcement of ICs, and Alternative OU-2-3 relies on maintenance of soil covers to prevent access to contaminated material that exceeds commercial/industrial standards, along with ICs to protect the cover and prohibit residential and unrestricted uses. Alternative OU-2-4 is protective because it removes contaminated soil exceeding commercial/industrial cleanup levels and disposes of the soil off-site at a licensed disposal facility or under the CHP Landfill cap. ICs would prohibit residential and unrestricted uses.

The No Action Alternative, OU-2-1, would not meet ARARs or risk-based cleanup levels. Alternative OU-2-2 would only meet ARARs and risk-based cleanup levels if ECs are maintained and ICs are enforced. Alternatives OU-2-3 and OU-2-4 would meet ARARs and risk-based cleanup levels by either covering or removal and off-site or on-site disposal of contaminated soils exceeding commercial/industrial cleanup levels, and ICs to prohibit residential and unrestricted exposure.

Alternatives OU-2-2 and OU-2-3 provide short- and long-term effectiveness maintenance and monitoring of ECs or soil covers, respectively, and through legally enforceable ICs established pursuant to a selected remedy under CERCLA. However, Alternative OU-2-3 is more effective because it isolates soil contaminants under a cover rather than relying on maintaining fences to restrict contaminant exposure. Alternative OU-2-4 provides long-term effectiveness and permanence through excavation and disposal of soil exceeding commercial/industrial cleanup levels either at an off-site facility or on-site in the CHP Landfill. OU-2-2, OU-2-3, and OU-2-4 all use ICs to prohibit residential and unrestricted use exposure. Alternative OU-2-4 poses

---

[13] Preliminary Remediation Goals (PRGs) are presented in the FS and Proposed Plan.  As part of ROD the goals are finalized and are referred to as Remedial Goals (RGs).

potential short-term hazards to workers since contaminated soil will require excavation and management prior to disposal. On-site disposal adds short-term hazards related to opening, regrading, and re-sealing the CHP Landfill engineered cover system; however, proper use of best management practices will prevent short-term hazards.

None of the OU-2 Alternatives will reduce toxicity, mobility, or volume through treatment.

Alternatives OU-2-2 and OU-2-3 have implementability challenges with monitoring and maintaining ECs and soil covers, respectively. For Alternative OU-2-4, on-site disposal in the CHP Landfill presents greater implementability challenges than off-site disposal, owing to technical requirements for CHP Landfill disruption and repair. However, there may be implementability issues with off-site disposal since the number of licensed disposal facilities that can accept the waste generated from the Site may be limited due to the presence of dioxin and furans in the waste. The availability of disposal at licensed facilities will likely be the deciding factor in whether soils are disposed on-site or off-site. Alternatives OU-2-3 and OU-2-4 add implementability challenges related to access and potential engineering constraints on cover installation and maintenance related to ponding of precipitation/runoff and wetlands in the area requiring a cover.

Alternative OU-2-1 has no cost except the cost to conduct statutorily-required five-year reviews. Excluding the No Action alternative, Alternative OU-2-2 has the lowest estimated cost: $285,000. Alternative OU-2-3 has an estimated cost of approximately $700,000, while estimated costs for Alternative OU-2-4 are approximately $500,000 for off-site disposal and $560,000 for on-site disposal beneath the existing landfill cap.

**Groundwater Contamination Beneath the CHP Landfill.** The No Action alternative, OU-3-CHP-1, does not protect human health and the environment and would not meet ARARs or risk-based standards. Alternative OU-3-CHP-2 would be protective of human health and the environment and would meet ARARs by ensuring groundwater does not migrate from the landfill and establishing ICs to prevent exposure to contaminated groundwater.

Alternative OU-3-CHP-2 will be effective in the short term, relying on ICs to prohibit potential exposure to groundwater vapor or from groundwater consumption within the groundwater compliance boundary established for the CHP Landfill. In conjunction with ICs, monitoring would be conducted to evaluate migration of COCs relative to the compliance boundary and groundwater and surface-water quality. Neither Alternative will reduce toxicity, mobility, or volume through treatment.

Alternative OU-3-CHP-1 is not effective in either the short-term or long-term. Alternative OU-3-CHP-2 is effective in the short term and maintenance and monitoring of groundwater ensures the long-term effectiveness and permanence of this alternative. ICs will be effective at restricting use of Site groundwater and exposure to soil vapor underlying the CHP Landfill and protecting remedial components of the alternative.

Alternative OU-3-CHP-1 is implementable because no action will be taken. Alternative OU-3-CHP-2 is implementable because long-term groundwater monitoring and establishment and

Record of Decision
Part 2: The Decision Summary

enforcement of ICs do not pose any significant implementability issues. The No Action alternative has no cost except the cost to conduct statutorily-required five-year reviews and the estimated cost of Alternative OU-3-CHP-2 is approximately $900,000 over 30 years.

**Groundwater Contamination Outside of the CHP Landfill.** No Action, OU-3-GW-1, would neither be protective of human health and the environment, nor meet ARARs or risk-based criteria. Alternative OU-3-GW-3, *in-situ* chemical oxidation (ISCO), ICs and monitoring, is protective of human health and the environment via ISCO treatment to reduce VOC concentrations. Alternative OU-3-GW-3 will achieve ARARs in approximately 20 years and implementation of ICs will prohibit groundwater use and exposure to groundwater vapor until groundwater cleanup levels are achieved.

Alternative OU-3-GW-1 does not reduce toxicity, mobility, or volume through treatment. Alternative OU-3-GW-3 reduces toxicity, mobility or volume through treatment through addition of *in situ* chemical reagents. Alternative OU-3-GW-1 is implementable because no action will be taken. Alternative OU-3-GW-3 is implementable because ISCO is a well-known treatment process, however site-specific factors can significantly impact treatment effectiveness (treatment effects may be localized in the vicinity of the injection point due the characteristics of deep bedrock at the Site).

Alternative OU-3-GW-1 will not be effective in the short-term because no action will be taken. Alternative OU-3-GW-3 is effective in the short term through monitoring to evaluate and confirm that COCs are not migrating into adjacent uncontaminated areas of groundwater or affecting surface water quality. Although Alternative OU-3-GW-3 may have short-term impact to workers implementing the treatment remedy, these impacts can be addressed through best management practices and health and safety requirements.

Alternative OU-3-GW-1 is not protective in the long-term because no action will be taken. Alternative OU-3-GW-3 is expected to be protective in the long-term because it permanently treats contaminated groundwater. Alternative OU-3-GW-3 also provides long-term protectiveness through ICs to prohibit groundwater use and exposure to groundwater vapor, until groundwater cleanup levels are achieved.

Alternative OU-3-GW-1 has no cost except the cost to conduct statutorily-required five-year reviews. Alternative OU-3-GW-3 has an estimated cost of approximately $1,600,000.

**Mercury and Mercury-contaminated Material Appearing on the Banks, in Debris and in the Riverbed of the Androscoggin River.** The OU-3 River remedy would be implemented in the stretch of river defined as AR-3, that is the run of River between Sawmill Dam and Riverside Dam and adjacent to the CHP. The No-Action alternative, OU-3-AR-3-1 would not comply with ARARs allowing mercury exceeding regulatory hazardous waste standards to remain in the River. The alternative would not include surface-water monitoring to ensure the protectiveness of Alternative OU-1-2 remedy.

Alternative OU-3-AR-3-2 includes the removal of liquid elemental mercury, hardened metal amalgams, and mercury-containing debris and ongoing removal of the same materials, as

required from Reach AR-3. The recovered materials will be transported to licensed facilities to recover the mercury for re-use or for disposal. The alternative also includes monitoring in the River for as long as contamination remains in the CHP Landfill. These actions would meet ARARs by removing improperly disposed hazardous waste and ensuring there is no future releases of contamination into the River from the CHP Landfill.

Alternative OU-3-AR-3-2 involves a phased work approach to continue and enhance removal of liquid elemental mercury, hardened metal amalgams, and mercury-containing debris from Reach AR-3 consistent with all previously implemented actions taken since 1999.

Neither alternative reduces the mobility, toxicity and volume of contamination through treatment (unless for Alternative OU-3-AR-3-2 some treatment of water generated from dewatering of the removed material is required prior to discharge of the water back to the River, although no such dewatering has been required to date).

Alternative OU-3-AR-3-1 is implementable because no action will be taken. Alternative OU-3-AR-3-2 is implementable as demonstrated in previously implemented actions by NHDES, EPA and others beginning in 1999, plus the adaptation of more appropriate collection efforts in the phased approach commenced by G-P in 2015. Inspections and recoveries will occur when water conditions in the River are safe during the period from May to September. The area where mercury appears is difficult to access, requiring some effort to descend over the ten to 20-foot rock face and then climb out. The bank consists of uneven rock that in some circumstances may pose a slip hazard due to recent increases in flow. The area to inspect is approximately 150-feet downstream of Sawmill Dam sluice gates that may need to be opened at any time.  Coordination with Brookfield Power, the operator of Sawmill Dam, will be necessary to ensure notification if there is a need for a release.

Alternative OU-3-AR-3-1 will not be effective in the short-term or long-term because no action will be taken. Alternative OU-3-AR-3-2 is effective, both short-term and long-term, as demonstrated by mercury removal actions taken to date, with an estimated cost of $1,200,000. The No Action alternative has no cost except the cost to conduct statutorily-required five-year reviews.

**State Acceptance**

The State of New Hampshire, through its lead agency, NHDES, has expressed its support for EPA's preferred alternatives presented in the June 2020 Proposed Plan and concurs with the selected remedy outlined in this ROD (see Appendix A of this ROD for the State concurrence letter).

**Community Acceptance**

EPA's community engagement efforts at the Site included the publication of a Proposed Plan in June 2020, and the public meetings described in Part II, Section C of this ROD. A virtual public informational meeting was held on June 10, 2020 and was immediately followed with a virtual Public Hearing. A transcript was created for this hearing and has been made part of the

Record of Decision
Part 2: The Decision Summary

Administrative Record for this ROD. EPA also made available a dedicated voice-mail box to receive verbal comments throughout the comment period, although no comments were received. There were no oral comments.  One written comment letter was submitted. A summary of the comments specific to the proposed alternatives for the Site and EPA's responses to the comments are included in the Responsiveness Summary, Part 3 of this ROD.

**Principle Threat Wastes**

No principle threat waste has been identified at the Site.  The landfilled wastes are contained within the CHP landfill, with no evidence of migration to the adjacent groundwater or River.

L. THE SELECTED REMEDY

      1.      Summary of the Rationale for the Selected Remedy

The selected remedy components are protective of human health and the environment and meet the ARARs requirements identified in Appendix D.

The CHP Landfill is capped and has a containment system that isolates contaminated wastes from the environment preventing the exposure of the public and ecological receptors to contaminants in the landfill. The present containment system meets the criteria for an alternative cap design and satisfies the requirements of the New Hampshire hazardous waste landfill regulations that incorporate federal regulatory standards at 40 CFR 264 subparts G (closure and post-closure) and N (landfills) by reference, as discussed in Section 7.2.2 of the FS. Contaminated groundwater beneath the CHP Landfill has not been found to migrate.  Therefore, monitoring and maintenance of the containment system of the CHP Landfill that includes the engineered cap, the slurry wall, and the retaining wall will attain the RAOs for the CHP Landfill cited in Part II, Section H.

Contaminated soils in the SFSA, EFSA, and uncapped areas of the CHP property consist of isolated, discreet occurances. The selected remedy will excavate soils exceeding commercial/industrial cleanup levels and dispose of them off-site at a licensed facility or on-site under the CHP Landfill cap. These actions will remove the contaminated soils exceeding these standards from the environment, utilize ICs to restrict residential exposure to soils exceeding residential cleanup levels, and address the RAO developed for soils. The other alternatives would leave the waste in-place and an enduring requirement to monitor and enforce the ICs and maintain the ECs for each of the isolated areas. The selected remedy for OU-2 would not require ECs and ICs to prevent commercial/industrial exposure and would only require ICs to prohibit residential or unrestricted uses in areas exceeding residential cleanup levels.

Groundwater inside and outside the landfill is contaminated with VOCs and metals at concentrations that exceed risk-based and regulatory standards. The selected remedy for inside the compliance boundary (which traces the footprint of the CHP landfill) will meet the RAOs through maintaining the current cap on the landfill and monitoring of the groundwater to ensure that  contamination does not migrate beyond the compliance boundary into the River or adjacent drinking water aquifers and ICs to prevent exposure to contaminated groundwater or

Record of Decision
Part 2: The Decision Summary

contaminated vapors. The selected remedy for contaminated groundwater under the SFSA would treat the contaminants to achieve groundwater cleanup levels within approximately 20 years and meet the RAOs.

The selected remedy for the removal of mercury, mercury amalgams, and mercury-contaminated debris from Reach AR-3 in the Androscoggin River will address the RAO.

2.      Description of the Selected Remedy

EPA has selected actions that represent a comprehensive remedy for the Site. The selected remedy consists of the following actions:

**OU-1-2, CHP Landfill**: The major components of this remedy include:

- Monitoring and maintenance of the existing CHP Landfill containment system (the CHP Landfill cap, monitoring wells, the retaining wall, and the slurry wall) that includes:
    - Annual inspections and maintenance of the CHP landfill engineered cover system. Maintenance will consist of removing woody vegetation on the cap, inspections, and repairs to the infrastructure, as needed.
    - Periodic groundwater and surface water monitoring (in conjunction with OU-3 Groundwater) to assess the effectiveness of the CHP Landfill containment system.
    - On-going monitoring of the foundation/retaining wall to determine if stability of the foundation/retaining wall may be compromised.
    - Pre-Design activities to determine the types and frequency of monitoring of the foundation/retaining wall, slurry wall, and groundwater monitoring wells, and monitoring points in, and on the banks of, the Androscoggin River adjacent to the CHP Landfill under different conditions to include the 500-year flood and potential seismic loading scenarios.
- ICs: To prevent exposure to contaminated groundwater and groundwater vapor, and to protect the components of the remedy, ICs (which are legally-enforceable restrictions), will be placed on the property.  These ICs shall be established pursuant to CERCLA and applicable state requirements, that will prohibit the construction of buildings on the CHP Landfill, disturbance of the existing landfill cap and other remedial infrastructure (including monitoring wells, the retaining wall and slurry wall), use of the property for residential and other unrestricted uses, and prohibit the use of groundwater for anything other than monitoring.
- ECs: Construct additional ECs to augment existing access restrictions (*i.e.* fencing and signage) to deter trespassing. Monitoring and maintaining the fence and the containment system.

In conjunction with its work on  the SRI, G-P has performed maintenance of the CHP Landfill, since 2015, removing woody vegetation and ensuring the integrity of the cap. G-P also undertook the monitoring and assessment of the 100-year old retaining wall (former foundation wall). Monitoring of wall stability has been on-going to ensure that waste is contained. Additionally, when the SRI began, portions of the wall were severely eroded. G-P used shotcrete to repair the

entire wall in addition to the eroded sections. Operation and Maintenance activities that may occur as part of the remedy include:

- Repair of the retaining wall.
- Replacement of 2,000 linear feet of fencing and associated signage.
- Repair of the cap.
- If contaminated soil from the OU-2 remedy component is disposed of on-site the cap will need to be opened, the new material regraded into the landfill, the cap reconfigured over the added material, and the opening in the cap resealed.

**OU-2-4, Contaminated Soil in the SFSA, EFSA and the Uncapped Areas of the CHP Property**: The selected remedy for contaminated soils in the SFSA, EFSA and the 0.6-acre area southwest of the CHP Landfill that is uncapped, consists of the following:

- Additional testing to refine the extent of contamination in those areas identified by the Human Health Risk Assessment in the EFSA, SFSA and the uncapped portion of the CHP Landfill.
- Excavation of soils that exceed cleanup levels to address unacceptable risks from commercial/industrial exposure.
- Disposal of excavated soils, at a permitted off-site facility or the contaminated soils will be placed inside the CHP Landfill containment system, if that option is more practicable.
- The excavated areas will be backfilled with clean soils and restored with native vegetation to resemble the surrounding habitat.
- Establish ICs, pursuant to CERCLA and applicable state requirements, that will prohibit residential and other unrestricted uses.

**OU-3-CHP-2, Contaminated Groundwater beneath the CHP Landfill.** The selected remedy will be monitoring and ICs. This remedy was selected because under federal guidance standards, contaminated groundwater beneath a designated waste management unit does not require active cleanup if migration of the contaminated groundwater is controlled. The components of this remedy are:

- Groundwater will be monitored to ensure that contaminated groundwater remains within a "compliance boundary," which would be established around the footprint of the CHP Landfill. Monitoring would confirm that contaminated groundwater is neither migrating into the River nor contaminating adjacent aquifers. A pre-design investigation will determine the monitoring analytes, locations, methods and sampling frequencies.
- The River will also be monitored as part of the OU-3-AR-3-2 component of the remedy to ensure no groundwater contamination is migrating into the River.
- If groundwater or surface water monitoring finds that contaminant migration may be occuring, additional monitoring may be required to determine the source and a risk assessment conducted to determine if an unacceptable risk is present.
- If the river or groundwater outside the compliance boundary becomes impacted from the CHP Landfill and the remedy is deemed to no longer be protective of human health or the environment, EPA will make a determination regarding a modification of the

groundwater and CHP Landfill components of the remedy, as applicable, to address the remedy protectiveness.

- ICs will consist of legally enforceable restrictions to protect the containment system and other remedial infrastructures, prohibit the use of groundwater for drinking water, prohibit the building of structures on the landfill and prohibit any residential or other unrestricted uses. Groundwater monitoring performance standards for groundwater within the compliance boundary are listed in Table 2a of Appendix B.

**OU-3-GW-3, *In-situ* treatment of Contaminated Groundwater outside the CHP Landfill**: EPA's selected remedy for contaminated groundwater outside the CHP Landfill compliance boundary and beneath the SFSA is described in the FS as Alternative OU-3-GW-3, *In-Situ* Chemical Oxidation (ISCO), monitoring and ICs. The components of this remedy are:

- A pre-design study will determine the type of chemical oxidation compound and its application. ISCO will be designed and implemented to destroy VOC groundwater contaminants and immobilize metals, in-place.
- Conducting the ISCO treatment with treatments that destroy or immobilize groundwater contaminants.
- Monitoring will follow the treatment to assess the effectiveness of the treatment and to determine if additional treatments are required or if natural attenuation processes may address any remnant contamination above groundwater cleanup levels left after the implementation of the ISCO remedy.
- ICs will consist of legally enforceable restrictions to prohibit the use of groundwater as drinking water or any uses that may influence groundwater migration. ICs will also prohibit the building of structures without mitigation to prevent potential intrusion by groundwater vapors.

It is estimated that groundwater cleanup levels established in Table 2b, Appendix B will be attained in approximately 20 years.

**OU-3-AR-3-2, Liquid elemental mercury, mercury amalgams, and mercury-contaminated debris in the Androscoggin River**: The selected remedy for this OU involves continued, periodic inspections for, and removal of, liquid elemental mercury, hardened metal amalgams and mercury-containing debris from Reach AR-3 in the River adjacent to the CHP. Inspections and removals shall continue for as long as mercury can be visually located in the River, or on its banks, and contamination remains in the CHP Landfill that may migrate outside of the compliance boundary. The inspections shall record, describe and evaluate the locations, amounts and forms of mercury present.

Inspections and recoveries will occur when River conditions are safe for access during the period from May to September. The area to inspect is approximately 150-feet downstream of Sawmill Dam sluice gates and extends for approximately 370-feet. For the first five years of remedy implementation at least three inspections and one removal will be performed annually, as safety permits. The experience of past collection activities and an analysis of inspections and removals up to the first Five-Year Review will be used to adjust and target future collection actions.

Coordination with the operators of Sawmill Dam will be necessary to ensure notification if there is a need for a release of water from the dam sluice gates.

**Coordination of all the above remedial components**: It would be expected that all components of the Selected Remedy would be implemented as soon as possible: ICs, ECs, and a pre-design effort to perform the soil sampling and groundwater design work. Following the implementation of the pre-design investigations and implementation of the soil excavation and the OU-3-GW-3 remedy, the only remaining tasks will be ongoing monitoring, the periodic River inspections, and mercury removals.

Common to all these efforts will be a requirement for annual data reviews and reporting that describes the activities performed in the preceding year, an IC compliance assessment, and an assessment that evaluates the character of the landfill, groundwater, and the River. The assessment will also re-evaluate the assumptions regarding groundwater contamination, as well as the occurrence of mercury in the CHP Landfill and River. Because waste will remain in-place at concentrations that will not safely permit unlimited exposure and unrestricted use  after the final remedy is implemented, EPA will perform statutory five-year reviews of environmental conditions within 5 years after the initiation of remedial action and continue at least every 5 years conducting reviews for as long as contamination is present on-site to determine cleanup progress and the protectiveness of the remedy.

3.      Summary of the Estimated Remedy Costs

The overall cost for the selected remedy is $5 million. A summary of the costs for each of the OUs are explained in the summary table below. Additional details are in Table 5 in Appendix B.

| Summary Table of Costs for the Selected Remedy[1] | | | |
|---|---|---|---|
| | Capital Costs | Annual O&M Costs | Total Cost[2] |
| **OU-1**: CHP Landfill Maintenance & Monitoring, ICs & ECs. | $44,550 | $42,330 | $807,975 |
| **OU-2**: Soil excavation in the SFSA, EFSA, and uncapped areas of the CHP property, on-site or off-site disposal, and ICs. | $324,075 | $5,000 | $557,670 |
| **OU-3, CHP Landfill Groundwater**: ICs and monitoring. | $58,800 | $68,120 | $904,101 |
| **OU-3, Groundwater**: *In situ* chemical oxidation, monitoring & ICs. | $715,000 | $47,160 | $1,636,260 |
| **OU-3, River Mercury Monitoring and Removal** | $0 | $73,000 | $1,186,672 |
| **Total for the Selected Remedy** | **$1,142,425** | **$235,610** | **$5,092,678** |
| [1] Additional detail for the costs are provided in Appendix B in Table 5. Several of these remedies also contain estimates for contingencies that increase the overall costs, but those are factored into the Total Cost. [2] Total Costs are at a 7% discount rate over a 30-year period and are accurate within the range of +50% to -30%. | | | |

The information in this cost estimate summary table is based on the best available information regarding the anticipated scope of the remedial alternative. Changes in the cost elements are likely to occur as a result of new information and data collected during the engineering design of the remedial alternative. Major changes may be documented in the form of a memorandum in the Administrative Record file, an Explanation of Significant Differences, or a ROD amendment. This is an order-of-magnitude engineering cost estimate that is expected to be within +50 to -30 percent of the actual project cost.

The selected remedy may change to some degree as a result of pre-design studies, the remedial design, construction, or monitoring. To the extent there are any changes to the remedy described in this ROD, such changes would be documented through a technical memorandum added to the Administrative Record, an Explanation of Significant Differences (ESD), or a ROD amendment, as may be appropriate for the given change.

4.      Expected Outcomes of the Selected Remedy

The expected outcome of the Selected Remedy at the Site for the three OU's will be:

**OU-1, CHP Landfill, and OU-3, Groundwater beneath the CHP Landfill**: The remedy for this area within the limits of the landfill and the groundwater beneath the landfill, will be monitoring, maintenance and ICs. The future use of the CHP Landfill will be limited by ICs that, for example, restrict the building of structures and that prohibit the use of groundwater for anything other than monitoring. The CHP Landfill is abandoned and there are no plans for reuse at this time. Therefore, it will be maintained as a capped landfill.

**OU-2, the Southern and Eastern Facility Study Areas and the uncapped area of the CHP property**: The remedy, soil excavation and ICs, will remove contaminated soil exceeding commercial and industrial cleanup levels. ICs will, for example, prohibit residential use due to exceedances of residential cleanup levels. The SFSA and EFSA are privately owned, are zoned for commercial/industrial use and the adjoining biomass power plant has expressed an interest in commercial use of those areas.

**OU-3, Groundwater in the Southern Facility Study Area**: Contaminated groundwater outside of the CHP Landfill exists in fractured bedrock just south of the CHP Landfill in the SFSA. The remedy, *in situ* chemical oxidation will require well drilling on portions of that property, an estimated singular treatment event, and future monitoring for a 20-year period, until groundwater cleanup levels are achieved.  ICs will prohibit groundwater use for any purpose other than monitoring. ICs will also require that any buildings built over the groundwater contaminant plumes address the potential for soil vapors that exceed health-based standards.  ICs will be maintained until groundwater cleanup levels are achieved; at which time the groundwater will be available as a drinking water source, if needed.

**OU-3, Mercury removals in the Androscoggin River**: Liquid, elemental mercury, solid mercury amalgams and mercury-contaminated debris appear in the riverbed from fractures and other structures in the river. Annual inspections and removals will occur until it is determined that mercury levels have been reduced to a point where the frequency of inspections and monitoring can be modified.  The removal work will not alter the riverbed and there is no public access and no public use of this Reach of the river due to its inaccessibility and presence of dams up and down-stream of the Reach. The river is used solely for electric power generation in the area of AR-3.

### *Cleanup Levels*

Cleanup levels were developed for the COCs identified in the HHRA. COCs are the chemicals found at the Site that, based on the results of the risk assessment, were determined to pose an Incremental Lifetime Cancer Risk (ILCR) greater than 1 in 1 million or an HI greater than 1 for target organs. COCs were identified for exposure areas that posed a cancer risk in excess of an ILCR of 1 in 10,000, an HI greater than 1 for any target organ, a child blood lead level greater than 5 μg/dL in more than 5% of the population exposed, or a significant ecological risk. The tables listing Cleanup Levels for soil and groundwater along with their basis are presented in Appendix B. Soil Cleanup Levels are in Table 1, while that for groundwater is in Table 2a for groundwater inside the CHP Landfill and Table 2b for groundwater outside the CHP Landfill.

## M. STATUTORY DETERMINATIONS

The remedial action selected for implementation at the Chlor-Alkali Facility (Former) Superfund Site is consistent with CERCLA and, to the extent practicable, the NCP. The selected remedy is protective of human health and the environment, will comply will ARARs, and is cost-effective. In addition, the selected remedy utilizes permanent solutions and alternate treatment technologies or resource recovery technologies to the maximum extent practicable, and partially satisfies the statutory preference for treatment that permanently and significantly reduces the mobility,

toxicity, or volume of hazardous substances as a principal element to the maximum extent practicable.

## 1. The Selected Remedy is Protective of Human Health and the Environment

The selected remedy will adequately protect human health and the environment by eliminating, reducing, or controlling exposures to human and environmental receptors through excavation, treatment, engineering controls, long-term monitoring, and institutional controls. The selected remedy will reduce potential human health risk levels such that they do not exceed EPA's target risk range of a total excess lifetime cancer risk of $10^{-6}$ to $10^{-4}$ and/or a non-cancer HI greater than 1.0, or (for lead only) a target blood lead level greater than 5 μg/dL, and recover mercury released to the Androscoggin River from fractures and debris.

More specifically, for the source control component of the remedy, maintenance and monitoring of the existing CHP Landfill containment system coupled with soil excavation in isolated locations in the SFSA, EFSA, and uncapped areas of the CHP property and disposal either off-site or on-site, beneath the CHP Landfill cover system, will be protective of human health and the environment by preventing exposure. Monitoring of groundwater beneath the CHP Landfill to ensure that it remains isolated from the environment and Institutional Controls will prevent exposure to groundwater contaminants. *In situ* treatment of contaminated groundwater beneath the SFSA to destroy or immobilize contaminants and the use of ICs will prevent future exposure to drinking water until groundwater cleanup levels are achieved.

Long-term monitoring of groundwater, surface water, and the vapor intrusion pathway will ensure the remedy remains protective. Institutional Controls are necessary to: prohibit future unrestricted use at the Chlor-Alkali Site, including any residential uses; prevent future construction worker exposure to soil contamination in the SFSA and EFSA until contaminated soils are removed; prevent disturbance to the existing engineered cover system and other components of the remedy (*i.e.* monitoring and treatment wells); prevent contact with soil beneath the existing engineered cover system on the CHP Landfill; and require either a vapor intrusion evaluation or vapor mitigation system be installed if a new building is constructed over the CHP Landfill or areas where overburden groundwater is contaminated with VOCs in the SFSA. ICs prohibiting groundwater use will be in place permanently within the CHP compliance boundary, and temporarily, for approximately 20 years, outside of the compliance boundary until groundwater cleanup levels are achieved.

## 2. The Selected Remedy Complies with ARARs

The selected remedy will comply will all federal and any more stringent state ARARs identified for the Site. The selected remedy will also incorporate procedures and processes identified by policies, advisories, criteria, and guidance documents (To Be Considered). A detailed list of ARARs/To Be Considered requirements for the selected remedy is included in Appendix D of this ROD. A discussion of the more significant ARAR issues is include below.

*Wetlands Impacts*

Pursuant to Section 404 of the Clean Water Act (CWA), EPA has determined that the selected remedy is the least environmentally damaging practicable alternative (LEDPA) for protecting

Record of Decision
Part 2: The Decision Summary

federal jurisdictional wetlands and aquatic ecosystems at the Site under these standards. EPA will minimize potential harm and avoid adverse impacts to wetlands by using best management practices during excavation and by restoring or replicating, if necessary, these areas consistent with federal and New Hampshire's wetlands protection laws. Any wetlands affected by remedial work will be restored (or replicated, if necessary) with native wetland vegetation and any restoration efforts will be monitored. Mitigation measures will be used to protect wildlife and aquatic life during remediation, as necessary. EPA solicited public comment through its Proposed Plan on its LEDPA determination and did not receive any negative comments (see Part 3 of this ROD)

EPA's selected remedy balances the need to address the contamination that poses an ecological risk to the wetlands and waterways and its ability to restore any (temporarily or permanently) altered wetland resources and aquatic habitats impacted by the remediation. As required under relevant and appropriate federal wetlands regulations at 44 C.F.R. Part 9 and Executive Order 11990 (Protection of Wetlands), EPA solicited public comment through its Proposed Plan regarding the remedy's potential impacts on wetland resources and received no comments adverse to the proposed remedies (see Part 3 of this ROD).

*Floodplain Impacts*

Pursuant to Executive Order 11988 (Floodplain Management) and federal regulations at 44 C.F.R. Part 9, EPA has determined that the selected remedy will cause temporary impacts to 100-year and 500-year floodplains but will not result in the occupancy and modification of floodplains, except for limited periods during remedy implementation or potentially O&M of the CHP Landfill. Best management practices will be used during the remedial activities to minimize temporary impacts to floodplains and any excavations within floodplain will be returned to original grade to avoid diminishing flood storage capacity. Remedial infrastructure within the floodplain (*i.e.* monitoring wells, the CHP Landfill retaining wall) will be installed/maintained to prevent any release of contamination is up to a 500-year flood/storm event.  Restoration and monitoring activities are included in the response actions. As required under relevant and appropriate federal wetlands regulations at 44 C.F.R. Part 9, EPA solicited public comment in its Proposed Plan regarding the remedy's potential impacts on floodplain resources and received no negative comments (see Part 3 of this ROD).

*TSCA; PCB Determination*

This ROD includes a finding by EPA that PCB-contaminated soil and landfill debris at the Site meets the definition of a PCB remediation waste, as defined under 40 C.F.R. Section 761.3 of regulations promulgated under the Toxic Substances Control Act (TSCA), 15 U.S.C. § 2601 *et seq.*, and thus are regulated for cleanup and disposal under 40 C.F.R. Part 761. Under 40 C.F.R. Section 761.61(c), EPA may authorize disposal of PCBs in a manner not otherwise specified, provided EPA determines that the disposal will not pose an unreasonable risk of injury to health or the environment. EPA is solicited public comment on EPA's draft TSCA finding through the Proposed Plan and addressed a comment on the Determination in the Responsiveness Summary (see Part 3 of this ROD).  EPA has not modified its Determination based on the comment.

Record of Decision
Part 2: The Decision Summary

Consistent with the TSCA regulatory requirements at 40 C.F.R. Section 761.61(c), EPA has reviewed the Administrative Records for the proposed remedial action, which includes the following activities:

(1) Any PCB-contaminated debris or soil currently existing within the CHP landfill is currently covered with a landfill cap that meets the TSCA regulatory requirements of 40 C.F.R. Section 761.61(a)(7) and RCRA Subtitle C regulations (40 C.F.R. Section 264.310).

(2) PCB-contaminated soil from the EFSA with equal or greater than (≥) 10 parts per million (ppm) (measured *in situ*) will be excavated and disposed of at an off-site disposal facility or on-site under the CHP landfill cap. If the existing cap is opened to receive additional on-site wastes, the opening will be repaired to meet the TSCA regulatory requirements of 40 C.F.R. Section 761.61(a)(7) and RCRA Subtitle C regulations (40 C.F.R. Section 264.310). Removal and disposal of the ≥ 10 ppm PCB-contaminated soil from the EFSA will address potential human health risks posed to commercial/industrial workers from PCB-contaminated soil within the Site.

(3) The existing CHP Landfill containing PCB-contaminated waste will be monitored and maintained to prevent any release of and exposure to PCB-contaminated material within the landfill.

(4) Remaining uncapped areas of contaminated soil with PCB-contaminated soil at ≥ 1 ppm but less than 10 ppm PCBs that pose an unacceptable risk for residential and unrestricted use exposure will be addressed through institutional controls that will restrict residential development and other unrestricted uses.

The PCB cleanup standards are based on EPA human health and ecological risk assessments that have determined that the soil PCB cleanup levels established will not pose an unacceptable risk of injury to health or to the environment. EPA has determined that the proposed on-site disposal or excavation/off-site disposal of PCB-contaminated soil, as set out in the Administrative Record for the proposed remedy, will not pose an unacceptable risk of injury to health or the environment as long as the following conditions are met:

 (1) any soil designated for either on-site or off-site disposal shall be tested for PCBs *in situ*, and depending on any PCB contamination identified, shall be managed as required under 40 C.F.R. § 761.61 and if required, disposed of in an off-site disposal facility licensed to accept the concentration of PCB-contaminated material identified.

(2) any water generated from excavations or dewatering of PCB-contaminated soils shall be tested for PCBs and, depending on any PCB contamination identified, managed, treated (if required) and disposed of in compliance with the TSCA requirements at 40 C.F.R. § 761.79(b).

(3) air monitoring and appropriate dust suppression measures shall be implemented and maintained to ensure that airborne PCB levels are below levels of concern as specified in

the ROD during any excavation, passive dewatering, and management of excavated soil conducted prior to off-site disposal and during site work prior to construction completion of the clean covers.

(4) the PCB marking and storage requirements for PCB waste under 40 C.F.R. §§ 761.40, 761.45, and 761.65 are implemented.

(5) land use restrictions shall be established to prohibit residential and other unrestricted use, to prohibit construction of buildings on the landfill cap, and to require maintenance of the landfill cap.

(6) a long-term monitoring and maintenance plan shall be developed and implemented for the landfill cap, with groundwater and River monitoring to ensure the effectiveness of the landfill containment in eliminating direct exposure and ensuring no migration of PCBs from the capped areas.

EPA makes the above findings based on all information contained in the Administrative Record for the Site. EPA reserves its right to modify this 40 C.F.R. § 761.61(c) determination and the right to require additional remedial measures in the event of changes in site conditions or use, review of long-term monitoring results, or if any new information is presented that indicates these measures are no longer effective, including the discovery of additional PCB contamination or previously unknown conditions.

### 3. The Selected Remedy is Cost-Effective

In EPA's judgement, the selected remedy is cost-effective because the remedy costs are proportional to its overall effectiveness (see 40 C.F.R. 300.430(f)(1)(ii)(D)). This determination was made by evaluating the overall effectiveness of those alternatives that satisfied the threshold criteria (*i.e.*, that are protective of human health and the environment and comply with all federal and any more stringent state ARARs, or as appropriate, waive ARARs). Overall effectiveness was evaluated by assessing three of the five balancing criteria—long-term effectiveness and permanence; reduction in toxicity, mobility, or volume through treatment; and short-term effectiveness, in combination. The overall effectiveness of each alternative then was compared to the alternative's cost to determine cost-effectiveness. The relationship of the overall effectiveness of this remedial alternative was determined to be proportional to its costs and hence represents a reasonable value for the money to be spent.

The estimated present worth cost of the components that comprise the selected remedy is approximately $5 million. The range in estimated cost for each of the areas of contamination are:

- CHP Landfill: $0 (OU-1-1: No Action) to $120,000 (OU-1-2: CHP Landfill maintenance and monitoring).
- For the four soil remediation alternatives for the SFSA, EFSA and uncapped area of the CHP property: $0 (OU-2-1: No Action) to $700,000 (OU-2-3: soil cover and ICs). The selected remedy for soil contamination in the SFSA, EFSA, and the uncapped area of the CHP property is $560,000 with no future costs.

- Groundwater beneath the CHP Landfill: $0 (OU-3-CHP-1: No Action) to $900,000 (OU-3-CHP-2: monitoring and ICs).
- Groundwater outside the CHP Landfill: $0 (OU-3-GW-1: No Action) to $1,600,000 (OU-3-GW-2: *in situ* treatment and ICs).
- Mercury in the Androscoggin River: $0 (OU-3-AR-3-1: No Action) to $1,200,000 (OU-3-AR-3-2: periodic recovery of mercury and mercury amalgams in the river).

Table 5 in Appendix B helps demonstrate the cost-effectiveness of the selected landfill, soil, groundwater, and river remedies.

## 4. The Selected Remedy Utilizes Permanent Solutions and Alternative Treatment or Resource Recovery Technologies to the Maximum Extent Practicable

Once the Agency identified those alternatives that attain or, as appropriate, waive ARARs and that are protective of human health and the environment, EPA identified which alternatives utilized permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable. This determination was made by deciding which one of the identified alternatives provides the best balance of trade-offs among alternatives in terms of: 1) long-term effectiveness and permanence; 2) reduction of toxicity, mobility, or volume through treatment; 3) short-term effectiveness; 4) implementability; and 5) cost.

The balancing test emphasized long-term effectiveness and permanence and the reduction of toxicity, mobility, or volume through treatment. It considered the preference for treatment as a principal element; the bias against land disposal of untreated waste, to the extent practicable; and community and state acceptance. The selected remedy provides the best balance of trade-offs among the alternatives. The selected remedy is protective of human health and the environment, uses proven cleanup technologies such as excavation, off-site disposal, treatment, and institutional controls, and is cost effective, while achieving the Site-specific cleanup levels and RAOs in a reasonable timeframe.

This cleanup approach provides both short- and long-term protection of human health and the environment; attains all applicable or relevant and appropriate federal environmental laws and state environmental and facility siting laws; reduces the toxicity, mobility, or volume of contaminated groundwater through treatment, to the maximum extent practicable; utilizes permanent solutions and uses land use restrictions to prevent unacceptable exposures in the future to the contaminants that will remain at the Site.

## 5. The Selected Remedy Partially Satisfies the Preference for Treatment Which Permanently and Significantly Reduces the Toxicity, Mobility, or Volume of the Hazardous Substances as a Principal Element

Since no principle threat waste is present at the Site, treatment technologies to address the landfill debris, contaminated soil, and mercury contamination in the River were determined not to be practicable. Instead, the principal elements of the selected remedy for these media are

source control and management of migration. The remedy includes *in situ* treatment of groundwater outside the CHP Landfill to attain cleanup standards in groundwater.

### 6. Five-Year Reviews of the Selected Remedy are Required

At the conclusion of the remedy construction, hazardous substances, pollutants or contaminants will remain at the Site that will not allow unlimited use and unrestricted exposure. Therefore, as required by law, EPA will review the Site remedy to ensure that the remedial action continues to protect human health and the environment at least once every five years as part of the Agency's five-year reviews of the Site. These five-year reviews will evaluate the components of the Site remedy for as long as contaminated media above CERCLA risk levels remain in place.

## N. DOCUMENTATION OF NO SIGNIFICANT CHANGES

EPA presented the Chlor-Alkali Proposed Plan for remediation of the Site to the public for review and comment on June 10, 2020. The Plan described the alternatives considered and EPA's preferred alternatives for the selected remedy.

As discussed in Part 3 below, EPA reviewed all comments submitted during the public comment period, which began on June 3, 2020, and ended on July 3, 2020. Based upon a review of the comments, EPA determined that no significant changes to the remedy, as originally identified in the June 2020 Proposed Plan were necessary.

## O. STATE ROLE

The State of New Hampshire, through its lead agency, NHDES, concurs with the selected remedy for the Site. A copy of the declaration of NHDES's concurrence is attached as Appendix A of this ROD.

## PART 3: THE RESPONSIVENESS SUMMARY

**PUBLIC COMMENTS AND EPA RESPONSES**

EPA published the notice of availability of the Proposed Plan and Administrative Record in the Berlin Sun on May 28, 2020 and released the Proposed Plan to the public by posting a publicly accessible link on EPA's website. In addition, EPA provided the Proposed Plan to the Berlin Public Library located at 290 Main Street, Berlin, New Hampshire.

From June 3, 2020, through July 3, 2020, EPA held a thirty-day public comment period to accept public comments on the alternatives presented in the Feasibility Study and Proposed Plan, and on any other documents previously released to the public. On June 10, 2020 at 7pm, EPA held a virtual public informational meeting on-line, immediately followed by a virtual Public Hearing that was also on-line, to describe EPA's Proposed Plan and to accept any oral or written comments. No comments were received during the virtual meeting. EPA made available a dedicated voice mailbox to receive oral comments during the 30-day comment period. No oral comments were received in the voice mailbox or via any other telephone message.

EPA did receive one comment letter from Georgia-Pacific Consumer Products LP (Georgia-Pacific) within the comment period. The comments are summarized here, and the full text of the written comment letter has been included in the Administrative Record for the Site.

**Summary of the six written comments received from Georgia-Pacific on July 1, 2020 and EPA's responses:**

**Georgia-Pacific Comment #1**

Georgia-Pacific criticizes EPA's finding that that polychlorinated biphenol (PCB) contaminated soil and landfill debris at the Site meets the definition of a PCB remediation waste, as defined under 40 C.F.R. Section 761.3 of regulations promulgated under the Toxic Substances Control Act (TSCA), 15 U.S.C. § 2601 et seq., and thus are regulated for cleanup and disposal under 40 C.F.R. Part 761.  EPA's finding is now memorialized in this Record of Decision.

Georgia-Pacific's criticism of the TSCA finding is that it is incongruous with the Administrative Record for the following reasons:

- Georgia-Pacific notes that throughout the sampling conducted for the RI and SRI, there was only one sample with a PCB detection greater than the OU-2 Cleanup Level (i.e., SFSA and EFSA) of 10 ppm.
- Georgia-Pacific notes a finding of EPA's human health risk assessment for the Site (the HHRA) that risks associated with non-residential exposure to PCBs in OU-2 are within the EPA target levels.
- Georgia-Pacific notes that TSCA-related guidance, as well as EPA/New Hampshire Department of Environmental Services (NHDES) practice at other sites have allowed soils with PCBs greater than 10 ppm to remain in place under certain circumstances, including in "low occupancy areas."

**EPA Response to Comment #1**: While, to date, there is only one soil sample identified that exceeds the PCB Cleanup Levels, other exceedances of the standard may be discovered during remedial design and implementation of the remedy. The sample grid for soil samples during the RI varied from 200-feet in the EFSA to 50-feet in the SFSA. A finer-grid utilized during RD\RA may find additional occurrences of PCB-contaminated soils. Since the RAO for the remedy is to prevent exposure to commercial/industrial receptors, the selected remedy calls for the excavation of all soils that pose a commercial/industrial risk. EPA's PCB Cleanup Level is a conservative, reasonable approach to address all potential commercial/industrial exposure risks present in the SFSA, EFSA and the uncapped areas of the CHP property, in light of anticipated potential future uses for the Site. The HHRA determined that PCBs in the SFSA area pose a significant non-cancer risk to construction workers, even though the predominant risk drivers are manganese, mercury, and arsenic (Table 6.2-1).

Georgia-Pacific suggests that a less conservative Cleanup Levels should be established here consistent with a "low occupancy area" because this approach has been utilized at another site in New Hampshire and is discussed in EPA guidance. Even assuming that all the requisite elements of the TSCA guidance could be fulfilled here (and this showing has not been established), taking this approach would also require establishing additional ICs to restrict commercial/industrial use of the property to meet the requirements for a "low occupancy area" under the TSCA regulations. The CERCLA remedy selection process is site-specific, by definition.  While EPA's decision making at a given NPL site may be informed by guidance and approaches taken at other NPL sites, EPA is not bound to an inflexible adherence to an approach that may have been deemed appropriate for another situation at another site. For this Site, EPA has developed the soil remedy so that only ICs to restrict residential use would be necessary and no ICs restricting commercial/industrial use in the SFSA and EFSA would be required.

---

**Georgia-Pacific Comment #2**

This comment suggests that EPA's conclusion that lead in soil poses an unacceptable risk to current and future workers in the SFSA potion of the Site is not supported by the record and specifically that the HHRA does not support this finding.

**EPA Response to Comment #2**:  According to the HHRA (page 62), "*Although the results of the Adult Lead Model (ALM) indicate that adverse effects are not anticipated for fetuses of pregnant workers at the SFSA, it should be noted that the maximum lead concentration in surface soils at the SFSA (24,438 mg/kg at FSA-168) is more than ten times the average concentration*." According to the HHRA, the average lead concentration in the SFSA surface soil data set was 1,068 mg/kg, while the average lead concentration in the aggregate soil data set was 655 mg/kg. These average concentrations were used in the ALM to calculate potential risks.

According to Figure 36 of the SRI, the maximum lead concentration of 24,438 mg/kg was detected in the top 1 foot of soil at FSA-168, and the lead concentrations detected in the adjacent surface soil (top 1 foot) samples were also elevated (*i.e.*, relative to the average concentrations used for the HHRA), ranging between 2,325 mg/kg and 4,096 mg/kg. Therefore, although the

average lead concentration does not result in significant risks at the SFSA area, the small area including FSA-168 had relatively high lead concentrations that would warrant additional delineation and characterization.

It should be noted that in its risk calculations documented in the HHRA, EPA has applied the updated ALM using the updated default parameters (https://semspub.epa.gov/work/HQ/196766.pdf). Using the updated values, the average surface soil lead concentration of 1,068 mg/kg would result in unacceptable risk to adult workers. The average lead concentration in the aggregate soil data set is still expected to result in a No Significant Risk conclusion.

―――――――――――――

**Georgia-Pacific Comment #3**

In this comment Georgia-Pacific states that Institutional Controls (ICs) are an important element of remedial alternatives described in the Proposed Plan and suggests that EPA take notice of two existing documents that purport to provide certain use restrictions for properties comprising the Site. The comment suggests, but does not expressly state, that reference to these documents be made in this decision document, and that the documents be included as the ICs to be selected for implementation of the remedial action.

**EPA Response to Comment #3**: No specific ICs are identified in the ROD.  Rather, the ROD only establishes the substantive restrictions that are required to maintain the protectiveness of the remedy. As noted in EPA's "Clarification and Limitations to the Final Supplemental Remedial Investigation Report," the legal effect of the documents or instruments has described as "deed restrictions" in these comments and in a number of other reports and submissions to EPA by G-P has not yet been determined by EPA. The ICs to be implemented for this Site pursuant to this ROD will be determined by EPA to be effective in contributing to long-term protectiveness at the Site, in this case by restricting specific land and resource uses (i.e., groundwater), and by protecting engineered remedy components. The evaluation of whether ICs are effective is a site-specific determination. This determination is expected to be a part of the remedial design process.

―――――――――――――

**Georgia-Pacific Comment #4**

In this comment, G-P seeks to contrast EPA's determination that there is insufficient data at this time to evaluate Monitored Natural Attenuation (MNA) as a remedy component at this Site, with EPA's determination that *in-situ* chemical oxidation (ISCO) may be included as a component of the Selected Remedy.  In the case of MNA, G-P's comment suggests that an adequate basis for the evaluation of MNA already exists for this Site, while in the case of the ISCO component, G-P's comment suggests that additional study would still be required to evaluate its implementability and effectiveness before it should be included in the Selected Remedy.

**EPA Response to Comment #4**:  *In-Situ* Chemical Oxidation (ISCO) is a known effective remedy for contaminants at VOC-contaminated sites and, while details of implementation must

be evaluated, there is not a question that the remedy will be effective for remediating the contaminants if applied effectively. At this time, the limited site-specific evidence for MNA does not provide quantifiable information that the remedy will be effective at the site. Key measures include a sufficient period of monitoring of the well network, determination of metabolic products, how inorganic contaminants will be addressed, and a determination of a reasonable cleanup time. These requirements are discussed in the following EPA guidance documents:

- 1999 Use of Monitored Natural Attenuation Guidance April 1999, OSWER Directive 9200.4-17P, EPA 540/R-99/009
- 2015 Use of Monitored Natural Attenuation for Inorganic Contaminants in Groundwater, August 2015, OSWER Directive 9283.1-36.

As such, as more information is gathered, MNA could be evaluated in the future, including during the RD\RA; however, it cannot be presented as remedy alternative at this time.

---

## Georgia-Pacific Comment #5

With respect to removal of debris, liquid elemental mercury, and hardened metal amalgams from Reach AR-3 adjacent to the CHP, G-P comments that it expects less mercury to be observed and collected in the future and, accordingly, the Selected Remedy may not require annual collection events in the river. G-P also notes that collection events are not anticipated to occur for 30 years. Thus, G-P suggests the Remedial Alternative should allow for less frequent collection based on occurrence of liquid elemental mercury and hardened metal amalgams.

**EPA Response to Comment #5**:

The recurring observations of liquid elemental mercury together with hardened metal amalgams is a key feature of this Site that has been of ongoing concern since the inception of the Site investigation activities in 2004.  Through the RI and SRI activities, EPA and NHDES have sought to understand the fate and transport of mercury at the Site more fully. That work, however, has not conclusively established any one of a number of theories that have been proposed to explain the recurring occurrence of mercury in the river (i.e., conceptual site models or CSMs) to the exclusion of all other theories. Accordingly, in order to move forward with a cleanup plan, EPA has agreed at this time, and in light of the limitations on the data and evidence available, that the most plausible explanation for the occurrence of mercury in the River is that it is likely the result of direct disposal activities during operation and closure of the Chemical Plant facility (including, potentially, its demolition).

Nevertheless, at this time EPA remains uncertain that a pathway and mechanism for mercury migration from the landfill does not exist. Should such a pathway and mechanism for mercury migration exist, that would necessitate further measures be taken in order to ensure containment of the hazardous materials within the CHP landfill and the long-term protectiveness of the remedy. Accordingly, EPA believes that until the long-term trends for mercury occurrence are better understood, the yearly monitoring activity and removal should continue for as long as mercury, mercury amalgam, and mercury-contaminated debris appear in the River. The actual

period that monitoring/mercury removals will need to be continued will be contingent on the results of the monitoring as it goes forward.

---

## Georgia-Pacific Comment #6

This comment addresses the selected remedial action for AR-3, which is the portion of the Androscoggin River adjacent to the CHP. G-P notes that the Selected Remedy provides that some treatment of water generated from dewatering of the material removed may be required prior to discharge of the water back to the river. G-P notes, however, that current practices in conducting the river investigation and pilot study work do not involve water extraction or collection. Accordingly, G-P's comment states that this portion of the remedy is not anticipated to include water treatment.

**EPA Response to Comment #6**: During previous mercury removal activities, dewatering of specific areas of the river did occur and simple water treatment in the form of bag filtering of the removed water prior to discharge back to the river was used. As with all elements of the Selected Remedy, the ongoing remedial action to be undertaken for AR-3 will be in accord with ARARs. The specific requirements for this action, including whether dewatering of any removed material is necessary, and whether further treatment of the removed water will also be necessary, will be determined in the remedial design.

---

<center>End of Comments and Responses</center>

Record of Decision
Appendices

**APPENDICES**

APPENDIX A: Letter of Concurrence from the State of New Hampshire Department of
Environmental Services

APPENDIX B: Tables

APPENDIX C: Figures

APPENDIX D: Applicable and Relevant and Appropriate Requirement Tables

APPENDIX E: References

APPENDIX F: Acronyms and Abbreviations

APPENDIX G: Administrative Record and Guidance Documents

**Appendix A**: **New Hampshire Department of Environmental Services Letter of Concurrence**

The State of New Hampshire
# DEPARTMENT OF ENVIRONMENTAL SERVICES

————

### Robert R. Scott, Commissioner



EMAIL ONLY

September 17, 2020

Bryan Olson, Director
Superfund and Emergency Management Division
Office of Site Remediation and Restoration
US EPA New England, Region I
5 Post Office Sq., Suite 100
Boston, MA  02109-3912

**RE:     Record of Decision – Operable Units 1, 2, and 3**
**Chlor-Alkali Facility (former) Superfund Site**
**Berlin, New Hampshire – DES #199709046, Project RSN #10137**

**SUBJECT:     Declaration of Concurrence**

Dear Mr. Olson:

The New Hampshire Department of Environmental Services (NHDES) has reviewed the Record of Decision (ROD), dated September 2020, for the Chlor-Alkali Facility (former) Superfund Site in Berlin, New Hampshire. The United States Environmental Protection Agency (EPA) prepared this ROD in accordance with the provisions of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), as amended by the Superfund Amendments and Reauthorization Act of 1986. The ROD addresses the remedial actions necessary under CERCLA, as amended, to manage potential threats to human health and the environment at the Site.

**Rationale for the ROD**

The Chlor-Alkali Facility (former) Superfund Site (Site) lies on the east bank of the Androscoggin River (River) in Berlin, New Hampshire. The Chlor-Alkali Facility commenced operations in the late 1890's and provided chlorine for the manufacture of paper at the Brown Company pulp and paper mill located just south of the Chemical Plant. Chemical production ceased in the mid-1960's and portions of the Chemical Plant were either demolished or used for other purposes. The last Chemical Plant building (a cell house located adjacent to the River) was demolished in 1999 and the building debris were interred in an on-site landfill that was capped by the owners of the paper mill at that time and closed under the oversight of NHDES.

The Site came to the attention of NHDES, and subsequently EPA, due to the continuing appearance of liquid elemental mercury, solid mercury amalgams, and mercury-containing debris on the banks of, and in the riverbed, of the Androscoggin River. The liquid beads of elemental mercury range from between 0.5 millimeter in diameter to elongated forms that are 1 centimeter in diameter and up to 3 centimeters in length. Amalgam mercury also occurs as coatings on pebbles and solid metal forms. Mercury-containing debris consists of isolated liquid beads of mercury contained within scrap metal and solidified masses. Evidence supports that these debris, and associated mercury, were disposed into the river during Chemical Plant operations.

Case 1:22-cv-00395-PB   Document 2-1   Filed 09/30/22   Page 94 of 244

The Site has been divided into three Operable Units (OUs). The Cell House Property (CHP) Landfill, OU-1, contains contaminated soils beneath the 4-acre capped landfill area as well as a 0.6-acre uncapped area of native soils. The Southern Facility Study Area (SFSA), approximately 19-acres in size, located largely south of the CHP Landfill and Eastern Facility Study Area (EFSA), approximately 17-acres, located east of the CHP Landfill, is designated as OU-2 and has isolated hotspots of contaminated soils. OU-3 consists of two units: contaminated groundwater beneath the CHP Landfill and SFSA, and mercury that appears in the Androscoggin River between Sawmill and Riverside Dams, known as Androscoggin River Reach 3, or AR-3.

The hypothesis presented in the 2014 Remedial Investigation Report (RIR) is that the source of the mercury in the River was the CHP Landfill. The current premise is that most of the mercury and mercury-lead amalgams are the result of direct disposal into the River while the Chemical Plant was operating. The mercury is often collocated with metallic debris and in fractures and crevices in the bedrock surface of the River. The variable flows in the River create hydraulic conditions that cause the mercury to emerge from the debris and fractures. This mercury is then found on the River bottom and east bank.

The exposure assessment in the Human Health Risk Assessment (HHRA) concluded that current exposure risk exists to contaminated soil in the EFSA and SFSA, and to mercury appearing in the River. People working or trespassing in the SFSA or EFSA may be exposed to soil contaminants. No current exposure exists at the CHP Landfill, due to the cap and other containment features. Workers or trespassers in AR-3 may be exposed to liquid elemental mercury or hardened metal amalgams.

Based on the results of the HHRA, EPA found that the following pathways pose unacceptable human health risks because the calculated risks exceed EPA's acceptable cancer risk range of $10^6$ to $10^{-4}$, the non-cancer Hazard Index of 1, or EPA's risk-based standard for lead (or some combination of these):

- *Current trespassers and future residents and trespassers in the EFSA and SFSA*. In the EFSA Contaminants of Concern (COC) in soil that pose unacceptable risk include SVOCs such as benzo(a)pyrene and benzo(a)anthracene, as well as dioxin, furans, arsenic and mercury. In the SFSA, dioxin, furans, mercury and, arsenic in soils posed unacceptable risk.

- *Current and future workers in the EFSA and SFSA*. In the EFSA, dioxin, furans, and mercury in soil posed unacceptable risk. In the SFSA, mercury and lead in soil posed unacceptable risk.

- *Future residents, workers, and trespassers in the CHP Landfill* could be exposed to dioxin, furan, mercury, and benzo(a)pyrene in the landfilled materials that would create an unacceptable risk if the cap failed to contain the wastes.

- *Future use of groundwater inside the CHP Landfill as drinking water* would create an unacceptable exposure risk due to chloroform, carbon tetrachloride, chromium, arsenic and dioxin.

- *Future use of groundwater outside the CHP Landfill as drinking water* would create an unacceptable exposure risk due to chloroform, carbon tetrachloride, chromium, and arsenic.

- *Future use of portions of the CHP Landfill and SFSA for occupied structures* over those areas of the groundwater contaminant plume due to the potential for vapor intrusion into those structures.

The RI found no contamination in River surface water and therefore no unacceptable risk. The HHRA found that sediment in the River did contain COCs, but the RIR could not determine if the contaminants originated from the Site. However, the HHRA found that downstream sediment did not pose an unacceptable risk to adult or child recreators.

EPA found many of the COCs, including mercury, in fish sampled downstream of the Site. Consumption of fish was found to pose a risk to human health. But with many other potential upstream and downstream sources, the RIR could not attribute those contaminants as originating solely from the Site. Mercury was determined to pose a risk to anglers that consumed the fish. However, because the concentrations of mercury in fish were not statistically different from the background areas upriver of the Site, CERCLA prohibits taking remedial measures to address background contamination. The State of New Hampshire prohibits the taking and consumption of fish from Sawmill Dam downriver to the Maine State line due to the presence of contamination in those fish.

EPA assessed risk to the environment through two analyses: Terrestrial Screening Level Ecological Risk Assessment (TSLERA) for exposure to biota in the area of the EFSA, SFSA, and CHP, and a Baseline Ecological Risk Assessment (BERA) for biota in the Androscoggin River. In the EFSA and SFSA the TSLERA found little to no potential for current adverse effects to plant and soil invertebrate communities. A potential for adverse effects to bird and mammal populations was found to exist in these areas from the presence of dioxins, furans, PCBs, lead and PAHs. The CHP is capped and therefore there is only a future risk to bird and mammal populations if the cap were to fail. EPA did determine that there was potential ecological risk from exposure to contamination in the CHP landfill if the containment system were to fail and result in exposure of contamination to ecological receptors on land or in the River.

**Summary of Selected Remedy**

EPA has selected a comprehensive remedial strategy for the site. The selected remedial actions by OU are as follows:

OU-1, CHP Landfill, the remedy includes:

- Engineering Controls (ECs): Monitor and maintain the CHP Landfill containment system. The containment system consists of the landfill cover system, a slurry wall that minimizes groundwater entering the landfill footprint, and a retaining wall.

- Institutional Controls (ICs): Legally enforceable restrictions that prohibit certain uses on the property and manage the use of groundwater.

- Monitoring of ECs and ICs to ensure the remedy remains protective.

OU-2, the SFSA and EFSA, the remedy includes:

- Excavation of contaminated soil and disposal either beneath the CHP landfill cap or at a permitted off-site facility.
- Institutional Controls (ICs) will be used to prohibit certain uses on the property.

OU-3 consists of two divisions: groundwater and the AR-3-portion of the Androscoggin River.

- OU-3, Groundwater beneath the CHP Landfill: The selected remedy will monitor groundwater beneath the CHP Landfill to determine if the contaminated groundwater remains contained within a "compliance boundary," which would be established around the footprint of the CHP Landfill. ICs will be used to manage the use of groundwater.
- OU-3, Groundwater beneath the SFSA: The selected remedy for contaminated groundwater in this area will be in-situ chemical oxidation to destroy or immobilize the contaminants. ICs will be used to manage the use of groundwater.
- OU-3, Androscoggin River: The selected remedy will include periodic inspections to assess the presence of liquid, elemental mercury and solid mercury amalgams in the riverbed, in river debris, and on the banks. The remedy will also include periodic removals of mercury, mercury amalgams, and mercury-contaminated debris that appear in the river.

The selected remedy will combine these technologies in an effort to obtain a comprehensive approach for Site remediation in all three OUs.

**State Concurrence**

NHDES, in reviewing the referenced ROD, has determined that the selected remedy for all three operable units is consistent with NHDES' requirements for a remedial action plan and meets all of the criteria for remedial action plan approval. Ultimately, the remedy for all OUs will address the source of contamination, provide for institutional controls that will restrict the use of the Site and manage the use of groundwater, and provide for long-term monitoring and source removal actions at the Site and in the River that will be protective of human health and the environment. Therefore, NHDES, acting on behalf of the State of New Hampshire, concurs with the remedial actions described in the ROD.

Please contact the NHDES Site Project Manager, Andrew Hoffman, at (603) 271-4060 or andrew.hoffman@des.nh.gov, or me if you have questions or comments.

Sincerely yours,

Michael J. Wimsatt, P.G., Director
Waste Management Division
Tel: (603) 271-1997
michael.j.wimsatt@des.nh.gov

Record of Decision                                                    September 17, 2020
Chlor-Alkali Facility (former) Superfund Site                          Page 5 of 5
Berlin, New Hampshire

ec:   James Wheeler, City Manager, City of Berlin
      Berlin City Council, c/o Shelli Fortin
      City of Berlin Health Officer
      Melissa Taylor, USEPA
      Darryl Luce, USEPA
      Robert Scott, Commissioner, NHDES
      John Duclos, Acting Asst. Commissioner, NHDES
      Allen Brooks, NHDOJ
      Sarah Yuhas Kirn, NHDES
      Karlee Kenison, NHDES
      Robin Mongeon, NHDES
      Andrew Hoffman, NHDES

**Appendix B**: **Tables**

Record of Decision
Appendix B: Tables

| Table 1: Soil and Debris Standards and Cleanup Levels Chlor-Alkali Superfund Site, Berlin, New Hampshire | | |
|---|---|---|
| **Commercial / Industrial Standards (mg/kg)[1]** | | |
| **Contaminant of Concern** | *OU-1 – CHP Cap Area Landfilled Soil/Debris, Performance Standards* | *OU-2 – EFSA and SFSA and OU-1 Uncapped Area Soil, Cleanup Levels* |
| PCB (high risk = Aroclor 1254)[2] | 26 | 10 |
| PCDD/PCDF (TEQ)[3] | 1.17E-03 | 7.24E-04 |
| Benzo(a)anthracene | 307 | 207 |
| Benzo(a)pyrene | 31 | 21 |
| Benzo(b)fluoranthene | 308 | 211 |
| Dibenz(a,h)anthracene | 31 | 21 |
| Arsenic (inorganic) | 92 | 30 |
| Mercury (elemental) | 319 | 50 |
| Mercuric Chloride and Other Salts | 547 | 350 |
| Lead[4] | 1,000 | 1,000 |

[1] mg/kg: milligram per kilogram or parts per million.
The Cleanup Levels were developed using the RSL calculator and the Exposure Point Concentrations for all COCs for the two respective scenarios above, excepting lead.

[2] The RSL calculations incorporate potential non-carcinogenic risk and "high risk" Aroclor 1254 for PCB Cleanup Levels. The 10 mg/kg Cleanup Level for PCBs was developed using EPA's RSL calculator, consistent with procedures outlined in the Final SRI Report. The 10 mg/kg Cleanup Level is the more protective of the carcinogenic and non-carcinogenic screening levels developed via EPA RSL calculator. Attachment I of the Final SRI Report included the RSL output files.

[3] PCDD/PCDF (TEQ): Polychlorinated dibenzodioxin/polychlorinated dibenzofurans, toxicity equivalents.

[4] The Cleanup Level for lead is based on the Region 1 developed Regional Screening Level, developed using the updated Adult Lead Model and updated default parameters for Commercial and Industrial exposure with a targeted Blood Lead Level of 5 µg/dL.

## Table 2
### Groundwater Performance Standards
### Chlor-Alkali Superfund Site, Berlin, New Hampshire

| Table 2A: Groundwater Performance Standards for Groundwater Inside the CHP Landfill Boundary Chlor-Alkali Facility (Former) Superfund Site, Berlin, New Hampshire | | |
|---|---|---|
| **Contaminant** | **Cleanup Level** | **Basis, Notes** |
| Carbon tetrachloride | 5 µg/L | ARAR basis, MCL and AGQS |
| Chloroform | 70 µg/L | ARAR basis, AGQS is lower than MCL (80). |
| cis-1,2-Dichloroethene | 70 µg/L | ARAR basis, MCL and AGQS |
| Hexachlorobutadiene | 0.5 µg/L | ARAR basis, AGQS. No MCL. |
| Tetrachloroethene | 5 µg/L | ARAR basis, MCL and AGQS |
| Trichloroethene | 5 µg/L | ARAR basis, MCL and AGQS |
| Vinyl Chloride | 2 µg/L | ARAR basis, MCL and AGQS |
| Mercury | 2 µg/L | ARAR basis, MCL and AGQS |

| Table 2B: Groundwater Cleanup Levels for Groundwater Outside the CHP Landfill Boundary Chlor-Alkali Facility (Former) Superfund Site, Berlin, New Hampshire | | |
|---|---|---|
| **Contaminant** | **Cleanup Level** | **Basis, Notes** |
| 1,3-Dichlorobenzene | 600 µg/L | ARAR basis, MCL and AGQS |
| Carbon tetrachloride | 5 µg/L | ARAR basis, MCL and AGQS |
| cis-1,2-Dichloroethene | 70 µg/L | ARAR basis, MCL and AGQS |
| Trichloroethene | 5 µg/L | ARAR basis, MCL and AGQS |

**Notes**:
µg/L = micrograms per liter (parts per billion).
MCL = Maximum Contaminant Level in drinking water.
MCLG = Maximum Contaminant Level Goal in drinking water.
NHDES = New Hampshire Department of Environmental Services.
ARAR = Applicable and Relevant and Appropriate Requirements.
AGQS = NHDES Ambient Groundwater Quality Standard.

Record of Decision
Appendix B: Tables

# Table 3 Risk

| Table 3A: Risk from exposure to Contaminated On-Site Soils at the Chlor-Alkali Superfund Site, Berlin, New Hampshire | | | | | |
|---|---|---|---|---|---|
| Area | Receptor | Total Cancer Risk | | Total Non-Cancer Hazard Index | |
| | | Surface Soil | Aggregate Soil | Surface Soil | Aggregate Soil |
| CHP | Adult Resident | $1.3 \times 10^{-2}$ | $2.5 \times 10^{-2}$ | 126 | 654 |
| | Child Resident | | | 1023 | 2158 |
| | Adult Recreational Visitor | $1.1 \times 10^{-3}$ | Not evaluated | 34 | Not evaluated |
| | Child Recreational Visitor | $2.6 \times 10^{-3}$ | Not evaluated | 300 | Not evaluated |
| | Adolescent Trespasser | $7.3 \times 10^{-4}$ | Not evaluated | 50 | Not evaluated |
| | Commercial/Industrial Worker | $3.1 \times 10^{-3}$ | $4.9 \times 10^{-3}$ | 89 | 253 |
| | Day-Care Child | $5.2 \times 10^{-3}$ | $1.0 \times 10^{-2}$ | 724 | 1318 |
| SFSA | Adult Resident | $4.6 \times 10^{-4}$ | $3.3 \times 10^{-4}$ | 5.6 | 4.8 |
| | Child Resident | | | 22 | 22 |
| | Adolescent Trespasser | $2.4 \times 10^{-5}$ | Not evaluated | 1 | Not evaluated |
| | Construction Worker | Not evaluated | $5.2 \times 10^{-6}$ | Not evaluated | 3.9 |
| | Commercial/Industrial Worker | $6.7 \times 10^{-5}$ | $5.5 \times 10^{-5}$ | 2.4 | 2.3 |
| | Day-Care Child | $1.9 \times 10^{-4}$ | $1.4 \times 10^{-4}$ | 14 | 15 |
| ESFA | Adult Resident | $1.9 \times 10^{-3}$ | $1.8 \times 10^{-3}$ | 8.4 | 8.9 |
| | Child Resident | | | 59 | 67 |
| | Adolescent Trespasser | $1.0 \times 10^{-4}$ | Not evaluated | 2.9 | Not evaluated |
| | Construction Worker | Not evaluated | $1.6 \times 10^{-5}$ | Not evaluated | 9.5 |
| | Commercial/Industrial Worker | $2.4 \times 10^{-4}$ | $2.5 \times 10^{-4}$ | 5.3 | 5.9 |
| | Day-Care Child | $7.8 \times 10^{-4}$ | $7.5 \times 10^{-4}$ | 41 | 47 |

**Notes:** The merged Adult and Child resident represent an age-adjusted resident. Yellow highlighted cells exceed unacceptable risk levels.

| Table 3B: Risk from exposure to Contaminated Groundwater at the Chlor-Alkali Superfund Site, Berlin, New Hampshire as well as Sediment and Fish in the Androscoggin River | | |
|---|---|---|
| Media, Exposure and Receptor | Total Cancer Risk | Total Non-Cancer Hazard Index |
| Groundwater at the Site used as drinking water by an Age-Adjusted Resident | $5.8 \times 10^{-1}$ | 2510 |
| Sediment in the River exposure to an Adult Visitor* | $5.8 \times 10^{-6}$ | Less than 0.01 |
| Sediment in the River exposure to a Child Visitor* | $2.0 \times 10^{-5}$ | 0.41 |
| Fish from the River, consumed by an Age-Adjusted Angler* | $5.8 \times 10^{-1}$ | Not evaluated |
| Fish from the River, consumed by an Adult Angler* | Not evaluated | 126 |
| Fish from the River, consumed by a Child Angler* | Not evaluated | 238 |

* In the above instances of either "in the River" or "from the River," the risk value is from the Site downstream to the Maine State Line.
Yellow highlighting of a cell indicates an unacceptable risk in that particular media and for the noted receptor. For Fish consumption the main risk driver was PCBs that could not be directly attributed to the Site. Mercury did impart non-cancer risk, but again direct attribution was not possible as mercury concentrations in fish downstream of the site were not significantly different from those upstream of the Site.

Record of Decision
Appendix B: Tables

| Table 3C: Maximum Groundwater Concentrations of Contaminants of Concern compared to Vapor Intrusion Screening Levels and Incremental Lifetime Cancer Risk at the Chlor-Alkali Superfund Site, Berlin, New Hampshire | | | |
|---|---|---|---|
| Contaminant of Concern | Maximum Concentration (µg/l) | Target Groundwater VISL (µg/l) | *ILCR of Maximum Concentration or **HQ of Maximum Concentration |
| Carbon Tetrachloride | 2260 | 1.81 | **1.25 x 10$^{-3}$*** |
| Chloroform | 1780 | 3.55 | **5.01 x 10$^{-4}$*** |
| Methylene Chloride | 147 | 9230 | 1.59 x 10$^{-8}$* |
| Tetrachloroethylene | 8.8 | 65.2 | 1.35 x 10$^{-7}$* |
| Mercury | 119J | 0.373 | **32**** |

**Notes**: Values in Yellow highlight and Bold Text are those values that exceed EPA's cancer risk limit (Carbon Tetrachloride & Chloroform) or EPA's non-cancer risk limit (mercury).
The data in this table are extracted from Tables 1 & 2 of Technical Memorandum: *Potential Vapor Intrusion Risk to Workers Due to VOCs in Groundwater at Chlor Alkali Superfund Site,* Rick Sugatt, EPA Risk Assessor, January 2, 2020,  Also included as Attachment D in the 2020 Feasibility Study Report.
ILCR = Interim Lifetime Cancer Risk.
VISL = Vapor Intrusion Screening Level for ILCR = 1x10-6 or HQ = 0.1.
J = estimated value.

**Table 4**: Summary of Alternative comparisons.  The following set of tables will contrast the selected remedy with the other alternatives developed for that media in the 2020 Feasibility Study:
4A: OU-1, CHP Landfill;
4B: OU-2, Soils in the EFSA and SFSA;
4C: OU-3-CHP, Groundwater inside the CHP Landfill;
4D: OU-3-GW, Groundwater outside the CHP Landfill; and
4E: OU-3-AR-3, the Androscoggin River.

| Table 4A: OU-1, CHP Landfill. Chlor-Alkali Superfund Site, Berlin, New Hampshire | | | |
|---|---|---|---|
| **Evaluation Criteria** | **OU-X, No-Action** | **Selected Remedy[1]** | **Issues** |
| **Threshold Criteria** | | | |
| Protects human health and the environment | (does not meet) | (meets) | The selected remedy will ensure the monitoring and maintenance of the Landfill cap, slurry wall and retaining wall to ensure no exposure of the public or environment. |
| Meets Federal & State requirements | (does not meet) | (meets) | The selected remedy complies with requirements for landfills that contain hazardous materials any repairs will meet these criteria. |
| **Balancing Criteria** | | | |
| Provides long-term protection | (does not meet) | (meets) | Continued maintenance and monitoring. |
| Reduces toxicity, mobility and volume through treatment | (does not meet) | (does not meet) | Neither remedy meet this criterion. |
| Provides short-term protection | (does not meet) | (meets) | The landfill cap will contain the wastes. Although the selected remedy in OU-2 may require that the landfill be opened, an adequate Health and Safety Plan should ensure continued protection of the public and environmental health. |
| Implementable | (meets) | (meets) | Both easily meet this criterion. |
| Capital costs | $0 | $807,975 | |
| **Modifying Criteria** | | | |
| Community Acceptance | | (meets) | No comments were received from the community. |
| State Acceptance | | (meets) | The State has supplied a letter concurring with the selected remedy. |

**Notes:** The No-Action alternative is required by the NCP in the evaluation of all remedial alternatives.
[1] The selected remedy for OU-1, the CHP Landfill is continued monitoring and maaina.

(meets) Meets the Criterion.  (partial) Partially meets Criterion.  (does not meet) Does not meet Criterion

Record of Decision
Appendix B: Tables

| Table 4B: OU-2, Soil Contamination in the Eastern and Southern Facility Study Areas. Chlor-Alkali Superfund Site, Berlin, New Hampshire | | | | | |
|---|---|---|---|---|---|
| Evaluation Criteria | OU-2-1, No-Action | OU-2-2, ICs & EC[1] | OU-2-3, Soil cap[2] | Selected Remedy[3] | Issues |
| **Threshold Criteria** | | | | | |
| Protects human health and the environment | ✋ | 👍 | 👍 | 👍 | The area of contaminated soils is privately-owned property with potential re-use issues. Both OU-2-2 and OU-2-3 would require on-going maintenance. The selected remedy would see the contaminants removed from that property and placed in a controlled disposal facility. |
| Meets Federal & State requirements | ✋ | 👍 | 👍 | 👍 | |
| **Balancing Criteria** | | | | | |
| Provides long-term protection | ✋ | 👍 | 👍 | 👍 | The selected remedy would consolidate the waste and place it in a monitored facility. OU-2-2 and OU-2-3 would require monitoring and maintenance. |
| Reduces toxicity, mobility and volume through treatment | ✋ | ✋ | ✋ | ✋ | |
| Provides short-term protection | ✋ | 👍 | 👍 | 👍 | The selected remedy may have greater short-term impacts due to the trucks required to move approximately 150 cubic yards of contaminated soil. OU-2-2 and OU-2-3 would leave the soil in-place. |
| Implementable | 👍 | 👍 | 👍 | 👍 | |
| Capital costs | $0 | $285,000 | $700,000 | $557,670 | |
| **Modifying Criteria** | | | | | |
| Community Acceptance | | | | 👍 | No negative or modifying comments were received from the community. |
| State Acceptance | | | | 👍 | The State has issued a concurrence letter. |
| **Notes:** The No-Action alternative is required by the NCP in the evaluation of all remedial alternatives.<br>[1] **OU-2-2** consists of Engineering Controls (ECs) such as fencing and signage, and Institutional Controls (ICs) such as deed restrictions to prevent access and exposure.<br>[2] **OU-2-3** also uses ICs and ECs to prevent access and exposure but also uses a soil cap to prevent contact.<br>[3] The selected remedy for OU-2 is excavating areas of soil that exceed the remediation goals and disposing at an approved facility. | | | | | |

 Meets the Criterion.  ☺ Partially meets Criterion.   Does not meet Criterion

Record of Decision
Appendix B: Tables

| Table 4C: OU-3-CHP, Groundwater inside the CHP Landfill. Chlor-Alkali Superfund Site, Berlin, New Hampshire | | | |
|---|---|---|---|
| Evaluation Criteria | OU-3-CHP-1, No-Action | Selected Remedy¹ | Issues |
| **Threshold Criteria** | | | |
| Protects human health and the environment | ✋ | 👍 | The landfill containment system, consisting of the cap, retaining wall, and slurry wall prevent the migration of contaminants. CERCLA does not require the restoration of groundwater beneath landfills. |
| Meets Federal & State requirements | ✋ | 👍 | |
| **Balancing Criteria** | | | |
| Provides long-term protection | ✋ | 👍 | Monitoring of groundwater will ensure the protection of human health and the environment. |
| Reduces toxicity, mobility and volume through treatment | ✋ | ✋ | |
| Provides short-term protection | ✋ | 👍 | |
| Implementable | 👍 | 👍 | |
| Capital costs | $0 | $904,101 | This includes the cost of monitoring.  See Table 5 for more details. |
| **Modifying Criteria** | | | |
| Community Acceptance | | 👍 | No negative or modifying comments were received from the community. |
| State Acceptance | | 👍 | The State has issued a concurrence letter. |

**Notes:** The No-Action alternative is required by the NCP in the evaluation of all remedial alternatives.
¹ The selected remedy for OU-3-CHP groundwater is continuing monitoring of groundwater to ensure that no contaminants migrate from the limits of the landfill. ICs and ECs will also be necessary to prevent future exposures.

 Meets the Criterion.  ☺ Partially meets Criterion.   Does not meet Criterion

| Table 4D: OU-3-GW, Groundwater Outside the CHP Landfill. Chlor-Alkali Superfund Site, Berlin, New Hampshire | | | |
|---|---|---|---|
| **Evaluation Criteria** | **OU-3-GW-1 No-Action** | **Selected Remedy[1]** | **Issues** |
| **Threshold Criteria** | | | |
| Protects human health and the environment | 🖐 | 👍 | In Situ Chemical Oxidation (ISCO) will meet this criterion by destroying and immobilizing contaminants. |
| Meets Federal & State requirements | 🖐 | 👍 | Although it may not meet this criterion immediately, it will offer the greatest potential for contaminant reduction. |
| **Balancing Criteria** | | | |
| Provides long-term protection | 🖐 | 👍 | |
| Reduces toxicity, mobility and volume through treatment | 🖐 | 👍 | ISCO is a commonly used, effective remedy against VOC contaminants. |
| Provides short-term protection | 🖐 | 👍 | ISCO compounds are relatively safe and an adequate Health & Safety plan will meet this criterion. |
| Implementable | 👍 | 👍 | Although commonly used, ISCO must be tailored to the contaminants and the environment that they are to be inserted. |
| Capital costs | $0 | $1,636,260 | This cost includes that for monitoring the contaminant plume in this area to evaluate compliance with ARARs. |
| **Modifying Criteria** | | | |
| Community Acceptance | | 👍 | No negative or modifying comments were received from the community. One comment did express a preference for Monitored Natural Attenuation of groundwater. |
| State Acceptance | | 👍 | The State has issued a concurrence letter. |

**Notes:** The No-Action alternative is required by the NCP in the evaluation of all remedial alternatives.
[1] The selected remedy for OU-3-Groundwater outside the CHP Landfill is In Situ Chemical Oxidation.

 Meets the Criterion.  ☺ Partially meets Criterion.   Does not meet Criterion

Record of Decision
Appendix B: Tables

| Table 4E: OU-3-AR-3, Androscoggin River. Chlor-Alkali Superfund Site, Berlin, New Hampshire | | | |
|---|---|---|---|
| **Evaluation Criteria** | **OU-3, No-Action** | **Selected Remedy[1]** | **Issues** |
| **Threshold Criteria** | | | |
| Protects human health and the environment | ✋ | 👍 | Recovery and proper disposal of mercury will protect human health and the environment. |
| Meets Federal & State requirements | ✋ | 👍 | |
| **Balancing Criteria** | | | |
| Provides long-term protection | ✋ | 👍 | Will occur over 30-years. |
| Reduces toxicity, mobility and volume through treatment | ✋ | 😐 | Treatment will consist of ensuring that any water removed for dewatering purposes has sediment removed prior to discharging to the River. |
| Provides short-term protection | ✋ | 👍 | |
| Implementable | 👍 | 👍 | |
| Capital costs | $0 | $1,186,672 | |
| **Modifying Criteria** | | | |
| Community Acceptance | | 👍 | No negative or modifying comments were received from the community. |
| State Acceptance | | 👍 | The State has issued a concurrence letter. |

**Notes:** The No-Action alternative is required by the NCP in the evaluation of all remedial alternatives.
[1] The selected remedy for OU-3-AR-3 is the continuing recovery of mercury, mercury amalgams and mercury-containing debris from the banks and riverbed of the Androscoggin River in the stretch of river termed AR-3 and specifically adjacent to the CHP Landfill.

 Meets the Criterion.   😐 Partially meets Criterion.    Does not meet Criterion

.

Record of Decision
Appendix B: Tables

| Table 5: Estimated Costs of the Selected Remedy for all Operable Units at the Chlor-Alkali Superfund Site, Berlin, New Hampshire | |
|---|---|
| **Operable Unit, Type Cost: Summary[1]** | **Cost / Contingency** |
| **OU-1 Capital Costs**: Implement ICs ($20,000). Fencing, signage maintenance ($28,000). Project Management ($14,850). **Contingency**-replace fence &signs ($60,000). Contingency Project Management (PM) ($40,100). | $44,550 / $148,350 |
| **OU-1 Annual Operation & Maintenance Costs**: Vegetation clearing, monitoring and data interpretation ($42,300). **Contingencies** (assumed to occur in year 5): Wall repair ($112,500) + PM ($51,875). Cap repair ($22,500) + PM ($10,575). | $42,300 / $198,450 |
| **OU-1 Remedy Total Estimated Present Value[2]** | **$704,175 / $807,975[3]** |
| **OU-2 Remedy Capital Costs**: Sampling, excavation of 400 ft2 to a depth of 5 feet, restoration, opening of CHP cap, restoring it, and generating a report ($324,075). Contingency: 10% out-of-scope ($152,315). | $324,075 / $476,390 |
| **OU-2 Annual Operation & Maintenance Costs**: Inspections, Reports. | $5,000 / $6,550 |
| **OU-2 Remedy Total Estimated Present Value** | **$502,544 / $557,670[4]** |
| **OU-3 Cell House Groundwater Remedy Capital Costs**: Implement ICs, permitting ($40,000) + Contingency ($18,800). | $58,800 |
| **OU-3 Annual Operation & Maintenance Costs**: Sampling, analytical, IDW management, reporting ($52,000) + Contingency ($21,320). | $68,120 |
| **OU-3 Cell House Groundwater Remedy Total Estimated Present Value** | **$904,101[5]** |
| **OU-3 Groundwater Remedy Capital Costs**: Implement ICs, permitting ($60,000). ISCO evaluation, monitoring, pre-design ($460,000). MNA evaluation ($195,000). Contingency ($336,050). | $715,000 / $1,051,050 |
| **OU-3 Annual Operation & Maintenance Costs**: Monitoring, reporting. | $47,160 |
| **OU-3 Groundwater Remedy Total Estimated Present Value** | **$1,636,260[5]** |
| **OU-3 River Mercury Removal Capital Costs** | $0[6] |
| **OU-3 River Mercury Removal Operation & Maintenance Costs**: Annual inspection and removal, reporting and evaluation. | $73,000 |
| **OU-3 River Mercury Removal Total Estimated Present Value** | **$1,186,672** |
| **Total Present Value for the Selected Remedy Chlor-Alkali Superfund Site, Berlin, New Hampshire** | **$5,092,673** |

Notes:
[1] Details of Costs are in Attachment F of the Final Feasibility Study (FS).
[2] All estimated present values use a 7% discount rate over a 30-year period.
[3] All Costs are accurate within the range of +50% and -30%.
[4] Attachment F in the FS broke the remedy into two alternatives: on-site disposal and off-site disposal. The costs presented here represent the more expensive alternative, on-site disposal OU-2-4B which is approximately $55,000 more expensive than off-site disposal. The total cost of OU-2 is for off-site disposal and the contingency is for on-site disposal beneath the CHP Landfill cap.
[5] Groundwater monitoring costs are segregated between CHP and SFSA areas.
[6] This category has no cost as much of the work: surveys, preparation of software for data analysis and other details was done during the conduct of the Supplemental Remedial Investigation from 2015 to 2019.

**Appendix C**: **Figures**

Record of Decision
Appendix C: Figures

**Figure 1**: Location of Berlin, New Hampshire and the Chlor-Alkali Facility (Former) Superfund Site. **Source**: USGS 7.5 Minute Topographic Quadrangle obtained from NH GRANIT on-line GIS database, dated 1970, revised 1989.



Record of Decision
Appendix C: Figures

**Figure 2**: The Site consists of the Cell House Parcel Landfill (OU-1), the Eastern Facility Study Area and Southern Facility Study Areas (OU-2), and OU-3 which consists of both the banks and riverbed of the Androscoggin River between Sawmill and Riverside Dams but also contaminated groundwater beneath the Southern Facility Study Area and OU-1 (shown as a transparent brown overlay outlined by a dashed line). Groundwater is not contaminated by the Site on the Eastern Facility Study Area that is separated from the Southern Facility Study Area by the Yellow Line on the Figure.



Record of Decision
Appendix C: Figures

**Figure 3**: Photos of the area of the Site.

**Photo 1, at right**: A southward view of the Chemical Plant circa 1920. The Androscoggin River is running southward on the right of the photo and the Chemical Plant on the left (east) bank.





**Photo 2**: Looking southward. On the left is the capped CHP Landfill separated from the Androscoggin River (at low flow) by the retaining wall. The figure in a red shirt shows the scale.  Liquid, elemental mercury, solid mercury amalgams, and mercury containing debris lie along the banks and riverbed from the rocky knoll the red-shirted figure is on, southward for approximately 250-feet.

**Photo 3**: Liquid, elemental mercury in 6-inches of water in the Androscoggin River along with gravel and metallic debris.



Record of Decision
Appendix C: Figures



**Figure 4**: Closeup of the CHP Landfill and Southern Facility Study Area with the former locations of the Chemical Plant Buildings. The yellow-shaded, red-outlined shape includes the area for further investigation to implement the *in situ* chemical oxidation remedy. The area of investigation includes the areas beneath the former Chloroform Still House and Chloroform building shown on the figure. The yellow-shaded, dark blue-outlined shape is an approximation of the location of contaminated groundwater in overburden and bedrock.

**Appendix D: ARARs Tables**

**Chlor-Alkali Superfund Site**
**Cell House Parcel Landfill, OU-1**
**Table D1**: Action-Specific Applicable or Relevant and Appropriate Requirements (ARARs) /
To Be Considered (TBC) Guidance
**Table D2**: Chemical Specific ARARs and TBC Guidance
**Table D3**: Location-Specific ARARs and TBC Guidance

**Southern and Eastern Facility Study Areas, OU-2**
**Table D4**: Action-Specific ARARs and TBC Guidance
**Table D5**: Chemical Specific ARARs and TBC Guidance
**Table D6**: Location-Specific ARARs and TBC Guidance

**Groundwater beneath the Cell House Parcel Landfill, OU-3**
**Table D7**: Action-Specific ARARs and TBC Guidance
**Table D8**: Chemical Specific ARARs and TBC Guidance
**Table D9**: Location-Specific ARARs and TBC Guidance

**Groundwater beneath the Southern Facility Study Area, OU-3**
**Table D10**: Action-Specific ARARs and TBC Guidance
**Table D11**: Chemical Specific ARARs and TBC Guidance
**Table D12**: Location-Specific ARARs and TBC Guidance

**Androscoggin River mercury removal, OU-3**
**Table D13**: Action-Specific ARARs and TBC Guidance
**Table D14**: Chemical Specific ARARs and TBC Guidance
**Table D15**: Location-Specific ARARs and TBC Guidance

Record of Decision
Appendix D: ARARs Tables

| Table D1: Action-Specific ARARs for CHP Landfill OU-1: Monitoring & maintenance of the CHP Landfill cap and foundation/retaining wall*, Engineering Controls and Institutional Controls | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action to Be Taken to Achieve ARAR |
| Federal | Resource Conservation and Recovery Act (RCRA) | 42 U.S.C. §§ 6901, et seq., 40 C.F.R. Parts 261, 262 and 264 | Applicable | New Hampshire has been delegated the authority to administer these RCRA standards through its state hazardous waste management regulations (Env-Hw 100-1100). These provisions have been adopted by the State. | Any wastes generated by remedial activity will be analyzed by appropriate test methods. If found to be hazardous wastes, then they will be managed in accordance with the substantive requirements of the State hazardous waste regulations. Wastes that may be generated include: investigation derived waste from monitoring activities and contaminated media produced during the operation and maintenance of the landfill engineered cover system and other components of the remedy. Federal regulations at 40 C.F.R. Part 264, including but not limited to Subpart G (closure/post closure) have been incorporated by reference into the State hazardous waste regulations. |
| | Design and Construction of RCRA/CERCLA Final Covers | EPA 625-4-91/025. May 1991. | To Be Considered | Guidance on design and construction of final covers for hazardous and non-hazardous waste landfills to comply with RCRA/CERCLA. | The existing landfill engineered cover system (cap and retaining wall) meets design and construction standards identified in this guidance. |
| | EPA Revised Alternative Cap Design Guidance Proposed for Unlined, Hazardous Waste Landfills in the EPA Region 1, February 5, 2001. | | To Be Considered | Guidance for designer of a cover or cap system for unlined, hazardous waste landfills at Superfund landfill sites in New England. | The existing landfill engineered cover system (cap and retaining wall) meet design standards identified in this guidance. |
| | EPA Presumptive Remedy for CERCLA Municipal Landfill Sites Guidance | EPA 540F-93-035, Sept. 1993 | To Be Considered | Guidance on developing a presumptive remedy for landfills under CERCLA | This guidance has been followed in developing the FS alternatives for the landfill. |
| | Toxic Substances Control Act (TSCA), PCB Remediation Waste | 15 U.S.C. 2601 et seq., 40 C.F.R. 761.61(c) | Applicable | This section of the TSCA regulations provides risk- based cleanup and disposal options for PCB remediation waste based on the risks posed by the concentrations at which the PCBs are found. Written approval for the proposed risk-based cleanup must be obtained from the Director, Superfund & Emergency Management Division, EPA Region 1. | Maintenance of the existing landfill engineered cover system meets TSCA protectiveness standards for capping PCBs present within the CHP landfill. If the cover system is re-opened to dispose of OU-2 waste, the opened landfill will be managed to prevent any unreasonable risk of exposure to PCBs and closed so as to re-establish the long-term protectiveness of the remedy.  The disposal of the PCB-contaminated media under the CHP landfill engineered cover system will not pose an unreasonable risk to human health or the environment. |
| | Clean Air Act (CAA), Hazardous Air Pollutants, National Emission Standards for Hazardous Air Pollutants (NESHAPS) | 42.U.S.C. § 112(b)(1), 40 C.F.R. Part 61 | Applicable | The regulations establish emissions standards for 189 hazardous air pollutants. Standards set for dust and other release sources. | If maintenance/monitoring of the landfill engineered cover system, the re-opening of the cover system to dispose of OU-2 wastes, or the control of landfill gasses generate regulated air pollutants, then measures will be implemented to meet these standards. |

Record of Decision
Appendix D: ARARs Tables

| | Table D1: Action-Specific ARARs for CHP Landfill OU-1: Monitoring & maintenance of the CHP Landfill cap and foundation/retaining wall*, Engineering Controls and Institutional Controls | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action to Be Taken to Achieve ARAR |
| Federal | CAA, National Emission Standards for Hazardous Air Pollutants (NESHAPS), Standards tor Inactive waste disposal sites for asbestos mills and manufacturing and fabricating operations | 40 C.F.R. § 61.151 | Relevant and Appropriate | NESHAPS standards for preventing air releases from inactive asbestos disposal sites, including cover standards, dust suppression, and land use controls. | Maintenance of the existing landfill engineered cover system will meet protectiveness standards for the covering of asbestos present in the CHP landfill.  If the cover system is re-opened to dispose of OU-2 waste, the opened landfill will be managed to prevent any release of asbestos and closed so as to re-establish the long-term protectiveness of the remedy. |
| | Clean Water Act (CWA), Section 402, Discharge of Pollutants | 33 U.S.C. § 1342; 40 C.F.R.122,125, 131, 136, 450 | Applicable | These standards address water discharges which may be directed to surface water. Also establishes stormwater standards for construction and development projects that are over one acre. | Any remedial action, including maintenance of the landfill engineered cover system, that will result in the discharge of water to surface waters or that will disturb more than one acre will meet these discharge and stormwater standards. |
| | Clean Water Act, National Recommend Water Quality Criteria (NRWQC) | EPA-822-R-02-047, USEPA, Office of Water, Office of Science and Technology (Nov. 2002) | To Be Considered | NRWQC are health-based criteria developed for chemical constituents in surface water They have been developed to protect aquatic life and human health from harmful effects due to exposure to chemically impacted surface water.\n\nStandards to be used for monitoring surface water and sediment during remedial activities and long-term monitoring of the landfill. | Guidance on water quality standards used to develop monitoring performance standards for the long-term monitoring of the landfill's impact on the adjacent river.** |
| | Safe Drinking Water Act, National Primary Drinking Water Regulations, Maximum Contaminant Levels (MCLs) | 42 U.S.C. §300f et seq.; 40 C.F.R. 141, Subparts B and G | Relevant and Appropriate | Establishes maximum contaminant levels (MCLs) for common organic and inorganic contaminants applicable to public drinking water supplies. Numeric values in the regulations used as groundwater monitoring standards and exceedances of the standards require the establishment of institutional controls to prevent groundwater use. | MCLs will be used to develop monitoring performance standards for monitoring the compliance boundary for the CHP landfill established where contamination is left in place under the landfill engineered cover system*. Monitoring will ensure that groundwater contamination within the compliance boundary does not migrate beyond the boundary and cause adjacent groundwater not to meet groundwater standards**. Exceedances of these standards within the compliance boundary will be addressed by institutional controls. |
| | Safe Drinking Water Act, National Primary Drinking Water Regulations, Maximum Contaminant Level Goals (MCLGs) | 42 U.S.C. §300f et seq.; 40 C.F.R. 141, Subpart F | Relevant and Appropriate for non-zero MCLGs only; MCLGs set as zero are To Be Considered | Establishes maximum contaminant level goals (MCLGs) for public water supplies. MCLGs are health goals for drinking water sources. These unenforceable health goals are available for a number of organic and inorganic compounds. Numeric values in the regulations used as groundwater monitoring standards and exceedances of the standards require the establishment of institutional controls to prevent groundwater use. | Non-zero MCLGs will be used to develop monitoring performance standards for monitoring the compliance boundary for the CHP landfill established where contamination is left in place under the landfill engineered cover system*. Monitoring will ensure that groundwater contamination within the compliance boundary does not migrate beyond the boundary and cause adjacent groundwater not to meet drinking water standards**. Exceedances of these standards within the compliance boundary will be addressed by institutional controls. |

Record of Decision
Appendix D: ARARs Tables

| Table D1: Action-Specific ARARs for CHP Landfill OU-1: Monitoring & maintenance of the CHP Landfill cap and foundation/retaining wall*, Engineering Controls and Institutional Controls | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action to Be Taken to Achieve ARAR |
| **Federal** | Health Advisories (EPA Office of Drinking Water) | | To Be Considered | Health Advisories are estimates of risk due to consumption of contaminated drinking water; they consider non-carcinogenic effects only. To be considered for contaminants in groundwater that may be used for drinking water where the standard is more conservative than either federal or state statutory or regulatory standards. The Health Advisory standard for manganese is 0.3 mg/l. Guidance used to develop risk- based groundwater monitoring standards and exceedances of the standards require the establishment of institutional controls to prevent groundwater use. | The Health Advisory for manganese will be used to develop monitoring performance standards for monitoring the compliance boundary for the CHP landfill established where contamination is left in place under the landfill engineered cover system*. Monitoring will ensure that groundwater contamination within the compliance boundary does not migrate beyond the boundary and cause adjacent groundwater not to meet drinking water standards**. Exceedances of these standards (particularly for manganese) within the compliance boundary will be addressed by institutional controls. |
| | Guide to Management of Investigation-Derived Waste | USEPA OSWER 9345.303FS, January 1992 | To Be Considered | Investigation-derived wastes (IDW) generated from remedial activities (*e.g.*, drilling muds, purged water, etc.) are required to be properly stored, managed, and disposed. Guidance given in the publication includes waste material containment, collection labeling, *etc.* | Investigation-derived wastes (IDW) generated from remedial activities (*e.g.*, drilling muds, purged water, *etc.* from installing, maintaining and sampling treatment/monitoring wells or material generated during O&M of the landfill) will be stored, managed, and disposed of based on these guidance standards. |
| **State of New Hampshire** | Identification and Listing of Hazardous Wastes | N.H. Admin. Code Env-Hw 400 | Applicable | These standards list particular hazardous wastes and identify the maximum concentration of contaminants for which the waste would be a characteristic or listed hazardous waste. The analytical test set out in Appendix II of 40 C.F.R. Part 261 is referred to as the Toxicity Characteristic Leaching Procedure (TCLP). The federal regulations at 40 C.F.R. Part 261 are incorporated by reference. | Any wastes generated by remedial activity will be analyzed under these standards to determine whether they are listed or characteristic hazardous waste. Wastes that may be generated include investigation derived waste from monitoring activities and contaminated media produced during the O&M of the landfill and other components of the remedy. Materials that are listed waste or exceed TCLP hazardous waste thresholds will be disposed off-site in a RCRA Subtitle C facility. Non-hazardous materials will be disposed appropriately. |
| | Requirements for Hazardous Waste Generators | Env-Hw 500 | Applicable | Requires a determination as to whether waste materials are hazardous (Env-Hw 502) and, if so, requirements for managing environmental and health requirements (Env-Hw 506), for accumulating hazardous wastes on-site (Env-Hw 507) prior to shipment off site, and for emergency actions (Env-Hw 513). The federal regulations at 40 C.F.R. Part 262 are incorporated by reference. | If remedial activity generates hazardous wastes, then they will be managed in accordance with the substantive requirements of these regulations. |

Record of Decision
Appendix D: ARARs Tables

| Table D1: Action-Specific ARARs for CHP Landfill OU-1: Monitoring & maintenance of the CHP Landfill cap and foundation/retaining wall*, Engineering Controls and Institutional Controls | | | | | |
|---|---|---|---|---|---|
| **Authority** | **Law/Regulation/Guidance** | **Citation** | **ARAR/TBC Status** | **Requirement Synopsis** | **Action to Be Taken to Achieve ARAR** |
| **State of New Hampshire** | Requirements for Owners and Operators of Hazardous Waste Facilities | Env-Hw 700 | Relevant and Appropriate | Includes: General Design Requirements (Env-Hw 702.9); Groundwater Monitoring (Env-Hw 702.10); Other Monitoring (Env-Hw 702.11); Emergency/ Remedial Actions (Env-Hw 706); Operation Requirements (Env-Hw 708.2); and Technical Requirements (Env- Hw 708.3). Closure/post- closure requirements for hazardous waste landfills at Env-Hw 708.02(a) that incorporate federal regulations at 40 C.F.R. 264, Subpart G (closure and post-closure) and 40 C.F.R. 264, Subpart H (financial requirements). | It has been determined that the existing landfill engineered cover system (cap and retaining wall) meets hazardous waste landfill performance standards identified in these regulations. Long-term O&M, monitoring, institutional controls** and financial assurance requirements will be maintained for the capped landfill. If waste from OU-2 is disposed of on-site in the CHP landfill the landfill cover system will be re-opened, the waste deposited, and the cover system closed in compliance with these regulations. |
| | Management of Certain Wastes | Env-Sw 901 | Applicable | Management of asbestos waste from the point of waste origination to the point of waste disposal. | Maintenance of the existing landfill engineered cover system or re-opening of the cover system if OU-2 waste is disposed of in the CHP landfill will meet protectiveness standards for the covering of asbestos present in the CHP landfill. |
| | Asbestos Management and Control | Env-A 1800 | Applicable | Requirements for managing asbestos in a manner that prevents the release of asbestos fibers to the environment and human exposure thereto. | Maintenance of the existing landfill engineered cover system or re-opening of the cover system if OU-2 waste is disposed of in the CHP landfill will meet protectiveness standards for the covering of asbestos present in the CHP landfill. |
| | Drinking Water Quality Standards | Env-Dw 700 | Relevant and Appropriate for MCLs and non-zero MCLGs only; MCLGs set as zero are To Be Considered | State MCLs and MCLGs establish maximum contaminant levels permitted in public water supplies and are the basis of State Ambient Groundwater Quality Standards (AGQS) that are applicable to site ground water. Numeric values in the regulations, when more stringent than federal standards, used as groundwater monitoring standards and exceedances of the standards require the establishment of institutional controls to prevent groundwater use. | State drinking water standards that are more stringent than federal standards will be used to develop groundwater monitoring performance standards** and exceedances of State drinking water standards will require the establishment of institutional controls to prevent groundwater consumption. |
| | New Hampshire Ambient Groundwater Quality Standards (NH AGQS) | Env-Or 603.03, Table 600-1 | Applicable | Establishes maximum concentration levels for regulated contaminants in groundwater which result from human operations or activities. Numeric values in the regulations, when more stringent than federal standards, used as groundwater monitoring standards and exceedances of the standards require the establishment of institutional controls to prevent groundwater use. | State groundwater standards that are more stringent than federal standards will be used to develop groundwater monitoring performance standards** and exceedances of State groundwater standards will require the establishment of institutional controls to prevent groundwater consumption. |

Record of Decision
Appendix D: ARARs Tables

| Table D1: Action-Specific ARARs for CHP Landfill OU-1: Monitoring & maintenance of the CHP Landfill cap and foundation/retaining wall*, Engineering Controls and Institutional Controls | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action to Be Taken to Achieve ARAR |
| State of New Hampshire | Nondegradation of Groundwater to Protect Surface Water | Env-Or 603.01 (a), (b), and (c) | Applicable | Provides that groundwater shall be suitable for use as drinking water without treatment; shall not contain any regulated contaminant in concentrations greater than ambient groundwater quality standards established in Env- Or 603.03; and shall not contain any regulated contaminant at a concentration such that the natural discharge of that groundwater to surface water will cause a violation of a surface water quality standard established in Env-Wq 1700. | Groundwater and surface water monitoring will confirm that Site groundwater contamination is not impairing surface water quality in adjacent Androscoggin River**. |
| | Standards for the Construction, Maintenance and Abandonment of Wells | We 600 | Applicable for drinking water wells; Relevant and Appropriate for monitoring wells | This provision requires that wells be constructed, maintained, relocated, and/or abandoned according to these regulations. We 602.05 address restrictions on locating wells in contaminated areas. | Wells used for the remedy will be created, operated, and closed in compliance with these standards. Deed notifications shall be recorded into the chain of title for all properties within the GMZ to prohibit groundwater use outside of the CHP compliance boundary. |
| | Surface Water Quality Standards | Env-Wq 1700 | Applicable | Health-based criteria developed for chemical constituents in surface water. They have been developed to protect aquatic life and human health from harmful effects due to exposure to chemically impacted surface water. State standards to be used when more stringent than federal standards for monitoring surface water and sediment during remedial activities and long-term monitoring of the landfill. | Water quality standards used to develop monitoring performance standards for the long-term monitoring of the landfill's impact on the Androscoggin River**. |
| | Contaminated Site Management | Env-Or 600 | Applicable | Establishes standards for managing contaminated groundwater (Env-607), monitoring (Env-Or 610) and managing contaminated soil (Env-Or 611). | Regulatory standards for managing contaminated groundwater and soil and Site monitoring will be applied to the implementation of this landfill alternative. |
| | Ambient Air Quality Standards | RSA Ch. 125-C, Env-A 300 | Applicable | These regulations set primary and secondary ambient air quality standards (equivalent to federal standards). The standards do not allow significant deterioration of existing air quality. | If maintenance/monitoring of the landfill engineered cover system, the re-opening of the cover system to dispose of OU-2 wastes, or the control of landfill gasses generate regulated air pollutants, then measures will be implemented to meet these standards. |
| | Air Pollution Control, Fugitive Dust, N.H. Admin. | RSA Ch. 125-C, Env-A Part 1002 | Applicable | Requires precautions to prevent, abate and control fugitive dust during specified activities, including excavation, maintenance, and construction. | If maintenance/monitoring of the landfill engineered cover system, the re-opening of the cover system to dispose of OU-2 wastes, or the control of landfill gasses generate regulated air pollutants, then measures will be implemented to meet these standards. |

Record of Decision
Appendix D: ARARs Tables

|  | Table D1: Action-Specific ARARs for CHP Landfill OU-1: Monitoring & maintenance of the CHP Landfill cap and foundation/retaining wall*, Engineering Controls and Institutional Controls |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action to Be Taken to Achieve ARAR |
| **State of New Hampshire** | Air Pollution Control, Regulated Toxic Air Pollutants | RSA Ch. 125-C, Env-A Part 1400 | Applicable | Identifies toxic air pollutants discharge standards. These pollutants are also listed by EPA in 40 C.F.R. 261 | If maintenance/monitoring of the landfill engineered cover system, the re-opening of the cover system to dispose of OU-2 wastes, or the control of landfill gasses generate regulated air pollutants, then measures will be implemented to meet these standards. |
|  | New Hampshire Stormwater Manual Volume 3 Erosion and Sediment Controls During Construction |  | To Be Considered | This document provides guidance on installation and maintenance of erosion and sediment controls during remedial construction. | Guidance standards for preventing erosion and sediment controls will be implemented during the installation and maintenance of treatment/monitoring wells and O&M of the landfill or the re-opening of the cover system to dispose of OU-2 wastes. |

|  | Table D2: Chemical-Specific ARARs and TBCs, OU-1: Monitoring & maintenance of the CHP Landfill cap and foundation/retaining wall*, Engineering Controls and Institutional Controls |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action to Be Taken to Achieve ARAR |
| **Federal** | EPA Risk Reference Dose (RfDs) |  | To Be Considered | Dose levels developed by EPA to protect sensitive individuals over the course of a life-time. RfDs reflect a daily exposure level likely to be without appreciable risk of adverse health effects. Guidance used to develop non-carcinogenic risk-based cleanup standards. | O&M, institutional controls and long-term monitoring** of the landfill engineered cover system/retaining wall will prevent exposure to contaminants that pose a risk calculated using this guidance. |
|  | EPA Carcinogenic Slope Factor |  | To Be Considered | Slope factors are developed by EPA from Health Effects Assessments and present the most up-to-date information on cancer risk potency. Slope factors are developed by EPA from Health Effects Assessments by the Carcinogenic Assessment Group. Guidance used to develop carcinogenic risk-based standards | O&M, institutional controls and long-term monitoring** of the landfill engineered cover system/retaining wall will prevent exposure to contaminants that pose a risk calculated using this guidance. |
|  | Guidelines for Carcinogen Risk Assessment | EPA/630/P-03/001F (March 2005) | To Be Considered | Guidance for assessing cancer risk. Guidance used to develop risk-based cleanup standards | O&M, institutional controls and long-term monitoring** of the landfill engineered cover system/retaining wall will prevent exposure to contaminants that pose a risk calculated using this guidance. |
|  | Supplemental Guidance for Assessing Susceptibility from Early-Life Exposure to Carcinogens | EPA/630/R-03/003F (March 2005) | To Be Considered | Guidance for assessing cancer risks to children. Guidance used to develop risk-based cleanup standards for children. | O&M, institutional controls and long-term monitoring** of the landfill engineered cover system/retaining wall will prevent exposure to contaminants that pose a risk calculated using this guidance. |

Record of Decision
Appendix D: ARARs Tables

| Table D2: Chemical-Specific ARARs and TBCs, OU-1: Monitoring & maintenance of the CHP Landfill cap and foundation/retaining wall*, Engineering Controls and Institutional Controls | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action to Be Taken to Achieve ARAR |
| | Recommendations of the Technical Review Workgroup for Lead for an approach to Assessing Risks Associated with Adult Exposure to Lead in Soil | EPA-540-R-03-001 (January 2003) | To Be Considered | EPA Guidance for evaluating risks posed to adults by lead in soil. Guidance used to develop risk-based cleanup standards for lead. | O&M, institutional controls and long-term monitoring** of the landfill engineered cover system/retaining wall will prevent exposure to lead that poses a risk calculated using this guidance. |
| | Transmittal of Update to Adult Lead Methodology's Default Baseline Blood Lead Concentration and Geometric Standard Deviation Parameters | OLEM Directive 9285.6-56 | To Be Considered | EPA Guidance for evaluating risks posed to adults by lead in soil. Guidance used to develop risk-based cleanup standards for lead. | O&M, institutional controls and long-term monitoring** of the landfill engineered cover system/retaining wall will prevent exposure to lead that poses a risk calculated using this guidance. |
| | EPA Carcinogenic Assessment Group Potency Factors | | To Be Considered | These factors are used to evaluate an acceptable risk from a carcinogen (i.e. dioxin). Guidance used to develop risk-based cleanup standards for dioxin. | O&M, institutional controls and long-term monitoring** of the landfill engineered cover system/retaining wall will prevent exposure to contaminants that pose a risk calculated using this guidance. |
| | Recommended Toxicity Equivalence Factors (TEFs) for Human Health Risk Assessments of 2,3,7,8-Tetrachlorodibenzo-p-dioxin | EPA/600/R-10/005 | To Be Considered | Guidance used to develop site-specific risk- based cleanup standards for dioxin. | O&M, institutional controls and long-term monitoring** of the landfill engineered cover system/retaining wall will prevent exposure to dioxins that pose a risk calculated using this guidance. |
| | Ecological Risk Assessment Guidance for Superfund: Process for Designing and Conducting Ecological Risk Assessments – Interim Final. | EPA 540-R-97-006 | To Be Considered | Guidance used to develop ecological risk-based cleanup standards. | O&M, institutional controls and long-term monitoring** of the landfill engineered cover system/retaining wall will prevent release of contaminants that would pose ecological risks calculated using this guidance. |
| State of New Hampshire | Contaminated Site Management, Soil Remediation Criteria | Env-Or-606.19, Table 600-2 | Applicable | Promulgated numeric soil remediation standards. | O&M, institutional controls and long-term monitoring** of the landfill engineered cover system/retaining wall will prevent exposure to contaminants that exceed State remediation standards if more stringent than federal risk-based standards. |

Record of Decision
Appendix D: ARARs Tables

| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action to Be Taken to Achieve ARAR |
|---|---|---|---|---|---|
| **Table D3: Location-Specific ARARs / TBC, OU-1**: Monitoring & maintenance of the CHP Landfill cap and foundation/retaining wall[14], Engineering Controls and Institutional Controls[15] | | | | | |
| **Federal** | Floodplain Management and Protection of Wetlands | 44 C.F.R. § 9 | Relevant and Appropriate | FEMA regulations that set forth the policy, procedure and responsibilities to implement and enforce Executive Order 11988 (Floodplain Management) and Executive Order 11990 (Protection of Wetlands). Prohibits activities that adversely affect a federally-regulated wetland unless there is no practicable alternative and the proposed action includes all practicable measures to minimize harm to wetlands that may result from such use. Requires the avoidance of impacts associated with the occupancy and modification of federally-designated 100-year and 500-year floodplain and to avoid development within floodplain wherever there is a practicable alternative. An assessment of impacts to 500-year floodplain is required for critical actions – which includes siting contaminated sediment management facilities in a floodplain. Requires public notice when proposing any action in or affecting floodplain or wetlands. | If O&M of the landfill engineered cover system or installation/operation of monitoring wells or access to wells require altering federal jurisdictional wetlands or 500-year floodplain, mitigation measures will be taken, as required. No negative public comments were received. |
| | Clean Water Act, Section 404; Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material | 33 U.S.C. § 1344, 40 C.F.R. Part 230, 231 and 33 C.F.R. Parts 320- 323 | Applicable | For discharge of dredged or fill material into federal jurisdictional water bodies or wetlands, there must be no practical alternative with less adverse impact on aquatic ecosystem; discharge cannot cause or contribute to violation of state water quality standard or toxic effluent standard or jeopardize federal threatened and endangered species; discharge cannot significantly  degrade waters of U.S.; must take practicable steps to minimize and mitigate adverse impacts; must evaluate impacts on flood level, flood velocity, and flood storage capacity. Sets standards for restoration and mitigation required as a result of unavoidable impacts to aquatic resources. EPA must determine which alternative is the "Least Environmentally Damaging Practicable Alternative" (LEDPA) to protect wetland and aquatic resources. | If O&M of the landfill engineered cover system or installation/operation of monitoring wells or access to wells require filing federal jurisdictional wetlands, mitigation measures will be taken, as required. No negative public comments were received concerning EPA's LEDPA determination. |
| **Federal** | Fish and Wildlife Coordination Act | 16 U.S.C. §661 *et seq* . | Applicable | Any modification of a body of water or wetland requires consultation with the U.S. Fish and Wildlife Service and the appropriate state wildlife agency to develop measures to prevent, mitigate, or compensate for losses of fish and wildlife. | If O&M of the landfill engineered cover system or installation/operation of monitoring wells or access to wells require modifying any body of water or wetland consultation requirements addressing impacts to fish and wildlife resources will be followed. |

[14] CHP landfill cap and foundation/retaining wall also referred to as engineered cover system.

[15] ARARs and TBCs required for long-term monitoring and institutional controls for groundwater under the landfill also addressed under the OU3-CHP alternatives and long-term monitoring of surface water in Reach AR-3 to assess protectiveness of the CHP landfill also identified under the OU3-AR-3 alternatives.

Record of Decision
Appendix D: ARARs Tables

| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action to Be Taken to Achieve ARAR |
|---|---|---|---|---|---|
| | | | | **Table D3: Location-Specific ARARs / TBC, OU-1**: Monitoring & maintenance of the CHP Landfill cap and foundation/retaining wall[14], Engineering Controls and Institutional Controls[15] | |
| | RCRA Floodplain Restrictions for Hazardous Waste Facilities | 40 CFR 264.18(b) | Relevant and Appropriate | A hazardous waste treatment, storage, or disposal facility located in a 100-year floodplain must be designed, constructed, operated, and maintained to prevent washout or to result in no adverse effects on human health or the environment if washout were to occur. | The landfill engineered cover system will be maintained to prevent a release in the event of up to a 100-year flood event. |
| | National Historical Preservation Act and Regulations | 16 U.S.C. 469 et seq.; 36 C.F.R. Part 65 | Applicable | When a federal agency finds, or is notified, that its activities may cause irreparable loss or destruction of significant scientific, pre-historical, historical, archeological data, such agency shall consult with relevant federal and State officials to address the preservation of such data or other forms of mitigation, as necessary. | If it is determined that this alternative may cause irreparable loss or destruction of significant scientific, pre-historical, historical, or archaeological data (*i.e.* remaining historic mill structures), EPA will consult with federal and State officials and implement preservation and/or mitigation measures, as necessary. |
| **State of New Hampshire** | Criteria and Conditions for Fill and Dredge in Wetlands | RSA Ch. 482-A and NH Admin. Code Env-Wt Parts 100-900 | Applicable | These standards regulate filling and other activities in or adjacent to wetland resource areas (including the 100-year floodplain), and buffer zones and establish criteria for the protection of wetlands from adverse impacts on fish, wildlife, commerce, and public recreation. | If O&M of the landfill engineered cover system or installation/operation of monitoring wells or access to wells require filling State jurisdictional wetlands or buffer zone, mitigation measures will be taken, as required. |
| | Shoreland Water Quality Protection | RSA 483-B and NH Admin, Code Env-Wq 1400 | Applicable | These standards regulate activities conducted along shorelands to protect, restore and preserve these fragile natural resources. | If O&M of the landfill engineered cover system or installation/operation of monitoring wells or access to wells require work within regulated shoreland areas, mitigation measures will be taken, as required. |
| | Terrain Alteration | RSA 485-A:17 and NH Admin. Code Env-Wq 1500 | Applicable | These rules establish criteria for the protection of surface water quality resulting from activities that occur in or on the border of surface water or within a distance of surface water such that direct or immediate degradation may result to water quality. | If O&M of the landfill engineered cover system or installation/operation of monitoring wells or access to wells alter terrain regulated under this standards, mitigation measures will be taken to protect water quality, as required. |

Record of Decision
Appendix D: ARARs Tables

| Table D3: Location-Specific ARARs / TBC, OU-1: Monitoring & maintenance of the CHP Landfill cap and foundation/retaining wall[14], Engineering Controls and Institutional Controls[15] | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action to Be Taken to Achieve ARAR |
| State of New Hampshire | Siting requirements for hazardous waste facilities and variances | Env-Hw 304.08 (Existing facilities) and 304.09 (New facilities) | Relevant and Appropriate for floodplain and seismic standards | Flood control measures must be identified for any facility within the 100 year floodplain. Similarly, new facilities located within 3,000 feet of faults displaced in Holocene times must show that no faults pass within 200 feet of the facility. | The landfill will be maintained to prevent a release in the event of up to a 100-year flood event. |
| | Historic Preservation Act | RSA 227-C | Applicable | When activities may cause irreparable loss or destruction of significant scientific, pre-historical, historical, archeological data, the project proponent shall consult with relevant State officials to address the preservation of such data or other forms of mitigation, as necessary. | If it is determined that this alternative may cause irreparable loss or destruction of significant scientific, pre-historical, historical, or archaeological data (*i.e.*, remaining historic mill structures), EPA will consult with State officials and implement preservation and/or mitigation measures, as necessary. |
| | Native Plant Protection Act | R.S.A. 217-A | Applicable | Prohibits damaging plant species listed as endangered in the State. | If implementation of this alternative may take state-listed species the remedial action will need to meet these standards. |
| | Endangered Species Conservation Act | R.S.A. 212-A | Applicable | Identifies endangered species in NH and requirements for protection of species of wildlife determined to be threatened or endangered, including prohibitions on taking, possessing, and transporting of endangered species. | If implementation of this alternative may take state-listed species the remedial action will need to meet these standards. |

| Table D4: Action-Specific ARARs / TBC, OU-2: Excavation, backfill and either on-site or off-site disposal of contaminated soils, and Institutional Controls | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
| Federal | Resource Conservation and Recovery Act (RCRA) | 2 U.S.C. §§ 6901, *et seq* ., 40 C.F.R. Parts 261, 262 and 264 | Applicable | New Hampshire has been delegated the authority to administer these RCRA standards through its state hazardous waste management regulations (Env-Hw 100-1100). These provisions have been adopted by the State. | Any wastes generated by remedial activity will be analyzed by appropriate test methods. If found to be hazardous wastes, then they will be managed in accordance with the substantive requirements of the State hazardous waste regulations. Wastes that may be generated include contaminated media produced during the excavation and other components of the remedy. |

Record of Decision
Appendix D: ARARs Tables

| Table D4: Action-Specific ARARs / TBC, OU-2: Excavation, backfill and either on-site or off-site disposal of contaminated soils, and Institutional Controls | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
| | Toxic Substances Control Act (TSCA), PCB Remediation Waste | 15 U.S.C. 2601 *et seq.*, 40 C.F.R. 761.61(c) | Applicable | This section of the TSCA regulations provides risk-based cleanup and disposal options for PCB remediation waste based on the risks posed by the concentrations at which the PCBs are found. Written approval for the proposed risk- based cleanup must be obtained from the Director, Superfund & Emergency Management Division, EPA Region 1. | PCB-contaminated soil exceeding commercial/ industrial standards will be excavated and disposed of off-site or on-site in the CHP landfill.  PCB-contaminated soil exceeding residential standards will be subject to institutional controls restricting residential uses. |
| | Clean Air Act (CAA), Hazardous Air Pollutants, National Emission Standards for Hazardous Air Pollutants (NESHAPS) | 42.U.S.C. § 112(b)(1), 40 C.F.R. Part 61 | Applicable | The regulations establish emissions standards for 189 hazardous air pollutants. Standards set for dust and other release sources. | If soil excavation/on-site management generates regulated air pollutants, then measures will be implemented to meet these standards. |
| | Clean Water Act (CWA), Section 402, Discharge of Pollutants | 33 U.S.C. § 1342; 40 C.F.R.122,125, 131, 136, 450 | Applicable | These standards address water discharges which may be directed to surface water. Also establishes stormwater standards for construction and development projects that are over one acre. | Any remedial action, including any required dewatering associated with soil excavation, results in the discharge of water to surface waters or the excavation will disturb more than one acre, then the regulation's respective discharge and stormwater standards will be met. |
| | Clean Water Act, National Recommend Water Quality Criteria (NRWQC) | EPA-822-R-02-047, USEPA, Office of Water, Office of Science and Technology (Nov. 2002 | To Be Considered | NRWQC are health-based criteria developed for chemical constituents in surface water. They have been developed to protect aquatic life and human health from harmful effects due to exposure to chemically impacted surface water. Performance standards to be used for monitoring surface water and sediment during remedial activities and long- term monitoring of the landfill. | Guidance on water quality standards that may be used to develop monitoring performance standards for monitoring of the excavation's impact on surface waters. |
| | Guide to Management of Investigation-Derived Waste | USEPA OSWER 9345.303FS, January 1992 | To Be Considered | Investigation-derived wastes (IDW) generated from remedial activities (*e.g.*, drilling muds, purged water, etc.) are required to be properly stored, managed, and disposed. Guidance given in the publication includes waste material containment, collection labeling, *etc.* | Investigation-derived wastes (IDW) generated from remedial activities (*e.g.*, the soil excavation) will be stored, managed, and disposed of based on these guidance standards. |

Record of Decision
Appendix D: ARARs Tables

| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
|---|---|---|---|---|---|
| **Table D4: Action-Specific ARARs / TBC, OU-2**: Excavation, backfill and either on-site or off-site disposal of contaminated soils, and Institutional Controls | | | | | |
| State of New Hampshire | Identification and Listing of Hazardous Wastes | N.H. Admin. Code Env-Hw 400 | Applicable | These standards list particular hazardous wastes and identify the maximum concentration of contaminants for which the waste would be a characteristic or listed hazardous waste. The analytical test set out in Appendix II of 40 C.F.R. Part 261 is referred to as the Toxicity Characteristic Leaching Procedure (TCLP). The federal regulations at 40 C.F.R. Part 261 are incorporated by reference. | Any wastes generated by remedial activity will be analyzed under these standards to determine whether they are listed or characteristic hazardous waste, in particular during the excavation of contaminated soils. Materials that are listed waste or exceed TCLP hazardous waste thresholds will be disposed off-site in a RCRA Subtitle C facility. Non-hazardous materials will be disposed appropriately. |
| | Requirements for Hazardous Waste Generators | Env-Hw 500 | Applicable | Requires a determination as to whether waste materials are hazardous (Env-Hw 502) and, if so, requirements for managing environmental and health requirements (Env-Hw 506), for accumulating hazardous wastes on-site (Env-Hw 507) prior to shipment off site, and for emergency actions (Env-Hw 513). The federal regulations at 40 C.F.R. Part 262 are incorporated by reference. | If remedial activity generates hazardous wastes, then they will be managed in accordance with the substantive requirements of these regulations. |
| | Standards for the Construction, Maintenance and Abandonment of Wells | We 600 | Applicable for drinking water wells; Relevant and Appropriate for monitoring wells | This provision requires that wells be constructed, maintained, relocated, and/or abandoned according to these regulations. We 602.05 address restrictions on locating wells in contaminated areas. | Wells used for the remedy will be created, operated, and closed in compliance with these standards*. |
| | Surface Water Quality Standards | Env-Wq 1700 | Applicable | Health-based criteria developed for chemical constituents in surface water. They have been developed to protect aquatic life and human health from harmful effects due to exposure to chemically impacted surface water. State standards to be used when more stringent than federal standards for monitoring surface water and sediment during remedial activities and long-term monitoring of the landfill. | Water quality standards may be used to develop monitoring performance standards to assess the impact of the soil excavation/backfilling on surface waters. |
| | Contaminated Site Management | Env-Or 600 | Applicable | Establishes standards for managing contaminated groundwater (Env-607), monitoring (Env-Or 610) and managing contaminated soil (Env-Or 611). | Regulatory standards for managing contaminated groundwater* and soil and Site monitoring will be applied to the implementation of this remedial alternative. |
| | Ambient Air Quality Standards | RSA Ch. 125-C, Env-A 300 | Applicable | These regulations set primary and secondary ambient air quality standards (equivalent to federal standards). The standards do not allow significant deterioration of existing air quality. | If the soil excavation/management generates regulated air pollutants, then measures will be implemented to meet these standards. |

Record of Decision
Appendix D: ARARs Tables

| Table D4: Action-Specific ARARs / TBC, OU-2: Excavation, backfill and either on-site or off-site disposal of contaminated soils, and Institutional Controls | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
| State of New Hampshire | Air Pollution Control, Fugitive Dust, N.H. Admin. | RSA Ch. 125-C, Env-A Part 1002 | Applicable | Requires precautions to prevent, abate and control fugitive dust during specified activities, including excavation, maintenance, and construction. | If the soil excavation/management generates regulated air pollutants, then measures will be implemented to meet these standards. |
| | Air Pollution Control, Regulated Toxic Air Pollutants | RSA Ch. 125-C, Env-A Part 1400 | Applicable | Identifies toxic air pollutants discharge standards. These pollutants are also listed by EPA in 40 CFR 261 | If the soil excavation/ management generates regulated air pollutants, then measures will be implemented to meet these standards. |
| | New Hampshire Stormwater Manual Volume 3 Erosion and Sediment Controls During Construction | | To Be Considered | This document provides guidance on installation and maintenance of erosion and sediment controls during remedial construction. | Guidance standards for preventing erosion and sediment controls will be implemented during the soil excavation work.  Excavated areas will be backfilled and restored to meet these guidance standards. |

| Table D5: Chemical-Specific ARARs / TBC, OU-2: Excavation, backfill and either on-site or off-site disposal of contaminated soils, and Institutional Controls[16] | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
| Federal | EPA Risk Reference Dose (RfDs) | | To Be Considered | Dose levels developed by EPA to protect sensitive individuals over the course of a life-time.  RfDs reflect a daily exposure level likely to be without appreciable risk of adverse health effects.  Guidance used to develop non-carcinogenic risk-based cleanup standards. | Excavation of all soil exceeding commercial/industrial risk standards, disposal either off-site or on-site in the CHP landfill, and institutional controls to prevent residential development to address soils exceeding residential risk standards will prevent exposure to contaminants that pose a risk calculated using this guidance. |
| | EPA Carcinogenicity Slope Factor | | To Be Considered | Slope factors are developed by EPA from Health Effects Assessments and present the most up-to-date information on cancer risk potency.  Slope factors are developed by EPA from Health Effects Assessments by the Carcinogenic Assessment Group. Guidance used to develop carcinogenic risk based cleanup standards | Excavation of all soil exceeding commercial/industrial risk standards, disposal either off-site or on-site in the CHP landfill, and institutional controls to prevent residential development to address soils exceeding residential risk standards will prevent exposure to contaminants that pose a risk calculated using this guidance. |

[16] ARARs and TBCs required for long-term monitoring and institutional controls for groundwater under the EFSA and SFSA area addressed under the OU3-GW alternatives.

Record of Decision
Appendix D: ARARs Tables

| Table D5: Chemical-Specific ARARs / TBC, OU-2: Excavation, backfill and either on-site or off-site disposal of contaminated soils, and Institutional Controls[16] | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
| | Guidelines for Carcinogen Risk Assessment | EPA/630/P-03/001F (March 2005) | To Be Considered | Guidance for assessing cancer risk. Guidance used to develop risk-based cleanup standards | Excavation of all soil exceeding commercial/industrial risk standards, disposal either off-site or on-site in the CHP landfill, and institutional controls to prevent residential development to address soils exceeding residential risk standards will prevent exposure to contaminants that pose a risk calculated using this guidance. |
| | Supplemental Guidance for Assessing Susceptibility from Early-Life Exposure to Carcinogens | EPA/630/R-03/003F (March 2005) | To Be Considered | Guidance for assessing cancer risks to children.  Guidance used to develop risk-based cleanup standards for children. | Excavation of all soil exceeding commercial/industrial risk standards, disposal either off-site or on-site in the CHP landfill, and institutional controls to prevent residential development to address soils exceeding residential risk standards will prevent child exposure to contaminants that pose a risk calculated using this guidance. |
| | Recommendations of the Technical Review Workgroup for Lead for an approach to Assessing Risks Associated with Adult Exposure to Lead in Soil | EPA-540-R-03-001 (January 2003) | To Be Considered | EPA Guidance for evaluating risks posed to adults by lead in soil. Guidance used to develop risk-based cleanup standards for lead. | Excavation of all soil exceeding commercial/industrial lead risk standards, disposal either off-site or on-site in the CHP landfill, and institutional controls to prevent residential development to address soils exceeding residential lead risk standards will prevent exposure to lead that poses a risk calculated using this guidance. |
| | Transmittal of Update to Adult Lead Methodology's Default Baseline Blood Lead Concentration and Geometric Standard Deviation Parameters | OLEM Directive 9285.6-56 | To Be Considered | EPA Guidance for evaluating risks posed to adults by lead in soil. Guidance used to develop risk-based cleanup standards for lead. | Excavation of all soil exceeding commercial/industrial lead risk standards, disposal either off-site or on-site in the CHP landfill, and institutional controls to prevent residential development to address soils exceeding residential lead risk standards will prevent exposure to lead that poses a risk calculated using this guidance. |
| | EPA Carcinogenic Assessment Group Potency Factors | | To Be Considered | These factors are used to evaluate an acceptable risk from a carcinogen (i.e. dioxin). Guidance used to develop risk-based cleanup standards for dioxin. | Excavation of all soil exceeding commercial/industrial risk standards, disposal either off-site or on-site in the CHP landfill, and institutional controls to prevent residential development to address soils exceeding residential risk standards will prevent exposure to contaminants that pose a risk calculated using this guidance. |
| | Recommended Toxicity Equivalence Factors (TEFs) for Human Health Risk Assessments of 2,3,7,8-Tetrachlorodibenzo-p-dioxin | EPA/600/R-10/005 | To Be Considered | Guidance used to develop site-specific risk- based cleanup standards for dioxin. | Excavation of all soil exceeding commercial/industrial dioxin risk standards, disposal either off-site or on-site in the CHP landfill, and institutional controls to prevent residential development to address soils exceeding residential dioxin risk standards will prevent exposure to dioxins that pose a risk calculated using this guidance. |
| State of New Hampshire | Contaminated Site Management, Soil Remediation Criteria | Env-Or- 606.19, Table 600-2 | Applicable | Promulgated numeric soil remediation standards. | Excavation of all soil exceeding commercial/industrial risk standards and institutional controls to prevent residential development to address soils exceeding residential risk standards will prevent exposure to contaminants that pose exceed State remediation standards if more stringent than federal risk-based standards. |

Record of Decision
Appendix D: ARARs Tables

| | | | | Table D6: Location-Specific ARARs / TBC, OU-2: Excavation, backfill and either on-site or off-site disposal of contaminated soils, and Institutional Controls | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve |
| Federal | Floodplain Management and Protection of Wetlands | 44 C.F.R. § 9 | Relevant and Appropriate | FEMA regulations that set forth the policy, procedure and responsibilities to implement and enforce Executive Order 11988 (Floodplain Management) and Executive Order 11990 (Protection of Wetlands). Prohibits activities that adversely affect a federally-regulated wetland unless there is no practicable alternative and the proposed action includes all practicable measures to minimize harm to wetlands that may result from such use. Requires the avoidance of impacts associated with the occupancy and modification of federally-designated 100-year and 500-year floodplain and to avoid development within floodplain wherever there is a practicable alternative. An assessment of impacts to 500-year floodplain is required for critical actions – which includes siting contaminated sediment management facilities in a floodplain. Requires public notice when proposing any action in or affecting floodplain or wetlands. | If excavation/backfilling requires altering federal jurisdictional wetlands or 500-year floodplain, mitigation measures will be taken, as required. No public comments were received. |
| | Clean Water Act, Section 404, Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material | 33 U.S.C. § 1344, 40 C.F.R. Part 230, 231 and 33 C.F.R. Parts 320- 323 | ApplicableT | For discharge of dredged or fill material into federal jurisdictional water bodies or wetlands, there must be no practical alternative with less adverse impact on aquatic ecosystem; discharge cannot cause or contribute to violation of state  water quality standard or toxic effluent standard or jeopardize federal T&E species; discharge cannot significantly degrade waters of U.S.; must take practicable steps to minimize  and mitigate adverse impacts; must evaluate impacts on flood level, flood velocity, and flood storage capacity. Sets standards for restoration and mitigation required as a result of unavoidable impacts to aquatic resources. EPA must determine which alternative is the "Least Environmentally Damaging Practicable Alternative" (LEDPA) to protect wetland and aquatic resources. | If excavation/backfilling requires filling federal jurisdictional wetlands, mitigation measures will be taken, as required. No public comments on EPA's LEDPA finding were received. |
| | Fish and Wildlife Coordination Act | 16 U.S.C. §661 *et seq.* | Applicable | Any modification of a body of water or wetland requires consultation with the U.S. Fish and Wildlife Service and the appropriate state wildlife agency to develop measures to prevent, mitigate, or compensate for losses of fish and wildlife. | If excavation/backfilling requires modifying any body of water or wetland consultation requirements addressing impacts to fish and wildlife resources will be followed. |
| Federal | Management of Undesirable Plants on Federal Lands | 7 U.S.C. § 2814 | Relevant and Appropriate | Regulations call for establishing "integrated management systems" for containing or controlling an undesirable plant species or group of species using all available methods, including: preventive measures; physical or mechanical methods; biological agents; herbicide methods; cultural methods; and general land management practices. | If any wetlands, floodplain or other habitats are altered by the remedial action restoration will include preventing invasive, non-native plant species from becoming established. |

Record of Decision
Appendix D: ARARs Tables

| Table D6: Location-Specific ARARs / TBC, OU-2: Excavation, backfill and either on-site or off-site disposal of contaminated soils, and Institutional Controls | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve |
|  | National Historical Preservation Act and Regulations | 16 U.S.C. 469 et seq.; 36 C.F.R. Part 65 | Applicable | When a federal agency finds, or is notified, that its activities may cause irreparable loss or destruction of significant scientific, pre-historical, historical, archeological data, such agency shall consult with relevant federal and State officials to address the preservation of such data or other forms of mitigation, as necessary. | If it is determined that this alternative may cause irreparable loss or destruction of significant scientific, pre-historical, historical, or archaeological data (i.e. remaining historic mill structures), EPA will consult with federal and State officials and implement preservation and/or mitigation measures, as necessary. |
| State of New Hampshire | Criteria and Conditions for Fill and Dredge in Wetlands | RSA Ch. 482-A and NH Admin. Code Env-Wt Parts 100-900 | Applicable | These standards regulate filling and other activities in or adjacent to wetland resource areas (including the 100-year floodplain), and buffer zones and establish criteria for the protection of wetlands from adverse impacts on fish, wildlife, commerce, and public recreation. | If excavation/backfilling requires filling State jurisdictional wetlands or buffer zone, mitigation measures will be taken, as required. |
|  | Shoreland Water Quality Protection | RSA 483-B and NH Admin, Code Env-Wq 1400 | Applicable | These standards regulate activities conducted along shorelands to protect, restore and preserve these fragile natural resources. | If excavation/backfilling requires work within regulated shoreland areas, mitigation measures will be taken, as required. |
|  | Terrain Alteration | RSA 485-A:17 and NH Admin. Code Env-Wq 1500 | Applicable | These rules establish criteria for the protection of surface water quality resulting from activities that occur in or on the border of surface water or within a distance of surface water such that direct or immediate degradation may result to water quality. | If excavation/backfilling alters terrain regulated under these standards, mitigation measures will be taken to protect water quality, as required. |
|  | Historic Preservation Act | RSA 227-C | Applicable | When activities may cause irreparable loss or destruction of significant scientific, pre-historical, historical, archeological data, the project proponent shall consult with relevant State officials to address the preservation of such data or other forms of mitigation, as necessary. | If it is determined that this alternative may cause irreparable loss or destruction of significant scientific, pre-historical, historical, or archaeological data (i.e. remaining historic mill structures), EPA will consult with State officials and implement preservation and/or mitigation measures, as necessary. |
|  | Native Plant Protection Act | R.S.A. 217-A | Applicable | Prohibits damaging plant species listed as endangered in the State. | If implementation of this alternative may take state-listed species the remedial action will need to meet these standards. |
| State of New Hampshire | Endangered Species Conservation Act | R.S.A. 212-A | Applicable | Identifies endangered species in NH and requirements for protection of species of wildlife determined to be threatened or endangered, including prohibitions on taking, possessing, and transporting of endangered species. | If implementation of this alternative may take state-listed species the remedial action will need to meet these standards. |

Record of Decision
Appendix D: ARARs Tables

| Table D7: Action-Specific ARARs / TBC, OU-3: Groundwater beneath the CHP Landfill, Institutional Controls & Monitoring | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
| Federal | Resource Conservation and Recovery Act (RCRA) | 42 U.S.C. §§ 6901, et seq., 40 C.F.R. Parts 261, 262 and 264 | Applicable | New Hampshire has been delegated the authority to administer these RCRA standards through its state hazardous waste management regulations (Env- Hw 100-1100). These provisions have been adopted by the State. | Any wastes generated by remedial activity will be analyzed by appropriate test methods. If found to be hazardous wastes, then they will be managed in accordance with the substantive requirements of the State hazardous waste regulations. Wastes that may be generated include: investigation derived waste from monitoring activities and contaminated media produced during the O&M of the monitoring wells and other components of the remedy. |
| | Toxic Substances Control Act (TSCA), PCB Remediation Waste | 15 U.S.C. 2601 et seq., 40 C.F.R. 761.61(c) | Applicable | This section of the TSCA regulations provides risk- based cleanup and disposal options for PCB remediation waste based on the risks posed by the concentrations at which the PCBs are found. Written approval for the proposed risk-based cleanup must be obtained from the Director, Office of Site Remediation and Restoration, EPA Region 1. | Any PCB-contaminated material generated from well installation, maintenance, sampling will be managed and disposed of based so as to not pose an unreasonable risk of injury to health or the environment. |
| | Clean Air Act (CAA), Hazardous Air Pollutants, National Emission Standards for Hazardous Air Pollutants (NESHAPS) | 42.U.S.C. § 112(b)(1), 40 C.F.R. Part 61 | Applicable | The regulations establish emissions standards for 189 hazardous air pollutants. Standards set for dust and other release sources. | Any remedial actions, including installation/ maintenance of monitoring wells, that may generate contaminated dust will take measures to control releases. |
| | Clean Water Act (CWA), Section 402, Discharge of Pollutants | 33 U.S.C. § 1342; 40 C.F.R.122,125, 131, 136, 450 | Applicable | These standards address water discharges which may be directed to surface water. Also establishes stormwater standards for construction and development projects that are over one acre. | If a discharge from the remedial action, including construction and O&M of monitoring wells and accessways, is directed to surface water the discharge will be treated, if necessary, so that these standards will be achieved. |
| | Clean Water Act, National Recommend Water Quality Criteria (NRWQC) | EPA-822-R-02-047, USEPA, Office of Water, Office of Science and Technology (Nov. 2002 | To Be Considered | NRWQC are health-based criteria developed for chemical constituents in surface water. They have been developed to protect aquatic life and human health from harmful effects due to exposure to chemically impacted surface water. Performance standards to be used for monitoring surface water and sediment during remedial activities and long- term monitoring of the landfill. | Guidance used to develop performance standards that may will be used to monitor the river to determine if groundwater contamination is impairing water quality.* |

Record of Decision
Appendix D: ARARs Tables

| Table D7: Action-Specific ARARs / TBC, OU-3: Groundwater beneath the CHP Landfill, Institutional Controls & Monitoring | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
| Federal | Safe Drinking Water Act, National Primary Drinking Water Regulations, Maximum Contaminant Levels (MCLs) | 42 U.S.C. §300f et seq.; 40 C.F.R. 141, Subparts B and G | Relevant and Appropriate | Establishes maximum contaminant levels (MCLs) for common organic and inorganic contaminants applicable to public drinking water supplies.  Numeric values in the regulations used as groundwater monitoring standards and exceedances of the standards require the establishment of institutional controls to prevent groundwater use. | Used to establish Performance Standards for monitoring groundwater at the CHP landfill compliance boundary to ensure there is no migration of contaminated groundwater exceeding these standards beyond the boundary.* Inside of the compliance boundary, ICs will be required to prevent contact/ingestion of groundwater that exceeds these standards. |
| | Safe Drinking Water Act, National Primary Drinking Water Regulations, Maximum Contaminant Level Goals (MCLGs) | 42 U.S.C. §300f et seq.; 40 C.F.R. 141, Subpart F | Relevant and Appropriate for non-zero MCLGs only; MCLGs set as zero are To Be Considered | Establishes maximum contaminant level goals (MCLGs) for public water supplies.  MCLGs are health goals for drinking water sources. These unenforceable health goals are available for a number of organic and inorganic compounds. Numeric values in the regulations used as groundwater monitoring performance standards and exceedances of the standards require the establishment of institutional controls to prevent groundwater use. | Used to establish performance standards for monitoring groundwater at the CHP landfill compliance boundary to ensure there is no migration of contaminated groundwater exceeding these standards beyond the boundary.* Inside of the compliance boundary, ICs will be required to prevent contact/ingestion of groundwater that exceeds these standards. |
| | Health Advisories (EPA Office of Drinking Water) | | To Be Considered | Health Advisories are estimates of risk due to consumption of contaminated drinking water; they consider non-carcinogenic effects only. To be considered for contaminants in groundwater that may be used for drinking water where the standard is more conservative than either federal or state statutory or regulatory standards.  The Health Advisory standard for manganese is 0.3 mg/l. Guidance used to develop risk- based groundwater monitoring performance standards and exceedances of the standards require the establishment of institutional controls to prevent groundwater use. | Health Advisories will be used to develop risk-based groundwater performance standards for monitoring groundwater at the CHP landfill compliance boundary to ensure there is no migration of contaminated groundwater exceeding these standards beyond the boundary.* Inside of the compliance boundary, ICs will be required to prevent contact/ingestion of groundwater that exceeds risk-based standards developed using this guidance. |

Record of Decision
Appendix D: ARARs Tables

| Table D7: Action-Specific ARARs / TBC, OU-3: Groundwater beneath the CHP Landfill, Institutional Controls & Monitoring | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
| | Summary of Key Existing EPA CERCLA Policies for Groundwater Restoration | OSWER Directive 9283.1-33, June 26 2009 | To Be Considered | Guidance on developing groundwater remedies at CERCLA sites. | Beyond the CHP landfill compliance boundary groundwater must achieve federal drinking water and risk-based standards or more stringent State groundwater standards.* Inside of the CHP landfill compliance boundary groundwater use restrictions will be in place for as contamination remains in place under the landfill. Groundwater monitoring using these standards will be used to make sure groundwater exceeding these standards does not migrate beyond the compliance boundary. Exceedance of these standards within the compliance boundary is a basis for establishing prohibitions on the use of groundwater within the compliance boundary. An additional buffer zone beyond the compliance boundary to prevent groundwater wells from being installed that would draw contaminated groundwater beyond the compliance boundary may also be established, if required. |
| | OSWER Technical Guide for Assessing and Mitigating the Vapor Intrusion Pathway from Subsurface Vapor Sources to Indoor Air | OSWER Publication 9200.2-154 (June 2015) | To Be Considered | EPA guidance for addressing vapor intrusion issues at CERCLA sites. | Under this alternative ICs will be established requiring either a vapor intrusion evaluation or vapor mitigation system be installed if a new building is constructed over the area of contaminated groundwater until groundwater cleanup standards are achieved. |
| | Guide to Management of Investigation-Derived Waste | USEPA OSWER 9345.303FS, January 1992 | To Be Considered | Investigation-derived wastes (IDW) generated from remedial activities (e.g., drilling muds, purged water, etc.) are required to be properly stored, managed, and disposed. Guidance given in the publication includes waste material containment, collection labeling, etc. | Investigation-derived wastes (IDW) generated from remedial activities (e.g., drilling muds, purged water, etc. from installing, maintaining and sampling monitoring wells) will be stored, managed, and disposed of based on these guidance standards. |
| State of New Hampshire | Identification and Listing of Hazardous Wastes | N.H. Admin. Code Env-Hw 400 | Applicable | These standards list particular hazardous wastes and identify the maximum concentration of contaminants for which the waste would be a RCRA characteristic waste. The analytical test set out in Appendix II of 40 C.F.R. Part 261 is referred to as the Toxicity Characteristic Leaching Procedure (TCLP). The federal regulations at 40 C.F.R. Part 261 are incorporated by reference. | Wastes generated by remedial activity will be analyzed under these standards to determine whether they are listed or characteristic hazardous waste. Wastes that may be generated include: investigation derived waste from monitoring activities and contaminated media produced during the construction or O&M of the monitoring wells and other components of the remedy. Materials that are listed waste or exceed TCLP hazardous waste thresholds will be disposed off-site in a RCRA Subtitle C facility.  Non-hazardous materials will be disposed appropriately. |

Record of Decision
Appendix D: ARARs Tables

| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
|---|---|---|---|---|---|
| | | | | **Table D7: Action-Specific ARARs / TBC, OU-3**: Groundwater beneath the CHP Landfill, Institutional Controls & Monitoring | |
| | Requirements for Hazardous Waste Generators | Env-Hw 500 | Applicable | Requires a determination as to whether waste materials are hazardous (Env-Hw 502) and, if so, requirements for managing environmental and health requirements (Env-Hw 506), for accumulating hazardous wastes on-site (Env-Hw 507) prior to shipment off site, and for emergency actions (Env-Hw 513).  The federal regulations at 40 C.F.R. Part 262 are incorporated by reference. | If remedial activity generates hazardous wastes, then they will be managed in accordance with the substantive requirements of these regulations. |
| | Drinking Water Quality Standards | Env-Dw 700 | Relevant and Appropriate for MCLs and non-zero MCLGs only; MCLGs set as zero are To Be Considered | State MCLs and MCLGs establish maximum contaminant levels permitted in public water supplies and are the basis of State Ambient Groundwater Quality Standards (AGQS) that are applicable to site ground water.  Numeric values in the regulations, when more stringent than federal standards, used as groundwater monitoring performance standards and exceedances of the standards require the establishment of institutional controls to prevent groundwater use. | State drinking water standards that are more stringent than federal standards will be used to establish performance standards for monitoring groundwater at the CHP landfill compliance boundary to ensure there is no migration of contaminated groundwater exceeding these standards beyond the boundary.* Inside of the compliance boundary, ICs will be required to prevent contact/ingestion of groundwater that exceeds these standards. |
| | New Hampshire Ambient Groundwater Quality Standards (NH AGQS) | Env-Or 603.03, Table 600-1 | Applicable | Establishes maximum concentration levels for regulated contaminants in groundwater which result from human operations or activities.  Numeric values in the regulations, when more stringent than federal standards, used as groundwater monitoring performance standards and exceedances of the standards require the establishment of institutional controls to prevent groundwater use. | NH AGQS that are more stringent than federal standards will be used to establish performance standards for monitoring groundwater at the CHP landfill compliance boundary to ensure there is no migration of contaminated groundwater exceeding these standards beyond the boundary.* Inside of the compliance boundary, ICs will be required to prevent contact/ingestion of groundwater that exceeds these standards. |
| **State of New Hampshire** | Nondegradation of Groundwater to Protect Surface Water | Env-Or 603.01 (a), (b), and (c) | Applicable | Provides that groundwater shall be suitable for use as drinking water without treatment; shall not contain any regulated contaminant in concentrations greater than ambient groundwater quality standards established in Env- Or 603.03; and shall not contain any regulated contaminant at a concentration such that the natural discharge of that groundwater to surface water will cause a violation of a surface water quality standard established in Env-Wq 1700. | Groundwater monitoring will confirm that Site groundwater contamination in not migrating beyond the compliance boundary and is not impairing surface water quality.* |

Record of Decision
Appendix D: ARARs Tables

| Table D7: Action-Specific ARARs / TBC, OU-3: Groundwater beneath the CHP Landfill, Institutional Controls & Monitoring | | | | | |
|---|---|---|---|---|---|
| **Authority** | **Law/Regulation/Guidance** | **Citation** | **ARAR/TBC Status** | **Requirement Synopsis** | **Action To Be Taken To Achieve ARAR** |
| **State of New Hampshire** | Standards for the Construction, Maintenance and Abandonment of Wells | We 600 | Applicable for drinking water wells; Relevant and Appropriate for monitoring wells | This provision requires that wells be constructed, maintained, relocated, and/or abandoned according to these regulations. We 602.05 address restrictions on locating wells in contaminated areas. | Wells used for the remedy will be created, operated, and closed in compliance with these standards. Well restriction standards shall be incorporated into institutional controls to prevent groundwater use inside of the CHP compliance boundary. An additional buffer zone beyond the compliance boundary to prevent groundwater wells from being installed that would draw contaminated groundwater beyond the compliance boundary may also be established, if required. |
| | Surface Water Quality Standards | Env-Wq 1700 | Applicable | Health-based criteria developed for chemical constituents in surface water. They have been developed to protect aquatic life and human health from harmful effects due to exposure to chemically impacted surface water. State standards to be used when more stringent than federal standards for monitoring surface water and sediment during remedial activities and long-term monitoring of the landfill. | Performance standards will be used to monitor the river to determine if groundwater contamination is impairing water quality.* |
| | Enforcement of Classification | R.S.A. 485-A:12 | Applicable | Any discharge to groundwater or surface water that lowers the quality of the water below its classification is prohibited. | Groundwater/surface water monitoring will confirm that Site groundwater contamination is not impairing surface water quality.* |
| | Contaminated Site Management | Env-Or 600 | Applicable | Establishes standards for managing contaminated groundwater (Env-607), monitoring (Env-Or 610) and managing contaminated soil (Env-Or 611). | Regulatory standards for managing contaminated groundwater and soil and Site monitoring will be applied to the implementation of this remedial alternative.* |
| | Ambient Air Quality Standards | RSA Ch. 125-C, Env- A 300 | Applicable | These regulations set primary and secondary ambient air quality standards (equivalent to federal standards). The standards do not allow significant deterioration of existing air quality. | Any remedial actions, including installation/maintenance of monitoring wells, that may exceed ambient air quality measures will take measures to control releases. |
| | Air Pollution Control, Fugitive Dust, N.H. Admin. | RSA Ch. 125-C, Env- A Part 1002 | Applicable | Requires precautions to prevent, abate and control fugitive dust during specified activities, including excavation, maintenance, and construction. | Any remedial actions, including installation/maintenance of monitoring wells that may generate contaminated dust will take measures to control releases. |
| | Air Pollution Control, Regulated Toxic Air Pollutants | RSA Ch. 125-C, Env- A Part 1400 | Applicable | Identifies toxic air pollutants discharge standards. These pollutants are also listed by EPA in 40 CFR 261 | Any remedial actions, including installation/maintenance of monitoring wells, that may exceed air discharge standards will take measures to control releases. |

Record of Decision
Appendix D: ARARs Tables

| Table D7: Action-Specific ARARs / TBC, OU-3: Groundwater beneath the CHP Landfill, Institutional Controls & Monitoring | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
| | New Hampshire Stormwater Manual Volume 3 Erosion and Sediment Controls During Construction | | To Be Considered | This document provides guidance on installation and maintenance of erosion and sediment controls during remedial construction. | Guidance standards for preventing erosion and sediment controls will be implemented during the installation and maintenance of monitoring wells and accessways. |

| Table D8: Chemical-Specific ARARs / TBC, OU-3: Groundwater beneath the CHP Landfill, Institutional Controls & Monitoring | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Attain ARAR |
| Federal | Safe Drinking Water Act, National Primary Drinking Water Regulations, Maximum Contaminant Levels (MCLs) | 42 U.S.C. §300f et seq.; 40 C.F.R. 141, Subparts B and G | Relevant and Appropriate | Establishes maximum contaminant levels (MCLs) for common organic and inorganic contaminants applicable to public drinking water supplies.  Numeric values in the regulations used as cleanup standards for aquifers outside of the compliance boundary for the CHP landfill. | Institutional controls will prevent use of groundwater exceeding these standards.  Monitoring will ensure that groundwater contamination exceeding these standards does not migrate beyond the compliance boundary for the CHP landfill.* |
| | Safe Drinking Water Act, National Primary Drinking Water Regulations, Maximum Contaminant Level Goals (MCLGs) | 42 U.S.C. §300f et seq.; 40 C.F.R. 141, Subpart F | Relevant and Appropriate for non-zero MCLGs only; MCLGs set as zero are To Be Considered | Establishes maximum contaminant level goals (MCLGs) for public water supplies. MCLGs are health goals for drinking water sources.  These unenforceable health goals are available for a number of organic and inorganic compounds. Numeric values in the regulations used as cleanup standards for aquifers outside of the compliance boundary for the CHP landfill. | Institutional controls will prevent consumption of groundwater exceeding these standards.  Monitoring will ensure that groundwater contamination exceeding these standards does not migrate beyond the compliance boundary for the CHP landfill. |
| | Health Advisories (EPA Office of Drinking Water) | | To Be Considered | Health Advisories are estimates of risk due to consumption of contaminated drinking water; they consider non- carcinogenic effects only. To be considered for contaminants in groundwater that may be used for drinking water where the standard is more conservative than either federal or state statutory or regulatory standards.  The Health Advisory standard for manganese is 0.3 mg/l. Guidance used to develop risk-based cleanup standards for aquifers outside of the compliance boundary for the CHP landfill. | Institutional controls will prevent consumption of groundwater exceeding standards developed using this guidance.  Monitoring will ensure that groundwater contamination exceeding the risk-based standards developed using this guidance do not migrate beyond the compliance boundary for the CHP landfill. |

Record of Decision
Appendix D: ARARs Tables

| Table D8: Chemical-Specific ARARs / TBC, OU-3: Groundwater beneath the CHP Landfill, Institutional Controls & Monitoring ||||||
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Attain ARAR |
| Federal | EPA Risk Reference Dose (RfDs) | | To Be Considered | Dose levels developed by EPA to protect sensitive individuals over the course of a life-time. RfDs reflect a daily exposure level likely to be without appreciable risk of adverse health effects. Guidance used to develop non-carcinogenic risk-based cleanup standards. | Institutional controls will prevent consumption of groundwater exceeding standards developed using this guidance. Monitoring will ensure that groundwater contamination exceeding the risk-based standards developed using this guidance do not migrate beyond the compliance boundary for the CHP landfill. |
| | EPA Carcinogenicity Slope Factor | | To Be Considered | Slope factors are developed by EPA from Health Effects Assessments and present the most up-to-date information on cancer risk potency. Slope factors are developed by EPA from Health Effects Assessments by the Carcinogenic Assessment Group. Guidance used to develop carcinogenic risk-based cleanup standards | Institutional controls will prevent consumption of groundwater exceeding standards developed using this guidance. Monitoring will ensure that groundwater contamination exceeding the risk-based standards developed using this guidance do not migrate beyond the compliance boundary for the CHP landfill.* |
| | Guidelines for Carcinogen Risk Assessment | EPA/630/P-03/001F (March 2005) | To Be Considered | Guidance for assessing cancer risk. Guidance used to develop risk-based cleanup standards | Institutional controls will prevent consumption of groundwater exceeding standards developed using this guidance. Monitoring will ensure that groundwater contamination exceeding the risk-based standards developed using this guidance do not migrate beyond the compliance boundary for the CHP landfill.* |
| | Supplemental Guidance for Assessing Susceptibility from Early-Life Exposure to Carcinogens | EPASup/630/R-03/003F (March 2005) | To Be Considered | Guidance for assessing cancer risks to children. Guidance used to develop risk-based cleanup standards for children. | Institutional controls will prevent consumption of groundwater exceeding standards developed using this guidance. Monitoring will ensure that groundwater contamination exceeding the risk-based standards developed using this guidance do not migrate beyond the compliance boundary for the CHP landfill.* |
| | EPA Carcinogenic Assessment Group Potency Factors | | To Be Considered | These factors are used to evaluate an acceptable risk from a carcinogen (i.e. dioxin). Guidance used to develop risk-based cleanup standards for dioxin. | Institutional controls will prevent consumption of groundwater exceeding standards developed using this guidance. Monitoring will ensure that groundwater contamination exceeding the risk-based standards developed using this guidance do not migrate beyond the compliance boundary for the CHP landfill.* |
| State of New Hampshire | Drinking Water Quality Standards | NH Admin. Code Env-DW 700 | Relevant and Appropriate for MCLs and non- zero MCLGs only; MCLGs set as zero are To Be Considered | State MCLs and MCLGs establish maximum contaminant levels permitted in public water supplies and are the basis of State Ambient Groundwater Quality Standards (AGQS) that are applicable to site groundwater. The regulations are generally equivalent to the Federal Safe Drinking Water Act (SDWA). Numeric values in the regulations are more stringent than federal standards used as cleanup standards for aquifers outside of the compliance boundary for the CHP landfill. | Institutional controls will prevent consumption of groundwater exceeding these standards. Monitoring will ensure that groundwater contamination exceeding these standards does not migrate beyond the compliance boundary for the CHP landfill.* |

Record of Decision
Appendix D: ARARs Tables

| Table D8: Chemical-Specific ARARs / TBC, OU-3: Groundwater beneath the CHP Landfill, Institutional Controls & Monitoring | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Attain ARAR |
|  | New Hampshire Ambient Groundwater Quality Standards (NH AGQS) | Env-Or 603.03, Table 600-1 | Applicable | Establishes maximum concentration levels for regulated contaminants in groundwater which result from human operations or activities.  NH AGQS are equivalent to MCLs for contaminants that have MCLs.  NH AGQS have been established for site groundwater contaminants for which no MCLs are established, and are derived to be protective for drinking water uses.  Numeric values in the regulations that are more stringent than federal standards used as cleanup standards for aquifers outside of the compliance boundary for the CHP landfill. | Institutional controls will prevent consumption of groundwater exceeding these standards.  Monitoring will ensure that groundwater contamination exceeding these standards does not migrate beyond the compliance boundary for the CHP landfill.* |

| Table D9: Location-Specific ARARs / TBC, OU-3: Groundwater beneath the CHP Landfill, Institutional Controls & Monitoring | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Regulation | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
| Federal | Floodplain Management and Protection of Wetlands | 44 C.F.R. § 9 | Relevant and Appropriate | FEMA regulations that set forth the policy, procedure and responsibilities to implement and enforce Executive Order 11988 (Floodplain Management) and Executive Order 11990 (Protection of Wetlands).  Prohibits activities that adversely affect a federally-regulated wetland unless there is no practicable alternative and the proposed action includes all practicable measures to minimize harm to wetlands that may result from such use.  Requires the avoidance of impacts associated with the occupancy and modification of federally- designated 100-year and 500- year floodplain and to avoid development within floodplain wherever there is a practicable alternative.  An assessment of impacts to 500-year floodplain is required for critical actions – which includes siting contaminated sediment management facilities in a floodplain.  Requires public notice when proposing any action in or affecting floodplain or wetlands. | If installation/operation of monitoring wells or access to wells require altering federal jurisdictional wetlands or 500-year floodplain, mitigation measures will be taken, as required. No public comments were received. |

Record of Decision
Appendix D: ARARs Tables

| Table D9: Location-Specific ARARs / TBC, OU-3: Groundwater beneath the CHP Landfill, Institutional Controls & Monitoring ||||||
|---|---|---|---|---|---|
| Authority | Law/Regulation/Regulation | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
| | Clean Water Act, Section 404; Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material | 33 U.S.C. § 1344, 40 C.F.R. Part 230, 231 and 33 C.F.R. Parts 320-323 | Applicable | For discharge of dredged or fill material into federal jurisdictional water bodies or wetlands, there must be no practical alternative with less adverse impact on aquatic ecosystem; discharge cannot cause or contribute to violation of state water quality standard or toxic effluent standard or jeopardize federal T&E species; discharge cannot significantly degrade waters of U.S.; must take practicable steps to minimize and mitigate adverse impacts; must evaluate impacts on flood level, flood velocity, and flood storage capacity. Sets standards for restoration and mitigation required as a result of unavoidable impacts to aquatic resources. EPA must determine which alternative is the "Least Environmentally Damaging Practicable Alternative" (LEDPA) to protect wetland and aquatic resources. | If installation/operation of monitoring wells or access to wells require filling federal jurisdictional wetlands, mitigation measures will be taken, as required. No public comments on EPA's LEDPA finding were received. |
| | Fish and Wildlife Coordination Act | 16 U.S.C. §661 et seq. | Applicable | Any modification of a body of water or wetland requires consultation with the U.S. Fish and Wildlife Service and the appropriate state wildlife agency to develop measures to prevent, mitigate, or compensate for losses of fish and wildlife. | If installation/operation of monitoring wells or access to wells require modifying any body of water or wetland consultation requirements addressing impacts to fish and wildlife resources will be followed. |
| Federal | Management of Undesirable Plants on Federal Lands | 7 U.S.C. § 2814 | Relevant and Appropriate | Regulations call for establishing "integrated management systems" for containing or controlling an undesirable plant species or group of species using all available methods, including: preventive measures; physical or mechanical methods; biological agents; herbicide methods; cultural methods; and general land management practices. | If any wetlands, floodplain or other habitats are altered by the remedial action restoration will include preventing invasive, non-native plant species from becoming established. |
| | National Historical Preservation Act and Regulations | 16 U.S.C. 469 et seq.; 36 C.F.R. Part 65 | Applicable | When a federal agency finds, or is notified, that its activities may cause irreparable loss or destruction of significant scientific, pre-historical, historical, archeological data, such agency shall consult with relevant federal and State officials to address the preservation of such data or other forms of mitigation, as necessary. | If it is determined that this alternative may cause irreparable loss or destruction of significant scientific, pre-historical, historical, or archaeological data (i.e. remaining historic mill structures), EPA will consult with federal and State officials and implement preservation and/or mitigation measures, as necessary. |

Record of Decision
Appendix D: ARARs Tables

| Table D9: Location-Specific ARARs / TBC, OU-3: Groundwater beneath the CHP Landfill, Institutional Controls & Monitoring | | | | | |
|---|---|---|---|---|---|
| **Authority** | **Law/Regulation/Regulation** | **Citation** | **ARAR/TBC Status** | **Requirement Synopsis** | **Action To Be Taken To Achieve ARAR** |
| **State of New Hampshire** | Criteria and Conditions for Fill and Dredge in Wetlands | RSA Ch. 482-A and NH Admin. Code Env-Wt Parts 100-900 | Applicable | These standards regulate filling and other activities in or adjacent to wetland resource areas (including the 100-year floodplain), and buffer zones and establish criteria for the protection of wetlands from adverse impacts on fish, wildlife, commerce, and public recreation. | If installation/operation of monitoring wells or access to wells require filling State jurisdictional wetlands or buffer zone, mitigation measures will be taken, as required. |
| | Shoreland Water Quality Protection | RSA 483-B and NH Admin. Code Env-Wq 1400 | Applicable | These standards regulate activities conducted along shorelands to protect, restore and preserve these fragile natural resources. | If installation/operation of monitoring wells or access to wells require work within regulated shoreland areas, mitigation measures will be taken, as required. |
| | Terrain Alteration | RSA 485-A:17 and NH Admin. Code Env-Wq 1500 | Applicable | These rules establish criteria for the protection of surface water quality resulting from activities that occur in or on the border of surface water or within a distance of surface water such that direct or immediate degradation may result to water quality. | If installation/operation of monitoring wells or access to wells require alter terrain regulated under these standards, mitigation measures will be taken to protect water quality, as required. |
| | Historic Preservation Act | RSA 227-C | Applicable | When activities may cause irreparable loss or destruction of significant scientific, pre-historical, historical, archeological data, the project proponent shall consult with relevant State officials to address the preservation of such data or other forms of mitigation, as necessary. | If it is determined that this alternative may cause irreparable loss or destruction of significant scientific, pre-historical, historical, or archaeological data (i.e. remaining historic mill structures), EPA will consult with State officials and implement preservation and/or mitigation measures, as necessary. |
| | Native Plant Protection Act | R.S.A. 217-A | Applicable | Prohibits damaging plant species listed as endangered in the State. | If implementation of this alternative may take state- listed species the remedial action will need to meet these standards. |
| **State of New Hampshire** | Endangered Species Conservation Act | R.S.A. 212-A | Applicable | Identifies endangered species in NH and requirements for protection of species of wildlife determined to be threatened or endangered, including prohibitions on taking, possessing, and transporting of endangered species. | If implementation of this alternative may take state- listed species the remedial action will need to meet these standards. |

Record of Decision
Appendix D: ARARs Tables

| Table D10: Action-Specific ARARs / TBC, OU-3: Groundwater beneath the SFSA, In Situ Chemical Oxidation, Monitoring, and Institutional Controls | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
| Federal | Resource Conservation and Recovery Act (RCRA) | 42 U.S.C. §§ 6901, et seq ., 40 C.F.R. Parts 261, 262 and 264 | Applicable | New Hampshire has been delegated the authority to administer these RCRA standards through its state hazardous waste management regulations (Env-Hw 100-1100). These provisions have been adopted by the State. | Any wastes generated by remedial activity will be analyzed by appropriate test methods.  If found to be hazardous wastes, then they will be managed in accordance with the substantive requirements of the State hazardous waste regulations. Wastes that may be generated include: investigation derived waste and contaminated media produced during the O&M of the monitoring/treatment wells and other components of the remedy. |
| | Toxic Substances Control Act (TSCA), PCB Remediation Waste | 15 U.S.C. 2601 et seq, 40 C.F.R. 761.61(c) | Applicable | This section of the TSCA regulations provides risk-based cleanup and disposal options for PCB remediation waste based on the risks posed by the concentrations at which the PCBs are found. Written approval for the proposed risk-based cleanup must be obtained from the Director, Superfund & Emergency Management Division, EPA Region 1. | Any PCB-contaminated material generated from monitoring/treatment well installation, maintenance, and sampling will be tested and disposed of so as to not pose an unreasonable risk of injury to health or the environment. |
| | Clean Air Act (CAA), Hazardous Air Pollutants, National Emission Standards for Hazardous Air Pollutants (NESHAPS) | 42.U.S.C. § 112(b)(1), 40 C.F.R. Part 61 | Applicable | The regulations establish emissions standards for 189 hazardous air pollutants. Standards set for dust and other release sources. | Any remedial actions, including installation/maintenance of treatment/monitoring wells that may generate contaminated dust will take measures to control releases. |
| | RCRA, Interim Status Treatment, Storage, and Disposal Facility Standards, Chemical, Physical and Biological Treatment | 40 C.F.R. Part 265 Subpart Q | Relevant and Appropriate | Standards for operating chemical, physical and biological treatment systems, including the proper handling of reagents, system maintenance, and closure procedures. | The ISCO treatment component to this alternative will be implemented, including the handling/management of treatment reagents, in compliance with these standards. |
| | Underground Injection Control Program | 40 C.F.R. 144, 146, 147 (Subpart EE) | Applicable | Regulations established to assure that underground injection will not endanger drinking water sources. | The ISCO injection component to this alternative will be implemented in compliance with these standards to protect drinking water sources. |
| | Clean Water Act (CWA), Section 402, Discharge of Pollutants | 33 U.S.C. § 1342; 40 C.F.R.122,125, 131, 136, 450 | Applicable | These standards address water discharges which may be directed to surface water. Also establishes stormwater standards for construction and development projects that are over one acre. | If a discharge from the remedial action, including construction and O&M of treatment/monitoring wells and accessways, is directed to surface water the discharge will be treated, if necessary, so that these standards will be achieved. |
| | Clean Water Act, National Recommend Water Quality Criteria (NRWQC) | EPA-822-R-02-047, USEPA, Office of Water, Office of Science and Technology (Nov. 2002 | To Be Considered | NRWQC are health-based criteria developed for chemical constituents in surface water. They have been developed to protect aquatic life and human health from harmful effects due to exposure to chemically impacted surface water.  Performance standards to be used for monitoring surface water and sediment during remedial activities and long-term monitoring of the landfill. | Guidance used to develop performance standards that may be used to monitor the river to determine if groundwater contamination is impairing water quality. |

Record of Decision
Appendix D: ARARs Tables

| Table D10: Action-Specific ARARs / TBC, OU-3: Groundwater beneath the SFSA, In Situ Chemical Oxidation, Monitoring, and Institutional Controls | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
| | OSWER Technical Guide for Assessing and Mitigating the Vapor Intrusion Pathway from Subsurface Vapor Sources to Indoor Air | OSWER Publication 9200.2-154 (June 2015) | To Be Considered | EPA guidance for addressing vapor intrusion issues at CERCLA sites. | Under this alternative ICs will be established requiring either a vapor intrusion evaluation or vapor mitigation system be installed if a new building is constructed over the area of contaminated groundwater to remain in effect until groundwater cleanup standards are achieved. |
| | Summary of Key Existing EPA CERCLA Policies for Groundwater Restoration | OSWER Directive 9283.1-33, June 26 2009 | To Be Considered | Guidance on developing groundwater remedies at CERCLA sites. | ISCO will be used to attain beneficial reuse of Site groundwater. Institutional controls will prevent exposure to contaminated groundwater until cleanup standards are achieved. Groundwater monitoring using these standards will be used to determine where ICs are required and to document if cleanup standards are achieved. |
| | Guide to Management of Investigation-Derived Waste | USEPA OSWER 9345.303FS, January 1992 | To Be Considered | Investigation-derived wastes (IDW) generated from remedial activities (*e.g.*, drilling muds, purged water, etc.) are required to be properly stored, managed, and disposed. Guidance given in the publication includes waste material containment, collection labeling, *etc.* | Investigation-derived wastes (IDW) generated from remedial activities (*e.g.*, drilling muds, purged water, *etc.* from installing, maintaining and sampling treatment/monitoring wells) will be stored, managed, and disposed of based on these guidance standards. |
| State of New Hampshire | Identification and Listing of Hazardous Wastes | N.H. Admin. Code Env-Hw 400 | Applicable | These standards list particular hazardous wastes and identify the maximum concentration of contaminants for which the waste would be a listed or characteristic hazardous waste.  The analytical test set out in Appendix II of 40 C.F.R. Part 261 is referred to as the Toxicity Characteristic Leaching Procedure (TCLP). The federal regulations at 40 C.F.R. Part 261 are incorporated by reference. | Any wastes generated by remedial activity will be analyzed under these standards to determine whether they are listed or characteristic hazardous waste. Wastes that may be generated include: investigation derived waste from monitoring activities and contaminated media produced during the construction or O&M of the treatment/monitoring wells and other components of the remedy.  Materials that are listed waste or exceed TCLP hazardous waste thresholds will be disposed off-site in a RCRA Subtitle C facility. Non-hazardous materials will be disposed appropriately. |

Record of Decision
Appendix D: ARARs Tables

| Table D10: Action-Specific ARARs / TBC, OU-3: Groundwater beneath the SFSA, In Situ Chemical Oxidation, Monitoring, and Institutional Controls | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
| State of New Hampshire | Requirements for Hazardous Waste Generators | Env-Hw 500 | Applicable | Requires a determination as to whether waste materials are hazardous (Env-Hw 502) and, if so, requirements for managing environmental and health requirements (Env-Hw 506), for accumulating hazardous wastes on-site (Env-Hw 507) prior to shipment off site, and for emergency actions (Env-Hw 513).  The federal regulations at 40 C.F.R. Part 262 are incorporated by reference. | If remedial activity generates hazardous wastes, then they will be managed in accordance with the substantive requirements of these regulations. |
| | Protection of Groundwater | R.S.A. 485-A:13, Env-Wq 402 | Applicable | These regulations establish substantive requirements for discharges to groundwater, including prohibited discharges (Env-Wq 402.07), water quality sampling (Env-Wq 402.8), and compliance criteria (Env-Wq 402.22). | The ISCO injection component to this alternative will be implemented in compliance with these standards to protect drinking water sources. |
| | Underground Injection Controls | Env-Wq 404 | Applicable | State standards established to supplement federal underground injection standards that assure that underground injection will not endanger drinking water sources. | The ISCO injection component to this alternative will be implemented in compliance with these standards to protect drinking water sources. |
| | Nondegradation of Groundwater to Protect Surface Water | Env-Or 603.01 (a), (b), and (c) | Applicable | Provides that groundwater shall be suitable for use as drinking water without treatment; shall not contain any regulated contaminant in concentrations greater than ambient groundwater quality standards established in Env-Or 603.03; and shall not contain any regulated contaminant at a concentration such that the natural discharge of that groundwater to surface water will cause a violation of a surface water quality standard established in Env-Wq 1700. | Groundwater monitoring will confirm that Site groundwater contamination is not impairing surface water quality. |
| | Standards for the Construction, Maintenance and Abandonment of Wells | We 600 | Applicable for drinking water wells; Relevant and Appropriate for monitoring wells | This provision requires that wells be constructed, maintained, relocated, and/or abandoned according to these regulations. We 602.05 address restrictions on locating wells in contaminated areas. | Wells used for the remedy will be created, operated, and closed in compliance with these standards.  Well restriction standards shall be incorporated into institutional controls to prevent groundwater use outside of the CHP compliance boundary until groundwater cleanup standards are achieved. |

Record of Decision
Appendix D: ARARs Tables

| Table D10: Action-Specific ARARs / TBC, OU-3: Groundwater beneath the SFSA, In Situ Chemical Oxidation, Monitoring, and Institutional Controls | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
| State of New Hampshire | Surface Water Quality Standards | Env-Wq 1700 | Applicable | Health-based criteria developed for chemical constituents in surface water. They have been developed to protect aquatic life and human health from harmful effects due to exposure to chemically impacted surface water.  State standards to be used when more stringent than federal standards for monitoring surface water and sediment during remedial activities and long-term monitoring of the River. | Performance standards may be used to monitor the river to determine if groundwater contamination is impairing water quality. |
| | Enforcement of Classification | R.S.A. 485-A:12 | Applicable | Any discharge to groundwater or surface water that lowers the quality of the water below its classification is prohibited. | Groundwater monitoring will confirm that Site groundwater contamination is not impairing surface water quality. |
| | Contaminated Site Management | Env-Or 600 | Applicable | Establishes standards for managing contaminated groundwater (Env-607), monitoring (Env-Or 610) and managing contaminated soil (Env- Or 611). | Regulatory standards for managing contaminated groundwater and soil and Site monitoring will be applied to the implementation of this remedial alternative. |
| | Ambient Air Quality Standards | RSA Ch. 125-C, Env- A 300 | Applicable | These regulations set primary and secondary ambient air quality standards (equivalent to federal standards).  The standards do not allow significant deterioration of existing air quality. | Any remedial actions, including installation/maintenance of treatment/monitoring wells, that may exceed ambient air quality measures will take measures to control releases. |
| | Air Pollution Control, Fugitive Dust, N.H. Admin. | RSA Ch. 125-C, Env- A Part 1002 | Applicable | Requires precautions to prevent, abate and control fugitive dust during specified activities, including excavation, maintenance, and construction. | Any remedial actions, including installation/maintenance of treatment/monitoring wells that may generate contaminated dust will take measures to control releases. |
| | Air Pollution Control, Regulated Toxic Air Pollutants | RSA Ch. 125-C, Env- A Part 1400 | Applicable | Identifies toxic air pollutants discharge standards. These pollutants are also listed by EPA in 40 CFR 261 | Any remedial actions, including installation/maintenance of treatment/monitoring wells, that may exceed air discharge standards will take measures to control releases. |

Record of Decision
Appendix D: ARARs Tables

| Table D10: Action-Specific ARARs / TBC, OU-3: Groundwater beneath the SFSA, In Situ Chemical Oxidation, Monitoring, and Institutional Controls | | | | | |
|---|---|---|---|---|---|
| **Authority** | **Law/Regulation/Guidance** | **Citation** | **ARAR/TBC Status** | **Requirement Synopsis** | **Action To Be Taken To Achieve ARAR** |
| **State of New Hampshire** | New Hampshire Stormwater Manual Volume 3 Erosion and Sediment Controls During Construction | | To Be Considered | This document provides guidance on installation and maintenance of erosion and sediment controls during remedial construction. | Guidance standards for preventing erosion and sediment controls will be implemented during the installation and maintenance of treatment/monitoring wells and accessways. |

| Table D11: Chemical-Specific ARARs / TBC, OU-3: Groundwater beneath the SFSA, In Situ Chemical Oxidation, Monitoring, and Institutional Controls | | | | | |
|---|---|---|---|---|---|
| **Authority** | **Law/Regulation/Guidance** | **Citation** | **ARAR/TBC Status** | **Requirement Synopsis** | **Action To Be Taken To Attain ARAR** |
| **Federal** | Safe Drinking Water Act, National Primary Drinking Water Regulations, Maximum Contaminant Levels (MCLs) | 42 U.S.C. §300f *et seq.*; 40 C.F.R. 141, Subparts B and G | Relevant and Appropriate | Establishes maximum contaminant levels (MCLs) for common organic and inorganic contaminants applicable to public drinking water supplies. Numeric values in the regulations used as cleanup standards for aquifers outside of the compliance boundary for the CHP landfill. | ISCO will be used to treat contaminated groundwater to achieve these regulatory standards and monitoring will confirm when standards have been attained. Institutional controls will prevent exposure to contaminated groundwater until cleanup standards are achieved. |
| | Safe Drinking Water Act, National Primary Drinking Water Regulations, Maximum Contaminant Level Goals (MCLGs) | 42 U.S.C. §300f et seq.; 40 C.F.R. 141, Subpart F | Relevant and Appropriate for non-zero MCLGs only; MCLGs set as zero are To Be Considered | Establishes maximum contaminant level goals (MCLGs) for public water supplies. MCLGs are health goals for drinking water sources. These unenforceable health goals are available for a number of organic and inorganic compounds. Numeric values in the regulations used as cleanup standards for aquifers outside of the compliance boundary for the CHP landfill. | ISCO will be used to treat contaminated groundwater to achieve these regulatory standards and monitoring will confirm when standards have been attained.Institutional controls will prevent exposure to contaminated groundwater until cleanup standards are achieved. |

Record of Decision
Appendix D: ARARs Tables

| Table D11: Chemical-Specific ARARs / TBC, OU-3: Groundwater beneath the SFSA, In Situ Chemical Oxidation, Monitoring, and Institutional Controls | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Attain ARAR |
| Federal | Health Advisories (EPA Office of Drinking Water) | | To Be Considered | Health Advisories are estimates of risk due to consumption of contaminated drinking water; they consider non-carcinogenic effects only. To be considered for contaminants in groundwater that may be used for drinking water where the standard is more conservative than either federal or state statutory or regulatory standards. The Health Advisory standard for manganese is 0.3 mg/l. Guidance used to develop risk-based cleanup standards for aquifers outside of the compliance boundary for the CHP landfill. | ISCO will be used to treat contaminated groundwater to achieve risk-based standards calculated using Health Advisories and monitoring will confirm when standards have been attained..Institutional controls will prevent exposure to contaminated groundwater until cleanup standards are achieved. |
| | EPA Risk Reference Dose (RfDs) | | To Be Considered | Dose levels developed by EPA to protect sensitive individuals over the course of a life-time. RfDs reflect a daily exposure level likely to be without appreciable risk of adverse health effects. Guidance used to develop non-carcinogenic risk- based cleanup standards. | ISCO will be used to treat contaminated groundwater to achieve risk-based standards calculated using this guidance and monitoring will confirm when standards have been attained. Institutional controls will prevent exposure to contaminated groundwater until cleanup standards are achieved. |
| | EPA Carcinogenic Slope Factor | | To Be Considered | Slope factors are developed by EPA from Health Effects Assessments and present the most up-to-date information on cancer risk potency. Slope factors are developed by EPA from Health Effects Assessments by the Carcinogenic Assessment Group.  Guidance used to develop carcinogenic risk-based cleanup levels | ISCO will be used to treat contaminated groundwater to achieve risk-based standards calculated using this guidance and monitoring will confirm when standards have been attained. Institutional controls will prevent exposure to contaminated groundwater until cleanup standards are achieved. |
| | Guidelines for Carcinogen Risk Assessment | EPA/630/P-03/001F (March 2005) | To Be Considered | Guidance for assessing cancer risk. Guidance used to develop risk- based cleanup standards | ISCO will be used to treat contaminated groundwater to achieve risk-based standards calculated using this guidance and monitoring will confirm when standards have been attained. Institutional controls will prevent exposure to contaminated groundwater until cleanup standards are achieved. |

Record of Decision
Appendix D: ARARs Tables

| | | | | | |
|---|---|---|---|---|---|
| **Table D11: Chemical-Specific ARARs / TBC, OU-3**: Groundwater beneath the SFSA, In Situ Chemical Oxidation, Monitoring, and Institutional Controls | | | | | |
| **Authority** | **Law/Regulation/Guidance** | **Citation** | **ARAR/TBC Status** | **Requirement Synopsis** | **Action To Be Taken To Attain ARAR** |
| | Supplemental Guidance for Assessing Susceptibility from Early-Life Exposure to Carcinogens | EPA/630/R-03/003F (March 2005) | To Be Considered | Guidance for assessing cancer risks to children. Guidance used to develop risk-based cleanup standards for children. | ISCO will be used to treat contaminated groundwater to achieve risk-based standards calculated using this guidance and monitoring will confirm when standards have been attained. Institutional controls will prevent exposure to contaminated groundwater until cleanup standards are achieved. |
| | EPA Carcinogenic Assessment Group Potency Factors | | To Be Considered | These factors are used to evaluate an acceptable risk from a carcinogen (*i.e.* dioxin). Guidance used to develop risk-based cleanup standards for dioxin. | ISCO will be used to treat contaminated groundwater to achieve risk-based standards calculated using this guidance and monitoring will confirm when standards have been attained. Institutional controls will prevent exposure to contaminated groundwater until cleanup standards are achieved. |
| **State of New Hampshire** | Drinking Water Quality Standards | NH Admin. Code Env-DW 700 | Relevant and Appropriate for MCLs and non-zero MCLGs only; MCLGs set as zero are To Be Considered | State MCLs and MCLGs establish maximum contaminant levels permitted in public water supplies and are the basis of State Ambient Groundwater Quality Standards (AGQS) that are applicable to site groundwater. The regulations are generally equivalent to the Federal Safe Drinking Water Act (SDWA). Numeric values in the regulations that are more stringent than federal standards used as cleanup standards for aquifers outside of the compliance boundary for the CHP landfill. | ISCO will be used to treat contaminated groundwater to achieve these regulatory standards and monitoring will confirm when standards have been attained. Institutional controls will prevent exposure to contaminated groundwater until cleanup standards are achieved. |
| **State of New Hampshire** | New Hampshire Ambient Groundwater Quality Standards (NH AGQS) | Env-Or 603.03, Table 600-1 | Applicable | Establishes maximum concentration levels for regulated contaminants in groundwater which result from human operations or activities. NH AGQS are equivalent to MCLs for contaminants that have MCLs. NH AGQS have been established for site groundwater contaminants for which no MCLs are established, and are derived to be protective for drinking water uses. Numeric values in the regulations that are more stringent than federal standards used as cleanup standards for aquifers outside of the compliance boundary for the CHP landfill. | ISCO will be used to treat contaminated groundwater to achieve these regulatory standards and monitoring will confirm when standards have been attained. Institutional controls will prevent exposure to contaminated groundwater until cleanup standards are achieved. |

Record of Decision
Appendix D: ARARs Tables

| Table D12: Location-Specific ARARs / TBC, OU-3: Groundwater beneath the SFSA, In Situ Chemical Oxidation, Monitoring, and Institutional Controls | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
| Federal | Floodplain Management and Protection of Wetlands | 44 C.F.R. § 9 | Relevant and Appropriate | FEMA regulations that set forth the policy, procedure and responsibilities to implement and enforce Executive Order 11988 (Floodplain Management) and Executive Order 11990 (Protection of Wetlands). Prohibits activities that adversely affect a federally-regulated wetland unless there is no practicable alternative and the proposed action includes all practicable measures to minimize harm to wetlands that may result from such use. Requires the avoidance of impacts associated with the occupancy and modification of federally-designated 100-year and 500-year floodplain and to avoid development within floodplain wherever there is a practicable alternative. An assessment of impacts to 500-year floodplain is required for critical actions – which includes siting contaminated sediment management facilities in a floodplain. Requires public notice when proposing any action in or affecting floodplain or wetlands. | If installation/operation of treatment/monitoring wells or access to wells require altering federal jurisdictional wetlands or 500-year floodplain, mitigation measures will be taken, as required. No public comments were received. |
| | Clean Water Act, Section 404; Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material | 33 U.S.C. § 1344, 40 C.F.R. Part 230, 231 and 33 C.F.R. Parts 320- 323 | Applicable | For discharge of dredged or fill material into federal jurisdictional water bodies or wetlands, there must be no practical alternative with less adverse impact on aquatic ecosystem; discharge cannot cause or contribute to violation of state water quality standard or toxic effluent standard or jeopardize federal T&E species; discharge cannot significantly degrade waters of U.S.; must take practicable steps to minimize and mitigate adverse impacts; must evaluate impacts on flood level, flood velocity, and flood storage capacity. Sets standards for restoration and mitigation required as a result of unavoidable impacts to aquatic resources. EPA must determine which alternative is the "Least Environmentally Damaging Practicable Alternative" (LEDPA) to protect wetland and aquatic resources. | If installation/operation of treatment/monitoring wells or access to wells require filling federal jurisdictional wetlands, mitigation measures will be taken, as required. No public comments on EPA's LEDPA finding were received. |

Record of Decision
Appendix D: ARARs Tables

| Table D12: Location-Specific ARARs / TBC, OU-3: Groundwater beneath the SFSA, In Situ Chemical Oxidation, Monitoring, and Institutional Controls | | | | | |
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
| Federal | Fish and Wildlife Coordination Act | 16 U.S.C. §661 *et seq* . | Applicable | Any modification of a body of water or wetland requires consultation with the U.S. Fish and Wildlife Service and the appropriate state wildlife agency to develop measures to prevent, mitigate, or compensate for losses of fish and wildlife. | If installation/operation of treatment/monitoring wells or access to wells require modifying any body of water or wetland consultation requirements addressing impacts to fish and wildlife resources will be followed. |
| | Management of Undesirable Plants on Federal Lands | 7 U.S.C. § 2814 | Relevant and Appropriate | Regulations call for establishing "integrated management systems" for containing or controlling an undesirable plant species or group of species using all available methods, including: preventive measures; physical or mechanical methods; biological agents; herbicide methods; cultural methods; and general land management practices. | If any wetlands, floodplain or other habitats are altered by the remedial action restoration will include preventing invasive, non-native plant species from becoming established. |
| | National Historical Preservation Act and Regulations | 16 U.S.C. 469 et seq.; 36 C.F.R. Part 65 | Applicable | When a federal agency finds, or is notified, that its activities may cause irreparable loss or destruction of significant scientific, pre-historical, historical, archeological data, such agency shall consult with relevant federal and State officials to address the preservation of such data or other forms of mitigation, as necessary. | If it is determined that this alternative may cause irreparable loss or destruction of significant scientific, pre-historical, historical, or archaeological data (*i.e.* remaining historic mill structures), EPA will consult with federal and State officials and implement preservation and/or mitigation measures, as necessary. |
| State of New Hampshire | Criteria and Conditions for Fill and Dredge in Wetlands | RSA Ch. 482-A and NH Admin. Code Env-Wt Parts 100-900 | Applicable | These standards regulate filling and other activities in or adjacent to wetland resource areas (including the 100-year floodplain), and buffer zones and establish criteria for the protection of wetlands from adverse impacts on fish, wildlife, commerce, and public recreation. | If installation/operation of treatment/monitoring wells or access to wells require filling State jurisdictional wetlands or buffer zone, mitigation measures will be taken, as required. |
| | Shoreland Water Quality Protection | RSA 483-B and NH Admin, Code Env-Wq 1400 | Applicable | These standards regulate activities conducted along shorelands to protect, restore and preserve these fragile natural resources. | If installation/operation of treatment/monitoring wells or access to wells require work within regulated shoreland areas, mitigation measures will be taken, as required. |
| | Terrain Alteration | RSA 485-A:17 and NH Admin. Code Env-Wq 1500 | Applicable | These rules establish criteria for the protection of surface water quality resulting from activities that occur in or on the border of surface water or within a distance of surface water such that direct or immediate degradation may result to water quality. | If installation/operation of treatment/monitoring wells or access to wells require altering terrain regulated under these standards, mitigation measures will be taken to protect water quality, as required. |

Record of Decision
Appendix D: ARARs Tables

| Table D12: Location-Specific ARARs / TBC, OU-3: Groundwater beneath the SFSA, In Situ Chemical Oxidation, Monitoring, and Institutional Controls | | | | | |
|---|---|---|---|---|---|
| **Authority** | **Law/Regulation/Guidance** | **Citation** | **ARAR/TBC Status** | **Requirement Synopsis** | **Action To Be Taken To Achieve ARAR** |
| **State of New Hampshire** | Historic Preservation Act | RSA 227-C | Applicable | When activities may cause irreparable loss or destruction of significant scientific, pre-historical, historical, archeological data, the project proponent shall consult with relevant State officials to address the preservation of such data or other forms of mitigation, as necessary. | If it is determined that this alternative may cause irreparable loss or destruction of significant scientific, pre-historical, historical, or archaeological data (i.e. remaining historic mill structures), EPA will consult with State officials and implement preservation and/or mitigation measures, as necessary. |
| | Native Plant Protection Act | R.S.A. 217-A | Applicable | Prohibits damaging plant species listed as endangered in the State. | If implementation of this alternative may take state-listed species the remedial action will need to meet these standards. |
| | Endangered Species Conservation Act | R.S.A. 212-A | Applicable | Identifies endangered species in NH and requirements for protection of species of wildlife determined to be threatened or endangered, including prohibitions on taking, possessing, and transporting of endangered species. | If implementation of this alternative may take state-listed species the remedial action will need to meet these standards. |

| Table D13: Action-Specific ARARs / TBC, OU-3: Liquid Elemental Mercury, Hardened Metal Amalgam, and Mercury-Containing Debris Removal and Monitoring in Reach AR-3 | | | | | |
|---|---|---|---|---|---|
| **Authority** | **Law/Regulation/Guidance** | **Citation** | **ARAR/TBC Status** | **Requirement Synopsis** | **Action To Be Taken To Achieve ARAR** |
| **Federal** | Resource Conservation and Recovery Act (RCRA) | 42 U.S.C. §§ 6901, et seq., 40 C.F.R. Parts 261, 262 and 264 | Applicable | New Hampshire has been delegated the authority to administer these RCRA standards through its state hazardous waste management regulations (Env- Hw 100-1100). These provisions have been adopted by the State. | Any wastes generated by remedial activity will be analyzed by appropriate test methods. If found to be hazardous wastes, then they will be managed in accordance with the substantive requirements of the State hazardous waste regulations. Wastes that may be generated include: mercury and mercury-contaminated media removed from the river and investigation derived waste from monitoring activities. Federal regulations at 40 C.F.R. Part 264, including but not limited to Subpart G (closure/post closure) have been incorporated by reference into the State hazardous waste regulations. |
| | Toxic Substances Control Act (TSCA), PCB Remediation Waste | 15 U.S.C. 2601 et seq., 40 C.F.R. 761.61(c) | Applicable | This section of the TSCA regulations provides risk-based cleanup and disposal options for PCB remediation waste based on the risks posed by the concentrations at which the PCBs are found. Written approval for the proposed risk-based cleanup must be obtained from the Director, Superfund & Emergency Management Division, EPA Region 1. | Monitoring for PCBs in the river will ensure that the existing CHP landfill engineered cover system continues to meet TSCA protectiveness standards for capping PCBs present within the CHP landfill*. |

Record of Decision
Appendix D: ARARs Tables

| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
|---|---|---|---|---|---|
| **Table D13: Action-Specific ARARs / TBC, OU-3**: Liquid Elemental Mercury, Hardened Metal Amalgam, and Mercury-Containing Debris Removal and Monitoring in Reach AR-3 | | | | | |
| | Clean Water Act (CWA), Section 402, Discharge of Pollutants | 33 U.S.C. § 1342; 40 C.F.R.122,125, 131, 136, 450 | Applicable | These standards address water discharges which may be directed to surface water. Also establishes stormwater standards for construction and development projects that are over one acre. | Any remedial action, including removal/dewatering of mercury and mercury-contaminated materials, that will result in the discharge of water to surface waters back to the river will meet these discharge standards. |
| | Clean Water Act, National Recommend Water Quality Criteria (NRWQC) | EPA-822-R-02-047, USEPA, Office of Water, Office of Science and Technology (Nov. 2002 | To Be Considered | NRWQC are health-based criteria developed for chemical constituents in surface water. They have been developed to protect aquatic life and human health from harmful effects due to exposure to chemically impacted surface water. Performance standards to be used for monitoring surface water and sediment during remedial activities and long-term monitoring of the landfill. | Guidance used to develop performance standards for water quality/sediment monitoring to be conducted during the removal of contaminated material from the river. Long-term monitoring of surface water/ sediment in the river will confirm there is no contaminant migration beyond the landfill's compliance boundary into the river.* |
| | Guide to Management of Investigation-Derived Waste | USEPA OSWER 9345.303FS, January 1992 | To Be Considered | Investigation-derived wastes (IDW) generated from remedial activities (e.g., drilling muds, purged water, etc.) are required to be properly stored, managed, and disposed. Guidance given in the publication includes waste material containment, collection labeling, etc. | Investigation-derived wastes (IDW) generated from remedial activities will be stored, managed, and disposed of based on these guidance standards. |
| **State of New Hampshire** | Identification and Listing of Hazardous Wastes | N.H. Admin. Code Env-Hw 400 | Applicable | These standards list particular hazardous wastes and identify the maximum concentration of contaminants for which the waste would be a characteristic or listed hazardous waste. The analytical test set out in Appendix II of 40 C.F.R. Part 261 is referred to as the Toxicity Characteristic Leaching Procedure (TCLP). The federal regulations at 40 C.F.R. Part 261 are incorporated by reference. | Any wastes generated by remedial activity will be analyzed under these standards to determine whether they are listed or characteristic hazardous waste. Wastes that may be generated include: mercury and mercury-contaminated media removed from the river and investigation derived waste from monitoring activities. Materials that are listed waste or exceed TCLP hazardous waste thresholds will be disposed off-site in a RCRA Subtitle C facility. Non-hazardous materials will be disposed appropriately. |

Record of Decision
Appendix D: ARARs Tables

| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
|---|---|---|---|---|---|
| **Table D13: Action-Specific ARARs / TBC, OU-3**: Liquid Elemental Mercury, Hardened Metal Amalgam, and Mercury-Containing Debris Removal and Monitoring in Reach AR-3 | | | | | |
| State of New Hampshire | Requirements for Hazardous Waste Generators | Env-Hw 500 | Applicable | Requires a determination as to whether waste materials are hazardous (Env- Hw 502) and, if so, requirements for managing environmental and health requirements (Env-Hw 506), for accumulating hazardous wastes on- site (Env-Hw 507) prior to shipment off site, and for emergency actions (Env- Hw 513). The federal regulations at 40 C.F.R. Part 262 are incorporated by reference. | All mercury and mercury-contaminated media that meet hazardous waste standards will be removed from the river and managed in accordance with the substantive requirements of these regulations. |
| | Requirements for Owners and Operators of Hazardous Waste Facilities | Env-Hw 700 | Relevant and Appropriate | Includes: Other Monitoring (Env-Hw 702.11); Emergency/ Remedial Actions (Env-Hw 706); Operation Requirements (Env-Hw 708.2). Closure/post-closure requirements for hazardous waste landfills at Env-Hw 708.02(a) that incorporate federal regulations at 40 C.F.R. 264, Subpart G (closure and post-closure) and 40 C.F.R. 264, Subpart H (financial requirements). | Mercury and mercury-contaminated media will be removed from the river and disposed of off-site. Long-term monitoring of the river will be performed to ensure protectiveness of the CHP landfill engineered cover system.* |
| | Surface Water Quality Standards | Env-Wq 1700 | Applicable | Health-based criteria developed for chemical constituents in surface water. They have been developed to protect aquatic life and human health from harmful effects due to exposure to chemically impacted surface water. State standards to be used when more stringent than federal standards for monitoring surface water and sediment during remedial activities and long- term monitoring of the landfill. | Performance standards for water quality/sediment monitoring to be conducted during the removal of contaminated material from the river. Long-term monitoring of surface water/ sediment in the river will confirm there is no contaminant migration beyond the landfill's compliance boundary into the river.* |
| | Contaminated Site Management | Env-Or 600 | Applicable | Env-Hw 610 establishes standards for long-term site monitoring. | Long-term monitoring of surface water/sediment in the river will confirm there is no contaminant migration beyond the landfill's compliance boundary into the river[17] |
| | New Hampshire Stormwater Manual Volume 3 Erosion and Sediment Controls During Construction | | To Be Considered | This document provides guidance on installation and maintenance of erosion and sediment controls during remedial construction. | Guidance standards for preventing erosion and sediment controls will be implemented during the installation and maintenance of any onshore staging/storage used by the remedial action. |

[17] ARARs and TBCs required for long-term monitoring of the river to assess potential future releases from the landfill also identified under the OU1 and OU3 CHP alternatives.

Record of Decision
Appendix D: ARARs Tables

| Table D14: Chemical-Specific ARARs / TBC, OU-3: Liquid Elemental Mercury, Hardened Metal Amalgam, and Mercury-Containing Debris Removal and Monitoring in Reach AR-3 |||||| 
|---|---|---|---|---|---|
| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
| Federal | EPA Risk Reference Dose (RfDs) | | To Be Considered | Dose levels developed by EPA to protect sensitive individuals over the course of a life-time.  RfDs reflect a daily exposure level likely to be without appreciable risk of adverse health effects.  Guidance used to develop non-carcinogenic risk-based cleanup standards. | Removal of mercury and long-term monitoring of the river* will prevent exposure to mercury in the river and to any contaminants that may be released from the landfill in the future that pose a risk calculated using this guidance. |
| | EPA Carcinogenicity Slope Factor | | To Be Considered | Slope factors are developed by EPA from Health Effects Assessments and present the most up-to-date information on cancer risk potency.  Slope factors are developed by EPA from Health Effects Assessments by the Carcinogenic Assessment Group. Guidance used to develop carcinogenic risk based cleanup standards | Removal of mercury and long-term monitoring of the river* will prevent exposure to mercury in the river and to any contaminants that may be released from the landfill in the future that pose a risk calculated using this guidance. |
| | Guidelines for Carcinogen Risk Assessment | EPA/630/P-03/001F (March 2005) | To Be Considered | Guidance for assessing cancer risk. Guidance used to develop risk-based cleanup standards | Removal of mercury and long-term monitoring of the river* will prevent exposure to mercury in the river and to any contaminants that may be released from the landfill in the future that pose a risk calculated using this guidance. |
| | Supplemental Guidance for Assessing Susceptibility from Early-Life Exposure to Carcinogens | EPA/630/R-03/003F (March 2005) | To Be Considered | Guidance for assessing cancer risks to children.  Guidance used to develop risk-based cleanup standards for children. | Removal of mercury and long-term monitoring of the river* will prevent exposure to mercury in the river and to any contaminants that may be released from the landfill in the future that pose a risk calculated using this guidance. |
| | EPA Carcinogenic Assessment Group Potency Factors | | To Be Considered | These factors are used to evaluate an acceptable risk from a carcinogen (*i.e.* dioxin). Guidance used to develop risk-based cleanup standards for dioxin. | Removal of mercury and long-term monitoring of the river* will prevent exposure to mercury in the river and any contaminants that may be released from the landfill in the future that pose a risk calculated using this guidance. |

Record of Decision
Appendix D: ARARs Tables

| Authority | Law/Regulation/Guidance | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
|---|---|---|---|---|---|
| **Table D14: Chemical-Specific ARARs / TBC, OU-3**: Liquid Elemental Mercury, Hardened Metal Amalgam, and Mercury-Containing Debris Removal and Monitoring in Reach AR-3 | | | | | |
| | Recommended Toxicity Equivalence Factors (TEFs) for Human Health Risk Assessments of 2,3,7,8-Tetrachlorodibenzo-p-dioxin and Dioxin-Like Compounds. | EPA/600/R-10/005 | To Be Considered | Guidance used to develop site-specific risk-based cleanup standards for dioxin. | Long-term monitoring of the river* will prevent exposure to any dioxin that may be released from the landfill in the future that poses a risk calculated using this guidance. |
| | Ecological Risk Assessment Guidance for Superfund: Process for Designing and Conducting Ecological Risk Assessments – Interim Final | EPA 540-R-97-006 | To Be Considered | Guidance used to develop ecological risk-based cleanup standards. | Removal of mercury and long-term monitoring of the river* will prevent ecological receptors from being exposed to mercury in the river and to any contaminants that may be released from the landfill in the future that pose an ecological risk calculated using this guidance. |
| **State of New Hampshire** | Contaminated Site Management, Soil Remediation Criteria | Env-Or-606.19, Table 600-2 | Applicable | Promulgated numeric soil remediation standards. | Removal of mercury and long-term monitoring of the river* will prevent exposure to mercury in the river and to any contaminants that may be released from the landfill in the future that exceed State remediation standards if more stringent than federal risk-based standards. |

Record of Decision
Appendix D: ARARs Tables

| Authority | Law/Regulation | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
|---|---|---|---|---|---|
| | **Table D15: Location-Specific ARARs / TBC, OU-3:** Liquid Elemental Mercury, Hardened Metal Amalgam, and Mercury-Containing Debris Removal and Monitoring in Reach AR-3 | | | | |
| Federal | Floodplain Management and Protection of Wetlands | 44 C.F.R. § 9 | Relevant and Appropriate | FEMA regulations that set forth the policy, procedure and responsibilities to implement and enforce Executive Order 11988 (Floodplain Management) and Executive Order 11990 (Protection of Wetlands). Prohibits activities that adversely affect a federally-regulated wetland unless there is no practicable alternative and the proposed action includes all practicable measures to minimize harm to wetlands that may result from such use. Requires the avoidance of impacts associated with the occupancy and modification of federally-designated 100-year and 500-year floodplain and to avoid development within floodplain wherever there is a practicable alternative. An assessment of impacts to 500-year floodplain is required for critical actions – which includes siting contaminated sediment management facilities in a floodplain. Requires public notice when proposing any action in or affecting floodplain or wetlands. | If the removal of mercury and contaminated materials (including any staging/storage onshore) requires altering federal jurisdictional wetlands or 500-year floodplain, mitigation measures will be taken, as required. No public comments were received. |
| | Clean Water Act, Section 404; Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material | 33 U.S.C. § 1344, 40 C.F.R. Part 230, 231 and 33 C.F.R. Parts 320- 323 | Applicable | For discharge of dredged or fill material into federal jurisdictional water bodies or wetlands, there must be no practical alternative with less adverse impact on aquatic ecosystem; discharge cannot cause or contribute to violation of state  water quality standard or toxic effluent standard or jeopardize federal T&E species; discharge cannot significantly degrade waters of U.S.; must take practicable steps to minimize and mitigate adverse impacts; must evaluate impacts on flood level, flood velocity, and flood storage capacity. Sets standards for restoration and mitigation required as a result of unavoidable impacts to aquatic resources. EPA must determine which alternative is the "Least Environmentally Damaging Practicable Alternative" (LEDPA) to protect wetland and aquatic resources. | If the removal of mercury and contaminated materials (including any staging/storage onshore) requires filling federal jurisdictional wetlands, mitigation measures will be taken, as required. No public comments on EPA's LEDPA finding were received. |
| | Fish and Wildlife Coordination Act | 16 U.S.C. §661 *et seq.* | Applicable | Any modification of a body of water or wetland requires consultation with the U.S. Fish and Wildlife Service and the appropriate state wildlife agency to develop measures to prevent, mitigate, or compensate for losses of fish and wildlife. | If the removal of mercury and contaminated materials (including any staging/storage onshore) requires modifying any body of water or wetland consultation requirements addressing impacts to fish and wildlife resources will be followed. |

Record of Decision
Appendix D: ARARs Tables

| Authority | Law/Regulation | Citation | ARAR/TBC Status | Requirement Synopsis | Action To Be Taken To Achieve ARAR |
|---|---|---|---|---|---|
| **Table D15: Location-Specific ARARs / TBC, OU-3**: Liquid Elemental Mercury, Hardened Metal Amalgam, and Mercury-Containing Debris Removal and Monitoring in Reach AR-3 | | | | | |
| Federal | Management of Undesirable Plants on Federal Lands | 7 U.S.C. § 2814 | Relevant and Appropriate | Regulations call for establishing "integrated management systems" for containing or controlling an undesirable plant species or group of species using all available methods, including: preventive measures; physical or mechanical methods; biological agents; herbicide methods; cultural methods; and general land management practices. | If any wetlands, floodplain or other habitats are altered by the remedial action restoration will include preventing invasive, non-native plant species from becoming established. |
| | RCRA Floodplain Restrictions for Hazardous Waste Facilities | 40 CFR 264.18(b) | Applicable | A hazardous waste treatment, storage, or disposal facility located in a 100-year floodplain must be designed, constructed, operated, and maintained to prevent washout or to result in no adverse effects on human health or the environment if washout were to occur. | Any staging of facilities that will handle hazardous waste or any storage of hazardous waste collected from the river within the 100-year floodplain must be managed to ensure no release of hazardous waste in the event of up to a 100-year flood event. |
| | National Historical Preservation Act and Regulations | 16 U.S.C. 469 et seq.; 36 C.F.R. Part 65 | Applicable | When a federal agency finds, or is notified, that its activities may cause irreparable loss or destruction of significant scientific, pre-historical, historical, archeological data, such agency shall consult with relevant federal and State officials to address the preservation of such data or other forms of mitigation, as necessary. | If it is determined that this alternative may cause irreparable loss or destruction of significant scientific, pre-historical, historical, or archaeological data (*i.e.* remaining historic mill structures), EPA will consult with federal and State officials and implement preservation and/or mitigation measures, as necessary. |

END of ARAR / TBC Tables for the Selected Remedy

## Appendix E: References

Agency for Toxic Substances and Disease Registry [ASTDR]. *Public Health Assessment for the Former Chlor Alkali Facility below Sawmill Dam*. February 7, 2007.

Boscardin Consulting Engineers, Inc. *Foundation/Retaining Wall Stability and Suitability Assessment Report.* June 17, 2016.

Boscardin Consulting Engineers, Inc. 2017. *Updated Foundation/Retaining Wall Stability and Suitability Assessment Report.* October 31, 2017.

Kennedy/Jenks Consultants, Inc. (Kennedy Jenks). *Monitoring Well Assessment Report*. December 18, 2015.

Kennedy/Jenks. *TP-6 Study Completion Report*. April 24, 2017.

Kennedy/Jenks. *Final Supplemental Remedial Investigation Report*. October 19, 2018.

Kennedy/Jenks. Preliminary Remedial Timeframe Estimates related to MNA, Chlor-Alkali Facility (Former), Superfund Site. November 11, 2019.

Kennedy/Jenks. *Final Feasibility Study*, April 7, 2020.

New Hampshire Department of Environmental Services (NHDES). *Groundwater Use and Value Determination for Berlin – Chlor-Alkali Facility Superfund Site, DES Site #199709046, Project #10137*. January 22, 2013.

Nobis Engineering, Inc. *Remedial Investigation Chlor-Alkali Facility (Former) Superfund Site, Berlin, New Hampshire Remedial Investigation/Feasibility Study*. Volumes I-III., March 2014.

United States Environmental Protection Agency (U.S. EPA). *Guidance for Conducting Remedial Investigations and Feasibility Studies Under CERCLA*. OSWER Directive 9355.3-01. October, 1988.

U.S. EPA. *Final Covers on Hazardous Waste Landfills and Surface Impoundments.* Office of Solid Waste and Emergency Response. EPA/530-SW-89-047. July, 1989.

U.S. EPA. *Design and Construction of RCRA/CERCLA Final Covers*. Office of Research and Development. EPA/625/4-91/025. May 1991.

U.S. EPA. *Presumptive Remedy for CERCLA Municipal Landfill Sites.* OSWER Directive 9355.0-49FS. September 1993.

U.S. EPA. *Rules of Thumb for Superfund Remedy Selection*. EPA 540-R-97-013. OSWER Directive 9355.0-69. August 1997.

U.S. EPA. *Use of Monitored Natural Attenuation at Superfund, RCRA Corrective Action, and Underground Storage Tank Sites*. OSWER Directive 9200.4-17P. April 21, 1999.

U.S. EPA. *Revised Alternative Cap Design Guidance Proposed for Unlined, Hazardous Waste Landfills in the EPA Region I*. February 5, 2001.

U.S EPA. *Aerial Photographic and Fracture Trace Analyses of Chlor-Alkali Facility*, TS-PIC-20801101S. February 2008.

U.S. EPA. *Institutional Controls: A Guide to Planning, Implementing, Maintaining, and Enforcing Institutional Controls at Contaminated Sites*. OSWER Directive 9355.0-89. December 2012.

U.S. EPA. Memorandum: Estimated Risks of Soil Exposure Point Concentrations (EPCs) for Contaminants of Concern to Hypothetical Residents, Courtney Carroll, EPA Risk Assessor, November 20, 2019.

U.S. EPA. Memorandum from Richard Sugatt, Ph.D., EPA Risk Assessor to Darryl Luce, EPA Project Manager: *Potential Vapor Intrusion Risks to Workers Due to VOCs in Groundwater at the Chlor-Alkali Superfund Site*. January 2, 2020.

U.S. EPA. Memorandum from Darryl Luce, Ph.D., EPA Project Manager: *Analysis of groundwater contamination beneath the Cell House Parcel Landfill, Chlor-Alkali Superfund Site*. May 20, 2020.

United States Geological Survey (USGS). *Geology and Preliminary Hydrogeologic Characterization of the Cell-House Site*. 2004.

USGS. *Geophysical Bed Sediment Characterization of the Androscoggin River from the Chlor-Alkali Facility Superfund Site, Berlin, New Hampshire to the State Border with Maine, August 2009*. Revised June 2012.

USGS. *Characterization of Mercury Contamination in the Androscoggin River, Coos County, New Hampshire*. U.S. Geological Survey Open-File Report 2013-1076, 2013.

Weston Solutions, Inc. (Weston). *Site Investigation Report for Chlor-Alkali Facility (Former) Berlin, New Hampshire*. December 2004.

Weston. *Final Combined Preliminary Assessment/Site Investigation Report for Chlor-Alkali Facility (Former) Berlin, New Hampshire*. January 2005.

## Appendix F: Acronyms and Abbreviations

| | |
|---|---|
| ACM | Asbestos-Containing Materials |
| AR | Administrative Record |
| ARARs | Applicable or Relevant and Appropriate Requirements |
| BERA | Baseline Ecological Risk Assessment |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act of 1980 |
| CERCLIS | Comprehensive Environmental Response, Compensation, and Liability Information System |
| C.F.R. | Code of Federal Regulations |
| CHP | Cell House Parcel |
| CHP Landfill | Cell House Parcel Landfill |
| COC | Contaminant of Concern |
| CSM | Conceptual Site Model |
| CWA | Clean Water Act |
| EC | Engineering Controls |
| EFSA | Eastern Facility Study Area |
| EPA | U.S. Environmental Protection Agency |
| FS | Feasibility Study |
| G-P | Georgia-Pacific |
| HDPE | High Density Polyethylene |
| HHRA | Human Health Risk Assessment |
| HI | Hazard Index |
| HRS | Hazard Ranking System |
| IC | Institutional Control |
| ILCR | Incremental Lifetime Cancer Risk |
| ISCO | *In Situ* Chemical Oxidation |
| LEDPA | Least Environmentally Damaging Practicable Alternative |
| NCP | National Oil and Hazardous Substances Pollution Contingency Plan |
| NHDES | New Hampshire Department of Environmental Services |
| NPL | National Priorities List |
| O&M | Operations and Maintenance |
| OU | Operable Unit |
| PA | Preliminary Assessment |
| PAH | Polyaromatic Hydrocarbons |
| PA/SI | Preliminary Assessment/Site Inspection |
| PCB | Polychlorinated biphenyls |
| PFAS | Perfluorinated alkyl substances |
| PFOA | Perfluorinated octanic acids |
| PRP | Potentially Responsible Party |
| RAO | Remedial Action Objectives |

Record of Decision
Appendix E: References

| | |
|---|---|
| RI | Remedial Investigation conducted by EPA from 2009 to 2014 |
| RI\FS | Remedial Investigation and Feasibility Study |
| RIR | Remedial Investigation Report of 2014 |
| ROD | Record of Decision |
| SARA | Superfund Amendments and Reauthorization Act of 1986. |
| SEMD | Superfund and Emergency Management Division |
| SFSA | Southern Facility Study Area |
| SI | Site Inspection |
| Site | Chlor-Alkali Facility (former) Superfund Site in Berlin, NH. |
| SRI | Supplemental Remedial Investigation conducted by Georgia-Pacific from 2015 to 2018 |
| SRIR | Supplemental Remedial Investigation Report of 2018. |
| TBC | To Be Considered |
| TCE | Trichloroethene |
| TSCA | Toxic Substances Control Act |
| TSLERA | Terrestrial Screening Level Ecological Risk Assessment |
| VOC | Volatile Organic Compound |
| µg/l | Micrograms per liter or parts per billion |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

**Appendix G: Administrative Record Index**

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

# Chlor-Alkali Facility (Former) NPL Site Administrative Record Record of Decision (ROD)

## Index

### ROD signed: September 2020
### ROD Released: September 2020

## Prepared by
## EPA Region 1
## Superfund & Emergency Management Division

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

---

### Introduction to the Collection

This is the administrative record for the Chlor-Alkali Facility (Former) Superfund Site, Berlin, New Hampshire, Record of Decision (ROD), dated September 2020. The file contains site-specific documents and a list of guidance documents used by EPA staff in selecting a response action at the site.

This record replaces the administrative record file for the Chlor-Alkali Facility (Former) Superfund Site, Berlin, New Hampshire, Proposed Plan released in June 2020. Documents listed as cited references in documents cited in this index are also considered part of the administrative record. Some cited references might also be listed separately in the index.

The administrative record file is available for review at:

Online: https://go.usa.gov/xwZTG

Additional information about the site is also available at www.epa.gov/superfund/chloralkali

SEMS Records & Information Center
U.S. EPA Region 1 - New England
5 Post Office Square, Suite 100 (mail code: 02-3)
Boston, MA 02109-3912
 (617) 918-1440 (phone)
R1.Records-SEMS@epa.gov (email)

Berlin Public Library
270 Main Street
Berlin, NH 03570
(603) 752-5210 (phone)
(603) 752-8568 (fax)
https://www.berlinnh.gov/library

New Hampshire Department of Environmental Services
29 Hazen Drive
Concord, NH 03302
(603) 271-3503 (phone)
https://www.des.nh.gov/index.htm

An administrative record is required by the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), as amended by the Superfund Amendments and Reauthorization Act (SARA).

Questions about this administrative record should be directed to the EPA New England site manager, Darryl Luce (617) 918-1336, luce.darryl@epa.gov.

---

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: (US EPA REGION 1) | RECORD OF DECISION (ROD) | 9/23/2020 | 173 | RPT / Report | 649279 |
| R01: (US EPA REGION 1) | RESPONSIVENESS SUMMARY | 9/23/2020 | 5 | RPT / Report | 649280 |
| R01: Wimsatt, Michael (NH DEPT OF ENVIRONMENTAL SERVICES (NHDES)) | LETTER REGARDING STATE CONCURRENCE WITH RECORD OF DECISION (ROD) | 9/17/2020 | 5 | LTR / Letter | 649281 |
| R01: Luce, Darryl (US EPA REGION 1) | EPA APPROVAL OF FEASIBILITY STUDY (FS) REPORT | 7/15/2020 | 1 | LTR / Letter | 100014278 |
| R01: Montney, Paul A (GEORGIA-PACIFIC) | COMMENTS ON PROPOSED PLAN | 7/1/2020 | 4 | LTR / Letter | 100014174 |
| R01: (APEX REPORTING) | PUBLIC HEARING TRANSCRIPT | 6/10/2020 | 8 | MTG / Meeting Document | 100014324 |
| R01: (US EPA REGION 1) | VIDEO OF PUBLIC MEETING AND HEARING | 6/10/2020 | 1 | MTG / Meeting Document | 647094 |
| R01: Luce, Darryl (US EPA REGION 1) | PUBLIC MEETING AND HEARING PRESENTATION | 6/10/2020 | 21 | MTG / Meeting Document | 647020 |
| R01: (US EPA REGION 1) | NEWS RELEASE: EPA ANNOUNCES A PROPOSED PLAN TO CLEAN UP THE CHLOR-ALKALI FACILITY SUPERFUND SITE IN BERLIN, NH | 6/4/2020 | 3 | PUB / Publication | 647017 |
| R01: (BERLIN SUN) | NEWS ARTICLE: EPA WILL HOLD HEARING ON CHLOR ALKALI CLEAN UP PLAN | 6/3/2020 | 4 | PUB / Publication | 647007 |
| R01: Gonzalez, Ronald (US EPA REGION 1) | MEMO REGARDING PROPOSED PLAN PUBLIC COMMENT PERIOD - VIRTUAL PUBLIC PARTICIPATION MEASURES (EXCERPTS FROM PERTINENT NEW HAMPSHIRE ORDERS ATTACHED) | 6/1/2020 | 24 | LTR / Letter | 646197 |
| R01: (US EPA REGION 1) | PROPOSED PLAN | 6/1/2020 | 35 | RPT / Report | 643481 |
| R01: Luce, Darryl (US EPA REGION 1) | MEMO REGARDING ANALYSIS OF GROUNDWATER CONTAMINATION BENEATH THE CELL HOUSE PARCEL | 5/20/2020 | 7 | MEMO / Memorandum | 100013800 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R11: (U.S. EPA) | For Regional Superfund Site Teams: CERCLA Interim Guidance on Public Engagement During COVID-19 | 4/28/2020 | 2 | LAWS / Laws/Regulations/Guidance | 100002469 |
| R11: (Office of General Counsel) | Memorandum on Virtual Public Hearings and Meetings | 4/16/2020 | 2 | LAWS / Laws/Regulations/Guidance | 100002476 |
| R01: (KENNEDY/JENKS CONSULTANTS) | FINAL FEASIBILITY STUDY (FS) REPORT (TRANSMITTAL LETTER ATTACHED) | 4/7/2020 | 278 | RPT / Report | 100013366 |
| | DRAFT PROPOSED PLAN WITH CONTRACTOR COMMENTS | 2/24/2020 | 29 | WP / Work Plan | 100013825 |
| R01: Luce, Darryl (US EPA REGION 1) | LETTER PROVIDING EPA APPROVAL OF FEASIBILITY STUDY (FS) (DRAFT REDLINE STRIKEOUT (RLSO) FS, DRAFT FS, 11/20/2019 AND 01/02/2020 MEMOS AND 5 TABLES ATTACHED) | 1/7/2020 | 208 | LTR / Letter | 100012870 |
| R01: Hoffman, Andrew (NH DEPT OF ENVIRONMENTAL SERVICES (NHDES)) | EMAIL REGARDING PFAS SAMPLING RESULTS (EMAIL HISTORY ATTACHED) | 12/23/2019 | 3 | EML / Email | 100012823 |
| R01: Luce, Darryl (US EPA REGION 1) | LETTER REGARDING AGENCY COMMENTS ON SAMPLING PLAN FOR PFAS COMPOUNDS 10/14/2019 | 11/4/2019 | 2 | LTR / Letter | 100012767 |
| R01: Luce, Darryl (US EPA REGION 1) | LETTER REGARDING AGENCY EVALUATION OF 2019 REACH AR-3 CONCEPTUAL SITE MODEL (CSM) IMPLEMENTATION PLAN | 6/26/2019 | 1 | LTR / Letter | 100011848 |
| R01: Hoffman, Andrew (NH DEPT OF ENVIRONMENTAL SERVICES (NHDES)) | SITE VISIT OBSERVATIONS 08/21/2018 | 5/10/2019 | 5 | MEMO / Memorandum | 100011304 |
| R01: Luce, Darryl (US EPA REGION 1) | LETTER REGARDING EPA COMMENTS ON AR-3 CSM STUDY CONCEPTUAL SITE MODEL ACTIVITIES | 3/21/2019 | 4 | LTR / Letter | 100011051 |
| R01: Luce, Darryl (US EPA REGION 1) | LETTER PROVIDING COMMENTS ON THE DRAFT FEASIBILITY STUDY (FS) DATED 11/15/2018 | 3/7/2019 | 28 | LTR / Letter | 100011052 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Luce, Darryl (US EPA REGION 1) | MEMO REGARDING REPORT OF 09/19/2018 SITE VISIT AND INSPECTION OF AR-3 OF THE ANDROSCOGGIN RIVER | 2/27/2019 | 3 | MEMO / Memorandum | 100010987 |
| R01: Luce, Darryl (US EPA REGION 1) | COMMENTS ON AR-3 CONCEPTUAL SITE MODEL FIELD REPORT | 11/15/2018 | 2 | LTR / Letter | 100010580 |
| R01: (KENNEDY/JENKS CONSULTANTS) | REACH AR-3 CONCEPTUAL SITE MODEL STUDY - 2018 FIELD REPORT | 11/12/2018 | 45 | RPT / Report | 100010579 |
| R01: Montney, Paul A (GEORGIA-PACIFIC) | LETTER WITH MONTHLY PROGRESS REPORT | 11/7/2018 | 2 | RPT / Report | 100010548 |
| R01: (KENNEDY/JENKS CONSULTANTS) | FINAL SUPPLEMENTAL REMEDIAL INVESTIGATION (RI) REPORT (COMMENTS ATTACHED) | 10/19/2018 | 7939 | RPT / Report | 100010592 |
| R01: Montney, Paul A (GEORGIA-PACIFIC) | LETTER WITH MONTHLY PROGRESS REPORT - SEPTEMBER 2018 | 10/9/2018 | 2 | LTR / Letter | 100010552 |
| R01: Luce, Darryl (US EPA REGION 1) | LETTER REGARDING APPROVAL OF THE REVISED DRAFT SUPPLEMENTAL REMEDIAL INVESTIGATION REPORT | 10/9/2018 | 1 | LTR / Letter | 100010434 |
| R01: Montney, Paul A (GEORGIA-PACIFIC) | MONTHLY PROGRESS REPORT - AUGUST 2018 | 9/7/2018 | 7 | RPT / Report | 100010242 |
| R01: Montney, Paul A (GEORGIA-PACIFIC) | LETTER WITH MONTHLY PROGRESS REPORT - JULY 2018 | 8/9/2018 | 2 | LTR / Letter | 100010551 |
| R01: Luce, Darryl (US EPA REGION 1) | EPA APPROVAL OF DRAFT SAMPLING AND ANALYSIS PLAN (SAP) DATED 07/27/2018 FOR THE AR-3 RIVER INVESTIGATION | 8/9/2018 | 1 | LTR / Letter | 625443 |
| R01: Montney, Paul A (GEORGIA-PACIFIC) | MONTHLY PROGRESS REPORT - JUNE 2018 | 7/5/2018 | 2 | RPT / Report | 100009871 |
| R01: Montney, Paul A (GEORGIA-PACIFIC) | MONTHLY PROGRESS REPORT - MAY 2018 | 6/5/2018 | 2 | RPT / Report | 100009622 |
| R01: Luce, Darryl (US EPA REGION 1) | LETTER APPROVING REACH AR-3 CONCEPTUAL SITE MODEL IMPLEMENTATION PLAN | 5/2/2018 | 1 | LTR / Letter | 100009153 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Luce, Darryl (US EPA REGION 1) | LETTER REGARDING EPA AND NH DEPT OF ENVIRONMENTAL SERVICES (NHDES) APPROVAL OF THE REACH AR-3 CONCEPTUAL SITE MODEL IMPLEMENTATION PLAN DATED 04/26/2018 | 5/2/2018 | 1 | LTR / Letter | 100009383 |
| R01: Montney, Paul A (GEORGIA-PACIFIC) | MONTHLY PROGRESS REPORT | 5/2/2018 | 2 | LTR / Letter | 100009372 |
| R01: (KENNEDY/JENKS CONSULTANTS) | REACH AR-3 CONCEPTUAL SITE MODEL IMPLEMENTATION PLAN (04/26/2018 LETTER REGARDING RESPONSE TO COMMENTS ATTACHED) | 4/26/2018 | 42 | WP / Work Plan | 100009152 |
| R01: Montney, Paul A (GEORGIA-PACIFIC) | REACH AR-3 CONCEPTUAL SITE MODEL STUDY IMPLEMENTATION PLAN | 4/26/2018 | 42 | RPT / Report | 100009382 |
| R01: Luce, Darryl (US EPA REGION 1) | CONFERENCE CALL NOTES, COVERING RECAP OF 03/28/2018 AND 04/10/2018 MEETINGS, COMMENTS ON DRAFT SUPERFUND REDEVELOPMENT INITIATIVE (SRI) REPORT AND DEVELOPMENT AND INITIAL SCREENING OF ALTERNATIVES REPORT (DISAR), AND NEAR-TERM PROJECT SCHEDULE | 4/17/2018 | 3 | MTG / Meeting Document | 100011990 |
| R01: Montney, Paul A (GEORGIA-PACIFIC) | MONTHLY PROGRESS REPORT | 3/5/2018 | 2 | RPT / Report | 100002313 |
| R01: Luce, Darryl (US EPA REGION 1) | EPA COMMENTS ON DRAFT SUPPLEMENTAL REMEDIAL INVESTIGATION (RI) REPORT | 2/15/2018 | 14 | LTR / Letter | 623181 |
| R01: Luce, Darryl (US EPA REGION 1) | EMAIL TRANSMITTAL OF COMBINED EPA AND NH DEPT OF ENVIRONMENTAL SERVICES (NH DES) COMMENTS ON DRAFT SUPPLEMENTAL REMEDIAL INVESTIGATION (RI) REPORT | 2/15/2018 | 1 | EML / Email | 100002082 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Luce, Darryl (US EPA REGION 1), R01: (KENNEDY/JENKS CONSULTANTS) | EPA COMMENTS ON DRAFT SUPPLEMENTAL REMEDIAL INVESTIGATION (RI) REPORT, 11/30/2017 [HIGHLIGHTED] | 2/6/2018 | 151 | RPT / Report | 623183 |
| R01: Luce, Darryl (US EPA REGION 1), R01: (KENNEDY/JENKS CONSULTANTS) | EPA COMMENTS ON DRAFT SUPPLEMENTAL REMEDIAL INVESTIGATION (RI) REPORT, 11/30/2017, ATTACHMENTS K-L [MARGINALIA] | 2/6/2018 | 21 | RPT / Report | 623184 |
| R01: Luce, Darryl (US EPA REGION 1) | EPA COMMENTS TO ACCOMPANY ATTACHMENTS K AND L TO DRAFT SUPPLEMENTAL REMEDIAL INVESTIGATION (RI) REPORT, 11/30/2017 | 2/6/2018 | 2 | NOTE / Notes | 623185 |
| R01: Montney, Paul A (GEORGIA-PACIFIC) | MONTHLY PROGRESS REPORT LETTER | 1/5/2018 | 2 | RPT / Report | 100001419 |
| R01: Montney, Paul A (GEORGIA-PACIFIC CONSUMER PRODUCTS LP) | MONTHLY PROGRESS REPORT - NOVEMBER 2017 | 12/5/2017 | 2 | LTR / Letter | 631279 |
| R01: Montney, Paul A (GEORGIA-PACIFIC CONSUMER PRODUCTS LP) | MONTHLY PROGRESS REPORT - OCTOBER 2017 | 11/3/2017 | 2 | LTR / Letter | 100000662 |
| R01: Montney, Paul A (GEORGIA-PACIFIC) | MONTHLY PROGRESS REPORT - SEPTEMBER 2017 | 10/4/2017 | 2 | RPT / Report | 622999 |
| R01: (GEORGIA-PACIFIC) | PUBLIC MEETING PRESENTATION REGARDING PROJECT STATUS UPDATE | 9/19/2017 | 47 | MTG / Meeting Document | 622908 |
| R01: Massengill, David G (GEORGIA-PACIFIC) | LETTER PROVIDING NOTIFICATION OF PROJECT COORDINATOR CHANGE | 9/18/2017 | 2 | LTR / Letter | 621178 |
| R01: (US EPA REGION 1) | FACT SHEET | 9/1/2017 | 2 | PUB / Publication | 606183 |
| R01: (US EPA REGION 1) | FACT SHEET: SITE UPDATE | 9/1/2017 | 2 | PUB / Publication | 622907 |
| R01: Johnson, Shannon (GEORGIA-PACIFIC CONSUMER PRODUCTS LP) | MONTHLY PROGRESS REPORT FOR AUGUST 2017 | 9/1/2017 | 7 | RPT / Report | 621422 |
| R01: Luce, Darryl (US EPA REGION 1) | LETTER REGARDING AGENCY EVALUATIONS OF PROPOSED REVISIONS REGARDING DRAFT GROUNDWATER ASSESSMENT AND CONSTITUENT | 8/21/2017 | 8 | LTR / Letter | 620990 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|--------|-------|---------------|------------|---------------|-------------|
| | MIGRATION REPORT AND DRAFT CONCEPTUAL SITE MODEL | | | | |
| R01: Luce, Darryl (US EPA REGION 1) | LETTER REGARDING APPROVAL OF PROPOSED REVISIONS TO PROJECT SCHEDULE | 8/15/2017 | 2 | LTR / Letter | 561366 |
| R01: Johnson, Shannon (GEORGIA-PACIFIC CONSUMER PRODUCTS LP) | MONTHLY PROGRESS REPORT FOR JULY 2017 | 8/8/2017 | 2 | LTR / Letter | 595678 |
| R01: Luce, Darryl (US EPA REGION 1) | COMMENTS ON DRAFT CONCEPTUAL SITE MODEL REPORT, KENNEDY/JENKS 03/31/2017 | 5/17/2017 | 6 | LTR / Letter | 598568 |
| R01: Johnson, Shannon (GEORGIA-PACIFIC CONSUMER PRODUCTS LP) | LETTER REGARDING REQUEST FOR APPROVAL OF A PROPOSED REVISION TO PROJECT SCHEDULE | 5/11/2017 | 2 | LTR / Letter | 598560 |
| R01: Johnson, Shannon (GEORGIA-PACIFIC CONSUMER PRODUCTS LP) | MONTHLY PROGRESS REPORT - APRIL 2017 | 5/9/2017 | 2 | RPT / Report | 598951 |
| R01: Luce, Darryl (US EPA REGION 1) | COMMENTS ON DRAFT GROUNDWATER ASSESSMENT AND CONSTITUENT MIGRATION REPORT, 02/14/2017 | 4/26/2017 | 8 | LTR / Letter | 597137 |
| R01: Luce, Darryl (US EPA REGION 1) | COMMENTS ON DRAFT GROUNDWATER ASSESSMENT AND CONSTITUENT MIGRATION REPORT | 4/26/2017 | 8 | LTR / Letter | 598546 |
| R01: (KENNEDY/JENKS CONSULTANTS) | TEST PIT 6 (TP-6) STUDY COMPLETION REPORT (TRANSMITTAL LETTER ATTACHED) | 4/24/2017 | 2059 | RPT / Report | 598902 |
| R01: Johnson, Shannon (GEORGIA-PACIFIC CONSUMER PRODUCTS LP) | MONTHLY PROGRESS REPORT - MARCH 2017 | 4/10/2017 | 2 | RPT / Report | 597124 |
| R01: (KENNEDY/JENKS CONSULTANTS) | DRAFT CONCEPTUAL SITE MODEL REPORT | 3/31/2017 | 82 | RPT / Report | 597891 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Luce, Darryl (US EPA REGION 1) | LETTER REGARDING AGENCY COMMENTS CONCERNING DRAFT SOIL AND DEBRIS CHARACTERIZATION REPORT (CHARTS ATTACHED) | 3/28/2017 | 17 | LTR / Letter | 597730 |
| R01: Hoffman, Andrew (NH DEPT OF ENVIRONMENTAL SERVICES (NHDES)) | LETTER REGARDING WORK SCOPE APPROVAL (WSA) NO. 1 TO PROVIDE SUPPORT/REVIEW SERVICES (SUMMARY OF WORK SCOPE APPROVAL FORM ATTACHED) | 3/17/2017 | 2 | LTR / Letter | 598327 |
| R01: Johnson, Shannon (GEORGIA-PACIFIC CONSUMER PRODUCTS LP) | MONTHLY PROGRESS REPORT FOR FEBRUARY 2017 | 3/6/2017 | 2 | RPT / Report | 597843 |
| R01: (KENNEDY/JENKS CONSULTANTS) | DRAFT GROUNDWATER ASSESSMENT AND CONSTITUENT MIGRATION REPORT | 2/14/2017 | 4179 | RPT / Report | 596870 |
| R01: Johnson, Shannon (GEORGIA-PACIFIC CONSUMER PRODUCTS LP) | MONTHLY PROGRESS REPORT FOR JANUARY 2017 | 2/6/2017 | 2 | RPT / Report | 594599 |
| R01: Inglis, Holly (US EPA REGION 1) | LETTER TRANSMITTING BINDER WITH INSTRUCTION ON USING SITE PROFILE PAGES (SPP) TO ACCESS RECORDS VIA INTERNET AND REPOSITORY LETTERS TO FIELD REPOSITORY | 1/24/2017 | 2 | LTR / Letter | 597433 |
| R01: Hoffman, Andrew J (NH DEPT OF ENVIRONMENTAL SERVICES (NHDES)) | SUPPLEMENTAL REMEDIAL INVESTIGATION AND FEASIBILITY STUDY (RI/FS) OVERSIGHT V-96199601-1, 3RD QUARTER 2016 REPORT - 04/01/2016 - 06/30/2016 | 8/31/2016 | 2 | CORR / Correspondence | 591999 |
| R01: Romaine, Kathleen (KENNEDY/JENKS CONSULTANTS) | TEST PIT-6 (TP-6) STUDY BENCH-SCALE TREATABILITY STUDY AND OPTIONS ANALYSIS TECHNICAL MEMORANDUM | 8/23/2016 | 144 | MEMO / Memorandum | 591998 |
| R01: Johnson, Shannon (GEORGIA-PACIFIC CONSUMER PRODUCTS LP) | MONTHLY PROGRESS REPORT FOR JULY 2016 | 8/9/2016 | 2 | RPT / Report | 590968 |
| R01: (KENNEDY/JENKS CONSULTANTS) | Supplemental Remedial Investigation/Feasibility Study (RI/FS) Work Plan Addendum | 8/5/2016 | 451 | WP / Work Plan | 590967 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|--------|-------|---------------|------------|---------------|-------------|
| R01: Luce, Darryl (US EPA REGION 1) | LETTER REGARDING APPROVAL OF DRAFT TP-6 STUDY BENCH-SCALE TREATABILITY STUDY AND OPTIONS ANALYSIS TECHNICAL MEMORANDUM AND REQUEST FOR DETERMINATION OF FACILITY ACCEPTABILITY | 8/3/2016 | 1 | CORR / Correspondence | 591697 |
| R01: Luce, Darryl (US EPA REGION 1) | LETTER REGARDING APPROVAL OF 07/07/2016 DRAFT SUPPLEMENTAL REMEDIAL INVESTIGATION/FEASIBILITY STUDY (RI/FS) WORK PLAN ADDENDUM | 7/19/2016 | 2 | CORR / Correspondence | 591691 |
| R01: (BOSCARDIN CONSULTIING ENGINEERS INC) | FOUNDATION/RETAINING WALL STABILITY AND SUITABILITY ASSESSMENT REPORT (08/23/2016 TRANSMITTAL LETTER ATTACHED) | 6/17/2016 | 147 | RPT / Report | 591343 |
| R01: Luce, Darryl (US EPA REGION 1) | EPA APPROVAL OF 05/25/2016 GROUNDWATER RECOMMENDATIONS REPORT AND 05/26/2016 SUPPLEMENTAL REMEDIAL INVESTIGATIONS (SRI) WORK PLAN | 6/2/2016 | 1 | CORR / Correspondence | 587760 |
| R01: (KENNEDY/JENKS CONSULTANTS) | FINAL SUPPLEMENTAL REMEDIAL INVESTIGATION/FEASIBILITY STUDY (RI/FS) WORK PLAN | 5/26/2016 | 646 | WP / Work Plan | 588554 |
| R01: Luce, Darryl (US EPA REGION 1) | LETTER REGARDING DRAFT 2016 WORK PLAN | 5/24/2016 | 1 | CORR / Correspondence | 591621 |
| R01: (KENNEDY/JENKS CONSULTANTS) | MONITORING WELL ASSESSMENT REPORT | 12/18/2015 | 90 | RPT / Report | 584078 |
| R01: Romaine, Kathleen (KENNEDY/JENKS CONSULTANTS) | WORK PLAN FOR T-P STUDY BENCH-SCALE TREATABILITY | 12/14/2015 | 44 | WP / Work Plan | 581359 |
| R01: Luce, Darryl (US EPA REGION 1) | COMMENTS ON DRAFT MONITORING WELL ASSESSMENT | 12/9/2015 | 1 | LTR / Letter | 581358 |
| R01: Luce, Darryl (US EPA REGION 1) | COMMENTS ON DRAFT MONITORING WELL ASSESSMENT REPORT | 12/9/2015 | 1 | CORR / Correspondence | 591620 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Massengill, David G (GEORGIA-PACIFIC) | LETTER REGARDING NOTIFICATION OF PROJECT COORDINATOR CHANGE | 12/1/2015 | 2 | LTR / Letter | 581355 |
| R01: Luce, Darryl (US EPA REGION 1) | COMMENTS ON REVISED TP-06 BENCH SCALE TREATABILITY STUDY PLAN | 11/23/2015 | 2 | LTR / Letter | 581356 |
| R01: (YORK LAND SERVICES LLC) | BASEMAP | 11/6/2015 | 2 | FIG / Figure/Map/ Drawing | 100011985 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 11/3/2015 | 6 | PUB / Publication | 600440 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 10/30/2015 | 6 | PUB / Publication | 600470 |
| R01: (KENNEDY/JENKS CONSULTANTS) | ADDENDUM 1, SAMPLING AND ANALYSIS PLAN (SAP) FOR 2015 SUPPLEMENTAL REMEDIAL INVESTIGATION (SRI) ACTIVITIES (TRANSMITTAL LETTER ATTACHED) | 10/28/2015 | 97 | WP / Work Plan | 584046 |
| R01: Romaine, Kathleen (KENNEDY/JENKS CONSULTANTS) | FINAL TEST PIT 6 (TP-6) STUDY MATERIALS MANAGEMENT PLAN | 10/27/2015 | 21 | CORR / Correspondence | 588553 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 10/21/2015 | 6 | PUB / Publication | 600441 |
| | PHOTOGRAPHS OF SITE EXCAVATION FROM 08/27/2015-08/31/2015 | 8/31/2015 | 72 | PHT / Photograph | 581674 |
| R01: Luce, Darryl (US EPA REGION 1) | LETTER REGARDING APPROVAL OF SUPPLEMENTAL REMEDIAL INVESTIGATION (RI) WORK PLAN | 8/11/2015 | 1 | LTR / Letter | 572830 |
| R01: (KENNEDY/JENKS CONSULTANTS) | COMMUNITY INVOLVEMENT PLAN | 7/31/2015 | 19 | WP / Work Plan | 581215 |
| R01: (KENNEDY/JENKS CONSULTANTS) | SUPPLEMENTAL REMEDIAL INVESTIGATION (RI) WORK PLAN | 7/31/2015 | 717 | WP / Work Plan | 581214 |
| R01: Hoffman, Andrew (NH DEPT OF ENVIRONMENTAL SERVICES (NHDES)) | LETTER REGARDING SUPPLEMENTAL REMEDIAL INVESTIGATION (RI) AND FEASIBILITY STUDY (FS) OVERSIGHT, THIRD QUARTER 2015 REPORT (04/01/2015 - 06/30/2015) | 7/30/2015 | 2 | LTR / Letter | 581213 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|--------|-------|---------------|------------|---------------|-------------|
| R01: Luce, Darryl (US EPA REGION 1) | COMMENTS ON DRAFT COMMUNITY INVOLVEMENT PLAN | 7/28/2015 | 2 | LTR / Letter | 578392 |
| R01: Luce, Darryl (US EPA REGION 1) | COMMENTS ON REVISED DRAFT SUPPLEMENTAL REMEDIAL INVESTIGATION (RI) WORK PLAN | 7/24/2015 | 2 | LTR / Letter | 578393 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 7/14/2015 | 6 | PUB / Publication | 600442 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 7/10/2015 | 6 | PUB / Publication | 600443 |
| R01: Montney, Paul A (GEORGIA-PACIFIC) | MONTHLY PROGRESS REPORT | 7/8/2015 | 2 | RPT / Report | 576487 |
| R01: Luce, Darryl (US EPA REGION 1) | LETTER REGARDING APPROVAL OF REVISED DRAFT SITE PREPARATION WORK PLAN | 5/21/2015 | 1 | LTR / Letter | 576478 |
| R01: (KENNEDY/JENKS CONSULTANTS) | SITE PREPARATION WORK PLAN | 5/21/2015 | 18 | WP / Work Plan | 576596 |
| R01: Massengill, David G (GEORGIA-PACIFIC) | LETTER REGARDING NOTIFICATION OF A DESIGNATED PROJECT COORDINATOR FOR THE RESPONDENTS | 5/20/2015 | 2 | LTR / Letter | 576479 |
| R01: Montney, Paul (INTERNATIONAL PAPER CO) | LETTER REGARDING NOTIFICATION OF CONTRACTORS SELECTED BY GEORGIA-PACIFIC CONSUMER PRODUCTS LP (JANUARY 2012 QUALITY MANAGEMENT MANUAL ATTACHED) | 5/20/2015 | 58 | LTR / Letter | 576480 |
| R01: Barmakian, Nancy (US EPA REGION 1) | LETTER DESIGNATING RESPONDENTS AS AUTHORIZED REPRESENTATIVES | 5/5/2015 | 2 | LTR / Letter | 574597 |
| R11: Mccarthy, Gina (NONE), R11: (US ENVIRONMENTAL PROTECTION AGENCY) | Guidance on Considering Environmental Justice During the Development of Regulatory Actions | 5/1/2015 | 56 | LAWS / Laws/Regulations/Guidance | 199543 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 4/30/2015 | 6 | PUB / Publication | 600444 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 4/23/2015 | 6 | PUB / Publication | 600445 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Barmakian, Nancy (US EPA REGION 1) | ADMINISTRATIVE SETTLEMENT AGREEMENT (ASA) AND ORDER ON CONSENT (AOC) FOR SUPPLEMENTAL REMEDIAL INVESTIGATION/FEASIBILITY STUDY (RI/FS) - US EPA REGION 1 CERCLA DOCKET NO. 01-2015-0043 | 4/16/2015 | 71 | LGL / Legal Instrument | 574617 |
| R01: Southworth, George R (OAK RIDGE NATIONAL LABORATORY), R01: Watson, David (OAK RIDGE NATIONAL LABORATORY), R01: Lester, Brian (OAK RIDGE NATIONAL LABORATORY), R01: Lowe, Kenneth (OAK RIDGE NATIONAL LABORATORY), R01: Bogle, Mary, Anna (OAK RIDGE NATIONAL LABORATORY), R01: Miller, Carrie (OAK RIDGE NATIONAL LABORATORY), R01: Liang, Liyuan (OAK RIDGE NATIONAL LABORATORY), R01: Pierce, Eric (OAK RIDGE NATIONAL LABORATORY) | MERCURY SOURCE ZONE IDENTIFICATION USING SOIL VAPOR SAMPLING AND ANALYSIS, FRONTIERS IN ENVIRONMENTAL SCIENCE AND ENGINEERING | 4/2/2015 | 9 | PUB / Publication | 100011988 |
| R01: Chen, Celia Y (DARTMOUTH COLLEGE), R01: Chalmers, Ann, T (US GEOLOGICAL SURVEY), R01: Taylor, Vivien, F (DARTMOUTH COLLEGE), R01: Marvin-dipasquale, Mark, C (US GEOLOGICAL SURVEY), R01: Agee, Jennifer, L (US GEOLOGICAL SURVEY), R01: Buckman, Kate, L (DARTMOUTH COLLEGE), R01: Broadley, Hannah, J (DARTMOUTH COLLEGE), R01: Jackson, Brian, P (DARTMOUTH COLLEGE) | INFLUENCE OF A CHLOR-ALKALI SUPERFUND SITE ON MERCURY BIOACCUMULATION IN PERIPHYTON AND LOW-TROPHIC LEVEL FAUNA, ENVIRONMENTAL TOXICOLOGY AND CHEMISTRY | 3/2/2015 | 10 | PUB / Publication | 100011989 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 2/6/2015 | 6 | PUB / Publication | 600446 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|--------|-------|---------------|------------|---------------|-------------|
| R01: Luce, Darryl (US EPA REGION 1) | LETTER REGARDING NOTIFICATION OF PLANNED NEGOTIATIONS WITH POTENTIALLY RESPONSIBLE PARTIES (PRP) | 11/25/2014 | 1 | LTR / Letter | 567636 |
| R01: Owens, James T (US EPA REGION 1) | LETTER REGARDING NOTIFICATION OF PLANNED NEGOTIATIONS WITH POTENTIALLY RESPONSIBLE PARTIES (PRP) | 11/25/2014 | 1 | LTR / Letter | 567637 |
| R01: Luce, Darryl (US EPA REGION 1) | LETTER REGARDING NOTIFICATION OF PLANNED NEGOTIATIONS WITH POTENTIALLY RESPONSIBLE PARTIES (PRP) | 11/25/2014 | 1 | LTR / Letter | 567638 |
| R01: (US EPA REGION 1) | NEWS RELEASE: UPDATED INFORMATION ON CHLOR-ALKALI SUPERFUND SITE IN BERLIN, NH, PUBLIC COMMUNITY MEETING WILL BE THURSDAY 05/29/2014 | 5/22/2014 | 2 | PUB / Publication | 557099 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 3/25/2014 | 5 | PUB / Publication | 600447 |
| R01: (NOBIS ENGINEERING INC) | REMEDIAL INVESTIGATION (RI) VOLUME 3A OF 3: BASELINE ECOLOGICAL RISK ASSESSMENT (BERA) - RIVER STUDY AREA | 3/1/2014 | 1314 | RPT / Report | 541620 |
| R01: (NOBIS ENGINEERING INC) | REMEDIAL INVESTIGATION (RI) VOLUME 1 OF 3 | 3/1/2014 | 3060 | RPT / Report | 550298 |
| R01: Xu, Jingying (LULEA UNIVERSITY OF TECHNOLOGY), R01: Biester, Harald (UNIVERSITY OF BRAUNSCHWEIG), R01: Lagerkvist, Anders (LULEA UNIVERSITY OF TECHNOLOGY), R01: Kupiene, Jurate (LULEA UNIVERSITY OF TECHNOLOGY), R01: Kleja, Dan, B (SWEDISH GEOTECHNICAL INSTITUTE) | INFLUENCE OF PARTICLE SIZE DISTRIBUTION, ORGANIC CARBON, PH AND CHLORIDES ON WASHING OF MERCURY CONTAMINATED SOIL, CHEMOSPHERE | 2/28/2014 | 7 | PUB / Publication | 100011987 |
| R01: (NOBIS ENGINEERING INC) | REMEDIAL INVESTIGATION (RI) VOLUME 3B OF 3: SCREENING LEVEL ECOLOGICAL RISK ASSESSMENT (SLERA) - TERRESTRIAL | 2/1/2014 | 483 | RPT / Report | 541621 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 1/29/2014 | 5 | PUB / Publication | 600448 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: (NOBIS ENGINEERING INC) | REMEDIAL INVESTIGATION (RI) VOLUME 2 OF 3: HUMAN HEALTH RISK ASSESSMENT (HHRA) REVISION 2 | 1/1/2014 | 801 | RPT / Report | 550299 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 9/27/2013 | 5 | PUB / Publication | 600449 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 7/24/2013 | 5 | PUB / Publication | 600450 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 2/7/2013 | 5 | PUB / Publication | 600451 |
| R01: Burack, Thomas S (NH DEPT OF ENVIRONMENTAL SERVICES (NHDES)) | LETTER REGARDING GROUNDWATER USE AND VALUE DETERMINATION (FIGURE AND TABLES ATTACHED) | 1/22/2013 | 9 | LTR / Letter | 551662 |
| R01: Luce, Darryl (US EPA REGION 1), R01: Coles, James (US GEOLOGICAL SURVEY), R01: Degnan, James R (US GEOLOGICAL SURVEY), R01: Chalmers, Ann, T (US GEOLOGICAL SURVEY), R01: Marvin-dipasquale, Mark, C (US GEOLOGICAL SURVEY), R01: Agee, Jennifer, L (US GEOLOGICAL SURVEY) | CHARACTERIZATION OF MERCURY CONTAMINATION IN THE ANDROSCOGGIN RIVER | 1/1/2013 | 68 | PUB / Publication | 100011986 |
| R01: Chu, Liyang (NOBIS ENGINEERING) | EMAIL FORWARDING THE ASSESSMENT OF GROUNDWATER RESULTS (EMAIL HISTORY ATTACHED) | 11/30/2012 | 4 | EML / Email | 70007046 |
| R01: Luce, Darryl (US EPA REGION 1) | EMAIL CONCERNING SITE DEFINITION (EMAIL HISTORY ATTACHED) | 10/24/2012 | 2 | EML / Email | 70005173 |
| R01: Peary, Robert (TECHLAW INC) | DATA VALDIATION REPORT FOR CASE NO. 41380, SDG NO. C0668 (03/13/2012 DATA VALIDATION COMPLETE FORM ATTACHED) | 3/14/2012 | 1159 | ADD / Analytical Data Document | 507574 |
| R01: Peary, Robert (TECHLAW INC) | DATA VALDIATION REPORT FOR CASE NO. 41380, SDG NO. F0668 (03/12/2012 DATA VALIDATION COMPLETE FORM ATTACHED) | 3/12/2012 | 745 | ADD / Analytical Data Document | 507573 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Yang, Yunru (WESTON SOLUTIONS INC), R01: Quigley, Diane (NOBIS ENGINEERING INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 3 ORGANIC DATA VALIDATION REPORT FOR CASE #41770, SDG #A4600 AND A4612 | 2/1/2012 | 106 | ADD / Analytical Data Document | 505554 |
| R01: Downey, Leslie (TECHLAW INC), R01: Macri, Louis (TECHLAW INC) | STAGE 4 ELECTRONIC AND MANUAL DATA VALIDATION REPORT FOT CASE #41389, SDG #C0651 (01/23/2012 TRANSMITTAL MEMO ATTACHED) | 1/20/2012 | 1527 | ADD / Analytical Data Document | 505242 |
| R01: (TECHLAW INC) | CRAYFISH, WHITE SUCKER AND SMALLMOUTH BASS TISSUE PROCESSING AND DMA-80 MILESTONE MERCURY ANALYSIS (TRANSMITTAL LETTER ATTACHED) | 1/20/2012 | 9 | ADD / Analytical Data Document | 536098 |
| R01: Zapisek, Izabela (WESTON SOLUTIONS INC), R01: Quigley, Diane (NOBIS ENGINEERING INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 3 INORGANIC DATA VALIDATION REPORT FOR CASE #41770, SDG #A4600 AND A4612 | 1/16/2012 | 75 | ADD / Analytical Data Document | 505555 |
| R01: Macri, Louis (TECHLAW INC), R01: Peary, Robert (TECHLAW INC) | STAGE 4 ELECTRONIC AND MANUAL DATA VALIDATION REPORT FOR CASE #41380, SDG #F0651 | 1/10/2012 | 933 | ADD / Analytical Data Document | 501686 |
| R01: Downey, Leslie (TECHLAW INC), R01: Macri, Louis (TECHLAW INC) | DATA VALIDATION REPORT FOR CASE NO. 41380, SDG NO. F0648 (10/26/2011 DATA VALIDATION COMPLETE FORM ATTACHED) | 10/27/2011 | 403 | ADD / Analytical Data Document | 497619 |
| R01: Insley, Erin (NOBIS ENGINEERING INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 ORGANIC DATA VALIDATION REPORT FOR CASE NO. 41488, SDG NO. A45F1 | 10/24/2011 | 90 | ADD / Analytical Data Document | 497689 |
| R01: Deruzzo, Gail (NOBIS ENGINEERING INC), R01: Cox, Lori (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE NO. 41448, SDG NO. MA45W3 | 10/13/2011 | 44 | ADD / Analytical Data Document | 497637 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Deruzzo, Gail (NOBIS ENGINEERING INC), R01: Cox, Lori (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE NO. 41448, SDG NO. MA45A9 | 10/13/2011 | 64 | ADD / Analytical Data Document | 497640 |
| R01: Deruzzo, Gail (NOBIS ENGINEERING INC), R01: Cox, Lori (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE NO. 41448, SDG NO. MA45A1 | 10/12/2011 | 51 | ADD / Analytical Data Document | 497634 |
| R01: Deruzzo, Gail (NOBIS ENGINEERING INC), R01: Cox, Lori (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE NO. 41448, SDG NO. MA45Z5 | 10/12/2011 | 38 | ADD / Analytical Data Document | 497635 |
| R01: Deruzzo, Gail (NOBIS ENGINEERING INC), R01: Cox, Lori (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE NO. 41448, SDG NO. MA45D3 | 10/12/2011 | 41 | ADD / Analytical Data Document | 497638 |
| R01: Deruzzo, Gail (NOBIS ENGINEERING INC), R01: Cox, Lori (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE NO. 41448, SDG NO. MA45B2 | 10/12/2011 | 47 | ADD / Analytical Data Document | 497639 |
| R01: Deruzzo, Gail (NOBIS ENGINEERING INC), R01: Cox, Lori (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE NO. 41448, SDG NO. MA45A2 | 10/12/2011 | 63 | ADD / Analytical Data Document | 497642 |
| R01: Deruzzo, Gail (NOBIS ENGINEERING INC), R01: Cox, Lori (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE NO. 41448, SDG NO. MA45W9 | 10/11/2011 | 42 | ADD / Analytical Data Document | 497636 |
| R01: Deruzzo, Gail (NOBIS ENGINEERING INC), R01: Cox, Lori (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE NO. 41448, SDG NO. MA45A8 | 10/11/2011 | 54 | ADD / Analytical Data Document | 497641 |
| R01: Downey, Leslie (TECHLAW INC), R01: Macri, Louis (TECHLAW INC) | DATA VALIDATION REPORT FOR CASE #41380, SDG #C0616 (10/06/2011 TRANSMITTAL MEMO ATTACHED) | 10/6/2011 | 1191 | ADD / Analytical Data Document | 496247 |
| R01: Peary, Robert (TECHLAW INC) | DATA VALIDATION REPORT FOR CASE #41380, SDG #C0610 (10/04/2011 TRANSMITTAL MEMO ATTACHED) | 10/3/2011 | 1409 | ADD / Analytical Data Document | 496223 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|--------|-------|---------------|------------|---------------|-------------|
| R01: Insley, Erin (NOBIS ENGINEERING INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 ORGANIC DATA VALIDATION REPORT FOR CASE NO. 41448, SDG NO. A45D9 | 9/26/2011 | 97 | ADD / Analytical Data Document | 497632 |
| R01: Downey, Leslie (TECHLAW INC), R01: Macri, Louis (TECHLAW INC) | DATA VALIDATION REPORT FOR CASE #41380, SDG # F0616 (09/20/2011 TRANSMITTAL MEMO TO REMEDIAL PROJECT MANAGER ATTACHED) | 9/20/2011 | 940 | ADD / Analytical Data Document | 495040 |
| R01: Macri, Louis (TECHLAW INC), R01: Peary, Robert (TECHLAW INC) | DATA VALIDATION REPORT FOR CASE #41380, SDG # F0610 (09/20/2011 TRANSMITTAL MEMO TO REMEDIAL PROJECT MANAGER ATTACHED) | 9/20/2011 | 1105 | ADD / Analytical Data Document | 495041 |
| R01: Insley, Erin (NOBIS ENGINEERING INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 ORGANIC DATA VALIDATION REPORT FOR CASE NO. 41448, SDG NO. A45B1 | 9/16/2011 | 79 | ADD / Analytical Data Document | 497633 |
| R01: Insley, Erin (NOBIS ENGINEERING INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 ORGANIC DATA VALIDATION REPORT FOR CASE NO. 41448, SDG #A45B8 | 9/1/2011 | 37 | ADD / Analytical Data Document | 492787 |
| R01: Insley, Erin (NOBIS ENGINEERING INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 ORGANIC DATA VALIDATION REPORT FOR CASE NO. 41448, SDG #A45A9 | 9/1/2011 | 53 | ADD / Analytical Data Document | 492788 |
| R01: Deruzzo, Gail (NOBIS ENGINEERING INC), R01: Cox, Lori (NOBIS ENGINEERING INC) | TIER 2 ORGANIC DATA VALIDATION REPORT FOR CASE #41448, SDG #A45B9 | 7/29/2011 | 53 | ADD / Analytical Data Document | 492711 |
| R01: Deruzzo, Gail (NOBIS ENGINEERING INC), R01: Cox, Lori (NOBIS ENGINEERING INC) | TIER 2 ORGANIC DATA VALIDATION REPORT FOR CASE #41448, SDG #A45D3 | 7/29/2011 | 48 | ADD / Analytical Data Document | 492712 |
| R01: (NOBIS ENGINEERING INC) | QUALITY ASSURANCE PROJECT PLAN (QAPP) | 7/27/2011 | 1481 | WP / Work Plan | 100013826 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 5/31/2011 | 5 | PUB / Publication | 600452 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Czerepak, Erica (TECHLAW INC) | SAMPLE PROCESSING AND ANALYSIS OF MARSH BIRD FEATHERS AND INFAUNA WORMS COLLECTED DURING THE 2010 FIELD SEASON | 3/31/2011 | 7 | ADD / Analytical Data Document | 536096 |
| R01: Macri, Louis (TECHLAW INC), R01: Peary, Robert (TECHLAW INC) | STAGE 2A MANUAL DATA VALIDATION REPORT FOR CASE #40445, SDG #C0590 (03/16/2011 TRANSMITTAL MEMO ATTACHED) | 3/16/2011 | 1996 | ADD / Analytical Data Document | 481437 |
| R01: Downey, Leslie (TECHLAW INC), R01: Macri, Louis (TECHLAW INC), R01: Chen, Jim (TECHLAW, INC) | STAGE 2A MANUAL DATA VALIDATION REPORT FOR CASE #40445, SDG #C0544 (03/11/2011 TRANSMITTAL MEMO ATTACHED) | 3/11/2011 | 819 | ADD / Analytical Data Document | 481430 |
| R01: Macri, Louis (TECHLAW INC), R01: Dimattei, Paula L (TECHLAW INC), R01: Peary, Robert (TECHLAW INC) | STAGE 2A MANUAL DATA VALIDATION REPORT FOR CASE #40445, SDG #F0519 (03/011/2011 TRANSMITTAL MEMO ATTACHED) | 3/9/2011 | 1188 | ADD / Analytical Data Document | 481429 |
| R01: Downey, Leslie (TECHLAW INC), R01: Macri, Louis (TECHLAW INC), R01: Chen, Jim (TECHLAW, INC) | STAGE 2A ELECTRONIC AND MANUAL DATA VALIDATION REPORT FOR CASE #40445, SDG #C0519 (03/11/2011 TRANSMITTAL MEMO ATTACHED) | 3/9/2011 | 1648 | ADD / Analytical Data Document | 481433 |
| R01: Macri, Louis (TECHLAW INC), R01: Peary, Robert (TECHLAW INC), R01: Chen, Jim (TECHLAW, INC) | STAGE 2A ELECTRONIC AND MANUAL DATA VALIDATION REPORT FOR CASE #40445, SDG #C0518 (03/08/2011 TRANSMITTAL MEMO ATTACHED) | 3/8/2011 | 1810 | ADD / Analytical Data Document | 481428 |
| R01: Macri, Louis (TECHLAW INC), R01: Chen, Jim (TECHLAW, INC) | STAGE 2A MANUAL DATA VALIDATION REPORT FOR CASE #40445, SDG #F0544 (03/08/2011 TRANSMITTAL MEMO ATTACHED) | 3/7/2011 | 618 | ADD / Analytical Data Document | 481427 |
| R01: Chen, Jim (METCALF & EDDY), R01: Macri, Louis (LOCKHEED ENVIRONMENTAL), R01: Peary, Robert (LOCKHEED ENVIRONMENTAL) | STAGE 2A ELECTRONIC AND MANUAL DATA VALIDATION FOR CASE #40445, SDG #F0419 (03/02/2011 TRANSMITTAL MEMO ATTACHED) | 3/2/2011 | 1593 | ADD / Analytical Data Document | 481424 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Macri, Louis (TECHLAW INC), R01: Peary, Robert (TECHLAW INC), R01: Chen, Jim (TECHLAW, INC) | STAGE 2A MANUAL DATA VALIDATION REPORT FOR CASE #40445, SDG #C0590 (03/04/2011 TRANSMITTAL MEMO ATTACHED) | 3/2/2011 | 1198 | ADD / Analytical Data Document | 481431 |
| R01: Macri, Louis (LOCKHEED ENVIRONMENTAL), R01: Peary, Robert (LOCKHEED ENVIRONMENTAL), R01: Tobin, Steffanie (LOCKHEED ENVIRONMENTAL) | STAGE 2A ELECTRONIC AND MANUAL DATA VALIDATION FOR CASE #40445, SDG #F0436 (03/02/2011 TRANSMITTAL MEMO ATTACHED) | 2/28/2011 | 1561 | ADD / Analytical Data Document | 481402 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Zapisek, Izabela (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE #40784, SDG #MA41D9 | 2/23/2011 | 64 | ADD / Analytical Data Document | 481496 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Zapisek, Izabela (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE #40784, SDG #MA41E5 | 2/23/2011 | 52 | ADD / Analytical Data Document | 481497 |
| R01: Tobin, Steffanie (TECHLAW INC), R01: Macri, Louis (LOCKHEED ENVIRONMENTAL), R01: Peary, Robert (LOCKHEED ENVIRONMENTAL) | STAGE 2A ELECTRONIC AND MANUAL DATA VALIDATION FOR CASE #40445, SDG #F0400 (02/17/2011 TRANSMITTAL MEMO ATTACHED) | 2/17/2011 | 2447 | ADD / Analytical Data Document | 481425 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 ORGANIC DATA VALIDATION REPORT FOR CASE #40784, SDG #A41E5 | 2/17/2011 | 88 | ADD / Analytical Data Document | 481498 |
| R01: Chen, Jim (METCALF & EDDY), R01: Macri, Louis (LOCKHEED ENVIRONMENTAL), R01: Peary, Robert (LOCKHEED ENVIRONMENTAL) | STAGE 2A ELECTRONIC AND MANUAL DATA VALIDATION FOR CASE #40445, SDG #F0400 (02/16/2011 TRANSMITTAL MEMO ATTACHED) | 2/16/2011 | 1622 | ADD / Analytical Data Document | 481403 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Yang, Yunru (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 3 ORGANIC DATA VALIDATION REPORT FOR CASE #40784, SDG #A41E3 | 2/8/2011 | 86 | ADD / Analytical Data Document | 479593 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Yang, Yunru (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE #40784, SDG #MA41E1 | 2/8/2011 | 42 | ADD / Analytical Data Document | 479595 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Yang, Yunru (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE #40784, SDG #MA41E3 | 2/8/2011 | 36 | ADD / Analytical Data Document | 479598 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE #40784, SDG #MA41E6 | 2/8/2011 | 47 | ADD / Analytical Data Document | 481401 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Yang, Yunru (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 ORGANIC DATA VALIDATION REPORT FOR CASE #40784, SDG #A41J0 | 2/7/2011 | 97 | ADD / Analytical Data Document | 479594 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE #40784, SDG #MA41J1 | 2/4/2011 | 52 | ADD / Analytical Data Document | 481400 |
| R01: Chen, Jim (METCALF & EDDY), R01: Macri, Louis (LOCKHEED ENVIRONMENTAL), R01: Dimattei, Paula L (LOCKHEED ENVIRONMENTAL) | DATA VALIDATION FOR CASE NO. 40445, SDG NO. C0529 | 2/3/2011 | 1817 | ADD / Analytical Data Document | 478734 |
| R01: Macri, Louis (LOCKHEED ENVIRONMENTAL), R01: Baca, Marie E (LOCKHEED ENVIRONMENTAL), R01: Peary, Robert (LOCKHEED ENVIRONMENTAL) | DATA VALIDATION FOR CASE NO. 40445, SDG NO. F0529 | 2/3/2011 | 1270 | ADD / Analytical Data Document | 478735 |
| R01: Macri, Louis (LOCKHEED ENVIRONMENTAL), R01: Tobin, Steffanie (LOCKHEED ENVIRONMENTAL) | DATA VALIDATION FOR CASE NO. 40445, SDG NO. F0493 | 2/3/2011 | 514 | ADD / Analytical Data Document | 478736 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Macri, Louis (LOCKHEED ENVIRONMENTAL), R01: Peary, Robert (LOCKHEED ENVIRONMENTAL), R01: Chen, Jim (TECHLAW, INC) | STAGE 2A MANUAL DATA VALIDATION REPORT FOR CASE #40445, SDG #C0419 | 2/3/2011 | 2508 | ADD / Analytical Data Document | 479558 |
| R01: Macri, Louis (LOCKHEED ENVIRONMENTAL), R01: Tobin, Steffanie (LOCKHEED ENVIRONMENTAL) | DATA VALIDATION FOR CASE NO. 40445, SDG NO. C0494 | 2/1/2011 | 526 | ADD / Analytical Data Document | 478731 |
| R01: Macri, Louis (LOCKHEED ENVIRONMENTAL), R01: Peary, Robert (LOCKHEED ENVIRONMENTAL), R01: Tobin, Steffanie (LOCKHEED ENVIRONMENTAL) | DATA VALIDATION FOR CASE NO. 40445, SDG NO. C0474 | 2/1/2011 | 620 | ADD / Analytical Data Document | 478732 |
| R01: Chen, Jim (METCALF & EDDY), R01: Macri, Louis (LOCKHEED ENVIRONMENTAL) | DATA VALIDATION FOR CASE NO. 40445, SDG NO. F0508 | 1/31/2011 | 482 | ADD / Analytical Data Document | 478733 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE #40784, SDG #MA41E0 | 1/31/2011 | 48 | ADD / Analytical Data Document | 479596 |
| R01: Macri, Louis (LOCKHEED ENVIRONMENTAL), R01: Chen, Jim (TECHLAW, INC) | STAGE 2A ELECTRONIC AND MANUAL DATA VALIDATION REPORT FOR CASE #40445, SDG #C0508 (02/01/2011 TRANSMITTAL MEMO ATTACHED) | 1/28/2011 | 995 | ADD / Analytical Data Document | 479560 |
| R01: Macri, Louis (LOCKHEED ENVIRONMENTAL), R01: Chen, Jim (TECHLAW, INC) | STAGE 2A ELECTRONIC AND MANUAL DATA VALIDATION REPORT FOR CASE #40445, SDG #C0436 (01/28/2011 TRANSMITTAL MEMO ATTACHED) | 1/28/2011 | 2464 | ADD / Analytical Data Document | 479561 |
| R01: Bentley, Robert, E (WESTON SOLUTIONS INC), R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE #40784, SDG #MA41H8 | 1/27/2011 | 52 | ADD / Analytical Data Document | 479599 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|--------|-------|---------------|------------|---------------|-------------|
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Quigley, Diane (NOBIS ENGINEERING INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE #40784, SDG # MA41E4 | 1/25/2011 | 47 | ADD / Analytical Data Document | 479564 |
| R01: Bentley, Robert, E (WESTON SOLUTIONS INC), R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE #40784, SDG #MA41J0 | 1/24/2011 | 52 | ADD / Analytical Data Document | 479597 |
| R01: Macri, Louis (LOCKHEED ENVIRONMENTAL), R01: Peary, Robert (LOCKHEED ENVIRONMENTAL) | STAGE 4 ELECTRONIC AND MANUAL DATA VALIDATION REPORT FOR CASE #40445, SDG #F0462 (01/25/2011 TRANSMITTAL MEMO ATTACHED) | 1/21/2011 | 1893 | ADD / Analytical Data Document | 479559 |
| R01: Downey, Leslie (LOCKHEED ENVIRONMENTAL), R01: Macri, Louis (LOCKHEED ENVIRONMENTAL) | STAGE4 ELECTRONIC AND MANUAL DATA VALIDATION REPORT FOR CASE #40445, SDG #C0461 (01/25/2011 TRANSMITTAL MEMO ATTACHED) | 1/21/2011 | 2912 | ADD / Analytical Data Document | 479573 |
| R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 1 MODIFIED INORGANIC DATA VALIDATION FOR CASE NO. 0067S, SDG NO. D02469, LAB NO. C0J040494 | 1/20/2011 | 16 | ADD / Analytical Data Document | 478728 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE #40784, SDG # MA41E2 | 1/19/2011 | 45 | ADD / Analytical Data Document | 479565 |
| R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 1 DATA VALIDATION FOR CASE NO. 0066S, SDG NO. D02331 | 1/18/2011 | 22 | ADD / Analytical Data Document | 478729 |
| R01: Dimattei, Paula L (TECHLAW INC), R01: Macri, Louis (LOCKHEED ENVIRONMENTAL) | STAGE 2A ELECTRONIC AND MANUAL DATA VALIDATION REPORT FOR CASE #40445, SDG #F0474 (01/25/2011 TRANSMITTAL MEMO ATTACHED) | 1/18/2011 | 508 | ADD / Analytical Data Document | 479562 |
| R01: Insley, Erin (NOBIS ENGINEERING INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 ORGANIC DATA VALIDATION FOR CASE NO. 40784; SDG NO. A41E1 | 1/14/2011 | 59 | ADD / Analytical Data Document | 476993 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Insley, Erin (NOBIS ENGINEERING INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 ORGANIC DATA VALIDATION FOR CASE NO. 40784; SDG NO. A41H8 | 1/14/2011 | 57 | ADD / Analytical Data Document | 476994 |
| R01: Yang, Yunru (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 ORGANIC DATA VALIDATION REPORT FOR CASE #40517, SDG # A0499 | 1/14/2011 | 99 | ADD / Analytical Data Document | 479567 |
| R01: Yang, Yunru (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 3 INORGANIC DATA VALIDATION REPORT FOR CASE #40517, SDG # MA0499 | 1/12/2011 | 51 | ADD / Analytical Data Document | 479563 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 3 ORGANIC DATA VALIDATION REPORT FOR CASE #40517, SDG # A41C2 | 1/7/2011 | 103 | ADD / Analytical Data Document | 479566 |
| R01: Czerepak, Erica (TECHLAW INC) | SAMPLE PROCESSING AND ANALYSIS OF OLIGOCHAETES, TREE SWALLOW BLOOD, FEATHERS AND EGGS, MARSH BIRD BLOOD AND FEATHERS, BAT FUR, AND EISENIA FETIDA FROM THE IN-SITU TOXICITY TESTING OF SOIL, ALL COLLECTED AT THE FORMER CHLOR-ALKALI FACILITY | 1/6/2011 | 34 | ADD / Analytical Data Document | 536097 |
| R01: Luce, Darryl (US EPA REGION 1), R01: Johnston, Craig M (US DOI/US GEOLOGICAL SURVEY), R01: Degnan, James R (US GEOLOGICAL SURVEY), R01: Teeple, Andrew, P (US GEOLOGICAL SURVEY), R01: Marvin-dipasquale, Mark, C (US GEOLOGICAL SURVEY) | GEOPHYSICAL BED SEDIMENT CHARACTERIZATION OF THE ANDROSCOGGIN RIVER FROM THE FORMER CHLOR-ALKALI FACILITY SUPERFUND SITE, BERLIN, NH, TO THE STATE BORDER WITH ME, AUGUST 2009 | 1/1/2011 | 40 | RPT / Report | 100011984 |
| R01: Insley, Erin (NOBIS ENGINEERING INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 ORGANIC DATA VALIDATION FOR CASE NO. 40784; SDG NO. A41D9 | 12/30/2010 | 55 | ADD / Analytical Data Document | 476986 |
| R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 1 MODIFIED INORGANIC DATA VALIDATION FOR CASE NO. 0076S, SDG NO. D02582, LAB NO. J2448 | 12/30/2010 | 33 | ADD / Analytical Data Document | 478730 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 1 MODIFIED INORGANIC DATA VALIDATION FOR CASE NO. 0067S, SDG NO. D02446, LAB NO. J1897 | 12/28/2010 | 24 | ADD / Analytical Data Document | 478723 |
| R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 1 MODIFIED INORGANIC DATA VALIDATION FOR CASE NO. 0067S, SDG NO. D02354, LAB NO. J1819 | 12/28/2010 | 24 | ADD / Analytical Data Document | 478724 |
| R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 1 MODIFIED INORGANIC DATA VALIDATION FOR CASE NO. 0067S, SDG NO. D02389, LAB NO. J1853 | 12/28/2010 | 21 | ADD / Analytical Data Document | 478725 |
| R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 1 MODIFIED INORGANIC DATA VALIDATION FOR CASE NO. 0067S, SDG NO. D02421, LAB NO. J1854 | 12/28/2010 | 24 | ADD / Analytical Data Document | 478726 |
| R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 1 MODIFIED INORGANIC DATA VALIDATION FOR CASE NO. 0076S, SDG NO. D02530, LAB NO. J2419 | 12/28/2010 | 30 | ADD / Analytical Data Document | 478727 |
| R01: (TECHLAW INC) | 28-DAY EISENIA FETIDA IN-SITU SOIL CHRONIC TOXICITY TEST USING SOILS FROM THE FORMER CHLOR-ALKALI FACILITY | 12/20/2010 | 39 | ADD / Analytical Data Document | 536095 |
| R01: Yang, Yunru (WESTON SOLUTIONS INC), R01: Quigley, Diane (NOBIS ENGINEERING INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 ORAGANIC DATA VALIDATION REPORT FOR CASE #40517; SDG NO. A4151 | 12/13/2010 | 102 | ADD / Analytical Data Document | 476953 |
| R01: Yang, Yunru (WESTON SOLUTIONS INC), R01: Quigley, Diane (NOBIS ENGINEERING INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 3 ORAGANIC DATA VALIDATION REPORT FOR CASE #40517; SDG NO. A41A9 | 12/13/2010 | 100 | ADD / Analytical Data Document | 476954 |
| R01: Yang, Yunru (WESTON SOLUTIONS INC), R01: Quigley, Diane (NOBIS ENGINEERING INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 ORAGANIC DATA VALIDATION REPORT FOR CASE #40517; SDG NO. A4130 | 12/8/2010 | 102 | ADD / Analytical Data Document | 476955 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Quigley, Diane (NOBIS ENGINEERING INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 ORGANIC DATA VALIDATION FOR CASE NO. 40517; SDG NO. A4160 | 12/7/2010 | 84 | ADD / Analytical Data Document | 476987 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Zapisek, Izabela (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE #40517; SDG NO. MA4160 | 12/5/2010 | 49 | ADD / Analytical Data Document | 476958 |
| R01: Zapisek, Izabela (WESTON SOLUTIONS INC), R01: Quigley, Diane (NOBIS ENGINEERING INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE #40517; SDG NO. MA41C5 | 12/3/2010 | 58 | ADD / Analytical Data Document | 476956 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 ORGANIC DATA VALIDATION REPORT FOR CASE #40556; SDG NO. A4156 | 11/29/2010 | 76 | ADD / Analytical Data Document | 476962 |
| R01: Zapisek, Izabela (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE #40556; SDG NO. MA4156 | 11/24/2010 | 50 | ADD / Analytical Data Document | 476957 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Zapisek, Izabela (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE #40517; SDG NO. MA41B3 | 11/19/2010 | 55 | ADD / Analytical Data Document | 476959 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Zapisek, Izabela (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE #40517; SDG NO. MA4171 | 11/19/2010 | 81 | ADD / Analytical Data Document | 476961 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 11/10/2010 | 5 | PUB / Publication | 600453 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Zapisek, Izabela (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE #40517; SDG NO. MA4130 | 11/1/2010 | 65 | ADD / Analytical Data Document | 476960 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: (TECHLAW INC) | TWO SPECIES, 96 HOUR, ACUTE TOXICITY TESTING RESULTS USING PORE WATER SAMPLES COLLECTED FROM THE ANDROSCOGGIN RIVER IN AREAS ASSOCIATED WITH FORMER CHLOR-ALKALI FACILITY IN BERLIN, NH (INCLUDES TRANSMITTAL LETTER) | 10/15/2010 | 74 | ADD / Analytical Data Document | 536054 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE #40422; SDG NO. MA40H7 | 10/4/2010 | 65 | ADD / Analytical Data Document | 476964 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE #40422; SDG NO. MA40G7 | 10/1/2010 | 65 | ADD / Analytical Data Document | 476963 |
| R01: Fodor, Gretchen, M (WESTON SOLUTIONS INC), R01: Downey, Leslie (LOCKHEED ENVIRONMENTAL), R01: Macri, Louis (LOCKHEED ENVIRONMENTAL) | TIER 3 DATA VALIDATION REPORT FOR CASE #CB005, SDG #C0261 (08/18/2010 TRANSMITTAL MEMO ATTACHED) | 8/18/2010 | 1522 | ADD / Analytical Data Document | 479574 |
| R01: Macri, Louis (TECHLAW INC), R01: Dimattei, Paula L (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. CB004, SDG NO. C0151, PART 1 OF 6 | 8/9/2010 | 566 | ADD / Analytical Data Document | 474381 |
| R01: Macri, Louis (TECHLAW INC), R01: Dimattei, Paula L (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. CB004, SDG NO. C0151, PART 2 OF 6 | 8/9/2010 | 488 | ADD / Analytical Data Document | 474382 |
| R01: Macri, Louis (TECHLAW INC), R01: Dimattei, Paula L (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. CB004, SDG NO. C0151, PART 3 OF 6 | 8/9/2010 | 609 | ADD / Analytical Data Document | 474383 |
| R01: Macri, Louis (TECHLAW INC), R01: Dimattei, Paula L (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. CB004, SDG NO. C0151, PART 4 OF 6 | 8/9/2010 | 477 | ADD / Analytical Data Document | 474384 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Macri, Louis (TECHLAW INC), R01: Dimattei, Paula L (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. CB004, SDG NO. C0151, PART 5 OF 6 | 8/9/2010 | 549 | ADD / Analytical Data Document | 474385 |
| R01: Macri, Louis (TECHLAW INC), R01: Dimattei, Paula L (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. CB004, SDG NO. C0151, PART 6 OF 6 | 8/9/2010 | 583 | ADD / Analytical Data Document | 474386 |
| R01: Dimattei, Paula L (TECHLAW INC), R01: Macri, Louis (LOCKHEED ENVIRONMENTAL) | TIER 3 DATA VALIDATION REPORT FOR CASE #CB005, SDG #C0270 (08/03/2010 TRANSMITTAL MEMO ATTACHED) | 8/2/2010 | 2343 | ADD / Analytical Data Document | 479577 |
| R01: Truini, Deborah (TECHLAW INC), R01: Macri, Louis (LOCKHEED ENVIRONMENTAL), R01: Peary, Robert (LOCKHEED ENVIRONMENTAL) | TIER 3 DATA VALIDATION REPORT FOR CASE #CB005, SDG #C0250 | 7/30/2010 | 2171 | ADD / Analytical Data Document | 481404 |
| R01: Peary, Robert (TECHLAW INC), R01: Macri, Louis (LOCKHEED ENVIRONMENTAL), R01: Chen, Jim (TECHLAW, INC) | TIER 3 DATA VALIDATION FOR CASE #CB005, SDG #C0283 (07/21/2010 TRANSMITTAL MEMO ATTACHED) | 7/21/2010 | 1307 | ADD / Analytical Data Document | 479570 |
| R01: Truini, Deborah (TECHLAW INC), R01: Macri, Louis (LOCKHEED ENVIRONMENTAL) | TIER 3 DATA VALIDATION FOR CASE #CB004, SDG #C0300 (07/20/2010 TRANSMITTAL MEMO ATTACHED) | 7/20/2010 | 803 | ADD / Analytical Data Document | 479569 |
| R01: Macri, Louis (TECHLAW INC), R01: Tobin, Steffanie (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. CB002, SDG NO. C0122, PART 1 OF 8 (07/15/2010 TRANSMITTAL MEMO ATTACHED) | 7/14/2010 | 126 | ADD / Analytical Data Document | 474373 |
| R01: Macri, Louis (TECHLAW INC), R01: Tobin, Steffanie (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. CB002, SDG NO. C0122, PART 2 OF 3 | 7/14/2010 | 134 | ADD / Analytical Data Document | 474374 |
| R01: Macri, Louis (TECHLAW INC), R01: Tobin, Steffanie (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. CB002, SDG NO. C0122, PART 3 OF 8 | 7/14/2010 | 241 | ADD / Analytical Data Document | 474375 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Macri, Louis (TECHLAW INC), R01: Tobin, Steffanie (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. CB002, SDG NO. C0122, PART 4 OF 8 | 7/14/2010 | 508 | ADD / Analytical Data Document | 474376 |
| R01: Macri, Louis (TECHLAW INC), R01: Tobin, Steffanie (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. CB002, SDG NO. C0122, PART 5 OF 8 | 7/14/2010 | 707 | ADD / Analytical Data Document | 474377 |
| R01: Macri, Louis (TECHLAW INC), R01: Tobin, Steffanie (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. CB002, SDG NO. C0122, PART 6 OF 8 | 7/14/2010 | 593 | ADD / Analytical Data Document | 474378 |
| R01: Macri, Louis (TECHLAW INC), R01: Tobin, Steffanie (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. CB002, SDG NO. C0122, PART 7 OF 8 | 7/14/2010 | 493 | ADD / Analytical Data Document | 474379 |
| R01: Macri, Louis (TECHLAW INC), R01: Tobin, Steffanie (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. CB002, SDG NO. C0122, PART 8 OF 8 | 7/14/2010 | 526 | ADD / Analytical Data Document | 474380 |
| R01: Peary, Robert (TECHLAW INC), R01: Dellamia, Scout (TECHLAW INC), R01: Macri, Louis (LOCKHEED ENVIRONMENTAL) | TIER 3 DATA VALIDATION REPORT FOR CASE #DF010, SDG #F0123 (07/08/2010 TRANSMITTAL MEMO ATTACHED) | 7/7/2010 | 2075 | ADD / Analytical Data Document | 479576 |
| R01: Macri, Louis (TECHLAW INC), R01: Chen, Jim (TECHLAW, INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. CB002, SDG NO. C0115, PART 1 OF 8 (07/07/2010 TRANSMITTAL MEMO ATTACHED) | 6/22/2010 | 158 | ADD / Analytical Data Document | 474365 |
| R01: Macri, Louis (TECHLAW INC), R01: Chen, Jim (TECHLAW, INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. CB002, SDG NO. C0115, PART 2 OF 8 | 6/22/2010 | 482 | ADD / Analytical Data Document | 474366 |
| R01: Macri, Louis (TECHLAW INC), R01: Chen, Jim (TECHLAW, INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. CB002, SDG NO. C0115, PART 3 OF 8 | 6/22/2010 | 347 | ADD / Analytical Data Document | 474367 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Macri, Louis (TECHLAW INC), R01: Chen, Jim (TECHLAW, INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. CB002, SDG NO. C0115, PART 4 OF 8 | 6/22/2010 | 286 | ADD / Analytical Data Document | 474368 |
| R01: Macri, Louis (TECHLAW INC), R01: Chen, Jim (TECHLAW, INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. CB002, SDG NO. C0115, PART 5 OF 8 | 6/22/2010 | 312 | ADD / Analytical Data Document | 474369 |
| R01: Macri, Louis (TECHLAW INC), R01: Chen, Jim (TECHLAW, INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. CB002, SDG NO. C0115, PART 6 OF 8 | 6/22/2010 | 346 | ADD / Analytical Data Document | 474370 |
| R01: Macri, Louis (TECHLAW INC), R01: Chen, Jim (TECHLAW, INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. CB002, SDG NO. C0115, PART 7 OF 8 | 6/22/2010 | 331 | ADD / Analytical Data Document | 474371 |
| R01: Macri, Louis (TECHLAW INC), R01: Chen, Jim (TECHLAW, INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. CB002, SDG NO. C0115, PART 8 OF 8 | 6/22/2010 | 334 | ADD / Analytical Data Document | 474372 |
| R01: Fodor, Gretchen, M (WESTON SOLUTIONS INC), R01: Downey, Leslie (LOCKHEED ENVIRONMENTAL), R01: Macri, Louis (LOCKHEED ENVIRONMENTAL) | TIER 3 DATA VALIDATION REPORT FOR CASE #DF011, SDG #F0300 (06/30/2010 TRANSMITTAL MEMO ATTACHED) | 6/16/2010 | 441 | ADD / Analytical Data Document | 479575 |
| R01: Fodor, Gretchen (TECHLAW INC), R01: Macri, Louis (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT FOR CASE #DF012, SDG #F0270 (06/14/2010 TRANSMITTAL MEMO ATTAACHED) | 6/3/2010 | 1152 | CONTR / Contract Documentation | 491257 |
| R01: Macri, Louis (TECHLAW INC), R01: Dellamia, Scout (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. DF012, SDG NO. F0250, PART 1 OF 5 (06/01/2010 TRANSMITTAL MEMO ATTACHED) | 5/25/2010 | 273 | ADD / Analytical Data Document | 474355 |
| R01: Macri, Louis (TECHLAW INC), R01: Dellamia, Scout (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. DF012, SDG NO. F0250, PART 2 OF 5 | 5/25/2010 | 306 | ADD / Analytical Data Document | 474356 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Macri, Louis (TECHLAW INC), R01: Dellamia, Scout (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. DF012, SDG NO. F0250, PART 3 OF 5 | 5/25/2010 | 257 | ADD / Analytical Data Document | 474357 |
| R01: Macri, Louis (TECHLAW INC), R01: Dellamia, Scout (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. DF012, SDG NO. F0250, PART 4 OF 5 | 5/25/2010 | 253 | ADD / Analytical Data Document | 474358 |
| R01: Macri, Louis (TECHLAW INC), R01: Dellamia, Scout (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. DF012, SDG NO. F0250, PART 5 OF 5 | 5/25/2010 | 316 | ADD / Analytical Data Document | 474359 |
| R01: Macri, Louis (TECHLAW INC), R01: Dellamia, Scout (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT FOR CASE #DF012, SDG #F0289 (05/21/2010 TRANSMITTAL MEMO ATTAACHED) | 5/21/2010 | 621 | CONTR / Contract Documentation | 491258 |
| R01: Truini, Deborah (TECHLAW INC), R01: Macri, Louis (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. DF010, SDG NO.F0107, PART 1 OF 5 (05/18/2010 TRANSMITTAL MEMO ATTACHED) | 5/18/2010 | 240 | ADD / Analytical Data Document | 474360 |
| R01: Truini, Deborah (TECHLAW INC), R01: Macri, Louis (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. DF010, SDG NO.F0107, PART 2 OF 5 | 5/18/2010 | 234 | ADD / Analytical Data Document | 474361 |
| R01: Truini, Deborah (TECHLAW INC), R01: Macri, Louis (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. DF010, SDG NO.F0107, PART 3 OF 5 | 5/18/2010 | 286 | ADD / Analytical Data Document | 474362 |
| R01: Truini, Deborah (TECHLAW INC), R01: Macri, Louis (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. DF010, SDG NO.F0107, PART 4 OF 5 | 5/18/2010 | 245 | ADD / Analytical Data Document | 474363 |
| R01: Truini, Deborah (TECHLAW INC), R01: Macri, Louis (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT AND LABORATORY DATA PACKAGE, CASE NO. DF010, SDG NO.F0107, PART 5 OF 5 | 5/18/2010 | 225 | ADD / Analytical Data Document | 474364 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 DATA VALIDATION REPORT, CASE NO. DAS 0038S, SDG NO. 500-21559-1 AND 500-21559-2 | 4/27/2010 | 13 | ADD / Analytical Data Document | 474354 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 DATA VALIDATION REPORT, CASE NO. DAS 0032S, SDG NO. 500-20558-1 AND 500-20558-2 | 4/26/2010 | 13 | ADD / Analytical Data Document | 474352 |
| R01: Switalski, Gloria J (WESTON SOLUTIONS INC), R01: Quigley, Diane (NOBIS ENGINEERING INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 DATA VALIDATION REPORT, CASE NO. DAS 0038S, SDG NO. 500-21708-1 AND 500-21708-2 | 4/26/2010 | 14 | ADD / Analytical Data Document | 474353 |
| R01: Switalski, Gloria J (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 ORGANIC DATA VALIDATION REPORT FOR CASE #0030S, SDG #D02007 | 4/20/2010 | 9 | CONTR / Contract Documentation | 491250 |
| R01: Truini, Deborah (TECHLAW INC), R01: Macri, Louis (TECHLAW INC) | TIER 3 DATA VALIDATION REPORT FOR CASE #DF011, SDG: F02020 (05/07/2010 TRANSMITTAL MEMO ATTACHED) | 4/19/2010 | 86 | ADD / Analytical Data Document | 465620 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 DATA VALIDATION REPORT, CASE NO. DAS 0032S, SDG NO. 500-20588-1 AND 500-20588-2 | 4/19/2010 | 17 | ADD / Analytical Data Document | 474349 |
| R01: Switalski, Gloria J (WESTON SOLUTIONS INC), R01: Quigley, Diane (NOBIS ENGINEERING INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 DATA VALIDATION REPORT, CASE NO. DAS 0038S, SDG NO. 500-21790-1 AND 500-21790-2 | 4/19/2010 | 11 | ADD / Analytical Data Document | 474350 |
| R01: Switalski, Gloria J (WESTON SOLUTIONS INC), R01: Quigley, Diane (NOBIS ENGINEERING INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 DATA VALIDATION REPORT, CASE NO. DAS 0038S, SDG NO. 500-21712-1 AND 500-21712-2 | 4/19/2010 | 16 | ADD / Analytical Data Document | 474351 |
| R01: Switalski, Gloria J (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE #0044S, SDG #D02290 | 4/15/2010 | 9 | CONTR / Contract Documentation | 491253 |
| R01: Dimattei, Paula L (TECHLAW INC), R01: Macri, Louis (LOCKHEED ENVIRONMENTAL) | TIER 3 DATA VALIDATION FOR CASE #CB004, SDG #C0174 (04/15/2010 TRANSMITTAL MEMO ATTACHED) | 4/14/2010 | 2523 | ADD / Analytical Data Document | 479571 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 DATA VALIDATION REPORT, CASE NO. DAS 0038S, SDG NO. 500-21599-1 AND 500-21599-2 | 4/13/2010 | 11 | ADD / Analytical Data Document | 474347 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 DATA VALIDATION REPORT, CASE NO. DAS 0038S, SDG NO. 500-21761-1 AND 500-21761-2 | 4/13/2010 | 10 | ADD / Analytical Data Document | 474348 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Switalski, Gloria J (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 DATA VALIDATION REPORT FOR CASE NO. 38780, SDG NO. A3107 | 4/10/2010 | 54 | ADD / Analytical Data Document | 465661 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 DATA VALIDATION REPORT, CASE NO. DAS 0032S, SDG NO. 500-20308-1 AND 500-20308-2 | 4/9/2010 | 10 | ADD / Analytical Data Document | 474345 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 DATA VALIDATION REPORT, CASE NO. DAS 0032S, SDG NO. 500-20487-1 AND 500-20487-2 | 4/8/2010 | 11 | ADD / Analytical Data Document | 474346 |
| R01: Stodola, Steven (US EPA REGION 1) | DATA VALIDATION REPORT--CASE: CB002, SDG: C0100 | 3/30/2010 | 44 | ADD / Analytical Data Document | 465118 |
| R01: Deruzzo, Gail (NOBIS ENGINEERING INC), R01: Cox, Lori (NOBIS ENGINEERING INC) | TIER 2 DATA VALIDATION REPORT FOR CASE NO. 38780, SDG NO. A3127 | 3/29/2010 | 45 | ADD / Analytical Data Document | 465662 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Switalski, Gloria J (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 ORGANIC DATA VALIDATION REPORT FOR CASE #38780, SDG NO. A3138 | 3/29/2010 | 8 | ADD / Analytical Data Document | 465683 |
| R01: Stodola, Steven (US EPA REGION 1) | DATA VALIDATION REPORT--CASE: DF011, SDG: F0163 | 3/26/2010 | 45 | ADD / Analytical Data Document | 465117 |
| R01: Truini, Deb (COLUMBIA ANALYTICAL SERVICES, INC.), R01: Macri, Louis (COLUMBIA ANALYTICAL SERVICES, INC.) | TIER 3 DATA VALIDATION REPORT, CASE NO. CB002, SDG NO. C0107 (TRANSMITTAL MEMO ATTACHED) PART 1 OF 5 | 3/25/2010 | 491 | ADD / Analytical Data Document | 474340 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|--------|-------|---------------|------------|---------------|-------------|
| R01: Truini, Deb (COLUMBIA ANALYTICAL SERVICES, INC.), R01: Macri, Louis (COLUMBIA ANALYTICAL SERVICES, INC.) | TIER 3 DATA VALIDATION REPORT, CASE NO. CB002, SDG NO. C0107 (TRANSMITTAL MEMO ATTACHED) PART 2 OF 5 | 3/25/2010 | 413 | ADD / Analytical Data Document | 474341 |
| R01: Truini, Deb (COLUMBIA ANALYTICAL SERVICES, INC.), R01: Macri, Louis (COLUMBIA ANALYTICAL SERVICES, INC.) | TIER 3 DATA VALIDATION REPORT, CASE NO. CB002, SDG NO. C0107 (TRANSMITTAL MEMO ATTACHED) PART 3 OF 5 | 3/25/2010 | 461 | ADD / Analytical Data Document | 474342 |
| R01: Truini, Deb (COLUMBIA ANALYTICAL SERVICES, INC.), R01: Macri, Louis (COLUMBIA ANALYTICAL SERVICES, INC.) | TIER 3 DATA VALIDATION REPORT, CASE NO. CB002, SDG NO. C0107 (TRANSMITTAL MEMO ATTACHED) PART 4 OF 5 | 3/25/2010 | 327 | ADD / Analytical Data Document | 474343 |
| R01: Truini, Deb (COLUMBIA ANALYTICAL SERVICES, INC.), R01: Macri, Louis (COLUMBIA ANALYTICAL SERVICES, INC.) | TIER 3 DATA VALIDATION REPORT, CASE NO. CB002, SDG NO. C0107 (TRANSMITTAL MEMO ATTACHED) PART 5 OF 5 | 3/25/2010 | 349 | ADD / Analytical Data Document | 474344 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC DATA VALIDATION REPORT FOR CASE #0031S, SDG #D02007 | 3/25/2010 | 10 | CONTR / Contract Documentation | 491251 |
| R01: Stodola, Steven (US EPA REGION 1) | DATA VALIDATION--CASE: CB004, SDG: C0155 | 3/24/2010 | 35 | ADD / Analytical Data Document | 465121 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC & ORGANIC DATA VALIDATION REPORT FOR CASE 0036S, SDG #D02164 (K0908787) | 3/16/2010 | 89 | ADD / Analytical Data Document | 466281 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC & ORGANIC DATA VALIDATION REPORT FOR CASE 0036S, SDG #D02147 (K0908728) | 3/16/2010 | 53 | ADD / Analytical Data Document | 466282 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Switalski, Gloria J (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC & ORGANIC DATA VALIDATION REPORT FOR CASE 0036S, SDG #D02082 (K0907965) | 3/11/2010 | 54 | ADD / Analytical Data Document | 466284 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|--------|-------|---------------|------------|---------------|-------------|
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Switalski, Gloria J (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC & ORGANIC DATA VALIDATION REPORT FOR CASE 0036S, SDG #D02120 (K0908057) | 3/10/2010 | 27 | ADD / Analytical Data Document | 466283 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 INORGANIC & ORGANIC DATA VALIDATION REPORT FOR CASE 0036S, SDG #K0910174 | 3/10/2010 | 26 | ADD / Analytical Data Document | 466285 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER 2 ORGANIC DATA VALIDATION REPORT FOR CASE DAS 0036S, SDG #K0909100 | 3/8/2010 | 12 | ADD / Analytical Data Document | 466280 |
| R01: Switalski, Gloria J (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II INORGANIC DATA VALIDATION FOR CASE #38780, SDG #MA30Z8, METALS | 3/4/2010 | 9 | LTR / Letter | 463250 |
| R01: Switalski, Gloria J (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II INORGANIC DATA VALIDATION FOR CASE #38780, SDG #MA3129, METALS | 3/3/2010 | 15 | LTR / Letter | 463251 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 3/2/2010 | 5 | PUB / Publication | 600454 |
| R01: Switalski, Gloria J (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II INORGANIC DATA VALIDATION FOR CASE #38780, SDG #MA3107, METALS | 3/1/2010 | 17 | LTR / Letter | 463252 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Switalski, Gloria J (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER III ORGANIC DATA VALIDATION FOR CASE #39067, SDG #A31H3, VOLATILES | 2/22/2010 | 15 | LTR / Letter | 463247 |
| R01: Swift, Paul (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II INORGANIC DATA VALIDATION FOR CASE #39067, SDG #MA31M4, METALS | 2/18/2010 | 9 | LTR / Letter | 463249 |
| R01: Switalski, Gloria J (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II ORGANIC DATA VALIDATION FOR CASE #39067, SDG #A31J2, SEMIVOLATILES | 2/15/2010 | 30 | LTR / Letter | 463245 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Switalski, Gloria J (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II ORGANIC DATA VALIDATION FOR CASE #39067, SDG #A31D0, VOLATILES | 2/15/2010 | 16 | LTR / Letter | 463246 |
| R01: Swift, Paul (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II INORGANIC DATA VALIDATION FOR CASE #39067, SDG #MA31D2, METALS | 2/15/2010 | 9 | LTR / Letter | 463248 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II INORGANIC AND ORGANIC DATA VALIDATION FOR CASE #0036S, SDG #D02124 (K0908609) | 2/15/2010 | 31 | LTR / Letter | 463253 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II INORGANIC DATA VALIDATION FOR CASE #0036S, SDG #D02124 (K0908557) | 2/12/2010 | 8 | LTR / Letter | 463254 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II INORGANIC AND ORGANIC DATA VALIDATION FOR CASE #0036S, SDG #D02145 (K0908678) | 2/12/2010 | 18 | LTR / Letter | 463255 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Zapisek, Izabela (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II INORGANIC DATA VALIDATION FOR CASE #39173, SDG #MA31N8 MA31N9, METALS | 2/8/2010 | 7 | LTR / Letter | 463263 |
| R01: Swift, Paul (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II INORGANIC DATA VALIDATION FOR CASE #38974, SDG #MA3156, METALS | 2/8/2010 | 9 | LTR / Letter | 463264 |
| R01: Zapisek, Izabela (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II INORGANIC DATA VALIDATION FOR CASE #39067, SDG #MA31D0, METALS | 2/8/2010 | 10 | LTR / Letter | 463267 |
| R01: Swift, Paul (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II INORGANIC DATA VALIDATION FOR CASE #39067, SDG #MA31M5, METALS | 2/8/2010 | 8 | LTR / Letter | 463268 |
| R01: Bentley, Robert, E (WESTON SOLUTIONS INC), R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II INORGANIC DATA VALIDATION FOR CASE #39067, SDG #MA31D1, METALS | 2/3/2010 | 9 | LTR / Letter | 463260 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Bentley, Robert, E (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II INORGANIC DATA VALIDATION FOR CASE #39067, SDG #MA31M6, METALS | 2/3/2010 | 30 | LTR / Letter | 463265 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Switalski, Gloria J (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II ORGANIC DATA VALIDATION FOR CASE #39067, SDG #A31D2, SEMIVOLATILES | 2/1/2010 | 29 | LTR / Letter | 463266 |
| R01: Switalski, Gloria J (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II INORGANIC DATA VALIDATION FOR CASE #39067, SDG #MA31G1, METALS | 1/30/2010 | 12 | LTR / Letter | 463261 |
| R01: Switalski, Gloria J (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II INORGANIC DATA VALIDATION FOR CASE #39067, SDG #MA31G2, METALS | 1/30/2010 | 12 | LTR / Letter | 463262 |
| R01: Deruzzo, Gail (NOBIS ENGINEERING INC), R01: Stewart, Joshua (NOBIS ENGINEERING INC) | TIER 1 DATA VALIDATION REPORT FOR CASE #0042S, SDG #D02154 | 1/29/2010 | 19 | CONTR / Contract Documentation | 491252 |
| R01: Deruzzo, Gail (NOBIS ENGINEERING INC), R01: Stewart, Joshua (NOBIS ENGINEERING INC) | TIER 1 DATA VALIDATION REPORT FOR CASE #0042S, SDG #D02310 | 1/29/2010 | 13 | CONTR / Contract Documentation | 491254 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II INORGANIC DATA VALIDATION FOR CASE #39067, SDG #MA31M7, METALS | 1/26/2010 | 8 | LTR / Letter | 463269 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II INORGANIC DATA VALIDATION FOR CASE #39067, SDG #A31M4, VOLATILES | 1/26/2010 | 10 | LTR / Letter | 463270 |
| R01: Biles, Darren (COLUMBIA ANALYTICAL SERVICES, INC.) | AMENDED/ADDITIONAL DATA FOR REGION 1 PCBS/CB002/C0100 | 1/26/2010 | 61 | ADD / Analytical Data Document | 465120 |
| R01: Swift, Paul (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II INORGANIC DATA VALIDATION FOR CASE #38974, SDG #MA3159, METALS | 1/22/2010 | 9 | LTR / Letter | 463275 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|--------|-------|---------------|------------|---------------|-------------|
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II ORGANIC AND INORGANIC DATA VALIDATION FOR CASE #0036S, SDG #D02100 (K0908058) | 1/21/2010 | 45 | LTR / Letter | 463256 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II ORGANIC AND INORGANIC DATA VALIDATION FOR CASE #0036S, SDG #D02066 (K0907964) | 1/21/2010 | 36 | LTR / Letter | 463257 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 1/20/2010 | 5 | PUB / Publication | 600455 |
| R01: Truini, Deborah (TECHLAW INC), R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC), R01: Macri, Louis (LOCKHEED ENVIRONMENTAL) | TIER 3 DATA VALIDATION FOR CASE #40784, SDG #MA41H9 | 1/14/2010 | 47 | ADD / Analytical Data Document | 479568 |
| R01: Quigley, Diane (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II ORGANIC AND INORGANIC DATA VALIDATION FOR CASE #0036S, SDG #D02051 (K0907942) | 1/11/2010 | 50 | LTR / Letter | 463258 |
| R01: Bentley, Robert, E (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II INORGANIC DATA VALIDATION FOR CASE #38974, SDG #MA31A1, METALS | 1/8/2010 | 8 | LTR / Letter | 463271 |
| R01: Bentley, Robert, E (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II INORGANIC DATA VALIDATION FOR CASE #38974, SDG #MA3199, METALS | 1/8/2010 | 8 | LTR / Letter | 463272 |
| R01: Bentley, Robert, E (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II INORGANIC DATA VALIDATION FOR CASE #38974, SDG #MA3178, METALS | 1/8/2010 | 10 | LTR / Letter | 463273 |
| R01: Bentley, Robert, E (WESTON SOLUTIONS INC), R01: Deruzzo, Gail (NOBIS ENGINEERING INC) | TIER II INORGANIC DATA VALIDATION FOR CASE #38974, SDG #MA3182, METALS | 1/8/2010 | 10 | LTR / Letter | 463274 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 12/29/2009 | 5 | PUB / Publication | 600456 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|--------|-------|---------------|------------|---------------|-------------|
| R01: Deruzzo, Gail (NOBIS ENGINEERING INC), R01: Cox, Lori (NOBIS ENGINEERING INC) | TIER II ORGANIC DATA VALIDATION FOR CASE #38780, SDG #A30Z8, VOLATILES | 12/10/2009 | 22 | LTR / Letter | 463276 |
| R01: Stodola, Steven (US EPA REGION 1) | LAB'S RESPONSE FOR G773-13; SDG F0163 | 12/7/2009 | 126 | ADD / Analytical Data Document | 465119 |
| R01: Macri, Louis (TECHLAW INC), R01: Peary, Robert (LOCKHEED MARTIN ENVIRONMENTAL SYSTEMS & TECHNOLOGY CO) | TIER III DATA VALIDATION FOR CASE #DF010, SDG #F0100, WITH US EPA APPROVAL DATED1/7/2010 AND TRANSMITTAL MEMO TO DARRYL LUCE FROM STEVE STODOLA, EPA REGION 1 DATED 1/8/2010 | 11/24/2009 | 169 | LTR / Letter | 463259 |
| R01: (TECHLAW INC) | TWO SPECIES, CHRONIC TOXICITY TESTING RESULTS USING SURFACE WATER SAMPLES COLLECTED FROM THE ANDROSCOGGIN RIVER IN AREAS ASSOCIATED WITH FORMER CHLOR-ALKALI FACILITY IN BERLIN, NH (INCLUDES TRANSMITTAL LETTER) | 11/20/2009 | 47 | ADD / Analytical Data Document | 536056 |
| R01: Baca, Maria E (TECHLAW INC), R01: Macri, Louis (LOCKHEED ENGINEERING AND SCIENCES CO) | TIER 3 DATA VALIDATION REPORT FOR CASE #DF011, SDG#F0174 (01/08/2010 TRANSMITTAL MEMO AND APPROVAL ATTACHED) | 11/16/2009 | 236 | ADD / Analytical Data Document | 463280 |
| R01: (TECHLAW INC) | TWO SPECIES, 96 HOUR, ACUTE TOXICITY TESTING RESULTS USING PORE WATER SAMPLES COLLECTED FROM THE ANDROSCOGGIN RIVER IN AREAS ASSOCIATED WITH FORMER CHLOR-ALKALI FACILITY IN BERLIN, NH (INCLUDES TRANSMITTAL LETTER) | 11/2/2009 | 58 | ADD / Analytical Data Document | 536055 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 10/15/2009 | 5 | PUB / Publication | 600457 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: (UNITED STATES OF AMERICA), R01: (PULP & PAPER OF AMERICA), R01: (PULP OF AMERICA) | ACCESS ORDER - CIVIL ACTION NO. 1:09-CV-00269-JD | 8/11/2009 | 3 | LGL / Legal Instrument | 574596 |
| R01: Pauwels, Stan (TECHLAW INC) | NARRATIVES OF DATA QUALITY OBJECTIVES, DATA QUALITY INDICATORS, FIELD SAMPLING PLANS, AND STANDARD OPERATING PROCEDURES (SOPS) IN SUPPORT OF THE ECOLOGICAL RISK ASSESSMENT (ERA) (INCLUDES TRANSMITTAL LETTER) | 7/17/2009 | 21 | ADD / Analytical Data Document | 536059 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 6/22/2009 | 5 | PUB / Publication | 600458 |
| R01: Pauwels, Stan (TECHLAW INC) | MEETING NOTES FOR THE 06/10/2009 MEETING WITH EPA AND AVATAR ENVIRONMENTAL IN SUPPORT OF THE BASELINE ECOLOGICAL RISK ASSESSMENT (BERA) | 6/18/2009 | 7 | CORR / Correspondence | 536058 |
| R01: Pauwels, Stan (TECHLAW INC) | MEETING NOTES FOR THE 06/02/2009 CONFERENCE CALL WITH EPA AND US GEOLOGICAL SURVEY (USGS) REGARDING FIELD WORK IN SUPPORT OF THE ECOLOGICAL RISK ASSESSMENT (ERA) | 6/4/2009 | 2 | CORR / Correspondence | 536057 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 6/1/2009 | 6 | PUB / Publication | 600459 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 1/8/2009 | 6 | PUB / Publication | 600460 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 1/7/2009 | 6 | PUB / Publication | 600461 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 12/23/2008 | 5 | PUB / Publication | 600462 |
| R01: (E2 INC) | REUSE PLANNING REPORT FOR THE CELL HOUSE PROPERTY | 12/1/2008 | 69 | RPT / Report | 297569 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 3/12/2008 | 5 | PUB / Publication | 600463 |
| | Future Use Goals for Chlor-Alkali and Surrounding Mill Site Based on Reuse Planning Discussion, Community Visioning Session, CLIN: 8.2.1b | 3/5/2008 | 22 | MTG / Meeting Document | 151463 |
| R01: (US EPA REGION 1) | EPIC BOOK: AERIAL PHOTOGRAPHIC AND FRACTURE TRACE ANALYSES | 2/1/2008 | 40 | PHT / Photograph | 284800 |
| R01: Walvoord, Michelle, A (US GEOLOGICAL SURVEY), R01: Andraski, Brian, J (US GEOLOGICAL SURVEY), R01: Krabbenhoft, David, P (US GEOLOGICAL SURVEY), R01: Striegl, Robert, G (US GEOLOGICAL SURVEY) | TRANSPORT OF ELEMENTAL MERCURY IN THE UNSATURATED ZONE FROM A WASTE DISPOSAL SITE IN AN ARID REGION, APPLIED GEOCHEMISTRY | 1/1/2008 | 12 | PUB / Publication | 100011983 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 12/14/2007 | 5 | PUB / Publication | 600464 |
| | Revised Work Plan, Chlor-Alkali Superfund Site, Berlin, NH, CLIN: 0.2.1b | 9/1/2007 | 6 | WP / Work Plan | 151458 |
| | Overview of Community Planning Considerations for Berlin, NH, CLIN: 2.1.2b | 9/1/2007 | 8 | RPT / Report | 151460 |
| | Chlor-Alkali Superfund Site Memo Summary, Photos, CLIN: 2.1.3b | 5/11/2007 | 18 | PHT / Photograph | 151827 |
| R01: (AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY (ATSDR)) | PUBLIC HEALTH ASSESSMENT FOR FORMER CHLOR ALKALI FACILITY BELOW SAW MILL DAM | 2/7/2007 | 45 | RPT / Report | 100011982 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 2/1/2007 | 4 | PUB / Publication | 600465 |
| R01: (AXYS ANALYTICAL SERVICES LTD) | DIOXIN/FURAN ANALYSIS ELECTRONIC DELIVERABLES | 11/1/2006 | 1 | ADD / Analytical Data Document | 560199 |
| R01: (US EPA) | NATIONAL PRIORITIES LIST (NPL) SITE LISTING NARRATIVE | 9/1/2006 | 1 | PUB / Publication | 75001024 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 4/19/2006 | 4 | PUB / Publication | 600466 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 4/19/2006 | 4 | PUB / Publication | 600467 |
| R01: (US EPA REGION 1) | COMMUNITY UPDATE FEBRUARY 2006 | 2/1/2006 | 4 | PUB / Publication | 457356 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 2/1/2006 | 4 | PUB / Publication | 600468 |
| R01: Pfingst, Amanda (WESTERN WASHINGTON UNIVERSITY), R01: Kushima, Goro (WESTERN WASHINGTON UNIVERSITY), R01: Landis, Wayne, G (WESTERN WASHINGTON UNIVERSITY), R01: Chen, Valerie (WESTERN WASHINGTON UNIVERSITY) | ANDROSCOGGIN RIVER WATERSHED ECOLOGICAL RISK ASSESSMENT (ERA), FINAL REPORT | 1/31/2006 | 184 | RPT / Report | 100011981 |
| R01: (US EPA REGION 1) | SITE INVESTIGATION (SI) CLOSURE MEMORANDUM | 1/12/2006 | 4 | MEMO / Memorandum | 633490 |
| R01: (US EPA REGION 1) | NATIONAL PRIORITIES LIST PUBLIC ACCESS DATABASE (NPL PAD) WEB PAGE | 11/23/2005 | 4 | PUB / Publication | 600469 |
| R01: (FEDERAL REGISTER) | FEDERAL REGISTER FINAL RULE ADDING SITE TO NATIONAL PRIORITIES LIST (NPL) - VOL 70, NO 177 | 9/14/2005 | 8 | PUB / Publication | 70005181 |
| | FACT SHEET REGARDING NATIONAL PRIORITIES LIST (NPL) SITE NARRATIVE SUMMARY | 9/1/2005 | 1 | PUB / Publication | 579495 |
| R01: (US EPA REGION 1) | PRESS RELEASE: VERMONT SITE ADDED TO EPA SUPERFUND LIST; NEW HAMPSHIRE SITE PROPOSED FOR INCLUSION | 4/27/2005 | 2 | PUB / Publication | 593299 |
| R01: Varney, Robert W (US EPA REGION 1) | LETTER REGARDING PROPOSAL OF SITE TO NATIONAL PRIORITIES LIST (NPL) | 4/5/2005 | 2 | LTR / Letter | 555164 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Lynch, John H (NH GOVERNOR) | LETTER REGARDING REQUEST TO NOMINATE SITE TO NATIONAL PRIORITIES LIST (NPL) (03/23/2005 FAX TRANSMITTAL) | 3/15/2005 | 2 | LTR / Letter | 555165 |
| R01: (US EPA) | NATIONAL PRIORITIES LIST (NPL) SUMMARY | 2/1/2005 | 1 | PUB / Publication | 555166 |
| R01: (WESTON SOLUTIONS INC) | FINAL COMBINED PRELIMINARY ASSESSMENT/SITE INSPECTION (PA/SI) REPORT | 1/13/2005 | 366 | RPT / Report | 557857 |
| R01: (US EPA REGION 1) | FINAL COMBINED PRELIMINARY ASSESSMENT / SITE INSPECTION (PA/SI) REPORT FOR CHLOR-ALKALI FACILITY (FORMER) BERLIN, NEW HAMPSHIRE | 1/13/2005 | 365 | RPT / Report | 284849 |
| R01: Giunta, Anthony P (NH DEPT OF ENVIRONMENTAL SERVICES (NHDES)) | LETTER CONCERNING THE REGULATORY STATUS OF CONTAMINATED SOIL CUTTINGS, FORMER CELL HOUSE SITE | 12/17/2004 | 5 | LTR / Letter | 288763 |
| R01: (NORMANDEAU ASSOCIATES INC) | WETLAND DELINEATION REPORT | 11/8/2004 | 24 | RPT / Report | 288764 |
| R01: (WESTON SOLUTIONS INC) | TRIP REPORT FOR CHLOR-ALKALI FACILITY | 10/26/2004 | 48 | RPT / Report | 288770 |
| R01: Siegel, Lori S (NH DEPT OF ENVIRONMENTAL SERVICES (NHDES)) | MEMO REGARDING SUMMARY OF MERCURY DATA AT BERLIN SITE COMPARED TO AT OTHER LOCATIONS IN NH | 10/5/2004 | 8 | MEMO / Memorandum | 100011980 |
| R01: Gralenski, Lt Douglas J (NEW HAMPSHIRE FISH & GAME DEPARTMENT) | MEMO CONCERNING FISHING IN THE ADROSCOGGIN RIVER | 9/11/2004 | 2 | MEMO / Memorandum | 288783 |
| R01: Kahn, Peter (US EPA REGION 1) | MEMO CONCERNING MERCURY SAMPLING RESULTS (CHAIN OF CUSTODY FORMS ATTACHED) | 9/2/2004 | 5 | MEMO / Memorandum | 288784 |
| R01: Clark, Stewart F (US GEOLOGICAL SURVEY) | TRANSMITTAL EMAIL FORWARDING SAMPLING RESULTS (NOTES ATTACHED) | 9/2/2004 | 8 | MEMO / Memorandum | 288786 |
| R01: Miskiman, Alison (WESTON SOLUTIONS INC), R01: Kelly, John F (WESTON SOLUTIONS INC) | MEMO CONCERNING PRELIMINARY ASSESSMENT/SITE INSPECTION (PA/SI) | 8/9/2004 | 5 | MEMO / Memorandum | 288787 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Stodola, Steven (US EPA REGION 1) | MEMO CONCERNING DATA VALIDATION REPORT FOR CASE DF002 SDG A1C37 | 7/14/2004 | 1 | MEMO / Memorandum | 288788 |
| R01: Bartels, Janine (LOCKHEED ENVIRONMENTAL), R01: Macri, Louis (LOCKHEED ENVIRONMENTAL) | TIER 3 DATA VALIDATION REPORT FOR CASE #DF002, SDG NO. A1C37 | 7/14/2004 | 15 | ADD / Analytical Data Document | 288789 |
| R01: Gauthier, Carol W (GORHAM (NH) PROPERTY OWNER), R01: Gauthier, Kevin D (GORHAM (NH) PROPERTY OWNER), R01: Gauthier, Peter (GORHAM (NH) PROPERTY OWNER) | SIGNED CONSENT FOR ACCESS TO PROPERTY AT 2 CASCADE FLATS, GORHAM, NH | 7/12/2004 | 1 | FRM / Form | 288790 |
| R01: Cairns, Sara (NEW HAMPSHIRE NATURAL HERITAGE BUREAU) | MEMO WITH ATTACHED REVIEW OF ALL KNOWN RARE SPECIES AND EXEMPLARY NATURAL COMMUNITIES WITHIN A FOUR MILE RADIUS OF THE SITE | 6/3/2004 | 23 | MEMO / Memorandum | 524870 |
| R01: (NH DEPT OF HEALTH & HUMAN SERVICES) | FISH CONSUMPTION ADVISORY FOR FRESHWATER FISH, OCEANFISH AND SHELLFISH | 5/20/2004 | 4 | PUB / Publication | 541285 |
| R01: (NORTHEAST LABORATORY SERVICES) | NARRATIVE - NORTHEAST LABORATORY SERVICES - WESTON SOLUTIONS - SDG WS041504 | 4/29/2004 | 490 | RPT / Report | 557864 |
| | Sample Management Office (SMO) Case Folder, Case # 32635, Folder 3 (III) - Invoice Information, SDG # A1C37 | 4/23/2004 | 6 | ADD / Analytical Data Document | 142061 |
| | Sample Management Office (SMO) Case Folder, Case # 32635, Folder 3 (III) - Invoice Information, SDG # A1C59 | 4/23/2004 | 6 | ADD / Analytical Data Document | 142062 |
| | Sample Management Office (SMO) Case Folder, Case # 32635, Folder 3 (III) - Invoice Information, SDG # A1C53 | 4/20/2004 | 6 | ADD / Analytical Data Document | 142059 |
| | Sample Management Office (SMO) Case Folder, Case # 32635, Folder 3 (III) - Invoice Information, SDG # MA1C63 | 4/16/2004 | 7 | ADD / Analytical Data Document | 142058 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| | Sample Management Office (SMO) Case Folder, Case # 32635, Folder 3 (III) - Invoice Information, SDG # MA1C37 | 4/15/2004 | 6 | ADD / Analytical Data Document | 142057 |
| | Sample Management Office (SMO) Case Folder, Case # 32635, Folder 3 (III) - Invoice Information, SDG # MA1C40 | 4/15/2004 | 7 | ADD / Analytical Data Document | 142060 |
| | Sample Management Office (SMO) Case Folder, Case # 32635, Folder 3 (III) - Invoice Information, SDG # MA1C59 | 4/13/2004 | 6 | ADD / Analytical Data Document | 142056 |
| R01: Cairns, Sara (NEW HAMPSHIRE NATURAL HERITAGE BUREAU) | MEMO CONCERNING RESULTS OF DATABASE SEARCH FOR RARE SPECIES AND EXEMPLARY NATURAL COMMUNITIES NEAR THE SITE (03/10/2004 TRANSMITTAL MEMO ATTACHED) | 3/4/2004 | 5 | MEMO / Memorandum | 524871 |
| | Sample Management Office (SMO) Case Folder, Case # 32635, Folder 5 (Vs) - Sample Data Package, SDG # A1C53, A1C59, A1C37 | 3/1/2004 | 278 | ADD / Analytical Data Document | 142053 |
| | Sample Management Office (SMO) Case Folder, Case # 32635, Folder 2 (II) - CCS/DAT Information, SDG # MA1C59, MA1C40, A1C59, A1C53, A1C37 | 3/1/2004 | 283 | ADD / Analytical Data Document | 142055 |
| | Sample Management Office (SMO) Case Folder, Case # 32635, Folder 1 (I) - Scheduling/Shipping Information | 2/1/2004 | 101 | ADD / Analytical Data Document | 142054 |
| R01: Mcduffee, Mark J (WESTON SOLUTIONS INC) | E-MAIL CONCERNING A POTENTIAL CONFLICT OF INTEREST (COI) NOTIFICATION (E-MAIL HISTORY ATTACHED) | 1/13/2004 | 3 | MEMO / Memorandum | 289921 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: Harte, Philip T (US DOI/US GEOLOGICAL SURVEY), R01: Mack, Thomas J (US DOI/US GEOLOGICAL SURVEY), R01: Degnan, James R (US GEOLOGICAL SURVEY), R01: Clark, Stewart F (US GEOLOGICAL SURVEY), R01: (NH DEPT OF ENVIRONMENTAL SERVICES (NHDES)) | GEOLOGY AND PRELIMINARY HYDROGEOLOGIC CHARACTERIZATION OF THE CELL-HOUSE SITE, BERLIN, NH, 2003-04 | 1/1/2004 | 65 | PUB / Publication | 100011979 |
| R01: (NH FISH AND GAME) | ARTICLE: NEW HAMPSHIRE WEEKLY FISHING REPORT | 8/21/2003 | 18 | PUB / Publication | 541293 |
| R01: (NH FISH AND GAME) | ARTICLE: IS IT SAFE TO EAT THE FISH? REMIINDER ABOUT FISH CONSUMPTION GUIDELINES | 6/18/2003 | 3 | PUB / Publication | 541292 |
| R01: (TIGHE AND BOND) | SITE INVESTIGATION (SI) REPORT - T-1 TRANSFORMER | 3/1/2002 | 271 | RPT / Report | 557858 |
| R01: (HALEY & ALDRICH INC) | REPORT ON AMERICAN SOCIETY FOR TESTING AND MATERIALS (ASTM) PHASE 1 ENVIRONMENTAL SITE ASSESSMENT - PULP AND PAPER OF AMERICA BURGESS MILL | 2/1/2002 | 508 | RPT / Report | 557856 |
| R01: (RESOURCE LABORATORIES LLC) | CHAIN OF CUSTODY DOCUMENTATION -- BERLIN | 12/6/2001 | 1 | SHP / Shipping Manifest | 557861 |
| R01: (FRONTIER GEOSCIENCES) | CHAIN OF CUSTODY RECORD AND LABORATORY ANALYSIS REQUEST -- BERLIN SEDIMENT SAMPLING | 12/6/2001 | 2 | SHP / Shipping Manifest | 557862 |
| R01: Larson, David B (NH DEPT OF ENVIRONMENTAL SERVICES (NHDES)), R01: Harp, Paul R (NH DEPT OF ENVIRONMENTAL SERVICES (NHDES)) | MEMO CONCERNING FISH COLLECTION/MERCURY DETERMINATION FROM THE ANDROSCOGGIN RIVER IN AREA OF FORMER CHLOR ALKALI CELL HOUSE SITES (05/08/2001 ANALYTICAL REPORT AND 10/27/2004 FAX TRANSMITTAL DATED ATTACHED) | 4/12/2001 | 18 | MEMO / Memorandum | 288766 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: (RESOURCE LABORATORIES LLC) | CHAIN OF CUSTODY DOCUMENTATION -- PPA/BERLIN | 1/18/2001 | 1 | SHP / Shipping Manifest | 557860 |
| R01: Danforth, Raymond H (CROWN PAPER CO) | LETTER CONCERNING CELL HOUSE WASTE STATUS (10/28/2004 FAX TRANMITTAL MEMO AND SUPPORTING DOCUMENTS ATTACHED) | 11/24/1999 | 20 | LTR / Letter | 288765 |
| | A GUIDE TO PREPARING SUPERFUND PROPOSED PLANS, RECORDS OF DECISION, AND OTHER REMEDY SELECTION DECISION DOCUMENTS, OSWER DIRECTIVE 9200.1-23P | 7/1/1999 | 182 | LAWS / Laws/Regulations/Guidance | 500009392 |
| | ARTICLE: MILL CLEANS UP OLD CHEMICAL SITE; TRACES OF MERCURY FOUND IN 1950S CONSTRUCTION DEBRIS | 5/29/1999 | 2 | PUB / Publication | 541287 |
| R01: (TIGHE AND BOND CONSULTING) | MERCURY CONTAMINATION IN SOIL SAMPLING | 1/1/1999 | 5 | FIG / Figure/Map/ Drawing | 623186 |
| | TECHNICAL APPROACH FOR SAMPLING FISH FOR MERCURY ANALYSIS | 6/19/1998 | 20 | RPT / Report | 557859 |
| R01: (ENVIRONMENTAL SCIENCE AND TECHNOLOGY) | ARTICLE: ISOMER SPECIFIC ANALYSIS AND TOXIC EVALUATION OF POLYCHLORINATED NAPHTHALENES IN SOIL SEDIMENT AND BIOTA COLLECTED NEAR THE SITE OF A FORMER CHLOR-ALKALI PLANT [FIRST PAGE ONLY] | 1/1/1998 | 1 | PUB / Publication | 289926 |
| | EPA RULES OF THUMB FOR SUPERFUND REMEDY SELECTION | 8/1/1997 | 26 | | 157968 |
| R01: (US DEPT OF AGRICULTURE) | BLACK & WHITE AERIAL PHOTOGRAPH, 1994_134797, FRAME #46, SCALE 1:40,000 | 5/14/1994 | 1 | PHT / Photograph | 283224 |
| R01: (US DEPT OF AGRICULTURE) | BLACK & WHITE AERIAL PHOTOGRAPH, FRAME #46, SCALE 1 INCH = 320 FEET | 5/14/1994 | 1 | PHT / Photograph | 283225 |
| R01: (USGS) | AERIAL SURVEY PHOTOS, 1955 - 1994 | 5/14/1994 | 16 | PHT / Photograph | 474208 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| | Guidance for Conducting Remedial Investigations and Feasibility Studies Under CERCLA, Interim Final, OSWER Directive 9355.3-01 | 10/1/1988 | 186 | LAWS / Laws/Regulations/Guidance | 128301 |
| R01: Eichholz, Geoffrey, G (GEORGIA INSTITUTE OF TECHNOLOGY), R01: Petelka, M, Frank (GEORGIA INSTITUTE OF TECHNOLOGY), R01: Kury, Robert, L (GEORGIA INSTITUTE OF TECHNOLOGY) | MIGRATION OF ELEMENTAL MERCURY THROUGH SOIL FROM SIMULATED BURIAL SITES, WATER RESEARCH JOURNAL | 1/1/1988 | 6 | PUB / Publication | 100011978 |
| R01: (US DEPT OF AGRICULTURE) | AERIAL PHOTOGRAPH, FRAME #126, APPROXIMATE SCALE 1 INCH = 320 FEET | 5/13/1986 | 1 | PHT / Photograph | 283234 |
| R01: (US DEPT OF AGRICULTURE) | BLACK & WHITE AERIAL PHOTOGRAPH, FRAME #107, APPROXIMATE SCALE 1 INCH = 320 FEET | 10/11/1982 | 1 | PHT / Photograph | 283233 |
| R01: (US EPA) | AERIAL PHOTOGRAPH, FRAME #031, APPROXIMATE SCALE 1 INCH = 320 FEET | 8/23/1977 | 1 | PHT / Photograph | 283232 |
| R01: (US EPA) | AERIAL PHOTOGRAPH, 1976_76_216_078, FRAME #78, SCALE UNKNOWN | 8/19/1976 | 1 | PHT / Photograph | 283220 |
| R01: (US EPA) | COLOR AERIAL PHOTOGRAPH, FRAME #078, APPROXIMATE SCALE 1 INCH = 325 FEET | 8/19/1976 | 1 | PHT / Photograph | 283231 |
| R01: (US DEPT OF AGRICULTURE) | BLACK & WHITE AERIAL PHOTOGRAPH, 1970_134789, FRAME #3, SCALE 1:20,000 | 10/21/1970 | 1 | PHT / Photograph | 283218 |
| R01: (US DEPT OF AGRICULTURE) | BLACK & WHITE AERIAL PHOTOGRAPH, FRAME #3, APPROXIMATE SCALE 1 INCH = 320 FEET | 10/21/1970 | 1 | PHT / Photograph | 283230 |
| R01: (US GEOLOGICAL SURVEY) | AERIAL PHOTOGRAPH, FRAME 1585, APPROXIMATE SCALE 1 INCH = 400 FEET | 9/14/1969 | 1 | PHT / Photograph | 283229 |
| R01: (USGS) | AERIAL SURVEY PHOTOS | 9/14/1969 | 3 | PHT / Photograph | 474207 |
| R01: (US GEOLOGICAL SURVEY) | BLACK & WHITE AERIAL PHOTOGRAPH, FRAME 125, APPROXIMATE SCALE 1 INCH = 400 FEET | 5/6/1965 | 1 | PHT / Photograph | 283228 |

Record of Decision
Appendix G: Administrative Record Index and Guidance Documents

| Author | Title | Document Date | Page Count | Resource Type | Document ID |
|---|---|---|---|---|---|
| R01: (AVPT) | BLACK & WHITE AERIAL PHOTOGRAPH, FRAME 7396, APPROX IMATE SCALE 1 INCH = 405 FEET | 11/4/1964 | 1 | PHT / Photograph | 283227 |
| R01: (USGS) | AERIAL SURVEY PHOTOS | 5/6/1964 | 2 | PHT / Photograph | 474206 |
| R01: (US DEPT OF AGRICULTURE) | BLACK & WHITE AERIAL PHOTOGRAPH, FRAME #51, SCALE 1 INCH = 320 FEET | 8/4/1955 | 1 | PHT / Photograph | 283226 |
| R01: Tetreault, Barbara (BERLIN (NH) DAILY SUN) | ARTICLE: STATE AWAITS MERCURY TESTING RESULTS ON ANDROSCOGGIN RIVER SEDIMENT | Undated | 2 | PUB / Publication | 541289 |
| R01: Rule, John (METCALF & EDDY) | HISTORY OF THE BROWN COMPANY: FROM NORTH COUNTRY SAWMILL TO WORLD'S LEADING PAPER PRODUCER | Undated | 27 | RPT / Report | 556500 |
| R01: Macri, Louis (TECHLAW INC), R01: Chen, Jim (TECHLAW, INC) | STAGE 2A MANUAL DATA VALIDATION REPORT FOR CASE #40445, SDG #C0518 (03/07/2011 TRANSMITTAL MEMO ATTACHED) | Undated | 1186 | ADD / Analytical Data Document | 481432 |
| R01: (WESTON SOLUTIONS INC) | FAX TRANSMITTAL OF THREE MAPS (SITE PLAN AND 2 PROPERTY MAPS) | Undated | 3 | FIG / Figure/Map/ Drawing | 289904 |
| R01: (TOPOZONE) | TOPOGRAPHIC MAP OF THE BERLIN, NH QUADRANGLE | Undated | 1 | FIG / Figure/Map/ Drawing | 289910 |
| | MAP OF BERLIN, NH | Undated | 1 | FIG / Figure/Map/ Drawing | 289920 |
| | PHOTOGRAPH: LOOKING SOUTH OVER THE TOP OF THE CAPPED DISPOSAL AREA | Undated | 2 | PHT / Photograph | 452940 |
| | PHOTOGRAPH: FRACTURED BEDROCK THAT UNDERLIES THE DISPOSAL AREA ADJACENT TO THE ANDROSCOGGIN RIVER | Undated | 2 | PHT / Photograph | 452941 |

Consent Decree in U.S., et. al. v. Fort James LLC, et. al.

Appendix B

Statement of Work

**REMEDIAL DESIGN/REMEDIAL ACTION**

**STATEMENT OF WORK**

**OPERABLE UNITS 1, 2, and 3**

**CHLOR-ALKALI FACILITY (FORMER) SUPERFUND SITE**

**Berlin, Coos County, State of New Hampshire**

**EPA Region 1**

**TABLE OF CONTENTS**

1.   INTRODUCTION ........................................................................................................3

2.   COMMUNITY INVOLVEMENT ..............................................................................7

3.   COORDINATION AND SUPERVISION ...................................................................8

4.   REMEDIAL DESIGN ................................................................................................10

5.   REMEDIAL ACTION................................................................................................13

6.   REPORTING ..............................................................................................................19

7.   DELIVERABLES.......................................................................................................20

8.   SCHEDULES .............................................................................................................25

9.   STATE PARTICIPATION.........................................................................................27

10.  REFERENCES ...........................................................................................................28

# 1.      INTRODUCTION

**1.1**   **Purpose of the SOW**. This Statement of Work (SOW) sets forth the procedures and requirements for implementing the Work set forth as the selected remedy in the Record of Decision (ROD) for the Site dated September 23, 2020.

**1.2**   **Structure of the SOW**

- Section 2 (Community Involvement) sets forth EPA's and Settling Defendant' responsibilities for community involvement.

- Section 3 (Coordination and Supervision) contains the provisions for selecting the Supervising Contractor and Project Coordinators regarding the Work.

- Section 4 (Remedial Design) sets forth the process for developing the Remedial Design, which includes the submission of specified primary deliverables.

- Section 5 (Remedial Action) sets forth requirements regarding the completion of the Remedial Action, including primary deliverables related to completion of the Remedial Action.

- Section 6 (Reporting) sets forth Settling Defendant' reporting obligations.

- Section 7 (Deliverables) describes the contents of the supporting deliverables and the general requirements regarding Settling Defendant' submission of, and EPA's review of, approval of, comment on, and/or modification of, the deliverables.

- Section 8 (Schedules) sets forth the schedule for submitting the primary deliverables, specifies the supporting deliverables that must accompany each primary deliverable, and sets forth the schedule of milestones regarding the completion of the Remedial Action.

- Section 9 (State Participation) addresses State participation.

- Section 10 (References) provides a list of references, including URLs.

**1.3**   The Scope of the Remedy, the "Work" to be performed under this SOW, includes the actions described in Part 1, Section D and Part 2, Section L of the ROD.  Within the ROD, EPA defined three Operable Units (OUs) and the general actions to respond to contamination in those areas.  Those OUs and actions include:

(a)   **OU-1: Cell House Parcel Landfill (CHP Landfill).** The existing CHP Landfill contains debris from the former chemical plant.  It is capped and contained by a retaining wall and slurry wall.  The major components of the remedy for this OU are to monitor and maintain the CHP Landfill containment system.  The containment system consists of the landfill cover system, the slurry wall that prevents groundwater from entering the landfill, and the retaining wall that prevents groundwater from leaving the landfill.  This remedy includes:

(1)   Monitoring and maintenance of the existing CHP Landfill containment system (the CHP Landfill cap, monitoring wells, the retaining wall, and the slurry wall) that includes:

(i)   Annual inspections and maintenance of the CHP landfill engineered cover system. Maintenance will consist of removing

woody vegetation on the cap, inspections, and repairs to the infrastructure, as needed.

(ii)   Periodic groundwater and surface water monitoring to assess the effectiveness of the CHP Landfill containment system.

(iii)   On-going monitoring of the foundation/retaining wall to determine if stability of the foundation/retaining wall may be compromised.

(iv)   Pre-Design activities, described in Section 3, to determine the types and frequency of monitoring of the foundation/retaining wall (henceforth, the "retaining wall"), slurry wall, and groundwater monitoring wells, and monitoring points in, and on the banks of, the Androscoggin River adjacent to the CHP Landfill. Types and frequency of monitoring of the retaining wall will consider different conditions to include the 500-year flood and potential seismic loading scenarios.

(2)   Institutional Controls (ICs): To prevent exposure to contaminated groundwater and groundwater vapor, and to protect the components of the remedy, ICs (which are legally-enforceable restrictions), will be placed on the property. These ICs shall be established pursuant to CERCLA and applicable state requirements, and will prohibit the construction of buildings on the CHP Landfill, disturbance of the existing landfill cap and other remedial infrastructure (including monitoring wells, the retaining wall and slurry wall), use of the property for residential and other unrestricted uses, and will prohibit the use of groundwater for anything other than monitoring.

(3)   Engineering Controls (ECs): Construct additional ECs to augment existing access restrictions (*i.e.,* fencing and signage) to deter trespassing. Monitoring and maintaining the fence and the containment system.

(4)   If contaminated soil from the contaminated soil remedy component (OU-2 and the uncapped portion of the CHP Landfill) is disposed of on-site, the cap will need to be opened, the new material regraded into the landfill, the cap reconfigured over the added material, and the opening in the cap resealed.

(b)   **Contaminated Soil in the Southern Facility Study Area (SFSA), Eastern Facility Study Area (EFSA) and the Uncapped Areas of the CHP Property**. The SFSA and EFSA contain isolated areas of contaminated soil that will be excavated and disposed at a permitted off-site facility or, if necessary, beneath the CHP Landfill cover system. The selected remedy for contaminated soils in the SFSA, EFSA and the 0.6-acre area southwest of the CHP Landfill that is uncapped, consists of the following:

4

(1)     Additional testing as part of a pre-design study to refine the extent of contamination in those areas identified by the Human Health Risk Assessment in the EFSA, SFSA and the uncapped portion of the CHP Landfill.

(2)     Excavation of soils that exceed cleanup levels to address unacceptable risks from commercial/industrial exposure.

(3)     Disposal of excavated soils, at a permitted off-site facility or the contaminated soils will be placed inside the CHP Landfill containment system, if that option is more practicable.

(4)     The excavated areas will be backfilled with clean soils and restored with native vegetation to resemble the surrounding habitat.

(5)     Establish ICs, pursuant to CERCLA and applicable state requirements, that will prohibit residential and other unrestricted uses.

(c)     **OU-3, Contaminated Groundwater Remedy and the Androscoggin River.** OU-3 consists of three areas of remediation: contaminated groundwater beneath the existing CHP Landfill, contaminated groundwater outside the footprint of the CHP Landfill, and the monitoring and recovery of elemental mercury and mercury amalgams found in reach AR-3 of the Androscoggin River.  Reach AR-3 is that portion of the River between Sawmill Dam and Riverside Dam. Details of the remedy for each of these areas follow.

(d)     **Contaminated Groundwater beneath the CHP Landfill.** Although this groundwater is contaminated, it is within the limits of the CHP Landfill and under federal guidance standards, contaminated groundwater beneath a waste management (i.e., landfill) unit does not require active cleanup if migration of the contaminated groundwater is controlled. EPA has determined that presently migration is prevented by the landfill containment system. The components of this remedy are:

(1)     Groundwater will be monitored to ensure that contaminated groundwater remains within a "compliance boundary," which would be established around the footprint of the CHP Landfill. Monitoring would confirm that contaminated groundwater is neither migrating into the River nor contaminating adjacent aquifers. A pre-design investigation will determine the monitoring analytes, locations, methods, and sampling frequencies.

(2)     The River will also be monitored to ensure no groundwater contamination is migrating into the River.

(3)     If groundwater or surface water monitoring finds that contaminant migration may be occurring, additional monitoring may be required to determine the source and a risk assessment conducted to determine if an unacceptable risk is present.

(4)     If the river or groundwater outside the compliance boundary becomes impacted from the CHP Landfill and the remedy is deemed to no longer be protective of human health or the environment, EPA will make a determination regarding a modification of the groundwater and CHP Landfill components of the remedy, as applicable, to address the remedy protectiveness.

(5)     ICs will consist of legally enforceable restrictions to protect the containment system and other remedial infrastructures, prohibit the use of groundwater for drinking water, prohibit the building of structures on the landfill and prohibit any residential or other unrestricted uses.

(e)     ***In-situ* treatment of Contaminated Groundwater outside the CHP Landfill**: Contaminated groundwater in this area will be treated *in situ* to destroy or immobilize the contaminants and restore the groundwater to its beneficial use as a potential source of drinking water. The components of this remedy are:

(1)     A treatability study as described in Section 3.4 will determine the type of oxidation compound and its application. *In Situ* Chemical Oxidation (ISCO) will be designed and implemented to destroy VOC groundwater contaminants and immobilize metals, in-place.

(2)     A pre-design study will determine the methods of introducing the ISCO treatment to the groundwater.

(3)     Conducting the ISCO treatment with treatments that destroy or immobilize groundwater contaminants.

(4)     Monitoring will follow the treatment to assess the effectiveness of the treatment and to determine if additional treatments are required or if natural attenuation processes may address any remnant contamination above groundwater cleanup levels left after the implementation of the ISCO remedy.

(5)     ICs that will consist of legally enforceable restrictions to prohibit the use of groundwater as drinking water or any uses that may influence groundwater migration. ICs will also prohibit the building of structures without mitigation to prevent potential intrusion by groundwater vapors.

(f)     **Liquid elemental mercury, mercury amalgams, and mercury-contaminated debris in the Androscoggin River**: Liquid, elemental mercury and solid mercury amalgams periodically appear in the riverbed, in river debris, and on the banks. The remedy will include periodic inspections and removals of mercury, mercury amalgams, and mercury-contaminated debris that appears. The selected remedy for this OU involves continued, periodic inspections for, and removal of, liquid elemental mercury, hardened metal amalgams and mercury-containing debris from Reach AR-3 in the River adjacent to the CHP. Inspections of the riverbed shall be conducted on a regular basis as described below. Removals shall continue

for as long as mercury can be visually located in the River, or on its banks, and contamination remains in the CHP Landfill that may migrate outside of the compliance boundary. The inspections shall record, describe, and evaluate the locations, amounts and forms of mercury present.

(g)     Inspections and recoveries will occur when River conditions are safe for access during the period from May to September. The area to inspect is approximately 150-feet downstream of Sawmill Dam sluice gates and extends for approximately 370-feet. For the first five years of remedy implementation at least three inspections and one removal will be performed annually, as safety permits. The experience of past collection activities and an analysis of inspections and removals up to the first Five-Year Review will be used to adjust and target future collection actions. Coordination with the operators of Sawmill Dam will be necessary to ensure notification if there is a need for a release of water from the dam sluice gates.

1.4     The terms used in this SOW that are defined in CERCLA, in regulations promulgated under CERCLA, or in the Consent Decree (Decree), have the meanings assigned to them in CERCLA, in such regulations, or in the Decree, except that the term "Paragraph" or "¶" means a paragraph of the SOW, and the term "Section" means a section of the SOW, unless otherwise stated.

## 2.     COMMUNITY INVOLVEMENT

2.1     As requested by EPA, Settling Defendant shall conduct community involvement activities under EPA's oversight as provided for in, and in accordance with this Section. Such activities must include designation of a Community Involvement Coordinator (CI Coordinator).

2.2     **Community Involvement Responsibilities**

(a)     EPA has the lead responsibility for developing and implementing community involvement activities at the Site. In accordance with 40 C.F.R. § 300.435(c), EPA shall review the existing Community Involvement Plan (CIP) and determine whether it should be updated and revised to describe further public involvement activities during the Work that are not already addressed or provided for in the existing CIP.

(b)     **Settling Defendants' CI Coordinator**. As requested by EPA, Settling Defendants shall, within 30 days, designate and notify EPA of Settling Defendants' CI Coordinator (Settling Defendants' CI Coordinator). Settling Defendants may hire a contractor for this purpose. Settling Defendants' notice must include the name, title, and qualifications of the Settling Defendants' CI Coordinator. Settling Defendants' CI Coordinator shall coordinate his/her activities with EPA's CI Coordinator, provide support regarding EPA's community involvement activities, and, as requested by EPA's CI Coordinator, provide draft responses to the public's inquiries including requests for information

or data about the Site. The Settling Defendants' CI Coordinator has the responsibility to ensure that when they communicate with the public, the Settling Defendants protect any "Personally Identifiable Information" ("PII") (e.g., sample results from residential properties) in accordance with "EPA Policy 2151.0: Privacy Policy."

(c)     As requested by EPA, Settling Defendant shall participate in community involvement activities, including participation in public meetings that may be held or sponsored by EPA to explain activities at or relating to the Site. Settling Defendant' support of EPA's community involvement activities may include providing online access to initial submissions and updates of deliverables to: (1) any Community Advisory Groups, (2) any Technical Assistance Grant (TAG) recipients and their advisors, and (3) other entities to provide them with a reasonable opportunity for review and comment. EPA may describe in its CIP Settling Defendant' responsibilities for community involvement activities. All community involvement activities conducted by Settling Defendant at EPA's request are subject to EPA's oversight. Upon EPA's request, Settling Defendant shall establish, as early as is feasible, a community information repository at or near the Site, as provided in the CIP, to house one copy of the administrative record.

(d)     **Information for the Community**. As requested by EPA, Settling Defendants shall develop and provide to EPA information about the design and implementation of the remedy including: (1) any validated data from monitoring of impacts to communities as provided in the Community Impacts Mitigation Plan under 8.7(f); (2) results from unvalidated sampling as provided under 8.7(e)(7); (3) a copy of the Community Impacts Mitigation Plan required under 8.7(f); (4) schedules prepared under Section 9; (5) dates that Settling Defendants completed each task listed in the schedules; and (6) digital photographs of the Work being performed, together with descriptions of the Work depicted in each photograph, the purpose of the Work, the equipment being used, and the location of the Work. The EPA Project Coordinator may use this information for communication to the public via EPA's website, social media, or local and mass media. The information provided to EPA should be suitable for sharing with the public and the education levels of the community. Translations should be in the dominant language(s) of community members with limited English proficiency.

## 3.      COORDINATION AND SUPERVISION

### 3.1   Project Coordinators

(a)     Settling Defendant' Project Coordinator must have sufficient technical expertise to coordinate the Work. Settling Defendant' Project Coordinator may not be an attorney representing Settling Defendant in this matter and may not act as the Supervising Contractor. Settling Defendant' Project Coordinator may assign other representatives, including other contractors, to assist in coordinating the Work.

(b)     EPA shall designate and notify the Settling Defendant of EPA's Project Coordinator and Alternate Project Coordinator. EPA may designate other representatives, which may include its employees, contractors and consultants, to oversee the Work. EPA's Project Coordinator/Alternate Project Coordinator will have the same authority as a remedial project manager or as an on-scene coordinator, or both, as described in the National Oil and Hazardous Substances Pollution Contingency Plan (NCP). This includes the authority to halt the Work and to conduct or direct any necessary response action when it is determined that conditions at the Site constitute an emergency or may present an immediate threat to public health or welfare or the environment due to a release or threatened release of Waste Material.

(c)     Settling Defendants' Project Coordinators shall communicate with EPA's Project Coordinator at least monthly.

**3.2**   **Supervising Contractor**. Settling Defendant' proposed Supervising Contractor must have sufficient technical expertise to supervise the Work and a quality assurance system that complies with the most recent version of *Quality Systems for Environmental Data and Technology Programs: Requirements with Guidance for Use* (American National Standard), ANSI/ASQC E4 (Feb. 2014).

**3.3**   **Procedures for Disapproval/Notice to Proceed**

(a)     Settling Defendant shall designate, and notify EPA, within ten days after the Effective Date, of the name(s), title(s), contact information, and qualifications of the Settling Defendant' proposed Project Coordinator and Supervising Contractor, whose qualifications shall be subject to EPA's review for verification based on objective assessment criteria (*e.g.*, experience, capacity, technical expertise) and do not have a conflict of interest with respect to the project.

(b)     EPA shall issue notices of disapproval or authorizations to proceed regarding any proposed Project Coordinator and Supervising Contractor, as applicable. If EPA issues a notice of disapproval, Settling Defendant shall, within 30 days, submit to EPA a list of supplemental proposed Project Coordinators or Supervising Contractors, or both, as applicable, including a description of the qualifications of each. Settling Defendant may select any coordinator/contractor covered by an authorization to proceed and shall, within 21 days, notify EPA of Settling Defendant' selection.

(c)     EPA may disapprove the proposed Project Coordinator, the Supervising Contractor, or both based on objective assessment criteria (*e.g.*, experience, capacity, technical expertise), if they have a conflict of interest regarding the project, or any combination of these factors.

(d)     Settling Defendant may change their Project Coordinator or Supervising Contractor, or both, by following the procedures of ¶¶ 3.3(a) and 3.3(b).

(e)     Notwithstanding the procedures of ¶¶ 3.3(a) through 3.3(d), Settling Defendant have proposed, and EPA has authorized Settling Defendant to proceed, regarding the following Project Coordinator and Supervising Contractor: David Smith, Georgia-Pacific, david.smith8@gapac.com and Kennedy Jenks/Neal Melchionni, NealMelchionni@kennedyjenks.com.

## 4.     REMEDIAL DESIGN

**4.1    Institutional Controls Implementation and Assurance Plan (ICIAP)**.  Settling Defendant shall submit a proposed ICIAP for EPA approval. The ICIAP should describe plans to implement, maintain, monitor, and enforce the Institutional Controls (ICs) at the Site. The ICIAP shall include plans to commence implementing ICs as early as is feasible, including before EPA approval of the 100% design under ¶ 4.9. The ICIAP also should include procedures for effective and comprehensive review of implemented ICs, procedures for the solicitation of input from affected communities regarding the implementation of ICs, procedures to periodically review and determine if the ICs are having their intended effect, and if not, procedures for the development, approval and implementation of alternative, more effective ICs. Settling Defendant shall develop the ICIAP in accordance with *Institutional Controls: A Guide to Planning, Implementing, Maintaining, and Enforcing Institutional Controls at Contaminated Sites*, OSWER 9355.0-89, EPA/540/R-09/001 (Dec. 2012), and *Institutional Controls: A Guide to Preparing Institutional Controls Implementation and Assurance Plans at Contaminated Sites*, OSWER 9200.0-77, EPA/540/R-09/02 (Dec. 2012). Settling Defendants also shall consider including in the ICIAP the establishment of effective Long-Term Stewardship procedures including those described in EPA Memorandum: Advanced Monitoring Technologies and Approaches to Support Long-Term Stewardship (July 20, 2018). The ICIAP must include the following additional requirements:

(a)     Locations of recorded real property interests (*e.g*., easements, liens) and resource interests in the property that may affect ICs (*e.g*., surface, mineral, and water rights) including accurate mapping and geographic information system (GIS) coordinates of such interests; and

(b)     Legal descriptions and survey maps that are prepared according to current American Land Title Association ("ALTA") Survey guidelines and certified by a licensed surveyor.

**4.2    Remedial Design Work Plan (RDWP)**. Settling Defendant shall submit a RDWP for EPA approval. The RDWP must include:

(a)     Plans for implementing all RD activities identified in this SOW, in the RDWP, or required by EPA to be conducted to develop the RD;

(b)     A description of the overall management strategy for performing the RD, including a proposal for phasing of design and construction, if applicable;

(c)     A description of the proposed general approach to contracting, construction, operation, maintenance, and monitoring of the Remedial Action (RA) as necessary to implement the Work;

(d)     A description of the responsibility and authority of all organizations and key personnel involved with the development of the RD;

(e)     Descriptions of any areas requiring clarification and anticipated problems (e.g., data needs);

(f)     A description of the treatability study discussed in Section 4.5 designed to determine the appropriate treatment reagents as well as devices and methods to apply them, and actions to be taken to address groundwater contamination in OU-3 outside the bounds of the CHP Landfill;

(g)     Descriptions of any applicable permitting requirements or equivalencies and other regulatory requirements;

(h)     Description of plans for obtaining access in connection with the Work, such as property acquisition, property leases, and/or easements; and

(i)     The following supporting deliverables described in ¶ 7.7 (Supporting Deliverables): Health and Safety Plan; and Emergency Response Plan.

**4.3**     Settling Defendant shall communicate regularly with EPA to discuss design issues as necessary, as directed or determined by EPA.

**4.4**     **Pre-Design Investigation (PDI)**. The purpose of the PDI is to address data needs by conducting additional field investigations.

(a)     **PDI Work Plan**. Settling Defendant shall submit a PDI Work Plan (PDIWP) to determine the proper monitoring for the retaining wall, the limits of soil contamination in OU-2, and the proper method of employing ISCO to address groundwater contamination for EPA approval. The PDIWP must include:

(1)     Purpose and objectives of the PDI;

(2)     An evaluation and summary of existing data and description of data needs;

(3)     A sampling plan that includes investigative methods, media to be sampled, contaminants or parameters for which sampling will be conducted, location (areal extent and depths) and number of samples, field measurements and observations;

(4)     Cross references to quality assurance/quality control (QA/QC) requirements set forth in the QAPP as described in ¶ 7.7(d); and

(5)     The following supporting deliverables described in ¶ 7.7 (Supporting Deliverables): Field Sampling Plan and QAPP for the pre-design investigation.

**4.5     Treatability Study (TS).**

(a)     Settling Defendant shall perform a TS for the purpose of determining the proper amendments and actions required to destroy or immobilize groundwater contaminants in groundwater outside of the CHP Landfill footprint.

(b)     Settling Defendant shall submit a TS Work Plan (TSWP) for EPA approval. Settling Defendant shall prepare the TSWP in accordance with EPA's *Guide for Conducting Treatability Studies under CERCLA, Final* (Oct. 1992), as supplemented for Remedial Design by the *Remedial Design/Remedial Action Handbook*, EPA 540/R-95/059 (June 1995).

(c)     The TSWP shall include the following supporting deliverables described in ¶ 7.7 (Supporting Deliverables): Field Sampling Plan and QAPP for the treatability study.

(d)     Following completion of the TS, Settling Defendant shall submit a TS Evaluation Report for EPA comment.

(e)     EPA may require Settling Defendant to supplement the TS Evaluation Report and/or to perform additional treatability studies.

**4.6     Preliminary (30%) Remedial Design**. Settling Defendant shall submit a Preliminary (30%) Remedial Design for EPA's comment that describes the site-specific implementation to perform all elements of the remedy and required by this SOW. The Preliminary Remedial Design must include:

(a)     A design criteria report, as described in the *Remedial Design/Remedial Action Handbook*, EPA 540/R-95/059 (June 1995);

(b)     Preliminary drawings and specifications;

(c)     Descriptions of permit requirements, if applicable;

(d)     Preliminary Operation and Maintenance (O&M) Plan and O&M Manual;

(e)     A description of how the Remedial Action will be implemented in a manner that minimizes environmental impacts in accordance with EPA's *Principles for Greener Cleanups* (Aug. 2009);

(f)     A description of monitoring and control measures to protect human health and the environment, such as air monitoring, and measures to reduce and manage traffic, noise, odors, and dust, during the Remedial Action in accordance with the

Community Involvement Handbook pp. 53-66 (text box on p. 55) to minimize community impacts;

(g) Any proposed revisions to the Remedial Action Schedule that is set forth in Section 8.3 (Remedial Action Schedule); and

(h) Updates of all supporting deliverables required to accompany the RDWP described in ¶ 4.2, the PDIWP described in ¶ 4.4(a), and the TSWP described in ¶ 4.5(b).

4.7    **Pre-Final (95%) Remedial Design**. Settling Defendant shall submit the Pre-final (95%) Remedial Design for EPA's comment. The Pre-final Remedial Design must be a continuation and expansion of the previous design submittal and must address EPA's comments regarding the Preliminary (30%) Remedial Design. The Pre-final Remedial Design will serve as the approved Final (100%) Remedial Design if EPA approves the Pre-final Remedial Design without comments. The Pre-final Remedial Design must include:

(a) A complete set of construction drawings and specifications that are: (1) certified by a registered professional engineer; (2) suitable for procurement; and (3) follow professional standards in the current edition of the Construction Specifications Institute's Master Format, 2020;

(b) A survey and engineering drawings showing existing Site features, such as elements, property borders, easements, and Site conditions;

(c) Pre-Final versions of the same elements and deliverables as are required for the Preliminary Remedial Design;

(d) A specification for photographic documentation of the Remedial Action; and

(e) Updates of all supporting deliverables required to accompany the Preliminary (30%) Remedial Design.

4.8    **Final (100%) Remedial Design**. Settling Defendant shall submit the Final (100%) Remedial Design for EPA approval. The Final Remedial Design must address EPA's comments on the Pre-final Remedial Design and must include final versions of all Pre-final Remedial Design deliverables.

## 5.    REMEDIAL ACTION

5.1    **Remedial Action Work Plan (RAWP)**. Settling Defendant shall submit a RAWP for EPA approval that includes:

(a) A proposed Remedial Action Construction Schedule;

(b) An updated health and safety plan that covers activities during the Remedial Action; and

(c)     Plans for satisfying permitting requirements, including obtaining permits for off-site activity and for satisfying substantive requirements of permits for on-site activity.

**5.2     Meetings and Inspections**

(a)     **Preconstruction Conference**. Settling Defendant shall hold a preconstruction conference with EPA and others as directed or approved by EPA and as described in the *Remedial Design/Remedial Action Handbook*, EPA 540/R-95/059 (June 1995). Settling Defendant shall prepare minutes of the conference and shall distribute the minutes to all Parties.

(b)     **Periodic Communications**. During the construction portion of the Remedial Action (Remedial Action Construction), Settling Defendant shall meet or confer monthly with EPA, and others as directed or determined by EPA, to discuss construction issues. Settling Defendant shall distribute an agenda and list of attendees to all Parties prior to each meeting or telephone call. Settling Defendant shall prepare minutes of the meetings or calls and shall distribute the minutes to all Parties.

(c)     **Inspections**

(1)     EPA or its representative shall conduct periodic inspections of the Work. At EPA's request, the Supervising Contractor or other designee shall accompany EPA or its representative during inspections.

(2)     Upon notification by EPA of any deficiencies in the Remedial Action Construction, Settling Defendant shall take all necessary steps to correct the deficiencies and/or bring the Remedial Action Construction into compliance with the approved Final Remedial Design, any approved design changes, and/or the approved RAWP. If applicable, Settling Defendant shall comply with any schedule provided by EPA in its notice of deficiency.

**5.3     Permits**

(a)     As provided in CERCLA § 121(e), and Section 300.400(e) of the NCP, no permit is required for any portion of the Work conducted entirely on-site *(i.e.,* within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any portion of the Work that is not on-site requires a federal or state permit or approval, Settling Defendant shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

(b)     Settling Defendant may seek relief under the provisions of Section X (Force Majeure) of the Decree for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit or approval referenced in ¶ 5.3(a) and required for the Work, provided that submitted timely and

14

complete applications and taken all other actions necessary to obtain all such permits or approvals.

(c)     Nothing in the Decree or this SOW constitutes a permit issued under any federal or state statute or regulation.

## 5.4     Emergency Response and Reporting

(a)     **Emergency Action**. If any event occurs during performance of the Work that causes or threatens to cause a release of Waste Material on, at, or from the Site and that either constitutes an emergency situation or that may present an immediate threat to public health or welfare or the environment, Settling Defendant shall: (1) immediately take all appropriate action to prevent, abate, or minimize such release or threat of release; (2) immediately notify the authorized EPA officer (as specified in ¶ 5.4(c)) orally; and (3) take such actions in consultation with the authorized EPA officer and in accordance with all applicable provisions of the Health and Safety Plan, the Emergency Response Plan, and any other deliverable approved by EPA under the SOW.

(b)     **Release Reporting**. Upon the occurrence of any event during performance of the Work that Settling Defendant required to report under CERCLA § 103 or Section 304 of the Emergency Planning and Community Right-to-know Act (EPCRA), Settling Defendant shall immediately notify the authorized EPA officer orally.

(c)     The "authorized EPA officer" for purposes of immediate oral notifications and consultations under ¶ 5.4(a) and ¶ 5.4(b) is the EPA Project Coordinator, the EPA Alternate Project Coordinator if the EPA Project Coordinator is unavailable, or the EPA Region 1 Emergency Response Center.

(d)     For any event covered by ¶ 5.4(a) and ¶ 5.4(b), Settling Defendant shall: (1) within 14 days after the onset of such event, submit a report to EPA describing the actions or events that occurred and the measures taken, and to be taken, in response thereto; and (2) within 30 days after the conclusion of such event, submit a report to EPA describing all actions taken in response to such event.

(e)     The reporting requirements under ¶ 5.4 are in addition to the reporting required by CERCLA § 103 or EPCRA § 304.

## 5.5     Off-Site Shipments

(a)     Settling Defendant may ship hazardous substances, pollutants, and contaminants from the Site to an off-Site facility only if they comply with CERCLA § 121(d)(3), and 40 C.F.R. § 300.440. Settling Defendant will be deemed to be in compliance with CERCLA § 121(d)(3) and 40 C.F.R. § 300.440 regarding a shipment if Settling Defendant obtain a prior determination from EPA that the proposed receiving facility for such shipment is acceptable under the criteria of 40 C.F.R. § 300.440(b).

(b)     Settling Defendants shall notify the City Manager, Planner, Department of Public Works superintendent, and Fire Chief of the City of Berlin prior to the off-site shipment of any waste materials.  The approximate date, time and expected traffic shall be included in the notice.  As a courtesy Settling Defendants shall notify the City Manager and Planner of any unusual traffic or activities associated with Work at the Site.

(c)     Settling Defendant may ship Waste Material from the Site to an out-of-state waste management facility only if, prior to any shipment, provide notice to the appropriate state environmental official in the receiving facility's state and to the EPA Project Coordinator. This notice requirement will not apply to any off-Site shipments when the total quantity of all such shipments does not exceed 10 cubic yards. The notice must include the following information, if available: (1) the name and location of the receiving facility; (2) the type and quantity of Waste Material to be shipped; (3) the schedule for the shipment; and (4) the method of transportation. Settling Defendant also shall notify the state environmental official referenced above and the EPA Project Coordinator of any major changes in the shipment plan, such as a decision to ship the Waste Material to a different out-of-state facility. Settling Defendant shall provide the notice after the award of the contract for Remedial Action construction and before the Waste Material is shipped.

(d)     Settling Defendant may ship Investigation Derived Waste (IDW) from the Site to an off-Site facility only if they comply with CERCLA § 121(d)(3), 40 C.F.R. § 300.440, *EPA's Guide to Management of Investigation Derived Waste*, OSWER 9345.3-03FS (Jan. 1992), and any IDW-specific requirements contained in the ROD. Wastes shipped off-Site to a laboratory for characterization, and RCRA hazardous wastes that meet the requirements for an exemption from RCRA under 40 CFR § 261.4(e) shipped off-site for treatability studies, are not subject to 40 C.F.R. § 300.440.

## 5.6     Remedial Action Construction Completion

(a)     For purposes of this ¶ 5.6, "Remedial Action Construction" comprises, for any Remedial Action that involves the construction and operation of a system to achieve Performance Standards, the construction of such system and the performance of all activities necessary for the system to function properly and as designed. For the Site, Remedial Action Construction includes the OU-1, CHP Landfill maintenance and monitoring remedy, the OU-2 contaminated soil excavation and disposal, and OU-3, the groundwater remedies for inside and outside of the CHP Landfill as well as the AR-3 mercury recovery remedy.

(b)     **Inspection of Constructed Remedy**. Settling Defendant shall schedule an inspection to review the construction and operation of the system and to review whether the system is functioning properly and as designed. The inspection must be attended by Settling Defendant and EPA or their representatives. A reinspection must be conducted if requested by EPA.

16

(c)   **Remedial Action Report**. Once the Settling Defendants believe that they have completed construction of all components of the remedy, they shall send a technical memorandum citing the evidence that all tasks are complete and that the Site may enter the long-term response phase. If EPA approves that memorandum the Settling Defendants shall undertake to complete the tasks and supply information required to prepare a "Remedial Action Report." Settling Defendant shall submit the Remedial Action Report requesting EPA's determination that Remedial Action Construction has been completed. The Remedial Action Report must: (1) include statements by a registered professional engineer and by Settling Defendant' Project Coordinator that the construction of the system is complete and that the system is functioning properly and as designed; (2) include a demonstration, and supporting documentation, that construction of the system is complete and that the system is functioning properly and as designed; (3) include as-built drawings signed and stamped by a registered professional engineer; (4) be prepared in accordance with Chapter 2 (Remedial Action Completion) of EPA's *Close Out Procedures for NPL Sites* guidance (May 2011), as supplemented by *Guidance for Management of Superfund Remedies in Post Construction*, OLEM 9200.3-105 (Feb. 2017); and (5) be certified in accordance with ¶ 7.5 (Certification).

(d)   If EPA determines that Remedial Action Construction is not complete, EPA shall so notify Settling Defendant. EPA's notice must include a description of, and schedule for, the activities that Settling Defendant must perform to complete Remedial Action Construction. Settling Defendant shall perform all activities described in the EPA notice in accordance with the schedule.

(e)   If EPA determines, based on the initial or any subsequent Remedial Action Report, that Remedial Action Construction is complete, EPA shall so notify Settling Defendant.

**5.7   Certification of Remedial Action Completion**

(a)   **Remedial Action Completion Inspection**. The Remedial Action is "Complete" for purposes of this ¶ 5.7 when it has been fully performed and the Performance Standards have been achieved. Settling Defendant shall schedule an inspection for the purpose of obtaining EPA's Certification of Remedial Action Completion. The inspection must be attended by Settling Defendant and EPA and/or their representatives.

(b)   **Remedial Action Report/Monitoring Report**. Following the inspection, Settling Defendant shall submit a Remedial Action Report/Monitoring Report to EPA requesting EPA's Certification of Remedial Action Completion. The report must: (1) include certifications by a registered professional engineer and by Settling Defendant' Project Coordinator that the Remedial Action is complete; (2) include as-built drawings signed and stamped by a registered professional engineer; (3) be prepared in accordance with Chapter 2 (Remedial Action Completion) of EPA's *Close Out Procedures for NPL Sites* guidance (May 2011), as supplemented by

*Guidance for Management of Superfund Remedies in Post Construction*, OLEM 9200.3-105 (Feb. 2017); (4) contain monitoring data to demonstrate that Performance Standards have been achieved; and (5) be certified in accordance with ¶ 7.5 (Certification).

(c)     If EPA concludes that the Remedial Action is not Complete, EPA shall so notify Settling Defendant. EPA's notice must include a description of any deficiencies. EPA's notice may include a schedule for addressing such deficiencies or may require Settling Defendant to submit a schedule for EPA approval. Settling Defendant shall perform all activities described in the notice in accordance with the schedule.

(d)     If EPA concludes, based on the initial or any subsequent Remedial Action Report or Monitoring Report requesting Certification of Remedial Action Completion, that the Remedial Action is Complete, EPA shall so certify to Settling Defendant. This certification will constitute the Certification of Remedial Action Completion for purposes of the Decree, including Section XIII of the Decree (Covenants by Plaintiff). Certification of Remedial Action Completion will not affect Settling Defendant' remaining obligations under the Decree.

**5.8    Periodic Review Support Plan (PRSP)**. Settling Defendant shall submit the PRSP for EPA approval.  The PRSP addresses the studies and investigations that Settling Defendant shall conduct to support EPA's reviews of whether the Remedial Action is protective of human health and the environment in accordance with CERCLA § 121(c) (also known as "Five-year Reviews"). Settling Defendant shall develop the plan in accordance with *Comprehensive Five-year Review Guidance*, OSWER 9355.7-03B-P (June 2001), and any other relevant five-year review guidance.

**5.9    Certification of Work Completion**

(a)     **Work Completion Inspection**. Settling Defendant shall schedule an inspection for the purpose of obtaining EPA's Certification of Work Completion. The inspection must be attended by Settling Defendant and EPA or their representatives.

(b)     **Work Completion Report**. Following the inspection, Settling Defendant shall submit a report to EPA requesting EPA's Certification of Work Completion. The report must: (1) include certifications by a registered professional engineer and by Settling Defendant' Project Coordinator that the Work, including O&M activities for OU-2 and for groundwater outside the CHP Landfill, is complete; and (2) be certified in accordance with ¶ 7.5 (Certification). If the Remedial Action Report/Monitoring Report submitted under ¶ 5.7(b) includes all elements required under this ¶ 5.9(b), then the Remedial Action Report/Monitoring Report suffices to satisfy all requirements under this ¶ 5.9(b).

(c)     If EPA concludes that the Work is not complete, EPA shall so notify Settling Defendant. EPA's notice must include a description of the activities that Settling

Defendant must perform to complete the Work. EPA's notice must include specifications and a schedule for such activities or must require Settling Defendant to submit specifications and a schedule for EPA approval. Settling Defendant shall perform all activities described in the notice or in the EPA-approved specifications and schedule.

(d)     If EPA concludes, based on the initial or any subsequent report requesting Certification of Work Completion, that the Work is complete, EPA shall so certify in writing to Settling Defendant. Issuance of the Certification of Work Completion does not affect the following continuing obligations: (1) activities under the Periodic Review Support Plan; (2) obligations under Sections VI (Property Requirements), and XVI (Records) of the Decree; (3) Institutional Controls obligations as provided in the ICIAP; (4) monitoring and maintenance of the CHP Landfill; and (5) reimbursement of EPA's Future Response Costs under Section IX (Payments for Response Costs) of the Decree.

## 6.     REPORTING

6.1     **Progress Reports**. Commencing with the month Remedial Design begins and until EPA approves the Remedial Action Construction Completion, Settling Defendant shall submit progress reports to EPA on or before the 10th of each month, or as otherwise requested by EPA. The reports must cover all activities that took place during the prior reporting period, including:

(a)     The actions that have been taken toward achieving compliance with the Decree;

(b)     A summary of all results of sampling, tests, and all other data received or generated by Settling Defendants;

(c)     A description of all deliverables that Settling Defendant submitted to EPA;

(d)     A description of all activities relating to Remedial Action Construction that are scheduled for the next eight weeks;

(e)     An updated Remedial Action Construction Schedule, together with information regarding percentage of completion, delays encountered or anticipated that may affect the future schedule for implementation of the Work, and a description of efforts made to mitigate those delays or anticipated delays;

(f)     A description of any modifications to the work plans or other schedules that Settling Defendants have proposed or that have been approved by EPA; and

(g)     A description of all activities undertaken in support of the Community Involvement Plan (CIP) during the reporting period and those to be undertaken in the next six weeks.

6.2     **Notice of Progress Report Schedule Changes**. If the schedule for any activity described in the Progress Reports, including activities required to be described under ¶ 6.1(d),

19

changes, Settling Defendant shall notify EPA of such change at least seven days before performance of the activity.

## 7.    DELIVERABLES

7.1    **Applicability**. Settling Defendant shall submit deliverables for EPA approval or for EPA comment as specified in the SOW. If neither is specified, the deliverable does not require EPA's approval or comment. Paragraphs 7.2 (In Writing) through ¶ 7.4 (Technical Specifications) apply to all deliverables. Paragraph 7.5 (Certification) applies to any deliverable that is required to be certified. Paragraph 7.6 (Approval of Deliverables) applies to any deliverable that is required to be submitted for EPA approval.

7.2    **In Writing**. All deliverables under this SOW must be in writing unless otherwise specified.

7.3    **General Requirements for Deliverables.** All deliverables must be submitted by the deadlines in the Remedial Design Schedule or Remedial Action Schedule, as applicable. Settling Defendant shall submit all deliverables to EPA in electronic form. Technical specifications for sampling and monitoring data and spatial data are addressed in ¶ 7.4. All other deliverables shall be submitted to EPA in the electronic form specified unless otherwise agreed to by all parties at that time. If any deliverable includes maps, drawings, or other exhibits that are larger than 8.5" by 11", Settling Defendant shall also provide EPA with paper copies of such exhibits at the request of the EPA Project Coordinator.

7.4    **Technical Specifications**

(a)    Reports and all deliverables shall be sent to EPA and the State in a form specified by the EPA and State project coordinators. Sampling and monitoring data should be submitted in standard regional Staged Electronic Data Deliverable (SEDD) format specified by the Region 1 GIS Section. Other delivery methods may be allowed if electronic direct submission presents a significant burden or as technology changes.

(b)    Spatial data, including spatially-referenced data and geospatial data, should be submitted: (1) in the ESRI File Geodatabase format specified by the Region 1 GIS Section; and (2) as unprojected geographic coordinates in decimal degree format using North American Datum 1983 (NAD83) or World Geodetic System 1984 (WGS84) as the datum. If applicable, submissions should include the collection method(s). Projected coordinates may optionally be included but must be documented. Spatial data should be accompanied by metadata, and such metadata should be compliant with the Federal Geographic Data Committee (FGDC) Content Standard for Digital Geospatial Metadata and its EPA profile, the EPA Geospatial Metadata Technical Specification. An add-on metadata editor for ESRI software, the EPA Metadata Editor (EME), complies with these FGDC and EPA metadata requirements and is available at https://www.epa.gov/geospatial/epa-metadata-editor.

(c)    Each file must include an attribute name for each site unit or sub-unit submitted. Consult https://www.epa.gov/geospatial/geospatial-policies-and-standards for any further available guidance on attribute identification and naming.

(d)    Spatial data submitted by Settling Defendant does not, and is not intended to, define the boundaries of the Site.

**7.5**    **Certification**. All deliverables that require compliance with this paragraph must be signed by the Settling Defendant' Project Coordinator, or other responsible official of Settling Defendant, and must contain the following statement:

I certify under penalty of perjury that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I have no personal knowledge that the information submitted is other than true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

**7.6**    **Approval of Deliverables**

(a)    **Initial Submissions**

(1)    After review of any deliverable that is required to be submitted for EPA approval under the Decree or the SOW, EPA shall: (i) approve, in whole or in part, the submission; (ii) approve the submission upon specified conditions; (iii) disapprove, in whole or in part, the submission; or (iv) any combination of the foregoing.

(2)    EPA also may modify the initial submission to cure deficiencies in the submission if: (i) EPA determines that disapproving the submission and awaiting a resubmission would cause substantial disruption to the Work; or (ii) previous submission(s) have been disapproved due to material defects and the deficiencies in the initial submission under consideration indicate a bad faith lack of effort to submit an acceptable deliverable.

(b)    **Resubmissions**. Upon receipt of a notice of disapproval under ¶ 7.6(a) (Initial Submissions), or if required by a notice of approval upon specified conditions under ¶ 7.6(a), Settling Defendant shall, within 30 days or such longer time as specified by EPA in such notice, correct the deficiencies and resubmit the deliverable for approval. After review of the resubmitted deliverable, EPA may: (1) approve, in whole or in part, the resubmission; (2) approve the resubmission upon specified conditions; (3) modify the resubmission; (4) disapprove, in whole or in part, the resubmission, requiring Settling Defendant to correct the deficiencies; or (5) any combination of the foregoing.

(c)     **Implementation**. Upon approval, approval upon conditions, or modification by EPA under ¶ 7.6(a) (Initial Submissions) or ¶ 7.6(b) (Resubmissions), of any deliverable, or any portion thereof: (1) such deliverable, or portion thereof, will be incorporated into and enforceable under the Decree; and (2) Settling Defendant shall take any action required by such deliverable, or portion thereof. The implementation of any non-deficient portion of a deliverable submitted or resubmitted under ¶ 7.6(a) or ¶ 7.6(b) does not relieve Settling Defendant of any liability for stipulated penalties under Section **XII** (Stipulated Penalties) of the Decree.

(d)     If: (1) an initially submitted deliverable contains a material defect and the conditions are met for modifying the deliverable under ¶ 7.6(a)(2); or (2) a resubmitted deliverable contains a material defect; then the material defect constitutes a lack of compliance for purposes of this Paragraph.

7.7     **Supporting Deliverables**. Settling Defendant shall submit each of the following supporting deliverables for EPA approval, except as specifically provided. Settling Defendant shall develop the deliverables in accordance with all applicable regulations, guidances, and policies (see Section 10 (References)). Settling Defendant shall update each of these supporting deliverables as necessary or appropriate during the course of the Work, or as requested by EPA.

(a)     **Health and Safety Plan (HASP)**. The HASP describes all activities to be performed to protect on site personnel and area residents from physical, chemical, and all other hazards posed by the Work. Settling Defendant shall develop the HASP in accordance with EPA's Emergency Responder Health and Safety and Occupational Safety and Health Administration (OSHA) requirements under 29 C.F.R. §§ 1910 and 1926. The HASP should cover Remedial Design activities and should be, as appropriate, updated to cover activities during the Remedial Action and updated to cover activities after Remedial Action completion. EPA does not approve the HASP, but will review it to ensure that all necessary elements are included and that the plan provides for the protection of human health and the environment.

(b)     **Emergency Response Plan (ERP)**. The ERP must describe procedures to be used in the event of an accident or emergency at the Site (for example, power outages, water impoundment failure, treatment plant failure, slope failure, etc.). The ERP must include:

(1)     Name of the person or entity responsible for responding in the event of an emergency incident;

(2)     Plan and date(s) for meeting(s) with the local community, including local, State, and federal agencies involved in the cleanup, as well as local emergency squads and hospitals;

22

(3)    Spill Prevention, Control, and Countermeasures (SPCC) Plan (if applicable), consistent with the regulations under 40 C.F.R. Part 112, describing measures to prevent, and contingency plans for, spills and discharges;

(4)    Notification activities in accordance with ¶ 5.4(b) (Release Reporting) in the event of a release of hazardous substances requiring reporting under CERCLA § 103 or EPCRA § 304; and

(5)    A description of all necessary actions to ensure compliance with ¶ 5.4 of the SOW in the event of an occurrence during the performance of the Work that causes or threatens a release of Waste Material from the Site that constitutes an emergency or may present an immediate threat to public health or welfare or the environment.

(c)    **Field Sampling Plan (FSP)**. The FSP addresses all sample collection activities. The FSP must be written so that a field sampling team unfamiliar with the project would be able to gather the samples and field information required. Settling Defendant shall develop the FSP in accordance with *Guidance for Conducting Remedial Investigations and Feasibility Studies*, EPA/540/G 89/004 (Oct. 1988).

(d)    **Quality Assurance Project Plan (QAPP)**. The QAPP must include a detailed explanation of Settling Defendants' quality assurance, quality control, and chain of custody procedures for all treatability, design, compliance, and monitoring samples. Settling Defendants shall develop the QAPP in accordance with EPA Directive CIO 2105.1 (Environmental Information Quality Policy, 2021), the most recent version of Quality Management Systems for Environmental Information and Technology Programs - Requirements with Guidance for Use, ASQ/ANSI E-4 (Feb. 2014, and Guidance for Quality Assurance Project Plans, EPA QA/G-5, EPA Office of Environmental Information (Dec. 2002). Settling Defendants shall collect, produce, and evaluate all environmental information at the Site in accordance with the approved QAPP.

(e)    **Site Wide Monitoring Plan (SWMP)**. The purpose of the SWMP is to obtain baseline information regarding the extent of contamination in affected media at the Site; to obtain information, through short- and long- term monitoring, about the movement of and changes in contamination throughout the Site, before and during implementation of the Remedial Action; to obtain information regarding contamination levels to determine whether Performance Standards are achieved; and to obtain information to determine whether to perform additional actions, including further Site monitoring. The SWMP must include:

(1)    Description of the environmental media to be monitored;

(2)    Parameters to be monitored and their purpose;

(3)    Description of the data collection parameters, including existing and proposed monitoring devices and locations, schedule and frequency of

monitoring, analytical parameters to be monitored, and analytical methods employed;

(4)     Description of how performance data will be analyzed, interpreted, and reported, and/or other Site-related requirements;

(5)     Description of verification sampling procedures;

(6)     Description of deliverables that will be generated in connection with monitoring, including sampling schedules, laboratory records, monitoring reports, and monthly and annual reports to EPA and State agencies; and

(7)     Description of proposed additional monitoring and data collection actions (such as increases in frequency of monitoring, and/or installation of additional monitoring devices in the affected areas) in the event that results from monitoring devices indicate changed conditions (such as higher than expected concentrations of the contaminants of concern or groundwater contaminant plume movement).

(8)     A plan to immediately provide to EPA any unvalidated sampling data from Community Areas as defined in ¶ 7.7(f) affected by the remedy that exceed removal management levels or three times remedial cleanup levels, whichever is lower; and

(9)     A plan to expedite sampling and analysis in Community Areas as defined in ¶ 7.7(f) affected by the remedy (particularly in situations where EPA determines that unvalidated sampling data indicates substantial exceedances of cleanup standards), including procedures for expedited analysis, validation, and communication of sampling results to affected communities.

(f)     **Community Impacts Mitigation Plan (CIMP)**. The CIMP describes all activities, including any to address concerns of Environmental Justice (EJ) and disadvantaged communities, to be performed: (1) to reduce and manage the impacts from remedy implementation (e.g., air emissions, traffic, noise, odor, temporary or permanent relocation) to residential areas, schools, playgrounds, healthcare facilities, or recreational or impacted public areas ("Community Areas") from and during remedy implementation, (2) to conduct monitoring in Community Areas of impacts from remedy implementation, (3) to expeditiously communicate validated remedy implementation monitoring data, (4) to make adjustments during remedy implementation in order to further reduce and manage impacts from remedy implementation to affected Community Areas, (5) to expeditiously restore community resources damaged during remediation such as roads and culverts, and (6) to mitigate the economic effects that the Remedial Action will have on the community by structuring remediation contracts to allow more local business participation . The CIMP should contain information about impacts to Community Areas that is sufficient to assist EPA's Project Coordinator

24

in performing the evaluations recommended under the Superfund Community Involvement Handbook, OLEM 9230.0-51 (March 2020), pp. 53-56.

(g)   **O&M Plan**. The O&M Plan describes the requirements for inspecting, operating, and maintaining the Remedial Action. Settling Defendant shall develop the O&M Plan in accordance with *Guidance for Management of Superfund Remedies in Post Construction*, OLEM 9200.3-105 (Feb. 2017). The O&M Plan must include the following additional requirements:

(1)   Description of Performance Standards required to be met to implement the ROD;

(2)   Description of activities to be performed: (i) to provide confidence that Performance Standards will be met; and (ii) to determine whether Performance Standards have been met;

(3)   **O&M Reporting**. Description of records and reports that will be generated during O&M, such as daily operating logs, laboratory records, records of operating costs, reports regarding emergencies, personnel and maintenance records, monitoring reports, and monthly and annual reports to EPA and State agencies;

(4)   Description of corrective action in case of systems failure, including: (i) alternative procedures to prevent the release or threatened release of Waste Material which may endanger public health and the environment or may cause a failure to achieve Performance Standards; (ii) analysis of vulnerability and additional resource requirements should a failure occur; (iii) notification and reporting requirements should O&M systems fail or be in danger of imminent failure; and (iv) community notification requirements; and

(5)   Description of corrective action to be implemented in the event that Performance Standards are not achieved; and a schedule for implementing these corrective actions.

(h)   **O&M Manual**. The O&M Manual serves as a guide to the purpose and function of the equipment and systems that make up the remedy. Settling Defendant shall develop the O&M Manual in accordance with *Guidance for Management of Superfund Remedies in Post Construction*, OLEM 9200.3-105 (Feb. 2017).

## 8.   SCHEDULES

**8.1   Applicability and Revisions**. All deliverables and tasks required under this SOW must be submitted or completed by the deadlines or within the time durations listed in the Remedial Design Schedule (Section 8.2) and Remedial Action Schedule (Section 8.3) set forth below. Settling Defendant may submit proposed revised Remedial Design Schedules and Remedial Action Schedules for EPA approval. Upon EPA's approval, the revised Remedial Design and Remedial Action Schedules supersede the Remedial Design

and Remedial Action Schedules set forth below, and any previously-approved Remedial
Design and Remedial Action Schedules.

**8.2**   **Remedial Design Schedule**

|   | Description of Deliverable, Task | ¶ Ref. | Deadline |
|---|---|---|---|
| 1 | RDWP | 4.2 | 90 days after the entry of the Decree in the United Stated District Court for the District of New Hampshire. Stream-lined efforts, such as the river mercury inspection and recovery may be included as separate RD\RA deliverables. |
| 2 | PDIWP & TSWP | 4.4 and 4.5(b) | Performance of these tasks shall occur as set forth in the RDWP and during the period from May 15 to September 15. |
| 3 | Other documents: QAPP, HASP, FSP, ERP and Stream-lined Efforts | | As set forth in the RDWP. Supporting documents for field efforts are to be submitted prior to work. |
| 4 | Preliminary (30%) RD | 4.6 | 90 days after completion and EPA approval of the Treatability Study described in Section 4.5. |
| 5 | Pre-final (95%) RD | 4.6(h) | 45 days after receipt of EPA comments on the Preliminary RD. |
| 6 | Final (100%) RD | 4.84.8 | 30 days after EPA comments on Pre-final RD. |

**8.3     Remedial Action Schedule**

| Description of Deliverable / Task | ¶ Ref. | Deadline |
|---|---|---|
| Award RA contract | | 90 days after EPA Notice of Authorization to Proceed with RA. |
| RAWP | 5.1 | 120 days after EPA Notice of Authorization to Proceed with RA.  Stream-lined efforts such as the river mercury inspection and recovery may proceed on a separate track as set forth in the RDWP. |
| Submit ICIAP for Approval | | 90 days after entry of the Decree. |
| Pre-Construction Conference | 5.2(a) | 30 days after Approval of RAWP |
| Start of Construction | | As set forth in the RAWP, upon approval, and within the period from May 15 to September 15. |
| Completion of Construction | | As set forth in schedule below. |
| Pre-final Inspection | 5.6(b) | 60 days after completion of construction |
| Pre-final Inspection Report | 5.6(c) | 90 days after completion of Pre-final Inspection |
| Final Inspection | 5.9(a) | 60 days after Completion of Work identified in Pre-final Inspection Report |
| RA Report | 5.6(c) | 90 days after Final Inspection |
| Monitoring Report | 5.7(b) | 90 days after Final Inspection |
| Work Completion Report | 5.9(b) | |
| Periodic Review Support Plan | 5.8 | Three years after Start of RA Construction |

## 9.     STATE PARTICIPATION

**9.1     Copies**. Settling Defendants shall, at any time they send a deliverable to EPA, send a copy of such deliverable to the State. EPA shall, at any time it sends a notice, authorization, approval, disapproval, or certification to Settling Defendant, send a copy of such document to the State.

**9.2     Review and Comment**. The State will have a reasonable opportunity for review and comment prior to:

(a)     Any EPA notice to proceed under ¶ 3.3 (Procedures for Disapproval/Notice to Proceed);

(b)     Any EPA approval or disapproval under ¶ 7.6 (Approval of Deliverables) of any deliverables that are required to be submitted for EPA approval; and

(c)     Any approval or disapproval of the Construction Phase under ¶ 5.6 (Remedial Action Construction Completion), any disapproval of, or Certification of Remedial Action Completion under ¶ 5.7 (Certification of Remedial Action

27

Completion), and any disapproval of, or Certification of Work Completion under ¶ 5.9 (Certification of Work Completion).

## 10.    REFERENCES

10.1    The following regulations and guidance documents, among others, apply to the Work. Any item for which a specific URL is not provided below is available on one of the three EPA webpages listed in ¶ 10.2:

(a)    A Compendium of Superfund Field Operations Methods, OSWER 9355.0-14, EPA/540/P-87/001a (Aug. 1987).

(b)    CERCLA Compliance with Other Laws Manual, Part I: Interim Final, OSWER 9234.1-01, EPA/540/G-89/006 (Aug. 1988).

(c)    Guidance for Conducting Remedial Investigations and Feasibility Studies, OSWER 9355.3-01, EPA/540/G-89/004 (Oct. 1988).

(d)    CERCLA Compliance with Other Laws Manual, Part II, OSWER 9234.1-02, EPA/540/G-89/009 (Aug. 1989).

(e)    Guidance on EPA Oversight of Remedial Designs and Remedial Actions Performed by Potentially Responsible Parties, OSWER 9355.5-01, EPA/540/G-90/001 (Apr.1990).

(f)    Guidance on Expediting Remedial Design and Remedial Actions, OSWER 9355.5-02, EPA/540/G90/006 (Aug. 1990).

(g)    Guide to Management of Investigation-Derived Wastes, OSWER 9345.3 03FS (Jan. 1992).

(h)    Permits and Permit Equivalency Processes for CERCLA On-Site Response Actions, OSWER 9355.7 03 (Feb. 1992).

(i)    Guidance for Conducting Treatability Studies under CERCLA, OSWER 9380.3-10, EPA/540/R 92/071A (Nov. 1992).

(j)    National Oil and Hazardous Substances Pollution Contingency Plan; Final Rule, 40 C.F.R. Part 300 (Oct. 1994).

(k)    Guidance for Scoping the Remedial Design, OSWER 9355.0-43, EPA/540/R-95/025 (Mar. 1995).

(l)    Remedial Design/Remedial Action Handbook, OSWER 9355.0-04B, EPA/540/R-95/059 (June 1995).

(m)    EPA Guidance for Data Quality Assessment, Practical Methods for Data Analysis, QA/G-9, EPA/600/R-96/084 (July 2000).

(n)     Comprehensive Five-year Review Guidance, OSWER 9355.7-03B-P, EPA/540 R 01-007 (June 2001).

(o)     Guidance for Quality Assurance Project Plans, EPA QA/G-5, EPA Office of Environmental Information (Dec. 2002) https://www.epa.gov/quality/guidance-quality-assurance-project-plans-epa-qag-5.

(p)     Institutional Controls: Third Party Beneficiary Rights in Proprietary Controls (Apr. 2004).

(q)     EPA National Geospatial Data Policy, CIO Policy Transmittal 05-002 (Aug. 2005), https://www.epa.gov/geospatial/epa-national-geospatial-data-policy.

(r)     EPA Guidance on Systematic Planning Using the Data Quality Objectives Process, QA/G-4, EPA/240/B-06/001 (Feb. 2006).

(s)     EPA Requirements for Quality Management Plans, QA/R-2, EPA/240/B 01/002 (Mar. 2001, reissued May 2006).

(t)     EPA Guidance on Environmental Data Verification and Data Validation; EPA QA/G-8 (Nov. 2002).

(u)     EPA National Functional Guidelines for Inorganic Superfund Methods Data Review (January 2017).

(v)     EPA National Functional Guidelines for Organic Superfund Methods Data Review (January 2017).

(w)     EPA Region 1-EPA New England Environmental Data Review Supplement, EQADR-Supplement1 (June 2018).

(x)     Summary of Key Existing EPA CERCLA Policies for Groundwater Restoration, OSWER 9283.1-33 (June 2009).

(y)     Principles for Greener Cleanups (Aug. 2009), https://www.epa.gov/greenercleanups/epa-principles-greener-cleanups.

(z)     Close Out Procedures for National Priorities List Sites, OSWER 9320.2-22 (May 2011).

(aa)    Groundwater Road Map: Recommended Process for Restoring Contaminated Groundwater at Superfund Sites, OSWER 9283.1-34 (July 2011).

(bb)    Recommended Evaluation of Institutional Controls: Supplement to the "Comprehensive Five-Year Review Guidance," OSWER 9355.7-18 (Sep. 2011).

(cc)    Plan EJ 2014: Legal Tools, EPA Office of General Counsel (Dec. 2011), https://www.epa.gov/environmentaljustice/plan-ej-2014-legal-tools.

(dd)    Construction Specifications Institute's MasterFormat, 2020, available from https://www.csiresources.org/home.

(ee)    Updated Superfund Response and Settlement Approach for Sites Using the Superfund Alternative Approach, OSWER 9200.2 125 (Sep. 2012)

(ff)    Institutional Controls: A Guide to Planning, Implementing, Maintaining, and Enforcing Institutional Controls at Contaminated Sites, OSWER 9355.0-89, EPA/540/R-09/001 (Dec. 2012), https://semspub.epa.gov/work/HQ/175446.pdf.

(gg)    Institutional Controls: A Guide to Preparing Institutional Controls Implementation and Assurance Plans at Contaminated Sites, OSWER 9200.0-77, EPA/540/R-09/02 (Dec. 2012).

(hh)    EPA's Emergency Responder Health and Safety Manual, OSWER 9285.3-12 (July 2005 and updates), https://www.epaosc.org/_HealthSafetyManual/manual-index.htm.

(ii)    Broader Application of Remedial Design and Remedial Action Pilot Project Lessons Learned, OSWER 9200.2-129 (Feb. 2013).

(jj)    Guidance for Evaluating Completion of Groundwater Restoration Remedial Actions, OSWER 9355.0-129 (Nov. 2013).

(kk)    Quality management systems for environmental information and technology programs -- Requirements with guidance for use, ASQ/ANSI E4:2014 (American Society for Quality, February 2014).

(ll)    Groundwater Remedy Completion Strategy: Moving Forward with the End in Mind, OSWER 9200.2-144 (May 2014).

(mm)    Quality Management Systems for Environmental Information and Technology Programs -- Requirements with Guidance for Use, ASQ/ANSI E-4 (February 2014), available at https://webstore.ansi.org/.

(nn)    Guidance for Management of Superfund Remedies in Post Construction, OLEM 9200.3-105 (Feb. 2017), https://www.epa.gov/superfund/superfund-post-construction-completion.

(oo)    Advanced Monitoring Technologies and Approaches to Support Long-Term Stewardship (July 20, 2018), https://www.epa.gov/enforcement/use-advanced-monitoring-technologies-and-approaches-support-long-term-stewardship.

(pp)    Superfund Community Involvement Handbook, OLEM 9230.0-51 (March 2020). More information on Superfund community involvement is available on the Agency's Superfund Community Involvement Tools and Resources web page at https://www.epa.gov/superfund/superfund-community-involvement-tools-and-resources.

(qq)    EPA directive CIO 2105.1 (Environmental Information Quality Policy, 2021), https://www.epa.gov/sites/production/files/2021-04/documents/environmental_information_quality_policy.pdf.

**10.2**    A more complete list may be found on the following EPA web pages:

(a)    Laws, Policy, and Guidance: https://www.epa.gov/superfund/superfund-policy-guidance-and-laws;

(b)    Search Superfund Documents at https://www.epa.gov/superfund/search-superfund-documents; and

(c)    Test Methods Collections: https://www.epa.gov/measurements/collection-methods.

**10.3**    For any regulation or guidance referenced in the Decree or SOW, the reference will be read to include any subsequent modification, amendment, or replacement of such regulation or guidance. Such modifications, amendments, or replacements apply to the Work only after Settling Defendants receive notification from EPA of the modification, amendment, or replacement.

Consent Decree in U.S., et al. v. Fort James LLC, et. al.

Appendix C

Map of Site



**Chlor-Alkali Facility (Former) Superfund Site Map**
(Including the Cell House Parcel Landfill, and the Southern and Eastern Facility Study Areas.)